**Oral Argument- Not Yet Scheduled**
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

APPEAL NO: 17-3027

UNITED STATES OF AMERICA,
                                                   Appellee,


v.


ALFREDO BELTRAN LEYVA
                                              Appellant,

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(Richard Leon, J.)

_____

MAIN BRIEF OF APPELLANT BELTRAN LEYVA

Stephen C. Leckar, #281691
Kalbian Hagerty, LLP
888-17th St., NW
Washington, D.C. 20006
202.742.4242
202.223.6625 (FAX)
Counsel for Alfredo Beltran Leyva

## CERTIFICATE TO PARTIES, RULINGS UNDER REVIEW AND RELATED PARTIES

Appellant certifies as follows:

(A)  <u>Parties and Amici</u>.  The individual who appeared before the District Court in the criminal proceedings is Alfredo Beltran Leyva.

The following parties are before the Court: Alfredo Beltran Leyva and the United States of America.

(B)  <u>Rulings Under Review:</u>

The Court is asked to review the District Court's unreported decisions denying Appellant's motion to reconsider whether to dismiss the indictment and its sentencing and forfeiture decisions.

(C)  <u>Related Cases</u>:  To our knowledge, there are no related cases before the Court.  The following related cases were before the District Court:
   - Fausto Isidro Meza Flores -- 1:12CR00116-001
   - Agustin Flores Apodaca    -- 1:12CR00116-002
   - Salome Flores Apodaca     -- 1:12CR00116-003
   - Domingo Avilez Urias      -- 1:14CR00058-001

(D)  <u>Related Parties</u>:  To our knowledge, there are no related Parties before the Court.

<u>/s/ Stephen C. Leckar</u>

Stephen C. Leckar

# Table of Contents

Jurisdictional Statement ........................................................................1

Statement of the Issues .........................................................................2

Constitutional Provisions, Statutes and Regulations .............................3

Concise Statement of the Case and Facts ..............................................4

    A. *The indictment and proceedings surrounding Appellant's guilty plea* ........................................................................................4

    B. *The Government relied exclusively on unreliable hearsay evidence from three absent cooperators with favorable plea agreements. The judge's finding that Appellant just made a "rather generalized attack" on the absent cooperators' stories is an unfounded attempt to minimize significant credibility deficiencies* ........................6

        1. Mauricio Poveda ........................................................8

        2. Rey Zambada ..........................................................10

        3. Sergio Villarreal Barragan ......................................11

    C. *The agents merely reported the cooperators' claims without making any independent investigation.* ..............................14

    D. *The District Judge uncritically accepted the "testimony" as reliable and based Appellant's Guidelines enhancements entirely on hearsay* ...........................17

        1. Leadership ................................................................17

        2. Weapons ..................................................................19

        3. Violence ...................................................................21

        4. Bribery ....................................................................22

i

5. Importation .................................................................. 24

E. *Amendment 748 Implications* ........................................ 25

F. *Denial of acceptance of responsibility credit* ............... 26

G. *Forfeiture* ..................................................................... 27

Summary of Argument ............................................................. 31

Argument .................................................................................. 36

I.  **The Trial Judge clearly failed to comply with Rule 11(b)(1), Fed. R. Crim. P., and erred in refusing to allow Appellant to withdraw his guilty plea** .......................................... 36

A. *Standard of review* ...................................................... 36

B. *Discussion* .................................................................... 36

II. **Appellant's right not to be sentenced based on unreliable information was violated** ................................................ 39

A. *Standard of review* ...................................................... 41

B. *The sentencing analysis was flawed* ............................ 42

1. A defendant may not be sentenced based on misinformation of constitutional magnitude ...................................................................... 42

2. The agents merely reported untrustworthy information given by unreliable sources ...................................................................... 44

3. It is error for a sentencing judge to rely completely on information whose reliability is highly questionable ......................... 47

4. Dependence entirely on hearsay and sometimes on multiple levels of hearsay enhances the likelihood of error in sentencing ........................ 48

5. The Government's failure to conduct any independent investigation into or seek to corroborate any information received from the cooperators added to the sentencing's overall unreliability ......... 49

C. *Appellant's right to be sentenced only on reliable information was eviscerated* ......... 51

1. Leadership ......... 53

2. Weapons ......... 54

3. Violence ......... 56

4. Bribery ......... 57

5. Importation Organizer ......... 58

**III.    Appellant's sentence was also tainted by Ex Post Facto violations** ......... 60

A. *Standard of review* ......... 60

B. *Discussion* ......... 61

**IV.    The District Judge erroneously denied credit for acceptance of responsibility.** ......... 64

A. *Standard of review* ......... 65

B. *The governing authorities* ......... 65

C. *Discussion* ......... 68

**V.    The forfeiture money judgment is based on unreliable assumptions and unsound legal reasoning.** ......... 69

A. *Standard of review* ......... 69

B. *The governing standards* ......... 70

C. *The forfeiture judgment is unsound* ......... 72

Conclusion .......................................................................................................74

Word count and font certificate ....................................................................74

Certificate of service .....................................................................................75

Appendix of Constitutional and Statutory Provisions and Rules .....................................

# Table of Authorities

A.   <u>Cases</u>

*Allstate Ins. Co. v. Swann*,
    27 F.3d 1539 (11th Cir. 1994) ........................................................... 50

*Brady v. United States*,
    397 U.S. 742 (1970) ............................................................................. 37

*Calder v. Bull*,
    3 Dall. 386 (1798) ............................................................................... 61

*Caplin & Drysdale v. United States*,
    491 U.S. 617 (1989) ............................................................................. 69

*Daniel v. Fulwood*,
    766 F.3d 57 (D.C. Cir. 2014) ............................................................ 63

*Davis v. Alaska*,
    415 U.S. 308 (1974) ............................................................................. 52

*Farrish v. Mississippi State Parole Board*,
    836 F.2d 969 (5th Cir.1988) ............................................................... 48

*Gardner v. Florida*,
    430 U.S. 349 (1977) ............................................................................. 39

*Honeycutt v. United States*,
    581 U.S. __, 137 S. Ct. 1626 (2017) ........................................... 69, 73

*In re Sealed Case*,
    246 F.3d 696 (D.C. Cir. 2001) .......................................................... 41

*In re Sealed Case*,
    573 F.3d 844 (D.C. Cir. 2009) .......................................................... 61

*Lafler v. Cooper*,
    566 U.S. 156, 132 S. Ct. 1376, 1388 (2012) .................................... 35

*Lee v. Illinois*,
    476 U.S. 530 (1986) .................................................................. 44

*Libretti v. United States*,
    516 U.S. 29 (1995) .................................................................... 69

*Maryland v. Craig*,
    497 U.S. 836 (1990) .................................................................. 52

*Miller v. Florida*,
    482 U.S. 423 (1987). ................................................................. 61

*Northern Marianas Islands v. Bowie*,
    243 F.3d 1109 (9th Cir. 2001) ................................................. 45

*Orloff v. Willoughby*,
    345 U.S. 83 (1952) .................................................................... 73

*Pacheco v. Serendensky*,
    393 F.3d 348 (2nd Cir. 2004) ................................................... 71

*Peugh v. United States*,
    569 U.S 530, 133 S. Ct. 2072 (2013) ............................. 34, 60, 62

*Singletary v. Reilly*,
    452 F.3d 868 (D.C. Cir. 2006) ........................................... 48, 56

*Starski v. Kirzhnev*,
    682 F.3d 51 (1st Cir. 2012) ...................................................... 55

*United States v. Adams*,
    432 F.3d 1092 (9th Cir. 2006) ................................................. 38

*United States v. Alexander*,
    714 F.3d 1085 (8th Cir. 2013) ................................................. 71

*United States v. Ali*,
    619 F.3d 713 (7th Cir. 2010) ................................................... 70

*United States v. Awad,*
    598 F.3d 76 (2nd Cir. 2010)............................................................71

*United States v. Bacallo,*
    149 F.3d 717 (7th Cir. 1998)...........................................................39

*United States v. Bader,*
    678 F.3d 858 (10th Cir. 2012).....................................................69, 70

*United States v. Bapack,*
    129 F.3d 1320 (D.C. Cir. 1997)......................................................39

*\*United States v. Barker,*
    514 F.2d 208 (D.C. Cir. 1975) (*en banc*)....................................37, 38

*United States v. Barner,*
    572 F.3d 1239 (11th Cir. 2009).......................................................66

*United States v. Barry,*
    961 F.2d 260 (D.C. Cir. 1992).........................................................67

*United States v. Beler,*
    20 F.3d 1428 (7th Cir. 1994)...........................................................47

*United States v. Berkeley,*
    567 F.3d 703 (D.C. Cir 2009)..............................................36, 65, 67

*United States v. Bernardine,*
    73 F.3d 1078 (11th Cir. 1996).........................................................51

*United States v. Bishop,*
    264 F.3d 535 (5th Cir. 2001)...........................................................55

*United States v. Blalock,*
    571 F.3d 1282 (D.C. Cir. 2009).......................................................41

*United States v. Bras,*
    483 F.3d 103 (D.C. Cir. 2007).........................................................39

*United States v. Brothers,
　　75 F.3d 845 (3rd Cir. 1996) ................................................ 39, 42, 47

United States v. Browning,
　　61 F.3d 752 (10th Cir.1995) ................................................ 53

United States v. Bruce,
　　976 F.2d 552 (9th Cir.1992) ................................................ 36

*United States v. Bullock,
　　454 F.3d 637 (7th Cir. 2006) ................................................ 66

*United States v. Cammisano,
　　917 F.2d 1057 (8th Cir. 1990) ................................................ 43, 48

*United States v. Cano-Flores,
　　796 F.3d 83 (D.C. Cir. 2015) ................................................ 69, 73

United States v. Capoccia,
　　503 F.3d 103 (2nd Cir. 2007) ................................................ 69

United States v. Chase,
　　499 F.3d 1061 (9th Cir. 2007) ................................................ 39

*United States v. Clark,
　　747 F.3d 890 (D.C. Cir. 2013) ................................................ 63

United States v. Contorinis,
　　692 F.3d 136 (2nd Cir. 2012) ................................................ 71

*United States v. Cooper,
　　274 F.3d 230 (5th Cir.2001) ................................................ 56

*United States v. Corral,
　　172 F.3d 714 (9th Cir. 1999) ................................................ 45, 48, 56

United States v. Cray,
　　47 F.3d 1203 (D.C. Cir. 1995) ................................................ 37

*United States v. Cutchin*,
    956 F.2d 1216 (D.C.Cir.1992) .......................................................67

*United States v. Demes*,
    941 F.2d 220 (3rd Cir.1991) .........................................................67

*United States v. Deverso*,
    518 F.3d 1250 (11th Cir. 2008) ....................................................55

*United States v. Dobruna*,
    146 F. Supp. 3d 458 (E.D.N.Y. 2015) .........................................71

*United States v. Drapeau*,
    121 F.3d 344 (8th Cir. 1997) ........................................................57

*United States v. Enterline*,
    894 F.3d 287 (8th Cir. 1990) ........................................................55

*\*United States v. Eschman*,
    227 F.3d 886 (7th Cir. 2000) .................................................66, 68

*\*United States v. Fair*,
    699 F.3d 508 (D.C. Cir. 2012) .....................................................74

*United States v. Fennell*,
    65 F.3d 812 (10th Cir. 1995) ........................................................43

*\*United States v. Ford*,
    993 F.2d 249 (D.C. Cir. 1993) .....................................................37

*United States v. Garcia*,
    81 F.3d 171 (9th Cir. 1996), 1993 WL 141659 ...........................57

*United States v. Garcia-Guizar*,
    160 F.3d 511 (9th Cir. 1998) ..................................................70, 71

*United States v. Garcia-Sanchez*,
    189 F.3d 1143 (9th Cir. 1999) ................................................42, 43

*United States v. Garrido*,
  596 F.3d 613 (9th Cir. 2010) ...................................................66

*United States v. Gomez-Lemos*,
  939 F.2d 326 (6th Cir.1991) ...................................................44

\*United States v. Graham*,
  162 F.3d 1180 (D.C. Cir. 1998) ...................................................54

*United States v. Hankton*,
  432 F.3d 779 (7[h] Cir. 2005) ...................................................53

\*United States v. Hanna*,
  49 F.3d 572 (9th Cir 1995) ...................................................39

\*United States v. Head*,
  817 F.3d 354 (D.C. Cir. 2016) ...................................................61, 63

*United States v. Henry*,
  557 F.3d 642 (D.C. Cir. 2009) ...................................................41

*United States v. Hollis*,
  823F.3d 1045 (6th Cir 2016) ...................................................65

\*United States v. Huckins*,
  53 F.3d 276 (9th Cir. 1995) ...................................................43, 45, 49, 56

*United States v. Jimenez-Martinez*,
  83 F.3d 488 (1st Cir. 1996) ...................................................44

*United States v. Joacquin*,
  326 F.3d 1287 (D.C. Cir. 2003) ...................................................58

*United States v. Jones*,
  221 F.3d 1353 (10th Cir. 2000), 2000 WL 1089533 ...................................................54

*United States v. (Alice) Jones*,
  502 F.3d 388 (6th Cir. 2007) ...................................................69

*United States v. Jordan,*
  256 F.3d 922 (9th Cir. 2001) ................................................................ 39, 43

United States v. Kiekow,
  872 F.3d 236 (5th Cir. 2017) ................................................................ 63

United States v. Labib,
  38 Fed. Appx. 257 (6th Cir. 2002) ...................................................... 53

*United States v. Lee,*
  653 F.3d 170 (2nd Cir. 2011) ................................................................ 66, 68

*United States v. Leonzo,*
  50 F.3d 1086 (D.C. Cir. 1995) ............................................................... 74

United States v. Lloyd,
  566 F.3d 341 (3rd Cir. 2009) ................................................................ 48, 56

United States v. Long,
  935 F.2d 1207 (11th Cir. 1991) ............................................................ 41

United States v. Magana-Olvera,
  917 F.2d 401 (9th Cir. 1990) ................................................................ 44

United States v. McEntire,
  153 F.3d 424 (7th Cir. 1998) ................................................................ 47

United States v. McGowan,
  668 F.3d 601 (9th Cir. 2012) ................................................................ 42, 44, 49

United States v. McGrady,
  173 F.3d 426, 1999 WL 95633 (4th Cir. 1999) .................................. 56

*United States v. Miele,*
  989 F.2d 659 (3rd Cir. 1993) ................................................................ 42, 47

United States v. Moore,
  394 F.3d 925 (D.C. Cir. 2005) ............................................................... 67

*United States v. Morrison,*
  656 F.Supp.2d 338 (E.D.N.Y. 2009)..............................................71

*\*United States v. Nava,*
  404 F.3d 1119 (9th Cir. 2005)..........................................69, 71, 72

*\*United States v. Negron,*
  967 F.2d 68 (2nd Cir.1992)....................................................66, 68

*United States v. Ocana,*
  204 F.3d 585 (5th Cir. 2000)........................................................53

*United States v. Olano,*
  507 U.S. 725 (1993)......................................................................60

*United States v. Ortiz,*
  993 F.2d 294 (10th Cir.1993)........................................................43

*\*United States v. Palmer,*
  248 F.3d 569 (7th Cir. 2001)........................................................51

*United States v. Pelliere,*
  95 F.3d 1161 (10th Cir. 1996), 1996 WL 472493.......................53, 57

*\*United States v. Pena-Gutierrez,*
  222 F.3d 1080 (9th Cir. 2000)......................................................55

*United States v. Pena-Jessie,*
  763 F.2d 1161 (4th Cir. 1996)......................................................55

*United States v. Pepper,*
  747 F.3d 520 (8th Cir. 2014)........................................................54

*\*United States v. Pimental-Lopez,*
  828 F.3d 1173 (9th Cir. 2016)................................................44, 53

*\*United States v. Price,*
  409 F.3d 436 (D.C. Cir. 2005)..............................................63, 66, 68

*United States v. Quigley,
    373 F.3d 133 (D.C. Cir. 2004) ..............................................54

United States v. Reeves,
    586 F.3d 20 (D.C. Cir. 2009) ...............................................67

*United States v. Reyes,
    300 F.2d 555 (5th Cir. 2002) ...............................................38

United States v. Roberts,
    660 F.3d 149 (2nd Cir. 2011) ...............................................71

United States v. Robinson,
    164 F.2d 1068 (7th Cir. 1999) ..............................................44

United States v. Robison,
    904 F.2d 365 (6th Cir. 1990) ...............................................47

United States v. (Jesus) Rodriguez,
    676 F.3d 183 (D.C. Cir. 2012) ........................................65, 67

United States v. (Ricardo) Rodriguez,
    630 F.3d 39 (1st Cir. 2010) ................................................63

*United States v. Romans,
    823 F.3d 299 (5th Cir. 2016) ...............................................56

*United States v. Saani,
    650 F.3d 761 (D.C. Cir. 2011) ....................................65, 66, 68

United States v. Saro,
    24 F.3d 283 (D.C. Cir. 1994) ...............................................61

United States v. Scheele,
    231 F.3d 492 (9th Cir. 2000) ...............................................57

United States v. Scroggins,
    880 F.2d 1204 (11th Cir.1989) .............................................40

*United States v. Sepulveda*,
 15 F.3d 1161 (1st Cir. 1993) ................................................................57

*United States v. Shacklett*,
 921 F.2d 580 (5th Cir. 1991) ..............................................................43

*United States v. Shakur*,
 691 F.3d 979 (8th Cir. 2012) ..............................................................70

*United States v. Sheffield*,
 832 F.3d 296 (D.C. Cir. 2016) ...........................................................63

*United States v. Simmons*,
 964 F.2d 763 (8th Cir. 1992) ..............................................................47

*United States v. (Jamie) Smith*,
 656 F.3d 821 (8th Cir.2011) ...............................................................70

*United States v. (Kerry) Smith*,
 770 F.3d 628 (7th Cir.2014) ...............................................................70

*United States v. Squillacote*,
 221 F.3d 542 (4th Cir. 2000) ..............................................................55

*United States v. Statham*,
 581 F.3d 548 (7th Cir. 2009) ..............................................................54

*United States v. Stewart*,
 2015 WL 6039742 (D. Neb. Oct.15, 2015) ........................................72

*United States v. Stoops*,
 25 F.3d 820 (9th Cir. 1994) ................................................................66

*United States v. Taylor*,
 937 F.2d 676 (D.C. Cir. 1991) ...........................................................67

**United States v. Terrell*,
 696 F.3d 1257 (D.C. Cir. 2012) .........................................................61*

*United States v. Thomas*,
  97 F.3d 1499 (D.C. Cir. 1996) ..................................................67

*United States v. Townley*,
  929 F.2d 365 (8th Cir. 1991) ...................................................49

*United States v. Treacy*,
  639 F.3d 32 (2nd Cir. 2011) ....................................................71

*United States v. (Anthony) Tucker*,
  286 F.3d 505 (8th Cir. 2002) ...................................................53

*United States v. (Forrest) Tucker*,
  404 U.S. 443 (1972) ................................................................39

*United States v. Turner*,
  548 F.3d 1094 (D.C. Cir. 2008) ..............................................63

*United States v. Uddin*,
  551 F.3d 176 (3rd Cir.2009) .....................................................71

*United States v. Vance*,
  62 F.3d 1152 (9th Cir. 1995) ...................................................66

* *United States v. Wilson*,
  605 F.3d 985, 1037 (D.C. Cir. 2010) .......................................54

**United States v. Zapata-Lara*,
  615 F.3d 388 (5th Cir. 2010) ...................................................56

*Weaver v. Graham*,
  450 U.S. 24 (1981) ................................................................61

*Weisberg v. U. S. Dep't of Justice*,
  543 F.2d 308 (D.C. Cir. 1976) ................................................52

*Williamson v. United States*,
  512 U.S. 594 (1994) ...............................................................45

B.    Constitutional, Statutory and Other Provisions

5 U.S.C. § 8331(20) ................................................................................. 58

18 U.S.C. § 3238 ...................................................................................... 68

21 U.S.C. § 853 ................................................................................... 69, 70

21 U.S.C. § 959 ..................................................................................... 1, 68

21 U.S.C. § 960 .......................................................................................... 1

21 U.S.C. § 963 .......................................................................................... 1

*Rule 11(b)(1), Fed. R. Crim. P. ................................................ 2, 5, 31, 36

Rule 32.2(b)(1)(B), Fed. R. Crim. P. ....................................................... 70

Rule 52(b), Fed. R. Crim. P. ..................................................................... 60

Rule 1002, Fed. R. Evid. ........................................................................... 50

Rule 1101(d)(3), Fed. R. Evid. ................................................................. 55

Rule 803(8)(A)(ii), Fed. R. Evid. ............................................................. 55

Rule 902(3), Fed. R. Evid. ........................................................................ 55

U.S.S.G. § 1B1.1 ....................................................................................... 57

U.S.S.G. § 2A.1.1-1.2 ............................................................................... 47

U.S.S.G. § 2D1.1(b)(1) ....................................................................... 19, 54

U.S.S.G. § 2D1.1(b)(2) ................................................................... 21, 25, 56

U.S.S.G. § 2D1.1(b)(11) ............................................................. 22, 23, 25, 57

U.S.S.G. § 2D1.1(b)(14) ............................................................... 24, 25, 58

U.S.S.G. § 3B1.1 ..................................................................17, 53

U.S.S.G. § 3E1.1 ............................................................3, 64, 65, 66

U.S.S.G. § 6A1.3 ..................................................................39, 42, 55

U.S.S.G., Amdt. 748 ....................................................3, 25, 26, 34, 62

C.     Other Authorities

Stefan D. Cassella, ASSET FORFEITURE LAW IN THE UNITED STATES,
(2nd ed. supp.2016) ..............................................................................71

David Debold, ed., PRACTICE UNDER THE FEDERAL SENTENCING GUIDELINES,
 (supp. 2014) .......................................................................................44

David B. Smith, PROSECUTION AND DEFENSE OF FORFEITURE CASES,
(2016) ................................................................................................70

J. Wigmore, EVIDENCE (Chadbourn rev. 1974) .........................................52

 "The U.S. Homeland Security Role in the Mexican War Against Drug Cartels," Hearings
before the House Subcommittee on Oversight, Investigations and Management, 112th
Cong., 1st Sess. (March 31, 2011)) ..........................................................13

Hon. Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*,
47 HASTINGS J.J. 1381 (1996) ..................................................................46

Oral Argument- Not Yet Scheduled
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

APPEAL NO: 17-3027

UNITED STATES OF AMERICA,
Appellee,

v.

ALFREDO BELTRAN LEYVA,
Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAIN BRIEF OF APPELLANT BELTRAN LEYVA

**Jurisdictional Statement**

Appellant Alfredo Beltran Leyva was indicted in 2012 for conspiracy to import narcotics from Mexico, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B)(ii), (b)(1)(H), and 963.[1] After extradition he ultimately pleaded guilty to cocaine and methamphetamine trafficking.

On April 5, 2017, Appellant was sentenced to life imprisonment. A Final Judgment and Notice of Appeal were filed that day.[2] Jurisdiction is invoked under

---

[1]  (App:036-039) [1]. ("App: __") refers to the corresponding page in the Appendix. ("Sealed App. _") refers to the Sealed Appendix. "[_]" refers to the corresponding PACER number.

[2]  [249] (Judgment); [247] (Notice of Appeal) [245] (Forfeiture Judgment).

28 U.S.C. §1291.

## Statement of the Issues

Those errors we identify are:

**1.** Appellant unsuccessfully sought to withdraw his guilty plea because the District Court had not complied with Rule 11(b)(1), Fed. R. Crim. P. It didn't advise him of, *inter alia*, the court's obligation to consider the Sentencing Guidelines and provisions of 18 U.S.C. § 3553. Was the Trial Judge's decision erroneous?

**2.** The District Judge subsequently rejected a post-plea proposed stipulated agreement to a Guidelines Level 42 sentence, which would have yielded a range of 360 months to life. Instead the judge imposed a life sentence – compared to the 25 years Appellant recommended. The court imposed five enhancements which the Government had sought. This ratcheted Appellant's Guidelines range from Level 38 to Level 50. Over Appellant's objections, the court relied exclusively on two FBI agents who related purported in-custody unsworn statements made by three career criminals with favorable plea agreements. The agents lacked personal knowledge of the facts, conducted no independent investigation and never corroborated the cooperators' stories. The court denied cross-examination of the cooperators, was dismissive of the evidence of their depraved character and lives of deception, and never mentioned internal inconsistencies among them. Is Appellant's sentence marred by reversible error?

**3.**    Three of the enhancements were adopted by Guidelines Amendment 748, which became effective November 1, 2010. There was no "testimony" that any conduct on which they rested occurred after that date. Although Appellant did not challenge the enhancements on that specific basis, was their imposition plain error under the Constitution's Ex Post Facto Clause?

**4.**    The court rejected the Probation Office's recommendation and denied Appellant an acceptance of responsibility reduction under U.S.S.G.§ 3E1.1. Appellant had contested the Government's efforts to enhance his sentence but hadn't repudiated his complicity. Was the judge's decision arbitrary?

**5.**    The judge used unreliable hearsay and extrapolations and a *sub silentio* theory of joint and several liability to estimate Appellant's proceeds from drug trafficking. Is the forfeiture money judgment invalid?

## CONSTITUTIONAL PROVISIONS, STATUTES AND REGULATIONS

Applicable Constitutional provisions, statutes, and Sentencing Guidelines appear in the Addendum.

## Concise Statement of the Case and Facts

### A. The indictment and proceedings surrounding Appellant's guilty plea

Appellant was charged with conspiracy to distribute cocaine, methamphetamine, marijuana and heroin from 2000-2012.[3]  Following extradition from Mexico, the parties sparred over various matters, largely over the rule of specialty, which limits prosecutions to crimes specified in the extradition papers.[4]

Appellant ultimately unconditionally pled guilty to the cocaine and methamphetamine charges. The Government dismissed the other allegations as barred from prosecution.[5]

Several months later the parties proposed a sentencing stipulation that would have yielded a Guideline Level 42, including a three-point reduction for acceptance of responsibility. That transposed to a range of 360 months to life under the 2016 Guidelines table.

---

[3]    App:036-039 [1].

[4]    Minute Entry (1/12/16) (denying Motion to Enforce Rule of Specialty [59]).

[5]    App:146-166.

The court rejected the proposal. The judge all but exhorted the Government to push for life imprisonment.[6] The Government complied and recommended precisely that. Appellant argued for a 25-year sentence.[7]

Appellant then revisited his jurisdictional challenge. He admitted the "factual elements of guilt" but argued that since the indictment violated the double jeopardy-type doctrine of *non bis in idem*, he should be allowed to withdraw his plea. Appellant concurrently moved to withdraw his guilty plea, for the Trial Judge had failed to comply with Rule 11(b)(1), Fed. R. Crim. P., which obliges judges to inform defendants seeking to plead guilty of the court's responsibility to consider the Sentencing Guidelines and of the potential for a forfeiture.[8]

The court refused to allow Appellant to withdraw his guilty plea.[9] Following a hearing, the judge unsurprisingly meted out a life sentence.[10]

---

[6]   App:188-186.

[7]   Gov't Sentencing Mem. (App:040-061) [174]; Def's Sentencing Mem. (App:062-090) [183]; Gov't Notice re: Sentencing (App:091-093) [209]; Def's Reply (App:94-97) [221]; Gov't Supp. Sentencing Mem. (App:121-132) [242]; Def's Supp. Sentencing Mem. (App:133-145) [243].

[8]   Def's Motion to Reconsider(App:103-107) [226]; Def's Motion to Withdraw Plea (App:108-125) [227]; App:146-166 (plea colloquy).

[9]   Memorandum Order (App:116-120) [236].

[10]   App:524.

**B. The Government relied exclusively on unreliable hearsay evidence from three absent cooperators with favorable plea agreements. The judge's finding that Appellant just made a "rather generalized attack" on the absent cooperators' stories is an unfounded attempt to minimize significant credibility deficiencies.**

The evidence's reliability made all the difference between a severe sentence– but with a hope of eventual release – and life imprisonment. The Government presented two FBI agents who testified using their notes of debriefings of three unsentenced cooperators with quite advantageous plea agreements. The agents conducted no independent investigation, didn't attempt to corroborate anything and produced no extrinsic evidence that was not hearsay.

Seven months before the sentencing hearings commenced, the judge rebuffed Appellant's objections that "fundamental fairness and due process" required an in-court appraisal of the cooperators' credibility, since the agents' credibility wasn't at issue. Appellant emphasized that the Government hadn't corroborated the informants and that cross-examining agents lacking first-hand knowledge of the facts would have limited value.[11]

Even after this protest, the Government didn't attempt to corroborate the cooperators' claims. In rejecting Appellant's renewed request at the sentencing hearing to cross-examine the cooperators, the judge retorted that only the Ninth Circuit, which he described as "reversed 80 percent of the time," might object to a

---

[11]  App:167-173.

sentencing hearing based exclusively on agents' hearsay.[12] Ultimately, his oral findings ("Findings") stated that the defense offered only "rather generalized" attacks on the cooperators' credibility.[13]

Some of Appellant's attack on these absent cooperators was "general" in some sense. They were people of low character and dubious reliability who had every incentive to ingratiate themselves with the Government. But simply dismissing Appellant's claims as "rather generalized" fails to pay appropriate deference to the serious challenge mounted to undermine the absentees' credibility.

Appellant made far more than a "generalized attack" on trustworthiness. There was a systematic failure on their part to be consistent with one another. This deficiency was exacerbated by the Government's penchant of relying on their assumptions rather than assertions of personal knowledge of events.  For example, two of these men barely knew Appellant – and what one claimed largely was what other people allegedly told him. Those are specific, not generalized, attacks on credibility.

Other, more direct assaults on the cooperators' credibility were precluded by the judge's refusing to require their appearance. For instance, their testimony, had they been cross-examined, might have yielded in-court inconsistencies with

---

[12]  App:187-190; 425.

[13]  App:454-455.

prior statements or among themselves or might have demonstrated implausibility in their accounts. Moreover, their absence deprived the proceedings of any influence their demeanor may have added.

In any event, these men were archcriminals with histories of murder, torture, corruption, falsehood, deception and addiction. Each was unsentenced and received generous deals with incentives to help the Government.

### 1. Mauricio Poveda

Agent Tom Hatherley related excerpts from meetings with Mauricio Poveda, a drug kingpin who was arrested in 2010 on federal indictments carrying mandatory life sentences. He had pleaded to charges carrying twenty years to life.[14] Poveda's career was spent trafficking in illicit drugs and weapons, using false passports, committing tax evasion and commissioning at least five murders.[15]

While under a plea agreement that bound him to cease crime, Poveda nonetheless tried to bribe a Bureau of Prisons official. The Government didn't rescind his agreement after this serious breach of trust – it let him plead to a count of public corruption and relocated his family.[16]

In addition, Poveda claimed to have brokered hundreds of millions of dollars

---

[14]  App:191-192, 314.

[15]  App:196-199, 316, 323.

[16]  App:192-199, 315-319.

of cocaine sales. The judge never considered the incongruity of why someone purportedly at the drug trade's upper echelons only remitted a million dollars under his plea agreement.[17]

The Findings don't address Poveda's character or motivation, much less what betraying a plea agreement shows about his reliability.[18] Nor do the Findings consider the Government's using a chart that ostensibly reflected Poveda's reconstructing twenty-two shipments of cocaine brokered over a decade, which ended years before the hearing.[19] The agent knew of no tangible evidence supporting the chart and even the judge had questioned Poveda's ability to remember remote events in detail.[20]  Nevertheless, the Findings ignored this discrepancy in the judge's assessment of Poveda's dependability.

Also unmentioned is Poveda's scant interaction with Appellant. Poveda operated in Mexico City, whereas Appellant was in Culiacan, in the northern

---

[17]  App:202-203.

[18]  App:458-59.

[19]  App:450, 527-528.

[20]  App:448-449. Although some whom Poveda claimed were involved in these deals were cooperating, the agents didn't approach them or seek other corroboration of Poveda's word. App:308-313, 320-322.

mountains.[21] Poveda said they only met three times over six years.[22]

## 2. Rey Zambada

Agent Hatherley also reported on what his notes reflected Rey Zambada, another man seeking to save his skin, claimed.

Zambada, who was arrested in 2008, was a hard-core cocaine addict.[23] His curriculum vitae included marking others for torture and death, kidnappings and using false identifications.[24] Although he had faced indictments carrying potential life sentences for overseeing the Sinaloa Cartel's Mexico City operations, the Government let him plead to lesser charges and relocated his family.[25]

Whether Zambada inflated his importance or downplayed his assets, or both, were fair grounds to assess his credibility. Appellant couldn't explore how someone of his purported high criminal stature only paid a $3 million forfeiture. The Findings don't address that, either.[26]

---

[21] App:207-208, 211-212.

[22] App:320, 322, 350-351.

[23] App:231-232, 234-235.

[24] App:231-235.

[25] App:232-234.

[26] App:233.

Zambada's absence foreclosed cross-examination over other credibility issues, such as his belief of Appellant's involvement in Zambada's son's death.[27] That, too, went unmentioned in the Findings. Likewise, no assessment was made of Zambada's operating out of Mexico City[28] and only meeting Appellant once, somewhere Agent Hatherley couldn't identify.[29]

As we shall discuss, much of what Zambada alleged was based on what he claimed others - chiefly his brother - said.

### 3. Sergio Villarreal Barragan

Villarreal also received a plea agreement for 20 years-to-life, not mandatory life, plus family relocation help.[30]  After matriculating as a car thief, he became a crooked local policeman and then morphed into a corrupt federal officer serving the Juarez Cartel.[31]  He violated his oath of office[32] about as quickly as Poveda returned to crime after pleading guilty. Villarreal's repertoire included cocaine

---

[27]  App:356.

[28]  App:231.

[29]  App:338-339.

[30]  App:357-358, 372.

[31]  App:394-397.

[32]  App:397.

addiction, weapons trafficking, using false identifications, providing false

identification to others, tax evasion, bribery of law enforcement officers, and

running a drug trafficking organization.[33]

A 6'7" man, "El Grande" reportedly admitted using his status as a policeman

to kidnap and savagely beat people and to attend while others were tortured and

murdered – but insisted that he hadn't personally committed murder.[34] The

Findings don't consider the fact that evidence in the *Giglio* files contradicted that

by describing his decapitating five airport workers, murdering a union president

and leading a hit squad of killers.[35]

Villarreal claimed to have been around Appellant in the mountains for 3-6

months (he wasn't clear how long) in 2005, while on a mission for Appellant's

brother Arturo.[36]  Nothing in the record suggests that he knew Zambada. He only

met Poveda while cooperating in this case.[37]

These are more than "rather generalized" concerns about Villarreal's

---

[33]   App:357-358, 383, 394-397.

[34]   App:358, 398-401.

[35]   App:402-408.

[36]   App:359-360.

[37]    App:395-396.

credibility and motivation.[38]  His lifestyle was based on deceiving others: he was a corrupt murderer masquerading as a policeman. No discussion of that appears in the Findings.

The prosecution's heavy focus on Villarreal's time as a security consultant to Appellant's brother Arturo left out something. After Arturo's demise in December 2009, the State Department viewed Villarreal and Edgar Valdez-Villlareal ("la Barbie"), as vying to control Arturo's organization.[39]

Moreover, a piece of telling evidence suggests that Villarreal was so motivated to ingratiate himself with the Government that he concocted a story to support its weapon enhancement theory. Villarreal claimed that Appellant was nicknamed El Aguila" ("Eagle"), the inscription engraved on a pistol found in a house where Appellant and several others were arrested. This attempt to link the pistol to Appellant strains credulity. The Colt Firearms Co. produced the "El

---

[38]  App:464-465.

[39]  Statement of Thomas Harrington, Ass't Administrator, Drug Enforcement Administration, "The U.S. Homeland Security Role in the Mexican War Against Drug Cartels," Hearings before the House Subcommittee on Oversight, Investigations and Management, 112th Cong., Ist Sess. (March 31, 2011) (available at https://www.gpo.gov/fdsys/pkg/CHRG-112hhrg72224/html/CHRG-112hhrg72224.htm) (last accessed March 26, 2018).

Aguila" engraved collector line in the 90's.[40] During debriefings Villarreal (and

Poveda) called Appellant "Mochomo" - "Desert Ant."[41] That is the sole nickname

appearing on the Indictment.[42]

### C. The agents merely reported the cooperators' claims without making any independent investigation.

The cooperators' credibility should also be measured by the extent of the

Government's efforts to corroborate their "evidence" with others or to reveal that

others did not corroborate those claims. The agents never checked out anything

imparted by the cooperators – even after Appellant emphasized that deficiency

months before the evidentiary hearing. The court never discussed how a lack of

external corroboration weakened the hearsay's reliability.[43]

Furthermore, neither agent was steeped in the investigation: they prepared

---

[40] The internet yields numerous examples of the "El Aquila" model sold at public auction. *See, e.g.,* https://images.search.yahoo.com/yhs/search;_ylt=A0LEVjDqJvZZMj8AKdEPx Qt.;_ylu=X3oDMTByMjB0aG5zBGNvbG8DYmYxBHBvcwMxBHZ0aWQD BHNlYwNzYw--?p=El+Aguila+pistol+gold+grips&fr=yhs-adk-adk_sbnt&hspart=adk&hsimp=yhs-adk_sbnt (last accessed October 29, 2017); https://www.rockislandauction.com/detail/53/1959/colt-el-aguila-government-model-semi-automatic-pistol-with-box#detail (last accessed October 29, 2017).

[41] App:353-354 (Poveda), 378 (Villarreal); 418 (Villarreal).

[42] App:391-392.

[43] App:453-59.

the cooperators to testify at trial and relied exclusively on debriefings.[44] Hatherley depended on interpreters during the 24-32 times he met Poveda and the "couple of dozen times" he prepared Zambada.[45] Nobody audio-recorded anything.[46]

The cooperators' claims weren't checked with the FBI's Mexico City office, although that is its largest overseas branch and historically has "worked together [with Mexico]] to combat drug trafficking."[47] Potential sources such as the DEA also were ignored.[48] The agents didn't approach Mexican law enforcement authorities.[49] Nobody sought wiretaps or videos from them.[50]

The agents' unquestioning reporting of the cooperators' word, without independent investigation or corroboration, was consistent. For instance, they didn't verify Zambada's statement that he had bribed Mexican prosecutors and

---

[44]  App:278-279, 283-284, 349-352, 355. The Government didn't call the lead investigator. App:278-279.

[45]  App:292-295, 324-325.

[46]  App:325-325a. Hatherley manifested unfamiliarity with people allegedly associated with the so-called "Beltran Leyva Organization," which Appellant's brother headed until 2009. For instance, Hatherley placed Edgar Valdez ("La Barbie") as a member of the rival "Zetas" organization.  App:347-348.

[47]  App:408-412.

[48]  App:411-412.

[49]  App:411.

[50]  App:412, 417-418.

obtained transcripts of coded messages that Appellant allegedly sent from prison to unnamed subordinates. Hatherley didn't know if those documents existed.[51] (Ironically, nobody recognized this as another instance of a cooperator's admitting to bribing public officials. And the story seems implausible: why would someone who barely knew Appellant procure transcripts of his messages?)

Nor did the agents check into Villarreal's claim that a Mexican general had rejected a bribe from Appellant. The agents couldn't explain why the officer wasn't approached for confirmation.[52]  In a similar vein, they didn't verify Villarreal's bald allegation that Appellant stored methamphetamine in swimming pools at his house.[53] And they shrugged off discrepancies of as much as 28% in the prices obtained for cocaine allegedly sold by Appellant.[54]

---

[51]  App:265-267, 327-327a.

[52]  App:366-368, 370, 420.

[53]  App:421-422.

[54]  App:416 (Poveda claimed cocaine sold for $11,500/KG in Culiacan; Villarreal claimed $16,000/KG.).

> **D. The District Judge uncritically accepted the "testimony" as reliable and based Appellant's Guidelines enhancements entirely on hearsay.**

The prosecutors and the court habitually referred to the cooperators' "testimony."[55] As we will explain, the judge overlooked numerous facts that diminished that ersatz "testimony's" reliability.

### 1. Leadership

In imposing this 4-point enhancement under U.S.S.G. § 3B1.1, the court concluded that the "witnesses" reported that Appellant was "the top authority" controlling "various areas in Mexico that were critical to what the Government called the Beltran Leyva drug trafficking organization" – but pointed specifically to Culiacan, where he found that "Poveda's and Villarreal's reports corroborate[d] each other."[56]  Additionally, the judge adverted to Appellant's meetings with "El Chapo" Guzman and Mayo Zambada - reportedly the Sinaloa Cartel's chief - as indicative of Appellant's authority to speak on behalf of the Organization.[57]

---

[55] *See, e.g.,* App:435 (prosecutor claimed Villarreal "testified"), 429-430 ("Villareal's testimony"), 432 ("testimony of the three witnesses"), 436 ("testimony from Poveda"), 437 ("Zambada testified"), 441 ("Villarreal … testified"), 444 ("testimony that Zambada observed"), 445 ("testimony by Mr. Villareal"), 446 (same), 447 ("Poveda testified"), 468 (Zambada's "testimony"), 473 (Poveda's "testimony"), 475 (Poveda and Villarreal's "testimony"), 482 (Court stated "Villarreal testified"), 485 (prosecutor claimed "Villarreal testified").

[56] App:453-454.

[57] App:454.

The Findings are weakened by several deficiencies.

- Poveda didn't claim to see Appellant meeting with El Chapo.[58] Nor was there evidence of Villarreal observing such a meeting or what made him believe it occurred.[59]

- Nobody saw Appellant meeting with Mayo Zambada, either. An agent said that Rey Zambada reported learning that from his brother. This double hearsay wasn't evidence of any material facts, for nobody established when or where this meeting occurred or what happened there.[60]

- No recordings or videos reflect Appellant meeting any cooperator.[61]

- At his plea Appellant denied being a leader in his brother's organization.[62]

- The judge didn't explain why Zambada's "understanding" that Poveda was a "main supplier" to the organization meant that Appellant led the

---

[58]  App:205.

[59]  App:361-362, 371.

[60]  App:239-240, 249, 251-252.

[61]  App:284-285.

[62]  App:163-164.

organization.[63]

## 2. Weapons

In adding a 2-point U.S.S.G. 2D1.1(b)(1) weapons enhancement, the judge alluded to Zambada and Villarreal "sa[ying] they witnessed" Appellant's having a pistol as he conducted trafficking.[64] The Findings don't recognize that Poveda didn't corroborate this claim.

Nor did Villarreal and Zambada squarely corroborate one another. For example, Zambada couldn't say when he saw Appellant armed and what weapon he possessed. Pressed where it occurred, Agent Hatherley replied "somewhere in Mexico."[65]

The judge dwelled on a pistol found when Appellant and four others were arrested, which was inscribed "El Aquila." Agent Peschka's vague aside that "the overall investigation yielded information that 'the eagle' refers to defendant" led the judge to conclude that this weapon "might have belonged" to Appellant.[66] However, Peschka's "major role" was debriefing Villarreal.[67]

---

[63] App:455.

[64] App:453-59.

[65] App:338-339.

[66] App:456.

[67] App:391, 393.

The weapons enhancement appears based on Villarreal's lying or blustering:

- It was unclear whether the pistol, seemingly from Colt's "El Aguila" line, was loaded, was found near appropriate ammunition or worked.[68]

- Nobody claimed Appellant's fingerprints were on the pistol.

- The agents never corroborated with Mexican authorities Villarreal's assertion that "El Aguila" referred to Appellant.[69]  There's no suggestion that Zambada called Appellant that and, as discussed above, the moniker Villarreal and Poveda used during debriefings was "Mochomo" - "Desert Ant."[70]

- No one claimed that Zambada or Poveda called Appellant "el Aquila." Peschka "wasn't sure" who (aside from Villarreal) supposedly called Appellant by that nickname. [71]

- Peschka didn't know where the pistol was seized or Appellant was situated when that occurred. The arresting officers weren't contacted

---

[68]  App:372-373, 376-377; App:388-390, 433-434.  *See also* N.40, *supra*.

[69]  App:389-391, 413.

[70]  Nn.41-42, *supra*. The Government's April 10, 2018, motion in limine filed in the "El Chapo" prosecution in the Eastern District of New York refers to Appellant as "Mochomo," not "El Aguila." (App:530-531) (excerpt).

[71]  App:426.

to determine what they could add.[72]

- The judge mentioned as corroboration the Mexican arrest report, which was admitted over objection as a "self-authenticating document."[73] While that legal proposition wasn't correct, as explained below,[74] the document was in Spanish, which the judge didn't speak.[75] Nor did the judge explain why he placed stock in a document he didn't understand that was prepared by someone working for Mexican law enforcement –which the prosecution had derided as corrupt.[76]

### 3. Violence

Adding a 2-point U.S.S.G. 2D1.1(b)(2) enhancement for using or directing violence, the District Judge credited Zambada and Villarreal's "evidence" of Appellant's ordering unnamed "employees" to attack members of the rival "Zetas"

---

[72] App:372-378, 389-90.  The prosecutor asserted that Villarreal "believed" that Appellant was arrested at home and the pistol was found there, although Villarreal wasn't even present at the time. App:443-443.  The extent to which such speculation influenced the judge cannot be discounted.

[73] App:372-375, 456.

[74] Nn. 171-72, *infra*.

[75] App:387-388.

[76] App:427-428, 440.

gang.[77] The judge's conclusion that they corroborated one another is undercut by the following factual revelations.

- Zambada, who met Appellant once, never claimed he saw him engage in violence or order attacks. His account was hearsay within hearsay that couldn't be corroborated – at some unspecified place and time Appellant's deceased brother Arturo supposedly mentioned that Appellant was fighting Zetas.[78]

- Villarreal never said when Appellant's alleged orders were made, to whom they were given and who else was present. Nor did anyone evaluate whether Villarreal's addiction impaired his ability to perceive and recall past events.

- Poveda evidently had nothing to support this claim.

The Violence enhancement, then, rests on Villarreal, whose tawdry character and motivation to dissemble personify unreliability.

### 4. Bribery

The judge imposed another 2-point enhancement under U.S.S.G. 2D1.1(b)(11) for bribing law enforcement officials. He concluded that graft flowed

---

[77]  App:3/8/17:7-8.

[78]  App:271.

from overseeing a geographic market for drugs.[79] He also credited Villarreal's

having been "a firsthand witness" to bribery.[80] These findings, however, rest on

Poveda and Zambada's assumptions and on Villarreal's word – which did not

assert that he witnessed bribes being paid.

- The agent did not state that Poveda knew that Appellant had bribed

  others.[81]

- The agent couldn't recall Zambada claiming that Appellant had bribed

  any "public official" (notably, "law enforcement officer" is the

  prescribed term appearing in § 2D1.1(b)(11)) or identifying anyone

  Appellant tried to bribe. Zambada reportedly was contacted by a

  "public official" whose name he couldn't recall who demanded a

  payment; on some unspecified date and at some undefined place

  Arturo purportedly said that he and Appellant would pay the man. The

  agents didn't try to check out anything Zambada said about bribery.[82]

- Villarreal did not say he saw Appellant bribing anyone. He told the

  agents that Appellant had admitted bribing unnamed corrupt police

---

[79]  App:458.

[80]  *Id*.

[81]  App:204.

[82]  App:263-265, 339-342, 347-348.

officers – poseurs just like Villarreal.[83] Villarreal also said he heard
that Appellant and others tried to bribe a Mexican general. Nobody
sought to confirm that, however.[84]

The Bribery enhancement, then, is based on assumptions and ambiguity,
coupled with a lack of corroboration. Ultimately it depended on shadowy claims by
Villarreal, whose life was crafted around deception.

### 5. Importation

Appellant was assessed a 2-point enhancement under U.S.S.G.
2D1.1(b)(14)(C), for being an organizer directly involved in importing controlled
substances. The judge credited "[w]itness" Villarreal's presence at daily calls when
subordinates reported to Appellant whether outgoing narcotics shipments had
passed the border. The court believed that claim was consistent with Poveda's
"report" that Appellant had confided that his cocaine supply would be sent to the
United States and with Zambada's "understanding" that Appellant controlled a
route through Mexico to the border.[85] These findings are suspect.

---

[83]  App:366-370.  The agent's testimony about Villarreal's description of
Appellant's relationship with the police is ambiguous and does not assert that
he saw Appellant bribing officers. *Compare* App: 369 (Agent Peschka) *with*
App:457 (finding).

[84]  App:366-370, 419-420.

[85]  App:457-458.

- Zambada's "understanding" was based on multiple levels of hearsay allegedly attributable to third parties' statements.[86]

- The agents knew of no interdictions and seizures of drugs that corroborated Villarreal's account of seeing multiple flights laden with tons of cocaine departing for the U.S.[87]

- Appellant had denied a leadership role.[88] The District Judge instead relied on hearsay from absentees with serious credibility gaps.

### E. Amendment 748 Ex Post Facto issues

An additional flaw taints the Findings. It wasn't until November 1, 2010, that Guidelines Amendment 748 extended enhancements to acts of violence and bribery incident to narcotics offenses and for overseeing narcotics importation schemes.[89]

The judge evidently assumed these enhancements applied, although nothing placed any events as occurring after October 2010. Plainly the informants could not have been sources, much less reliable ones, for events postdating October

---

[86] App: 238-240, 249-250, 336-337(double hearsay-Mayo Zambada), App:248-249 (double hearsay-Arturo Beltran Leyva).

[87] App:415.

[88] App:164-165.

[89] U.S.S.G. §§ 2D1.1(b)(2), 11, (b)(14)(C).

2010. Zambada (and Appellant) were arrested in Mexico during 2008.[90] Villarreal only was around Appellant for a few months in 2005 and was apprehended in September 2010.[91]  Poveda was arrested about November 4, 2010, two years after last encountering Appellant, four days after Amendment 748 became effective.[92]

### F.  Denial of Acceptance of Responsibility credit

The Probation Office found that Appellant "ha[d] clearly demonstrated acceptance of responsibility" and recommended that he receive a three-point credit.[93] Indeed, back in the fall of 2016, the Government concurred with his receiving that credit when it unsuccessfully joined Appellant in seeking a stipulated sentencing range.

The judge, however, found that Appellant had "sought to avoid responsibility, to the extent that he could, and minimize his involvement and role here."[94]

---

[90] App: 231 (Zambada); App: 383 (Appellant).

[91] https://en.wikipedia.org/wiki/Sergio_Villarreal_Barrag%C3%A1n (last accessed November 19, 2017).

[92] http://www.talkleft.com/story/2012/1/9/154124/3018/crimenews/The-Money-Laundering-Activities-of-Harold-Mauricio-Poveda-Ortega (last accessed September 22, 2017); 2/14/17:13, 167.

[93] Presentence Report 8.

[94] App:506-508.

The court overlooked something that he previously recognized: when Appellant sought to withdraw his plea, he never denied guilt.[95] He asserted a legal defense as to the court's jurisdiction over him.[96] As discussed below, Appellant had every legal right to insist on reliable evidence for the proposed enhancements.[97]

### G. Forfeiture

The sentencing hearings proved a harbinger for the forfeiture hearing.

The prosecutor repetitively mentioned the cooperators' "testimony."[98] The judge followed suit.[99]

Becoming an unsworn witness, the prosecutor described how the

---

[95]  Memorandum Opinion (App:098-102) [225].

[96]  Motion to Withdraw Guilty Plea (App:108-115) [227] and Declaration (filed under seal) (SA:004-006).

[97]  Nn. 207-09, *infra*.

[98]  App:461-462 ("Poveda's testimony"), 463 ("specific testimony from Poveda"), 466 ("testimony in the record is that Poveda learned…"), 467 ("direct evidence from Villarreal"), 468 ("testimony from Zambada"), 473 ("Poveda's testimony"), 476 ("testimony from Villarreal"), 477 ("what many of the witnesses said" [describing agents' claims of unidentified cooperators' accounts]), 485("testimony from Mr. Villarreal").

[99]  App:464 ("So Poveda attested …"), 465 ("you have a witness [Poveda] who's attesting to selling…"), 483 ("Villareal testified").

Government seizes properties overseas,[100] interpreted how Poveda's business worked,[101] represented what "many of the witnesses" said during the investigation - recognizing such statements were "not necessarily in evidence,"[102] mentioned unparticularized information in the Government's files, discussed "seizures" that would have been introduced at trial,[103] described how cocaine was transported by air,[104] and represented that the Government possessed corroborating "ledgers" -- which it never presented.[105]

Appellant protested that defending against this agglomeration was "shooting at ghosts,"[106] given the agents' lack of knowledge and corroboration.[107]

The Parties also disputed the Government's shifting depiction of Appellant's role.

● After describing Arturo Beltran Leyva as "heading" the organization,

---

[100] App:469-470.

[101] App:471-472.

[102] App:476-477.

[103] App:487-489.

[104] App:486-48761.

[105] App:487.

[106] App:483-484.

[107] App:479-481.

28

Agent Hatherley described Alfredo as the head, then claimed Arturo, Appellant, and their brother Hector were "leaders in their own right," then retreated to calling Arturo "the head," and finally confused Arturo for Hector.[108]

- When Zambada allegedly approached Alfredo about expanding into where Alfredo was operating, Alfredo needed to consult Arturo[109] - implying that Alfredo wasn't the organization's leader.

- Agent Peschka asserted that Villarreal said that Appellant had an aide named Osama who kept ledgers, but nobody pursued this.[110]

Declaring a $529 million figure "conservative," the District Judge credited Villareal's "statements" that he had seen at least seven planes depart for the U.S. weekly for 12 weeks in 2005, each carrying 300 KG of cocaine. However, Villarreal lacked records and never claimed to have seen each plane loaded, much less with 300 KG apiece. The judge assumed that everything was sold and Appellant reaped these "proceeds" at $21,000/KG, although nobody had testified to that effect.

---

[108] App:328-331.

[109] App:259-260, 330.

[110] App:362-364.

Although the judge baldly asserted that Villareal corroborated Poveda's "statements,"[111] neither cooperator claimed they'd worked together. Hence these determinations were sheer speculation.

---

[111] App:491-492.

## Summary of Argument

**1.**  The Trial Judge unambiguously departed from the colloquy mandated by Rule 11(b)(1), Fed, R. Crim. P. He neither advised Appellant of the role played by the Guidelines and 18 U.S.C. § 3553 and of the potential for a forfeiture if Appellant pleaded guilty. When Appellant later sought to withdraw his plea the court mistakenly claimed that it had substantially complied with Rule 11.

**2A.**  The later sentencing hearing strayed far from the Guidelines' intent that sentencing resemble a bench trial in a civil case. Instead, unreliable evidence based on out-of-court statements of career criminals with exceptionally favorable plea agreements held sway. The agents lacked first-hand knowledge and never corroborated the informants' claims, some of which was so lacking in probative value that they never should have been relied upon as the sole basis for a sentencing decision.

By refusing to require the Government to present the cooperators for meaningful cross-examination, by not assessing their histories of falsehoods, addiction, corruption, violence and strong incentives to help the Government, by overlooking the Government's failure to corroborate the informants' stories, and by dismissing Appellant's objections as being "rather generalized," the District Judge materially erred.

The judge never addressed palpable indicia of these desperate men's lack of

31

reliability, as reflected by Poveda's breaching his plea agreement and trying to bribe a federal officer, by Zambada's story being built on multiple levels of uncorroborated hearsay, and by Villarreal's understating his gruesome homicidal history and his life history as a man who lived a daily lie as a police officer engaged in drug dealing, kidnapping, torture and murder.

Moreover, the judge's finding that the informants' stories purportedly interlocked at some level is inaccurate. As we have seen, Poveda and Zambada barely knew Appellant and didn't overlap in their dealings. Although the three cooperators supposedly were Appellant's coconspirators, their clams don't mesh, contrary to what would be expected of people claiming to have been his confederates.

**2B.**   There was neither merit in nor corroboration for the five enhancements' twelve-point upwards swing. Firstly, the Leadership and other enhancements are greatly dependent on Villarreal, the only cooperator who claimed to have worked around Appellant. But he had severe issues as to his credibility and motivation which the judge never discussed.

Further, the evidence supporting the Weapons enhancement was not reliable. Poveda never claimed to have seen Appellant armed and Zambada and Villareal's accounts don't corroborate one another. While a firearm engraved "el Aguila" evidently was recovered when Appellant and others were arrested, precisely where it was recovered was unestablished. Not only did this weapon facially appear to be

a collector piece, the evidence of its being workable, much less belonging to

Appellant, and of its being connected to drug trafficking is conjecture.

This enhancement distills to the uncorroborated assertion that Villarreal,

who typically called Appellant "Mochomo" – the nickname used in the indictment-

also claimed that he was "el Aguila." But because Villarreal didn't testify,

Appellant was deprived of the opportunity to challenge that as another fabrication

offered up by someone well-versed in deception.

The Violence enhancement, in turn, is uncorroborated and unreliable.

Zambada and Poveda didn't claim they observed Appellant directing or engaging

in violence. This enhancement's soundness hinges on Villarreal, and there is near-

overwhelming reason to doubt his reliability.

Similar deficiencies permeate the Bribery enhancement. The Guidelines'

plain language requires proof that the defendant has personally bribed or tried to

bribe "law enforcement officers." No such claim was made by Poveda and

Zambada. Their bald assumption that bribery is a necessary adjunct of narcotics

dealing is not enough to meet the Government's burden of proof.

Nor is the Finding that Villarreal witnessed Appellant bribing the police

accurate. The Government's evidence was presented by an agent's relating

Villarreal's undifferentiated and uncorroborated accusations that Appellant had

admitted paying bribes and that someone told him Appellant had tried to bribe a

general. Nobody sought corroboration from the general, although the Government knew who he was.

**3.** There was no evidence of violence, bribery and/or leadership of a drug importation scheme occurring after November 1, 2010, when Guidelines Amendment 748 became effective. Since none of the three cooperators had been around Appellant for years by then, they could not have supported these enhancements, and did not claim as much. Accordingly, the six-point upwards adjustment these enhancements exerted on Appellant's offense level is unfounded.

Admittedly, Appellant didn't raise this issue below. Nonetheless it was plain and prejudicial legal error under *Peugh v. United States*[112] and this Court's Ex Post Facto Clause precedent to impose a more severe punishment based on enhancements that didn't exist at the time the conduct on which they rested was alleged to have occurred.

**4.** The court also should have granted Appellant credit for acceptance of responsibility, which the Probation Office recommended, and which the Government previously agreed with. The judge instead asserted that Appellant had sought to "minimize his involvement and his role here." In fact, Appellant never denied his guilt – as the court previously recognized. That Appellant demanded the Government to justify the enhancements and identified serious flaws in its claims

---

[112]  569 U.S 530, 133 S. Ct. 2072 (2013).

is no license to withhold the credit.

Strong policy reasons color the judge's decision. Most federal criminal cases are resolved by guilty pleas.[113] Rejecting an acceptance credit where the appellant pleaded to the indictment and never disavowed participating in the conspiracy sends a counterintuitive message to go to trial rather than plead guilty and receive the worst possible outcome short of death.

**5.** The forfeiture judgment is equally dependent on unreliable hearsay. Villarreal supposedly was around Appellant for only 3-6 months in 2005. Villarreal offered no information on what quantities of drugs went on each outgoing flight, what amount was sold here and what Appellant received from those sales. The Trial Judge's conclusion as to the proceeds Appellant received was rank speculation advanced under an impermissible theory of joint and several liability.

---

[113] Guilty pleas occur in 97% of federal prosecutions. *Lafler v. Cooper*, 566 U.S. 156, 132 S. Ct. 1376, 1388 (2012).

**Argument**

### I. The Trial Judge clearly failed to comply with Rule 11(b)(1), Fed. R. Crim. P., and erred in refusing to allow Appellant to withdraw his guilty plea.

The court failed to inform Appellant of several matters that are required before a guilty plea is accepted. These included the right to counsel, the potential for a forfeiture and the applicability of the Sentencing Guidelines and 18 U.S.C. § 3553.[114] Hence the district court's later statement when it denied Appellant's motion to withdraw his plea that the colloquy was "in substantial compliance" with Rule 11(b) is mistaken.[115]

#### A. Standard of review

A decision to deny a motion to withdraw a plea of guilty is reviewed for an abuse of discretion.[116] The question of whether the district court's colloquy satisfied the requirements of Rule 11(c)(1) is reviewed *de novo*.[117]

#### B. Discussion

The district court must apprise the defendant of the consequences of a plea and ensure that it is voluntary. If that duty is not discharged, the plea is deemed

---

[114]  Rule 11(b)(1)(D), (J), (M), Fed. R. Crim. P.

[115]  App:119 [236].

[116]  *United States v. Berkeley*, 567 F.3d 703, 708 (D.C. Cir. 2009).

[117]  *United States v. Bruce*, 976 F.2d 552, 559 (9th Cir.1992).

involuntary.[118] "Rule 11 clearly contemplates that departures from mandated procedures will be considered harmless only in 'limited' circumstances."[119]

This Court's decision in *United States v. Barker*[120] and more recent decisions "set out three factors to consider in order to establish whether the district court abused its discretion when it refused to allow the defendant to withdraw his plea of guilty. First, a defendant generally must make out a legally cognizable defense to the charge against him. Second, and most important, the defendant must show either an error in the taking of his plea or some 'more substantial' reason he failed to press his case rather than plead guilty. Finally, if those two factors warrant, the court may then inquire whether the Government would have been substantially prejudiced by the delay in going to trial."[121]

The second factor is especially important: when a colloquy lacks "substantial compliance" with Rule 11, the defendant should "almost always" be permitted to withdraw the plea.[122] Indeed, in those circumstances relief should typically be granted "'regardless of whether the movant has asserted his legal

---

[118]  *Brady v. United States*, 397 U.S. 742, 755 (1970).

[119]  *United States v. Gigot*, 147 F.3d 1193, 1197 (10th Cir. 1998) (quoting Advisory Committee Note to Rule 11 (1983)).

[120]  514 F.2d 208 (D.C. Cir. 1975) (*en banc*).

[121]   *United States v. Cray*, 47 F.3d 1203, 1207 (D.C. Cir. 1995).

[122]  *United States v. Ford*, 993 F.2d 249, 251 (D.C. Cir. 1993).

innocence.'"[123]

Here, Appellant asserted that as a legal matter he believed that the Court lacked jurisdiction over him. The Trial Judge found that the delay between his plea and the time of his motion only slightly prejudiced the prosecution's case.[124] And the noncompliance with Rule 11was material.[125] Hence it was error to deny Appellant's motion to withdraw his guilty plea.

---

[123] *Ford*, 993 F.2d at 251 (quoting *Barker*, 514 F.2d at 221).

[124] App:119 [236].

[125] *United States v. Adams*, 432 F.3d 1092, 1095-96 (9th Cir 2005) (mandatory fine); *United States v. Reyes*, 300 F.2d 555, 558 (5th Cir. 2002) (vacating plea).

## II. Appellant's right not to be sentenced based on unreliable information was violated.

Sentencing may not depend on "misinformation of constitutional magnitude."[126]  Accordingly, "[t]he Guidelines admonish that, although the sentencing court may rely on evidence that would be inadmissible at trial, the evidence must nonetheless have 'sufficient indicia of reliability to support its probable accuracy.'"[127]

The Government must produce reliable information supporting a proposed enhancement before the defense must come forward with evidence refuting it.[128] In turn, the Trial Judge must administer an even-handed sentencing proceeding. Properly administered, "[g]uideline sentencing is an adversarial process [which]

---

[126] *United States v. (Forrest) Tucker*, 404 U.S. 443, 447 (1972). *See also Gardner v. Florida*, 430 U.S. 349, 358 (1977) ("the sentencing process … must satisfy the requirements of the Due Process Clause"); *United States v. Chase,* 499 F.3d 1061, 1070 (9th Cir. 2007); *United States v. Jordan*, 256 F.3d 922, 926 n.2 (9th Cir. 2001); *United States v. Brothers*, 75 F.3d 845, 848 (3rd Cir. 1996);*United States v. Hanna*, 49 F.3d 572, 577 (9th Cir 1995).

[127]  *United States v. Bras*, 483 F.3d 103, 109 (D.C. Cir. 2007) (citing U.S.S.G. § 6A1.3).

[128]  *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997) ("At sentencing, it is the Government's burden to demonstrate by a fair preponderance of the evidence that an enhancement is warranted."); *United States v. Bacallo*, 149 F.3d 717, 720 n.2 (7th Cir. 1998) (vacating sentence imposed following plea).

39

envisions a confrontation between the parties similar to that which occurs at a civil bench trial."[129]

The process here departed greatly from that model. Appellant's sentence leapt upwards based on unreliable and uncorroborated assertions that were used to increase his presumptive sentence from 235/293 months – a long stretch by any measure – to life.

Since the informants never testified, the District Judge never personally appraised their credibility. Nor did his Findings discuss the concerns we have identified. Yet these were people whom the law has always looked upon with suspicion -- unsentenced extremely violent career criminals trying to extricate themselves from deep trouble with law enforcement. As the defense emphasized: "I would submit to the Court that if the Court were considering a case where money is an issue and not my client's liberty, that the Court wouldn't even accept this as having met a preponderance of the evidence."[130]

After discussing why a *de novo* standard of review should govern this appeal, we will explain why the enhancements are unfounded.

---

[129] *United States v. Scroggins*, 880 F.2d 1204, 1209 (11th Cir.1989).

[130] App:438-439.

*A.  Standard of review*

In this Circuit, "purely legal questions are reviewed *de novo*; factual findings are to be affirmed unless 'clearly erroneous'; and . . . 'due deference' [is given] to the district court's application of the guidelines to facts."[131] "Due deference" is a standard falling between *de novo* and clearly erroneous.[132]

The judge's denying Appellant's request to examine "live" the sole sources of information relative to the enhancements, given the undeniable credibility issues, is a legal issue reviewable *de novo*. Furthermore, the extent to which the procedures used affected the judge's application of the Guidelines calls for a standard of review closer to *de novo* than clearly erroneous.[133]

Under any standard of review, Appellant's sentence lacks the rigorous analysis demanded under the circumstances.

---

[131]  *United States v. Henry*, 557 F.3d 642, 645-45 (D.C. Cir. 2009).

[132]  *United States v. Blalock*, 571 F.3d 1282, 1285 (D.C. Cir. 2009).

[133]  *In re Sealed Case*, 246 F.3d 696, 700 (D.C. Cir. 2001).  *See also United States v. Long*, 935 F.2d 1207, 1210-11 (11th Cir. 1991).

*B. The sentencing analysis was flawed.*

District judges have an "independent obligation to ensure that the sentence was supported by sufficient reliable evidence."[134] Appellant's sentence does not rest on such evidence and the path to it was riddled with error.

1. A defendant may not be sentenced based on misinformation of constitutional magnitude.

"'[I]nformation used as a basis for sentencing under the Guidelines … [must] have sufficient indicia of reliability to support its probable accuracy.'"[135] A line of appellate cases has found reversible error where the prosecution's case at sentencing was based on agents reciting dubious information related by informants and cooperators with favorable plea agreements who were not made available for cross-examination by the defense. For instance, in *United States v. McGowan*, a due process violation was established by reliance on an inmate's allegations in an FBI interview that a prison guard used methamphetamine and smuggled drugs into prison. The district court did not observe the inmate testify, defense counsel had no opportunity for cross-examination, and the court saw no reason why the inmate's uncorroborated claims should be believed.[136] Likewise, plain error for imposing

---

[134]  *United States v. Garcia-Sanchez*, 189 F.3d 1143, 1149 (9th Cir. 1999).

[135]  *Brothers*, 75 F.3d at 848 (quoting *United States v. Miele*, 989 F.2d 659, 663 (3rd Cir. 1993)); U.S.S.G. § 6A1.3.

[136]  *See, e.g.*, *United States v. McGowan*, 668 F.3d 601, 607-08 (9th Cir. 2012).

firearms and abduction enhancements was found following a guilty plea for reliance on inconsistent and vague claims made by an "unsworn version of events presented out of court."[137]

To continue, error was found by the Tenth Circuit in the context of guilty pleas where courts unduly relied on the unsworn accounts of accomplices and others.[138] Other appellate courts have overturned lengthy sentences that were based on dubious assertions made by absentee accomplices and career criminals.[139]

By analogy, consider the familiar case where the drug quantity drives the base offense level. In such a case, as the Seventh Circuit observed, "[w]hile it's not required that a judge hear personally from witnesses under oath at a sentencing hearing about drug quantities, we think it's not a terribly bad idea to do so when the witness is going to provide the basis for, as here, 97 percent of a defendant's

---

[137] *Jordan*, 256 F.3d at 927-30, 33. *See also Garcia-Sanchez*, 189 F.3d at 1149 (testifying agent lacked reliable first-hand knowledge of conspiracy's sales); *United States v. Huckins*, 53 F.3d 276, 280 (9th Cir.1995) (rejecting enhancements imposed following a guilty plea where a key absentee "witness" was an accomplice seeking a plea agreement).

[138] *United States v. Fennell*, 65 F.3d 812, 813 (10th Cir. 1995) (criticizing absent witness' unsworn and unsupported statements and unreliable conclusions); *United States v. Ortiz*, 993 F.2d 294, 207 (10th Cir.1993) (uncorroborated accomplice hearsay without adequate reliability violated due process).

[139] *See, e.g., United States v. Shacklett*, 921 F.2d 580 (5th Cir. 1991) (finding undue reliance on undependable hearsay); *United States v. Cammisano*, 917 F.2d 1057 (8th Cir. 1990) (agents' uncorroborated testimony that defendant was member of organized crime found unreliable).

relevant conduct."[140] That is even more true for a life sentence that is heavily

dependent on enhancements resting on the stories of absentees with a motive to

fabricate.

2. The agents merely reported untrustworthy information given by unreliable sources.

Where courts don't carefully assess the credibility of sources of questionable

reliability, the seeds of error are present.[141]

The cooperators' claims made here were of an archetype that courts have

long found untrustworthy.[142] There is a "time-honored teaching that a co-

defendant's confession inculpating the accused is inherently unreliable."[143] "Due to

a co-conspirator's 'strong motivation to implicate the defendant,'" courts recognize

that co-conspirators' statements about the defendant's involvement in the crime

should be viewed with "'special suspicion.'"[144] "[B]ecause of the perverse and

---

[140]  *United States v. Robinson*, 164 F.3d 1068, 1070 (7ᵗʰ Cir. 1999).

[141]  *See, e.g., McGowan*, 668 F.3d at 606-09; *United States v. Jimenez-Martinez*, 83 F.3d 488, 494-95 (1ˢᵗ Cir. 1996); David Debold, ed., PRACTICE UNDER THE FEDERAL SENTENCING GUIDELINES, § 8.03[B] at p. 8-54 (supp. 2014).

[142]  *United States v. Magana-Olvera*, 917 F.2d 401, 409 (9ᵗʰ Cir. 1990).

[143]  *Lee v. Illinois*, 476 U.S. 530, 546 (1986); *United States v. Pimental-Lopez*, 828 F.3d 1173, 1178-79 (9ᵗʰ Cir. 2016) (vacating Leadership enhancement based on non-testifying cooperator's unreliable hearsay).

[144]  *United States v. Gomez-Lemos*, 939 F.2d 326, 330 (6ᵗʰ Cir.1991) (quoting *Lee v. Illinois*, 476 U.S. at 541).

mercurial nature of the devils with whom the criminal justice system has chosen to deal, each contract for testimony is fraught with the real peril that the proffered testimony will not be truthful, but simply factually contrived to 'get' a target of sufficient interest to induce concessions from the government." [145]

Plainly each of the absentee cooperators here "'may very well have been hoping to curry favor with law enforcement officials'" by implicating Appellant.[146] Moreover, since each cooperator was awaiting sentencing, "[t]he fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability."[147]

The judge, however, erroneously concluded that Appellant only made "rather generalized" attacks on credibility. He never assessed Poveda's violent criminal history, his violating his plea agreement by committing a further grave felony, and his great dependence on the Government to downplay all of that on his day of sentencing. Nor did the judge address Zambada's equally shady background, his very limited contact with Appellant, and the unescapable fact that

---

[145]  *Northern Marianas Islands v. Bowie*, 243 F.3d 1109, 1124 (9th Cir. 2001).

[146]  *Huckins*, 53 F.3d at 279. *See also United States v. Corral*, 172 F.3d 714, 716 (9th Cir. 1999) (due process violated following guilty plea by reliance on absent accomplice who might have spoken falsely to curry favor).

[147]  *Williamson v. United States*, 512 U.S. 594, 598 (1994).

his understanding about Appellant primarily was based on what he supposedly gleaned from others.

A more disciplined sentencing decision would have addressed why Villarreal, a corrupt policeman living an abiding lie, a torturer and a multiple murderer, and someone testifying under a generous plea agreement, should be credited. It is hard to describe these discomfiting revelations as merely "rather generalized" claims affecting these men's character.

The district court also failed to consider the extent to which the agents had unwittingly alerted the cooperators to alter their claims or conform their stories to the government's theory of the case. When people meet dozens of times, as these agents and their cooperators did, the agents may unwittingly convey the information that allows the cooperator to appear credible.[148]

In any event, regardless of where the impeaching evidence fell on the general/specific spectrum, it was undeniably powerful.

---

[148]  Hon. Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 HASTINGS J.J. 1381, 1403-04 (1996).

3. It is error to rely completely on information whose reliability is
highly questionable.

Zambada and Villarreal were addicts.[149] However, the Findings say nothing

about their ability to perceive and assimilate facts.[150]

Nor do the Findings mention other revelations in the Government's files, to

the effect that Villarreal was a sadistic multiple murderer who avoided

accountability for his personal involvement in killings. And they eschew his

incentive to hope that on the day of his sentencing that no one had examined too

closely into whether he had been personally responsible for murdering people,[151]

and if the DEA's view of him ever was disclosed, was a leader in his own right.

---

[149]  *See, e.g.*, *United States v. McEntire*, 153 F.3d 424, 436-37 (7th Cir. 1998)
(addicts' inconsistencies required "sufficiently searching inquiry"); *Brothers*,
75 F.3d at 849-50 (agent's hearsay account of addict's statements was
unreliable); *United States v. Beler*, 20 F.3d 1428, 1433-35 (7th Cir. 1994)
(requiring "searching scrutiny" of informant-addict's inconsistencies); *Miele,*
989 F.2d at 665-65 (informant-addict's claims unreliable); *United States v.
Simmons*, 964 F.2d 763, 776-78 (8th Cir. 1992) (finding erroneously based on
testimony of addict with impaired memory); *United States v. Robison*, 904 F.2d
365, 371 (6th Cir. 1990) (heavy drug users' estimates lacked reliability).

[150]  App:452-458.

[151] A finding of murder committed during a narcotics conspiracy would have
entailed additional levels of Guidelines exposure at Villarreal's sentencing – if
disclosed to a sentencing court. U.S.S.G. § 2A1.1-1.2.

4. <u>Dependence entirely on hearsay and sometimes multiple levels of hearsay enhances the likelihood of error in sentencing</u>.

Out-of-court statements containing multiple hearsay also have the potential to erode due process rights, as this Court recognized in *Singletary v. Reilly*.[152]

When hearsay from cooperators with highly questionable credibility itself includes hearsay from yet other sources the likelihood of error increases. An example of that is *United States v. Cammisamo*. There three FBI agents asserted at sentencing that FBI files had yielded wiretapped evidence of other crime figures discussing the defendant's ordering a murder and of two informants claiming he was a Mafia "under boss" who engaged in various bombings and murders, and "had a leadership role in the Kansas City organized crime organization."[153] "The government argued that each confidential informant corroborated the other, and 'therefore, it [was] unlikely that this [was] just a mere fantasy of the government or just total speculation on behalf of these confidential sources.'"[154] The Court of

---

[152] 452 F.3d 868, 871-75 (D.C. Cir. 2006); *United States v. Lloyd*, 566 F.3d 341, 343 (3rd Cir. 2009) (parole revocation) (citing *Fennell*, 65 F.3d at 813); *Farrish v. Mississippi State Parole Board*, 836 F.2d 969, 978 (5th Cir.1988) ("use of ... unreliable hearsay undermines the accuracy of the fact-finding process" where crucial testimony was provided by officer's recounting informant's "self-serving" statements). While those were parole revocation proceedings, the principle that one should look critically at multiple hearsay governs sentencings. *Corral*, 172 F.3d at 716.

[153]  *Cammisamo*, 917 F.2d at 1061.

[154]  *Id.*, 917 F.2d at 1062.

Appeals for the Eighth Circuit found that "this is merely 'hearsay upon hearsay upon hearsay' and does not 'constitute sufficiently reliable or credible evidence to support the conclusion that defendant[]was connected to organized crime.'"[155]

This record also is replete with agents repeating multiple levels of information related by informants.[156] It figured for instance, in the Violence enhancement, which credited Zambada's "testimony" that Appellant's brother confided that he had directed subordinates to fight rivals.[157] Yet the Findings skip over the significance of using multiple hearsay.

5.  <u>The Government's failure to conduct any independent investigation into or seek to corroborate any information received from the cooperators added to the sentencing's unreliability.</u>

Another factor noted in overturning sentencings where agents reported what accomplices supposedly claimed is the absence of corroboration.[158] Here, the agents simply reported the cooperators' word and made no effort to determine whether extrinsic sources of information would confirm or refute those claims. For

---

[155] *Cammisamo*, 917 F.2d at 1062 (citation omitted).

[156] *See, e.g.,* App:238-239, 249-250, 251-252 (what Zambada said his brother said about Appellant); App:238-239, 253-254, 263-264, 269-270 (what Zambada alleged his brother and others said).

[157] App:388.

[158] *See, e.g., McGowan*, 668 F.3d at 608; *United States v. Townley,* 929 F.2d 365, 371 (8th Cir. 1991). *See also Huckins*, 53 F.3d at 279.

instance, in seeking the Leadership enhancement, Agent Hatherley claimed that Zambada bribed a prosecutor's office to obtain transcripts of messages that Appellant had sent from a Mexican prison to direct an organization that he purportedly controlled. Nobody sought these messages or knew if they existed.[159] Easily-accessible sources such as the FBI's large Mexico City office also were bypassed.

The Bribery enhancement further exemplifies the absence of corroboration. The one person identified by any cooperator was a military officer who supposedly refused a bribe. But no one approached him.

Similarly, the agents didn't corroborate Poveda's claim of arranging shipments a decade previously, although they knew that several people whom he had fingered were cooperating. Nor did they approach another known imprisoned cooperator, Rey Zambada's nephew and the Sinaloa Cartel's co-leader's son, to learn what he could confirm or refute.[160]

---

[159] App:265-268, 325-326, 420a-b. Admitting "evidence" of the purported ledgers' contents transgressed the Best Evidence rule. *Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1543 (11th Cir. 1994); Rule 1002, Fed. R. Evid.

[160] App:343a-b. Mayo Zambada and Joaquin Guzman headed the Sinaloa Cartel. App:205. Vicente Zambada, Mayo Zambada's son, was being held in Chicago.

C. *Appellant's right to be sentenced only on reliable information was eviscerated.*

The tilted playing field here mirrors *United States v. Palmer*:

> This case presents a situation we have been encountering with increased regularity. A defendant pleads guilty to dealing in small amounts of crack-- ***--but then the presentence report lists huge amounts of crack as "relevant conduct," which dramatically ratchet up the resting point on the sentencing guideline grid. We conclude here that the 98 grams attributed to Palmer through Deal and the 14 grams attributed to him through Branscomb, though dwarfing the amounts involved in the actual sales, are supportable based on our review of this record. But we have serious misgivings about the huge amount, 241 grams, piled on Palmer through a U.S. marshal's recitation of a statement given to him by Griffin, who did not personally testify (he took the Fifth) at the sentencing hearing. Our doubts about Griffin's evidence, inaccurately presented to us by the government as Griffin's "testimony," gives us great pause even if only a portion of it is needed to move Palmer over 150 grams. First, the matters related by Griffin are remote in time-- over 2 years old--to the sales to Deal that form the basis for the counts of conviction. Second, the district court did not make any specific findings as to Griffin's reliability, which probably is understandable given the fact that the way his "evidence" was presented affords no basis for determining that what he told the marshal was true or accurate.[161]

Reliance here rested on the "testimony" of cooperators exchanging anecdotal accounts for leniency, whispered under conditions where everything was accepted at face value.[162] Although the judge stated that "Defendant has presented no evidence that is inconsistent with any of these reports,"[163] it was the Government's

---

[161]  248 F.3d 569, 571 (7th Cir. 2001).

[162]  *United States v. Bernardine*, 73 F.3d 1078, 1080-82 (11th Cir. 1996) (vacating enhancement for being drug abuser made after guilty plea to firearms offense).

[163]  App:454.

burden to present reliable evidence to support each enhancement. And it was the judge's duty under these fraught circumstances to require it to produce the cooperators for cross-examination – "'the greatest legal engine ever invented for the discovery of truth.'"[164]

Instead of demonstrating a well-reasoned effort to reach a fair result, as we shall explain, the court oversaw a Potemkin Village of a sentencing hearing.

---

[164] *Weisberg v. U. S. Dep't of Justice*, 543 F.2d 308, 311 (D.C. Cir. 1976) (quoting 5 J. Wigmore, EVIDENCE § 1367 at 32 (Chadbourn rev. 1974)). Cross-examination takes aim at credibility like no other procedural device. *Maryland v. Craig*, 497 U.S. 836, 846 (1990). A cross-examiner may "delve into the witness' story to test the witness' perceptions and memory." *Davis v. Alaska,* 415 U.S. 308, 316 (1974). He may "expose testimonial infirmities such as forgetfulness, confusion, or evasion . . . thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Craig*, 497 U.S. at 847. And he may "reveal[] possible biases, prejudices, or ulterior motives" that color the witness's testimony. *Davis*, 415 U.S. at 316.

1. Leadership

Leadership enhancements following guilty pleas have been sustained under

U.S.S.G. § 3B1.1 where the sources could be effectively cross-examined.[165] Here,

however, the judge relied on the informants' "reports" of Appellant's being the

"top authority in charge of controlling various geographic areas. . . ."[166] Those

reports came from agents repeating what they claimed they were told in

unrecorded and unsworn meetings with people – some of whom had very limited

interaction with Appellant-  who possessed every incentive to fabricate or distort

their claims.[167]

---

[165]  *See, e.g., United States v. Hankton*, 432 F.3d 779, 782-86 (7ʰ Cir. 2005)
(investigator, detective and cooperator testified); *United States v. (Anthony)
Tucker*, 286 F.3d 505, 508-11 (8ᵗʰ Cir. 2002) (investigator and co-defendant
testified) ; *United States v. Ocana*, 204 F.3d 585, 591-93 (5ᵗʰ Cir. 2000) (co-
conspirators testified); *United States v. Pelliere*, 95 F.3d 1161 (10ᵗʰ Cir. 1996),
1996 WL 472493 (investigator and cooperator testified, court looked to other
cooperators' grand jury transcripts plus one day of trial transcript); *United
States v. Browning*, 61 F.3d 752, 755-56 (10ᵗʰ Cir.1995) (co-conspirators
testified). *See also United States v. Labib*, 38 Fed. Appx. 257 (6ᵗʰ Cir. 2002)
(investigating agent, cooperators' statements and evidence reflecting
defendant's handwriting on checks negotiated in scam).

[166]  App:385-386.

[167]  *Pimental-Lopez*, 828 F.3d at 1178-79 (out-of-court statements related by agent
were insufficiently reliable to justify leadership enhancement).

Appellant had denied under oath that he had a leadership role in his brother's organization. Here, the judge never identified the criminally responsible "participants" to whom Appellant occupied a hierarchically superior role.[168]

2. Weapons

There are time-honored ways of securing firearms enhancements under U.S.S.G. § 2D1.1(b)(1) following guilty pleas, where cooperators and people with substantive knowledge appear and are cross-examined.[169]

This enhancement almost entirely hinged on Villarreal telling Peschka he'd heard of Appellant being called "the Eagle," the term inscribed on what appears to be a collector's piece that no one determined was operable. Since Villarreal was arrested in 2010, and the indictment issued in 2012, it is fair to ponder what epiphany led him years later to claim to call Appellant "the Eagle," after repeatedly calling him "the Desert Ant" in debriefings.

---

[168] *United States v. Quigley*, 373 F.3d 133, 139 (D.C. Cir. 2004) (vacating Leadership enhancement); *United States v. Wilson*, 605 F.3d 985, 1037 (D.C. Cir. 2010) (same); *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998).

[169] *See, e.g., United States v. Pepper*, 747 F.3d 520, 524-25 (8th Cir. 2014) (defendant admitted narcotics trafficking with Charles and machine gun found in Charles's possession was bought by defendant in pawn shop); *United States v. Statham*, 581 F.3d 548, 551-53 (7th Cir. 2009) (co-conspirators testified). *See also United States v. Jones*, 221 F.3d 1353 (10th Cir. 2000), 2000 WL 1089533, *3-*4 (investigating agent played wiretap of drug deal with defendant featuring informant's excited utterance about being handed defendant's "strap" [gun]).

Also missing from the Findings is any effort to reconcile Villarreal's uncorroborated claims with the facts that the circumstances of this weapon's seizure are murky and that no tangible evidence such as fingerprints connected the gun to Appellant.

The judge's reference to a Mexican police report as another reason to impose the enhancement is equally puzzling. While sentencing is not strictly governed by the Rules of Evidence,[170] police reports typically can't be used against the accused in criminal cases.[171] and arrest reports normally aren't considered "foreign public documents."[172] And even if one put those concerns aside, the judge failed to explain relying on ambiguous records in a language he didn't understand.

---

[170] Rule 1101(d)(3), Fed. R. Evid.; U.S.S.G. § 6A1.3, cmt.

[171] *See, e.g., United States v. Bishop*, 264 F.3d 535, 546 (5th Cir. 2001) (erroneous admission of IRS agents' notes of meeting with defendant); *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1087 (9th Cir. 2000); *United States v. Enterline*, 894 F.3d 287 (8th Cir. 1990) (matters observed at crime scene by law enforcement typically excluded); Rule 803(8)(A)(ii)), Fed. R. Evid.

[172] *Compare, e.g., Starski v. Kirzhnev*, 682 F.3d 51, 53-54 )1st Cir. 2012) (official record of conviction); *United States v. Deverso*, 518 F.3d 1250, 1255-56 (11th Cir. 2008) (Philippine birth records); *United States v. Squillacote*, 221 F.3d 542, 561-62 (4th Cir. 2000) (East German list of names, addresses and assigned operations of persons convicted of espionage); *United States v. Pena-Jessie*, 763 F.2d 1161(4th Cir. 1996) (Panamanian grant of permission to board vessel); Rule 902(3), Fed. R. Evid.

In these circumstances, the weapons enhancement is unsustainable.[173]

## 2. Violence

The U.S.S.G. § 2D1.1(b)(2) enhancement for using or directing violence depends on findings attributed to Zambada and Villarreal that Appellant had ordered attacks on the "Zeta" organization.[174] However, Zambada's claim wasn't based on personal familiarity.[175]

Since Poveda didn't address this issue, that leaves only the uncorroborated account of Villarreal, bereft of any particularized explanation from the judge for crediting the man on this or any other issue. What is missing are particular acts of violence committed by Appellant or any by other identifiable perpetrators on his explicit instructions. The Violence enhancement, then, is as unsound as its cohorts.

---

[173] *Huckins*, 53 F.3d at 279-80 (vacating weapons enhancement following guilty plea to unarmed bank robbery). *See also United States v. Romans,* 823 F.3d 299, 317-19 (5th Cir. 2016) (vacating weapons enhancement; no drugs recovered from house where weapon found); *United States v. Zapata-Lara*, 615 F.3d 388, 390-91 (5th Cir. 2010) (remanding; guilty plea; insufficient proof to justify enhancement); *United States v. Cooper*, 274 F.3d 230, 245-46 & n.8 (5th Cir.2001) (vacating enhancement found after guilty plea to conspiracy) (citing cases); *United States v. McGrady*, 173 F.3d 426, 1999 WL 95633, *8-*9 (4th Cir. 1999) (vacating weapons enhancement based on agent's account of witness who never mentioned firearms at trial).

[174] App:388-389.

[175] *Lloyd*, 566 F.3d at 343; *Singletary*, 452 F.3d at 871-75; *Corral*, 172 F.3d at 716.

3. <u>Bribery</u>

The courts have upheld bribery-obstruction enhancements under U.S.S.G. § 2D1.1(b)(11) stemming from guilty pleas where informants, accomplices and/or investigating agents, sometimes possessing extrinsic information, testified at sentencings.[176]  Not only did that not happen here, but the judge's explanation depended on supposition.[177]

Finding that Poveda and Zambada believed that one can't control a narcotics marketplace without bribery is no answer.  The enhancement requires reliable proof that the <u>defendant</u> bribed or tried to bribe "law enforcement officers."[178] Also, the Guidelines don't define what a "law enforcement officer" is.[179]

---

[176] *See, e.g., Pelliere*, 1996 WL 472493, at \*2-\*3 (accomplices testified); *United States v. Garcia*, 81 F.3d 171 (9th Cir. 1996), 1993 WL 141659 (co-conspirator testified and presented extrinsic evidence). *See also United States v. Drapeau*, 121 F.3d 344, 346-47 (8th Cir. 1997) (judge presided over co-defendant's sentencing and observed his testimony; other defendant testified against appellant before appellant pleaded); *United States v. Scheele*, 231 F.3d 492, 496, 501-02 (9th Cir. 2000) (officer testified to recognizing defendant's voice on tape-recording of threat that informant handed over).

[177] *See United States v. Sepulveda*, 15 F.3d 1161, 1197 (1st Cir. 1993) (overturning drug quantity calculations as speculative).

[178]  U.S.S.G. § 2D1.1(b)(11).

[179]  U.S.S.G. §§ 1B1.1; U.S.S.G. § 2D1.1(b)(11), cmt.

Politicians – a group whom the agent referred to generically- hardly fit the classic definition of a "law enforcement officer."[180]

A sentencing decision based on findings that contravene the Guidelines' "plain language" is improper. [181] Thus the bribery enhancement, to the extent it was grounded on generic assumptions about drug markets, is unsustainable.

That brings us to Villarreal's claim. While Villarreal supposedly said he saw Appellant meeting officers at a church, he never claimed that he saw what was happening there. And nobody approached the general for confirmation of Villarreal's assertion about his being the target of an attempted bribery. Such wholesale supposition was not a reasoned basis to impose this enhancement.

### 4. Importation Organizer

Lastly, Appellant had denied under oath that he had any leadership role. The tag-along enhancement under U.S.S.G. § 2D1.1(b)(14)(C) for being a leader of an offense that imported controlled substances,[182] was unsupported by any tangible

---

[180]  *See* 5 U.S.C. § 8331(20) (defining "law enforcement officer" as "an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, including an employee engaged in this activity who is transferred to a supervisory or administrative position.").

[181]  *United States v. Joacquin*, 326 F.3d 1287, 1288 (D.C. Cir. 2003) (vacating and finding plain error).

[182]  App:389-390.

evidence. The enhancement was the product of doubtful allegations and faulty reasoning.

In sum, none of the enhancements is well-grounded.

### III.  Appellant's sentence also was tainted by Ex Post Facto Violations

"[T]here is an *ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense."[183] Three of the enhancements imposed here carried a longer guidelines range in effect at the time of sentencing than the shorter range applicable when the crime was committed. It was plain error for the judge to apply those enhancements where the Government never proved any of the underlying conduct to have occurred after October 2010.

### A.  Standard of review

Because Appellant failed to raise an Ex Post Facto objection, review is for plain error.[184]  An error not timely raised below may be corrected where there was (1) legal error that (2) was plain, (3) affected the defendant's "substantial rights," and (4) seriously affected the "fairness, integrity or public reputation of the judicial proceedings."[185]

Appellant bears the burden of demonstrating prejudicial error.[186]  In the

---

[183]  *Peugh v. United States*, 569 U.S at ___, 133 S. Ct. at 2074.

[184]  Fed. R. Crim. P. 52(b).

[185]  *United States v. Olano*, 507 U.S. 725 ,732 (1993).

[186]  *Olano*, 507 U.S. at 734.

sentencing context, however, "that probabilistic showing is 'slightly less exacting than it is in the context of trial errors.'" [187] Indeed, "'[t]he circuit courts are in broad agreement that, even under plain-error review, the use of the wrong Guidelines, resulting in the risk of an increased sentence, "should be presumed to affect the defendant's substantial rights.'"" [188] Accordingly, "because 'keeping [a] defendant in prison longer for improper reasons' affects the fairness, integrity, and public reputation of judicial proceedings, we should ordinarily exercise our discretion to correct a clear error that causes such a result." [189]

## B. Discussion

The Ex Post Facto Clause prohibits "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." [190] It is clear that "applying amended sentencing guidelines that increase a defendant's recommended sentence can violate the Ex Post Facto Clause, notwithstanding the fact that sentencing courts possess discretion to

---

[187] *United States v. Terrell*, 696 F.3d 1257, 1263 (D.C. Cir. 2012) (quoting *United States v. Saro*, 24 F.3d 283, 287 (D.C.Cir.1994)).

[188] *United States v. Head*, 817 F.3d 354, 361 (D.C. Cir. 2016) (citations omitted).

[189] *Terrell*, 696 F.3d at 1263 (quoting *In re Sealed Case*, 573 F.3d 844, 852-53 (D.C.Cir.2009)).

[190] *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798); *see also Weaver v. Graham*, 450 U.S. 24, 30 (1981); *Miller v. Florida*, 482 U.S. 423, 429 (1987).

deviate from the recommended sentencing range."[191] After all, "when a Guidelines range moves up or down, offenders' sentences move with it."[192]

Under the Guidelines in effect prior to November 1, 2010, Appellant wasn't subject to enhancements for violence, bribery or holding a managerial role in a trafficking conspiracy.[193] The District Judge's imposing those enhancements, without even reciting when he found they occurred, was incurably erroneous. According to the judge, most of these add-ons stemmed from claims attributed to Zambada and Villareal. But Villareal wasn't around Appellant after 2005, Zambada only met him once, and Zambada and Villarreal were incarcerated before Amendment 748 became effective on November 1, 2010.

That leaves Poveda, who was arrested on November 4, 2010. However, his purported shipments to Appellant ended in 2008,[194] he never claimed to have witnessed Appellant bribing anyone (much less a "law enforcement officer") and the Findings don't reflect his stating that Appellant had engaged in or directed violence after November 1, 2010.[195]

---

[191] *Peugh*, 569 U.S. at __, 133 S. Ct. at 2082.

[192] *Id.,* 133 S. Ct. at 2084.

[193] U.S.S.G. § 2D1.1, Amdt. 748, *reprinted at* Supplement to the 2010 Guidelines Manual, App. C. (Nov. 1, 2010).

[194] App:527-528.

[195] App:385-391.

The law required the Government to "'carr[y] the burden of proving any facts that may be relevant in sentencing.'" [196] The defendant does "'not have to show definitively that he would have received a lesser sentence had the district court used the [correct] Guidelines.'"[197] Application of the post-November 2010 enhancements, which exerted a six-point upwards swing in Mr. Beltran Leyva's Guidelines range, obviously created "'a significant risk of prolonging [his] incarceration,'"[198] the error was plain, and, as recognized by the case law, it was prejudicial.[199]

---

[196] *United States v. Sheffield*, 832 F.3d 296, 312 (D.C. Cir. 2016) (finding plain error at sentencing) (quoting *United States v. Price*, 409 F.3d 436, 444 (D.C. Cir. 2005)).

[197] *Head,* 817 F.3d at 358 (quoting *United States v. Turner*, 548 F.3d 1094, 1100 (D.C. Cir. 2008)).

[198] *Daniel v. Fulwood*, 766 F.3d 57, 58 (D.C. Cir. 2014) (citation omitted).

[199] *Head*, 817 F.3d at 359-62 (plain error where defendant raised an ex post facto challenge based on the district court's application of the incorrect version of the Guidelines; collecting cases); *United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2013) (plain error not to apply pre-Amendment 748 Guidelines, reversing). *See also United States v. Kiekow*, 872 F.3d 236, 248-49 (5th Cir. 2017) (plain error in conspiracy case to use Guidelines in effect at sentencing); *United States v. (Ricardo) Rodriguez*, 630 F.3d 39, 41-43 (1st Cir. 2010) (plain error irrespective of Ex Post Facto considerations).

## IV.    The District Judge also erroneously denied credit for acceptance of responsibility.

Overruling the Probation Office's recommendation, the District Judge

denied Appellant credit under U.S.S.G.§ 3E1.1 for acceptance of responsibility

notwithstanding his unconditional plea of guilty.[200] The court erred because after

pleading guilty, Appellant never claimed to be factually innocent of the offense.

This decision was prejudicial. Originally the Government didn't oppose the

full three-point credit.[201]   If the twelve-point enhancements were based on

unreliable information and/or in violation of Ex Post Facto considerations, then the

presumptive Guidelines range should have been no greater than 235/293 months

(Level 38).[202] If one started with a Base Offense Level of 38 and gave the two-

point credit permitted when the Government doesn't join in the process, that places

Appellant at a Level 36 (188/235 months). And even if all that ultimately were

erased were the six-points interdicted by the Ex Post Facto Clause, an acceptance

credit would have placed Appellant at Level 42, still under a presumptive life

range.[203]

---

[200]  App:499-508.

[201]  *Compare* App:046 [174:7] (recommending credit) *with* App:122 [242:2] (urging denial); App: 494-499((same).

[202]  United States Sentencing Commission: Sentencing Table (2017).

[203]  *Id.*

A.  *Standard of review*

Because Appellant preserved this claim, review is for abuse of discretion.[204] In analyzing this issue, as in other sentencing matters, review of legal questions is *de novo*; review of findings of fact are for clear error.[205] However, where the underlying facts are undisputed, review is *de novo*.[206]  The judge erred under either standard.

B.  *The Governing authorities*

U.S.S.G. § 3E1.1(a) provides for a two-level decrease "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense;" § 3E1.1(b)(2) provides for an additional one-level decrease if, *inter alia*, the defendant otherwise qualifies for the two-level decrease and timely notifies authorities of his or her intention to plead guilty.[207]

It is error to deny an acceptance-of-responsibility credit where the defense raised legal defenses  "designed 'to assert and preserve issues that do not relate to

---

[204]  *United States v. (Jesus) Rodriguez*, 676 F.3d 183, 192 (D.C. Cir. 2012) (citation omitted).

[205]  *Rodriguez*, 676 F.3d at 192; *United States v. Saani*, 650 F.3d 761, 766-67 (D.C. Cir. 2011), *appeal after remand*, 794 F.3d 44 (D.C. Cir. 2015); *Berkeley*, 567 F.3d at 711.

[206]  *United States v. Hollis,* 823 F.3d 1045, 1047 (6th Cir 2016) (citing cases).

[207]  U.S.S.G. § 3E1.1(a), (b)(2).

factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).'"[208] For example, where appellants sought to withdraw pleas to raise a controlling legal issue, not to claim innocence, this Court has overturned decisions denying adjustment credits.[209] So have other appellate courts.[210]

Conversely, where the defendant's reasons weren't based on legal grounds, refusing to allow the credit was upheld, for it is one thing to admit criminal acts

---

[208] *United States v. Negron*, 967 F.2d 68, 73 (2nd Cir.1992) (quoting U.S.S.G. § 3E1.1, Application Note 2)).

[209] *See, e.g., Saani*, 650 F.3d at 769-70 (defendant asserted desire in speaking with Probation Officer to raise Fifth Amendment right with respect to potential additional claim); *United States v. Price*, 409 F.3d 436, 443-44 (D.C. Cir. 2005) (defendant wished to raise motion to suppress) (citing cases).

[210] *See, e.g., United States v. Bullock*, 454 F.3d 637, 638- 642 (7th Cir. 2006) (defendant pled guilty with no plea agreement and received "a whopper of a sentence;" if appellant's refusal to admit involvement with another conspiracy was correct, "refusal to admit involvement in it cannot be considered falsely denying or frivolously contesting relevant conduct."). *See also United States v. Lee*, 653 F.3d 170, 173-75 (2nd Cir. 2011) (defendant had right to contest inaccuracies in Presentence Report); *United States v. Garrido*, 596 F.3d 613, 617-20 (9th Cir. 2010) (defendant sought to plead to robbery charge which could not be grouped with contested § 924(c) charge); *United States v. Barner*, 572 F.3d 1239 (11th Cir. 2009) (defendant only went to trial to preserve argument that Hobbs Act inapplicable); *United States v. Eschman*, 227 F.3d 886, 891 (7th Cir. 2000) ("the court's finding appears to have been colored by Eschman's firm, but good faith challenge to the drug quantity calculation"); *United States v. Vance*, 62 F.3d 1152, 1157-58 (9th Cir. 1995) (defendant who promptly pled guilty after losing suppression motion—but reserved the right to appeal the motion's denial—entitled to adjustment); *United States v. Stoops*, 25 F.3d 820, 823 (9th Cir. 1994) (suppression); *Negron*, 967 F.2d at 73.

and another to both admit the action and accept responsibility for aberrant

behavior.[211] The quintessential example of the former is claiming entrapment,

which is tantamount to saying that "'It's not my fault, but I accept the

responsibility,'" or "'to engage in self-refutation.'"[212] That didn't occur here.

Other decisions of this Court have underscored conduct by defendants who

had not recognized the gravity of their actions.[213] That didn't occur here, either.

---

[211] *United States v. Thomas*, 97 F.3d 1499, 1501 (D.C. Cir. 1996) (defendant moved to suppress) (citing and quoting *United States v. Cutchin*, 956 F.2d 1216, 1219 (D.C.Cir.1992)).

[212] *Thomas*, 97 F.3d at 1501 ((citing and quoting *United States v. Demes*, 941 F.2d 220, 222 (3rd Cir.1991)). *See also Berkeley*, 567 F.3d at 711 (Berkeley was "in effect claiming that he accepted responsibility even though he was not responsible").

[213] *See, e.g., Rodriguez*, 676 F.3d at 192-93 (defendant continuously lied for months only to tell truth to gain sentencing advantage); *United States v. Reeves*, 586 F.3d 20, 25 (D.C. Cir. 2009) (defendant pled only after nearly a year of evading authorities); *Berkeley*, 567 F.3d at 711 (district judge "'didn't think that Berkeley was telling the truth'"); *United States v. Moore*, 394 F.3d 925, 931-33 (D.C. Cir. 2005) ("Moore's unwillingness to admit he had committed the offense — 'what do you mean I've got to admit that I did it?'" and "wanting more time to 'understand the plea' and decide whether to plead guilty or to go to trial" derailed acceptance); *United States v. Barry*, 961 F.2d 260, 267 (D.C. Cir. 1992) (defendant's statements to probation officer betrayed claim of acceptance and remorse); *United States v. Taylor*, 937 F.2d 676, 680 (D.C. Cir. 1991) (defendant's explanations not "truthful and complete").

*C. Discussion*

The District Judge's statement that Appellant "has sought to avoid responsibility, to the extent that he could, and minimize his involvement and role" was error.[214] "[A] defendant—even one who pleads guilty—has a due process right to reasonably contest errors in the PSR that affect his sentence."[215] Appellant had the legal right to contest the enhancements recommended by the Probation Office and the Government. In failing to recognize that Appellant merely sought to require the Government to justify enhancements through reliable information, the court erred.[216]

A final point: this Court also should consider the practical effect of denying an acceptance credit to a defendant who pleaded to the indictment and received a life sentence. In a system dependent on guilty pleas, and in a Circuit designated as a venue for international narcotics prosecutions,[217] disallowing the acceptance credit where the defendant doesn't deny complicity sends the wrong message: why plead if the incentive to do so will be taken away?

---

[214]  App:507.

[215]  *See, e.g., Lee*, 653 F.3d at 174-75 (citing *Eschman*, 227 F.3d at 891 (error to deny credit given appellant's "firm, but good faith challenge to the drug quantity calculation")).

[216]  *Lee*, 653 F.3d at 174-75; *Saani*, 650 F.3d at 769-70; *Price*, 409 F.3d at 443-44; *Negron*, 967 F.2d at 73.

[217]  18 U.S.C. § 3238; 21 U.S.C. §§ 959(c), 963.

### V. The forfeiture money judgment is based on unreliable assumptions and unsound reasoning.

The Supreme Court has cautioned that "broad [criminal] forfeiture provisions carry the potential for Government abuse and 'can be devastating when used unjustly.'"[218] This is such a case: the $529 million forfeiture order was hardly "conservative," notwithstanding the District Judge's declaration.[219]  It rests on erroneous factual assumptions and jargon from unreliable sources. These shortfalls are undermined by *Honeycutt v. United States,* which established that in conspiracy prosecutions, forfeitures under 21 U.S.C. § 853(a)(1) address what the defendant obtained.[220]  The Government presented no evidence of that.

### A.  Standard of review

Review of the district court's interpretation of the forfeiture laws is *de novo*, with findings of fact reviewed for clear error and the issue of whether those facts sufficiently support a proper criminal forfeiture reviewed *de novo*.[221]

---

[218] *Libretti v. United States*, 516 U.S. 29, 45 (1995) (quoting *Caplin & Drysdale v. United States*, 491 U.S. 617, 634 (1989)).

[219] App:493.

[220] 581 U.S. _, 137 S. Ct. 1626 (2017). *See also United States v. Cano-Flores*, 796 F.3d 83 (D.C. Cir. 2015) (rejecting joint and several liability).

[221] *United States v. Bader*, 678 F.3d 858, 893-94 (10th Cir. 2012); *United States v. (Alice) Jones*, 502 F.3d 388, 391 (6th Cir. 2007); *United States v. Capoccia*, 503 F.3d 103, 109 (2nd Cir. 2007); *United States v. Nava*, 404 F.3d 1119, 1127 n.3 (9th Cir. 2005) (same).

B. *The governing standards*

"'Procedural due process requires that an individual receive adequate notice and procedures to contest the deprivation of property rights' that result from criminal forfeiture under 21 U.S.C. § 853."[222]  Forfeiture therefore requires proof of "information" that is "relevant and reliable."[223] While the Government's burden is by a preponderance of the evidence,[224] and trustworthy hearsay is permissible,[225] "[t]he [Advisory] Committee Note states its view that 'in some instances live testimony will be needed to determine the reliability of proffered information.'"[226] As trenchantly put, "[t]he Committee was troubled by the notion that someone could lose their home based on the hearsay allegations of a snitch that he saw drugs stored there."[227]

The typical way to calculate an *in personam* money judgment forfeiture is to

---

[222] *United States v. Shakur*, 691 F.3d 979, 988 (8th Cir. 2012) (reversing) (citing *United States v. (Jamie) Smith*, 656 F.3d 821, 827 (8th Cir.2011) (emphasis by court)).

[223] Rule 32.2(b)(1)(B) Fed. R. Crim. P.

[224] *United States v. (Kerry) Smith*, 770 F.3d 628, 637 (7th Cir. 2014); *Bader*, 678 F.3d at 893-94; *United States v. Garcia-Guizar*, 160 F.3d 511, 517 (9th Cir. 1998).

[225] *United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010).

[226] 2 David B. Smith, PROSECUTION AND DEFENSE OF FORFEITURE CASES, ¶ 14.05A[2] at 14-95 (2016) (citing and quoting Advisory Committee Note to Rule 32.2(b)(1)).

[227] *Id.* (citing and quoting Advisory Committee Note to Rule 32.2(b)(1)).

aggregate the drugs sold and multiply them by the amount the organization could charge for them, without subtracting the cost of the drugs and other expenses.[228] While extrapolations and calculations need not be exact,[229] any "estimate" must be "reasonable."[230]  At the same time, forfeiture should not provide a "windfall" to the Government, especially when made through a "speculative" process.[231]

Those factors – unreliable hearsay, imprecise testimony of government witnesses and speculation - coalesced in *United States v. Nava,* a Ninth Circuit decision. In reversing a forfeiture order, the majority characterized the

---

[228] *United States v. Alexander*, 714 F.3d 1085, 1092-93 (8th Cir. 2013); *United States v. Roberts*, 660 F.3d 149, 153,166 (2nd Cir. 2011; *United States v. Awad*, 598 F.3d 76,78 (2nd Cir. 2010)); Stefan D. Cassella, ASSET FORFEITURE LAW IN THE UNITED STATES, § 25-6 at 935 (2nd ed. supp.2016).

[229] *Roberts*, 660 F.3d at 166.

[230] *United States v. Treacy*, 639 F.3d 32, 48 (2nd Cir. 2011).

[231] *See, e.g., United States v. Uddin*, 551 F.3d 176, 180-81 (3nd Cir.2009) (fraud case, affirming where extrapolation was discounted); *Pacheco v. Serendensky*, 393 F.3d 348, 355 (2nd Cir. 2004) (partial forfeiture; "the alternative could give the government an undeserved windfall."); *Garcia-Guizar*, 160 F.3d at 517-19 (evidence didn't support judgment requested); *United States v. Dobruna*, 146 F. Supp. 3d 458, 460 (E.D.N.Y. 2015) ("The measurement of a defendant's gains—the proceeds subject to disgorgement—is not a speculative event."); *United States v. Morrison*, 656 F.Supp.2d 338 (E.D.N.Y. 2009) (government sought "conservative" $172 million money judgment; court awarded only $6,120,268). *See also United States v. Contorinis*, 692 F.3d 136, 147-48 (2nd Cir. 2012) (reversing forfeiture of funds that were never possessed or controlled).

government's witnesses' testimony as being "convoluted" and "'hazy.'"[232]

That was precisely what occurred here.

### C. The forfeiture judgment is unsound.

The District Judge's determination was neither "conservative" nor within the outer bounds of reasonableness. And he failed to explain his conclusion that Appellant had received that sum from sales during the period that Villarreal was around him.

The prosecutor's invocation of Villarreal's claims never focused on what Appellant reaped. Moreover, Villarreal had every incentive to say whatever he thought the prosecutors wanted to hear; no one corroborated his story; helping them secure a lengthy sentence would only redound to his benefit when his sentencing came; and denying cross-examination of him hobbled any challenge to his story.

In setting the $529 million figure, the judge simply multiplied a gross number of kilograms shipped conjured by the prosecution by a price of $21,000/KG.[233] But Villarreal's proffers don't reflect the proceeds of sales, much

---

[232] 404 F.3d 1119, 1131-34 (9th Cir. 2005). *See also United States v. Stewart*, 2015 WL 6039742, *7-*8 (D. Neb. Oct.15, 2015) (preliminary finding that cooperating witnesses' anecdotal testimony of narcotics deals was too "suspect" and "vague" to order forfeiture of an amount unsupported by records).

[233] App:492-493.

less place them all in Appellant's hands.

This leaves Poveda, whose "statements" the District Judge mentioned fleetingly.[234] Yet the agents didn't place him as working with Appellant when they claimed that Villarreal worked alongside Mr. Beltran Leyva.

Undercutting reliance on Poveda's story are the following:

- The agents didn't relate anything Poveda claimed that Appellant gained.

- In characterizing Appellant, the Government shifted gears "as nimbly as dancing a quadrille."[235] When he pled guilty, the prosecution called him one of the "leaders" of the Organization,[236] which he denied.[237] At the forfeiture hearing, it called him the leader.

*Cano-Flores* and *Honeycutt* prohibit money judgment forfeitures of this ilk.[238] Appellant was improperly held accountable for every dollar the Organization supposedly reaped over a period, based on an absent witness' estimates of

---

[234] App:493.

[235] *Orloff v. Willoughby*, 345 U.S. 83, 87 (1952).

[236] App:160.

[237] App:164.

[238] *Honeycutt*, 581 U.S. at __, 137 S.Ct. at 1633-1635; *Cano-Flores*, 796 F.3d at 91-95.

shipments, but no proof of sales and crucially, Appellant's proceeds.

### Conclusion

The Court should permit Appellant to withdraw his guilty plea. However, if the case is remanded for resentencing, the Government shouldn't receive a "second bite at the apple."[239]

Respectfully submitted,

/s/ Stephen C. Leckar
Stephen C. Leckar, #281691
Kalbian Hagerty, LLP
888-17th St., NW, 10th Floor
Washington, D.C. 20006
202.742.4242
Counsel for Alfredo Beltran Leyva

Dated: May 7, 2018

### Word Count and Font Certificate

I certify that this brief contains approximately 13,986 words and is prepared in Times New Roman, 14-point font.

/s/ Stephen C. Leckar
Stephen C. Leckar

---

[239] *United States v. Fair*, 699 F.3d 508, 517-18 (D.C. Cir. 2012) (restitution); *United States v. Leonzo*, 50 F.3d 1086, 1087 (D.C. Cir. 1995) (sentence).

**Certificate of Service**

I caused a copy of the foregoing to be served this 7th day of May 2018, by ECF to:

> Adrienne Rose, Esq.
> U.S. Department of Justice
> Criminal Division
> Narcotic and Dangerous Drug Section
> 145 N Street, NE, Second Floor, East
> Washington, D.C. 20002

> <u>/s/ Stephen C. Leckar</u>
> Stephen C. Leckar

**Appendix of Constitutional and Statutory Provisions and Rules**

### A.  U.S. Constitution-Amdt. 5.

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

### B.  U.S. Constitution's Article 1 Section 9, Cl 3.

No Bill of Attainder or ex post facto Law shall be passed.

### C.  18 U.S.C. § 3553.

(a) Factors To Be Considered in Imposing a Sentence.— The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994 (a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28); and

(ii) that, except as provided in section 3742 (g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994 (a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28);

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission pursuant to section 994 (a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28); and

(B) that, except as provided in section 3742 (g), is in effect on the date the defendant is sentenced. [1] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

(b) Application of Guidelines in Imposing a Sentence.— (1) In general.— Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.

(2) Child crimes and sexual offenses.— (A)  [2] Sentencing.—In sentencing a defendant convicted of an offense under section 1201 involving a minor victim, an offense under section 1591, or an offense under chapter 71, 109A, 110, or 117, the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless— (i) the court finds that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence greater than that described;

(ii) the court finds that there exists a mitigating circumstance of a kind or to a degree, that—

(I) has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued under section 994 (a) of title 28, taking account of any amendments to such sentencing guidelines or policy statements by Congress;

(II) has not been taken into consideration by the Sentencing Commission in formulating the guidelines; and

(III) should result in a sentence different from that described; or

(iii) the court finds, on motion of the Government, that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense and that this assistance established a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence lower than that described.

In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission, together with any amendments thereto by act of Congress. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission, together with any amendments to such guidelines or policy statements by act of Congress.

(c) Statement of Reasons for Imposing a Sentence.— The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence—

(1) is of the kind, and within the range, described in subsection (a)(4), and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range; or

(2) is not of the kind, or is outside the range, described in subsection (a)(4), the specific reason for the imposition of a sentence different from that described, which reasons must also be stated with specificity in a statement of reasons form issued under section 994 (w)(1)(B) of title 28, except to the extent that the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32. In the event that the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32 the court shall state that such statements were so received and that it relied upon the content of such statements.

If the court does not order restitution, or orders only partial restitution, the court

shall include in the statement the reason therefor. The court shall provide a transcription or other appropriate public record of the court's statement of reasons, together with the order of judgment and commitment, to the Probation System and to the Sentencing Commission,, [3] and, if the sentence includes a term of imprisonment, to the Bureau of Prisons.

(d) Presentence Procedure for an Order of Notice.— Prior to imposing an order of notice pursuant to section 3555, the court shall give notice to the defendant and the Government that it is considering imposing such an order. Upon motion of the defendant or the Government, or on its own motion, the court shall—

(1) permit the defendant and the Government to submit affidavits and written memoranda addressing matters relevant to the imposition of such an order;

(2) afford counsel an opportunity in open court to address orally the appropriateness of the imposition of such an order; and

(3) include in its statement of reasons pursuant to subsection (c) specific reasons underlying its determinations regarding the nature of such an order.

Upon motion of the defendant or the Government, or on its own motion, the court may in its discretion employ any additional procedures that it concludes will not unduly complicate or prolong the sentencing process.

(e) Limited Authority To Impose a Sentence Below a Statutory Minimum.— Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

(f) Limitation on Applicability of Statutory Minimums in Certain Cases.— Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846) or section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 960, 963), the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—

(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged

in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

    (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

### D.    21 U.S. Code § 959- Possession, Manufacture or Distribution of Controlled Substance

  (a) Manufacture or distribution for purpose of unlawful importation

  It shall be unlawful for any person to manufacture or distribute a controlled substance in schedule I or II or flunitrazepam or a listed chemical intending, knowing, or having reasonable cause to believe that such substance or chemical will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States.

***

### E.  21 U.S. Code § 960(b)(1)(B)(ii) – Prohibited Acts A

  (a) Unlawful acts

  Any person who—

***

    (3) contrary to section 959 of this title, manufactures, possesses with intent to distribute, or distributes a controlled substance,

  (b) Penalties

  (1) In the case of a violation of subsection (a) of this section involving—

***

    (B) 5 kilograms or more of a mixture or substance containing a detectable amount of—

***

(ii) cocaine, its salts, optical and geometric isomers, and salts or isomers;

the person committing such violation shall be sentenced to a term of imprisonment of not less than 10 years and not more than life and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than 20 years and not more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $10,000,000 if the defendant is an individual or $50,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not less than 20 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $20,000,000 if the defendant is an individual or $75,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of title 18, any sentence under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 5 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 10 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this paragraph. No person sentenced under this paragraph shall be eligible for parole during the term of imprisonment imposed therein.

## F.  21 U.S. Code § 960(b)(1)(H) – Prohibited Acts-A

(a) Unlawful acts

Any person who—

***

(3) contrary to section 959 of this title, manufactures, possesses with intent to distribute, or distributes a controlled substance,

(b) Penalties

(1) In the case of a violation of subsection (a) of this section involving—

\*\*\*

(B) 5 kilograms or more of a mixture or substance containing a detectable amount of—

\*\*\*

(H) 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers[;]

the person committing such violation shall be sentenced to a term of imprisonment of not less than 10 years and not more than life and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than 20 years and not more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $10,000,000 if the defendant is an individual or $50,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not less than 20 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $20,000,000 if the defendant is an individual or $75,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of title 18, any sentence under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 5 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 10 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this paragraph. No person sentenced under this paragraph shall be eligible for parole during the term of imprisonment imposed therein.

### G.  Rule 11, Fed. R. Crim. P.

**Rule 11. Pleas**

(a) Entering a Plea.

(1) In General. A defendant may plead not guilty, guilty, or (with the court's consent) nolo contendere.

(2) Conditional Plea. With the consent of the court and the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion. A defendant who prevails on appeal may then withdraw the plea.

(3) Nolo Contendere Plea. Before accepting a plea of nolo contendere, the court must consider the parties' views and the public interest in the effective administration of justice.

(4) Failure to Enter a Plea. If a defendant refuses to enter a plea or if a defendant organization fails to appear, the court must enter a plea of not guilty.

(b) Considering and Accepting a Guilty or Nolo Contendere Plea.

(1) Advising and Questioning the Defendant. Before the court accepts a plea of guilty or nolo contendere, the defendant may be placed under oath, and the court must address the defendant personally in open court. During this address, the court must inform the defendant of, and determine that the defendant understands, the following:

(A) the government's right, in a prosecution for perjury or false statement, to use against the defendant any statement that the defendant gives under oath;

(B) the right to plead not guilty, or having already so pleaded, to persist in that plea;

(C) the right to a jury trial;

(D) the right to be represented by counsel—and if necessary have the court appoint counsel—at trial and at every other stage of the proceeding;

(E) the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses;

(F) the defendant's waiver of these trial rights if the court accepts a plea of guilty or nolo contendere;

(G) the nature of each charge to which the defendant is pleading;

(H) any maximum possible penalty, including imprisonment, fine, and term of supervised release;

(I) any mandatory minimum penalty;

(J) any applicable forfeiture;

(K) the court's authority to order restitution;

(L) the court's obligation to impose a special assessment;

(M) in determining a sentence, the court's obligation to calculate the applicable sentencing-guideline range and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. §3553(a);

(N) the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence; and

(O) that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

(2) Ensuring That a Plea Is Voluntary. Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement).

\*\*\*

## H.  U.S.S.G. §2D1.1(b)(1).  Specific Offense Characteristics

(1)     If a dangerous weapon (including a firearm) was possessed, increase by 2 levels

## I.  U.S.S.G. §2D1.1(b)(2).  Specific Offense Characteristics

(2)     If the defendant used violence, made a credible threat to use violence,

or directed the use of violence, increase by 2 levels.

### J.  U.S.S.G. §2D1.1(b)(11).  **Specific Offense Characteristics**

(11)    If the defendant bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense, increase by 2 levels.

### K.  U.S.S.G. §2D1.1(b)(15)(C). **Specific Offense Characteristics**

(15)    If the defendant receives an adjustment under §3B1.1 (Aggravating Role) and the offense involved 1 or more of the following factors:

\*\*\*

(C)    the defendant was directly involved in the importation of a controlled substance;

\*\*\*

increase by 2 levels.

### L.  U.S.S.G. §3B1.1(a).  **Aggravating Role**

Based on the defendant's role in the offense, increase the offense level as follows:

(a)    If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

\*\*\*

### M.  U.S.S.G. §3E1.1(a).  **Acceptance of Responsibility**

(a)    If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

(b)    If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1

additional level.

## M. U.S.S.G. § 6A1.3    <u>Resolution of Disputed Factors (Policy Statement)</u>

(a)    When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor.  In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

(b)    The court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P.

## N. Rule 803(8, Fed. R. Evid. - Exceptions to the Rule Against Hearsay

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

***

(8) Public Records. A record or statement of a public office if:

(A) it sets out:

(i) the office's activities;

(ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or

(iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

(B) neither the opponent does not show that the source of information nor or other circumstances indicate a lack of trustworthiness.

## O. Rule 902(3), F. R. Evid.-Evidence that is Self-Authenticating

The following items of evidence are self-authenticating; they require no

extrinsic evidence of authenticity in order to be admitted:

\*\*\*

(3) Foreign Public Documents. A document that purports to be signed or attested by a person who is authorized by a foreign country's law to do so. The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester — or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation. The certification may be made by a secretary of a United States embassy or legation; by a consul general, vice consul, or consular agent of the United States; or by a diplomatic or consular official of the foreign country assigned or accredited to the United States. If all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may, for good cause, either:

(A) order that it be treated as presumptively authentic without final certification; or

B) allow it to be evidenced by an attested summary with or without final certification.

### P.  5 U.S. Code § 8331 – Definitions

For purposes of this subchapter –

\*\*\*

(20)  "law enforcement officer" means an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, including an employee engaged in this activity who is transferred to a supervisory or administrative position. For the purpose of this paragraph, "detention" includes the duties of—

(A) employees of the Bureau of Prisons and Federal Prison Industries, Incorporated;
(B) employees of the Public Health Service assigned to the field service of the Bureau of Prisons or of the Federal Prison Industries, Incorporated;
(C) employees in the field service at Army or Navy disciplinary barracks or at confinement and rehabilitation facilities operated by any of the armed forces; and
(D) employees of the Department of Corrections of the District of Columbia, its industries and utilities;

whose duties in connection with individuals in detention suspected or convicted of offenses against the criminal laws of the United States or of the District of Columbia or offenses against the punitive articles of the Uniformed Code of Military Justice (chapter 47 of title 10) require frequent (as determined by the appropriate administrative authority with the concurrence of the Office) direct contact with these individuals in their detention, direction, supervision, inspection, training, employment, care, transportation, or rehabilitation;