**Oral Argument- Not Yet Scheduled**
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

APPEAL NO: 17-3027

UNITED STATES OF AMERICA,
Appellee,

v.

ALFREDO BELTRAN LEYVA
Appellant,

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(Richard Leon, J.)

JOINT APPENDIX TO MAIN BRIEF OF APPELLANT BELTRAN LEYVA
Volume II
Transcripts

Stephen C. Leckar, #281691
Kalbian Hagerty, LLP
888-17th St., NW
Washington, D.C. 20006
202.742.4242
202.223.6625 (FAX)
Counsel for Alfredo Beltran Leyva

Table of Contents

<u>Excerpts from hearings</u>

Plea (Feb. 23, 2016)..................................................................................145-166

Hearing (July 20, 2016)............................................................................167-177

Hearing (Oct. 18, 2016)............................................................................178-186

Sentencing Hearing (Feb. 14, 2017).........................................................187-342

Sentencing Hearing (Feb. 23, 2017).........................................................343-383

Sentencing Hearing (March 1, 2017)........................................................384-450

Sentencing Hearing (March 8, 2017)........................................................451-489

Sentencing (April 5, 2017)........................................................................490-527

<u>Exhibits from hearings</u>

Gov't Ex. 6................................................................................................528-529

<u>Public Records</u>

Gov't Motion, *United States v. Guzman*, 09-cr-0466 (E.D.N.Y.)
[213] (excerpt)..........................................................................................530-531

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | CR No. 12-184 |
| ) | |
| ) | Washington, D.C. |
| vs. ) | February 23, 2016 |
| ) | 12:20 p.m. |
| ALFREDO BELTRAN LEYVA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

TRANSCRIPT OF PLEA HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        AMANDA LISKAMM
                          ANDREA GOLDBARG
                          ADRIAN ROSALES
                          Assistant United States Attorney
                          555 4th Street, N.W.
                          Washington, D.C. 20036
                          (202) 252-7785
                          andrea.goldbarg@usdoj.gov

For the Defendant:         A. EDUARDO E. BALAREZO
                          Balarezo Law
                          400 5th Street N.W.
                          Suite 300
                          Washington, D.C. 20001
                          (202) 639-0999
                          info@balarezolaw.com

2

APPEARANCES CONTINUED:

Interpreter:                    Teresa Salazar


Court Reporter:                 William P. Zaremba, RMR, CRR
                                Official Court Reporter
                                U.S. Courthouse
                                333 Constitution Avenue, NW
                                Room 6511
                                Washington, D.C. 20001
                                (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

147

3

1          PROCEEDINGS

2              DEPUTY CLERK:  All rise.  This Honorable Court is

3    now in session.  The Honorable Judge Richard J. Leon

4    presiding.  God save the United States and this Honorable

5    Court.  Please be seated and come to order.

6              Your Honor, calling criminal Case No. 12-184, the

7    United States of America versus Alfredo Beltran Leyva.

8              The defendant is present in the courtroom,

9    Your Honor.

10             The interpreter who's present for these

11   proceedings is Ms. Salazar.  She has been sworn for the

12   record.

13             Will counsel for the parties please approach the

14   lectern and identify yourself for the record.

15             MS. GOLDBARG:  Good afternoon, Your Honor.

16   Andrea Goldbarg, Amanda Liskamm, Andrea Rosales,

17   Marcia Henry for the government.

18             Also present at government's table is our

19   paralegal, Angela Ancalle-Jimenez, and our case agent FBI

20   Special Agent Britton Boyd.

21             THE COURT:  Welcome.

22             MR. BALAREZO:  Good afternoon, Your Honor.

23   Eduardo Balarezo and Will Purpura on behalf of Alfredo

24   Beltran Leyva.

25             THE COURT:  Welcome.

4

1      All right, Mr. Balarezo.  As I understand it, your

2  client wishes to plead guilty today; is that correct?

3          MR. BALAREZO:  Yes, Your Honor.

4          Based on the government's factual proffer that was

5  presented in court last week, my client has decided that

6  it would be in his interest to plead to the indictment at

7  this time.

8          THE COURT:  Very good.

9          Because the indictment, as it is currently

10  constructed, is not consistent with the Court's prior ruling

11  and the Court's interpretation of the government of Mexico's

12  extradition agreement, the government needs to move to

13  dismiss those portions of the indictment relating to

14  allegations of illegal importation of heroin and marijuana

15  into the United States.  Does the government so move?

16          MS. GOLDBARG:  Yes, Your Honor.  Based on the

17  opinion by the government of Mexico limiting that the

18  defendant could not be tried for the drugs of heroin and

19  marijuana and also inconsistent with this Court's ruling

20  both with regards to the rule of specialty, the government

21  does so move to dismiss Count 1 to the defendant solely as

22  to heroin and marijuana.

23          THE COURT:  Very good.  The Court grants that

24  motion, and, therefore, the existing indictment which your

25  client wishes to plead to consists solely of the allegation

| | |
|---|---|
| 1 | of illegal importation of conspiracy to illegally import |
| 2 | cocaine and methamphetamine into the United States. |
| 3 | He may come up and be sworn. |
| 4 | DEPUTY CLERK:  Please raise your right hand. |
| 5 | (Defendant is placed under oath.) |
| 6 | THE DEFENDANT:  Yes, sir. |
| 7 | THE COURT:  All right.  Mr. Beltran Leyva, as |
| 8 | I understand from your attorney, you wish to enter a plea of |
| 9 | guilty to the indictment; is that correct? |
| 10 | THE DEFENDANT:  Yes, Your Honor. |
| 11 | THE COURT:  I need to ask you certain questions to |
| 12 | ensure that you do understand your rights and to ensure that |
| 13 | your plea is a voluntary one. |
| 14 | If you don't understand any of my questions at any |
| 15 | time, please do not hesitate to ask me to stop, and you can |
| 16 | ask any question you have of your counsel or the Court or |
| 17 | both of us.  Do you understand? |
| 18 | THE DEFENDANT:  Yes, Your Honor. |
| 19 | THE COURT:  All right.  Now, I want to remind you, |
| 20 | sir, that you're under oath.  The answers you give to the |
| 21 | Court's questions could be used against you in a later |
| 22 | prosecution for perjury or making false statement if you |
| 23 | don't answer truthfully.  Do you understand that? |
| 24 | THE INTERPRETER:  Yes, Your Honor. |
| 25 | THE COURT:  Does counsel for either side have any |

6

1   questions as to the defendant's competence to enter a plea

2   at this time?

3              MR. BALAREZO:  No, Your Honor.

4              MS. GOLDBARG:  Not for the government, Your Honor.

5              THE COURT:  Mr. Beltran Leyva, do you feel

6   competent to go forward today?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  Are you under the influence of any

9   drugs or alcohol or anything that might cloud your judgment

10  or make you unable to understand these proceedings in any

11  way?

12             THE DEFENDANT:  No, Your Honor.

13             THE COURT:  Based on the representations of

14  counsel, based on the representations of defendant, based on

15  the Court's own observations of the defendant, the Court

16  finds he is fully competent and capable of entering an

17  informed plea.

18             Now, as I understand it, you wish to plead guilty

19  to Count 1 of the indictment as is currently constructed

20  after the Court granted the motion here, which is a

21  conspiracy to distribute 5 kilograms or more of cocaine and

22  50 grams or more of methamphetamine, intending and knowing

23  that such substances would be unlawfully imported into the

24  United States in violation of 21 U.S. Code.

25             Have you had an adequate time and opportunity to

1    discuss this case with your attorney, or attorneys, I should

2    say?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Are you satisfied with your attorney's

5    representation of you?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  Now, let me ask you a few questions to

8    make sure you understand your rights under the

9    constitutional laws of the United States.

10             First of all, do you understand that you are

11   entitled to a trial by jury on the charge contained in this

12   indictment?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  All right.  Do you understand that if

15   there were a trial, you would be presumed to be innocent,

16   that the government would be required to prove you guilty by

17   competent evidence beyond a reasonable doubt.

18   Do you understand that?

19             THE INTERPRETER:  Yes, Your Honor.

20             THE COURT:  Do you understand that if there were a

21   trial, witnesses for the government would have to come to

22   court and testify in your presence, and your attorney,

23   attorneys, could cross-examine those witnesses and object to

24   any evidence offered by the government and, indeed, offer

25   evidence on your behalf.  Do you understand that?

8

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Furthermore, if there were a trial,

3    you would have a right to testify, but also would have a

4    right not to testify, and no inference or suggestion of

5    guilt could be drawn from the fact that you chose not to

6    testify.  Do you understand that?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Now, if I accept your guilty plea,

9    you'll be waiving all of those rights, there will be no

10   trial, and I will enter a judgment of guilt against you.

11   Do you understand that?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  As a result, you would be waiving your

14   right against self-incrimination since you'll have to

15   acknowledge your guilt in order for me to accept your plea.

16   Do you understand that?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  Now, the offense to which you're

19   pleading guilty is a felony offense.  If I accept your plea,

20   you will not only be found guilty of a felony, but you may,

21   as a result, be deprived of certain valuable civil rights,

22   such as the right to vote, the right to hold public office,

23   the right to perform certain jobs in both the public and

24   private sectors, the right to serve on a jury, and the right

25   to possess any kind of firearm.  Do you understand that?

9

```
 1            THE DEFENDANT:  Yes, Your Honor.
 2            THE COURT:  Now, in your case, you were born
 3   outside of the United States; is that correct?
 4            THE DEFENDANT:  Yes, Your Honor.
 5            THE COURT:  You were born in Mexico;
 6   is that right?
 7            THE DEFENDANT:  Yes, Your Honor.
 8            THE COURT:  All right.  Well, as a result of being
 9   in this country as an alien, there may very well be
10   consequences to your pleading guilty to this offense in the
11   form of immigration consequences, if you should ever wish to
12   re-enter the United States.
13            Do you understand that you would have very limited
14   opportunities in that regard?
15            Do you understand that?
16            THE DEFENDANT:  Yes, Your Honor.
17            THE COURT:  Now, having gone over all these rights
18   with you, do you still wish to go forward with a plea of
19   guilty?
20            THE DEFENDANT:  Yes, Your Honor.
21            THE COURT:  All right.  Let me ask Mr. Balarezo.
22            Do you have a copy of the indictment there with
23   you?
24            MR. BALAREZO:  Yes, Your Honor.
25            THE COURT:  All right.  If you could place that in
```

1   front of the defendant, I'd appreciate it.

2         Let me ask you a few questions:  Do you waive

3   reading of the indictment, Mr. Balarezo?

4         MR. BALAREZO:  Yes, Your Honor.

5         THE COURT:  All right.

6         Mr. Beltran Leyva, this is the document that

7   contains the charge against you that you wish to enter a

8   guilty plea to.  It's a conspiracy to distribute 5 kilograms

9   or more of cocaine, and conspiracy to distribute 50 grams or

10  more of methamphetamine, intending and knowing that such

11  substances would be unlawfully imported into the

12  United States, in violation of 21 U.S. Code.

13        Have you seen this document before?

14        THE DEFENDANT:  Yes, Your Honor.

15        THE COURT:  Have you had a chance to review it and

16  discuss it with your counsel?

17        THE DEFENDANT:  Yes.  I have consulted with my

18  attorney on all these things.

19        MR. BALAREZO:  Your Honor, if I just may

20  interject, Mr. Beltran Leyva does not speak English.

21  The document is in English, but I have gone over it with

22  him.

23        Additionally, when the government --

24        THE COURT:  You are fluent in Spanish, are you

25  not?

11

```
1              MR. BALAREZO:  I am, Your Honor.

2              THE COURT:  All right.

3              MR. BALAREZO:  And, additionally, when the

4   government requested his extradition, the documents that

5   were sent down were also in Spanish.  So he did receive a

6   copy in Spanish at one point.

7              THE COURT:  Very good.

8              And that's consistent with your recollection also,

9   isn't it, Mr. Beltran Leyva?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  Very good.

12             So would it be fair to say you understand the

13  charge against you.  Wouldn't that be a fair statement?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  And you understand that, after

16  discussing this with your counsel, that the maximum penalty

17  for this offense is a term of life in prison, a fine not to

18  exceed $10 million, and a period of supervised release of at

19  least five years.

20             You understand that that's the maximum possible

21  punishment under the law, right?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  And your counsel has also discussed

24  with you, has he not, that there's a mandatory minimum

25  sentence that's required by law as to this particular
```

12

```
 1   offense?

 2              THE DEFENDANT:  Yes, Your Honor.

 3              THE COURT:  And that mandatory minimum sentence is

 4   a term of imprisonment of at least ten years.

 5   You understand that, right?

 6              THE DEFENDANT:  Yes, Your Honor.

 7              THE COURT:  And there's no difference of opinion

 8   on that issue, is there, between counsel?

 9              You all agree that there's a mandatory minimum of

10   ten years?

11              MR. BALAREZO:  Based on the quantity, yes,

12   Your Honor.  Based on the charged offense.

13              THE COURT:  Very good.

14              The government agrees?

15              MS. GOLDBARG:  Yes, Your Honor.

16              THE COURT:  All right.

17              In addition, of course, you have to pay a special

18   assessment fee of $100 that's due and payable to our Clerk

19   of Court.

20              Now, your counsel has informed you, has he not,

21   that the Court will not be able to determine the exact

22   sentence that's applicable in your case until after a

23   presentence report has been completed that you and your

24   counsel and the government's counsel will all have an

25   opportunity to review and challenge any factual or legal
```

13

1    conclusion that's contained within it.

2    Do you understand that?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  You also understand that, under some

5    circumstances, you and the government may have a right to

6    appeal the sentence that I impose, and that a

7    Court of Appeals could review my sentence on the grounds of

8    its unreasonableness.  You understand that, right?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  You've also been informed, have you

11   not, by your counsel that parole has been abolished in the

12   federal system; and if you're sentenced to prison, you will

13   not be released on parole on any time.

14   Do you understand that?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  All right.

17             Now, has anyone threatened you or in any way

18   forced you to enter into this plea -- well, there isn't a

19   plea here -- well, entered into a decision to plead guilty

20   to this charge?  Has anyone threatened you or forced you?

21             THE DEFENDANT:  No, Your Honor.

22             THE COURT:  All right.

23             Has anyone made any specific prediction or promise

24   to you as to what your sentence might be in this case?

25             THE DEFENDANT:  No, Your Honor.

14

```
 1          THE COURT:  Do you understand that the sentence is

 2     up to the Court alone, but only after a presentence report

 3     has been prepared which you and your counsel and the

 4     government's counsel will all have an opportunity to review,

 5     evaluate, and object to any factual legal conclusions

 6     contained.  You understand that, don't you?

 7          THE DEFENDANT:  Yes, Your Honor.

 8          THE COURT:  All right.  I'm going to ask you to

 9     have a seat for a minute.  I'm going to ask the government

10     to make a presentation as to what evidence it believes it

11     would have proven if this case had gone to trial.  Listen

12     carefully; and when they're done, I'll have a few brief

13     questions for you with respect to what they go over, okay?

14     So you have a seat, and I'll have you back up in a minute or

15     so.

16          Ms. Goldbarg.

17          MS. GOLDBARG:  Your Honor, after two days of

18     proffering evidence to the Court in pretrial proceedings,

19     the government is confident that it would have been able to

20     prove that beginning in or around January of 2000, up until

21     the date that the indictment was returned in 2012, in Mexico

22     and elsewhere, the defendant was part of a conspiracy as

23     read in the indictment.

24          The object of that conspiracy was to distribute at

25     least 5 kilograms of cocaine and at least 50 grams of
```

1    methamphetamine, knowing and intending that such substances

2    would be unlawfully imported into the United States, and the

3    statutes are cited in the indictment.

4         More specifically, with regards to the factual

5    proffers of proposed witnesses and evidence, the government

6    is confident it would have been able to prove that between

7    1990 up until the defendant's arrest in January of 2008 by

8    Mexican authorities, this defendant was one of the leaders

9    of the Beltran Leyva drug-trafficking organization.  This

10   organization is a global criminal enterprise; it is

11   responsible for importing multiton quantities of both

12   cocaine and methamphetamine into the United States.

13        The evidence that the government would have

14   presented at trial would have also shown that some of those

15   drugs eventually made it to Washington, D.C.

16        The government, through the witnesses that it was

17   going to call at trial, would have been able to prove that

18   the defendant and his organization obtained tonnage,

19   literally tons of quantities of cocaine, from South American

20   suppliers.  The defendant and his co-conspirators helped to

21   finance these massive cocaine shipments.  These shipments

22   started in Colombia, and they were sent to Mexico via air,

23   land, and sea.

24        Once the cocaine reached the shores of Mexico, the

25   cocaine was transported by the defendant and his

16

| 1 | organization to central key points in Mexico.  One of those |
| 2 | key points was in Culiacán; Sinaloa, Mexico. |
| 3 | The defendant helped his organization control |
| 4 | Culiacán.  It was a central hub through which much of the |
| 5 | tonnage quantities of cocaine was sent to the United States. |
| 6 | Culiacán was also one of the central points where |
| 7 | the organization would collect literally billions of dollars |
| 8 | worth of drug proceeds for the drugs that were sold in the |
| 9 | United States. |
| 10 | Additionally, the defendant and his organization |
| 11 | produced methamphetamine in Mexico, which was then |
| 12 | distributed in the United States. |
| 13 | The government also presented evidence that, aside |
| 14 | from the drug trafficking and the movement of drugs, the |
| 15 | organization also carried out acts of violence.  These acts |
| 16 | of violence included murders, kidnappings, torture, violent |
| 17 | acts of debt collection.  Those acts of violence were done |
| 18 | in order to sustain the drug-importation operation. |
| 19 | The government's evidence, we strongly believe, |
| 20 | would have also indicated that this organization made |
| 21 | payments to public officials, and the purpose of that was to |
| 22 | ensure that the defendants and the organization's drugs |
| 23 | would move through Mexico uninhibited. |
| 24 | Also presented in the government's proffer was |
| 25 | that during the course of the defendant's involvement in the |

17

```
 1   conspiracy, there were several shipments of cocaine that

 2   were intended to be -- make it to the shores of Mexico and

 3   then to the United States that were seized by law

 4   enforcement authorities in several countries.

 5          The government presented evidence in the form of

 6   witnesses, as well as documentary evidence, that there were

 7   at least seven separate seizures that totaled over

 8   50,000 kilograms of cocaine, and it was part of this same

 9   seizure.  And the government would have been able to

10   introduce those seizures at trial.

11          Your Honor, this is just a brief summary of the

12   evidence that the government proffered during two days of

13   pretrial hearings, which we believe would satisfy the

14   elements of the offense.  If you have any more questions,

15   we're happy to answer them.  Thank you.

16          THE COURT:  Thank you.

17          You can come back up, Mr. Balarezo, with your

18   client.

19          Now, Mr. Beltran Leyva, you've heard the

20   government's summary of what it would have proved if this

21   case had gone to trial.  Let me ask you a few brief

22   questions with regard to that summary.

23          First, between 2000 and 2012, did you unlawfully,

24   knowingly and intentionally combine, conspire, confederate

25   and agree, together with other co-conspirators, to
```

18

1   unlawfully, knowingly, and intentionally distribute

2   5 kilograms or more of a mixture or substance containing a

3   detectable amount of cocaine, which is a narcotic drug and

4   controlled substance, intending or knowing that such cocaine

5   would be unlawfully imported into the United States in

6   violation of Title 21 United States Code?

7          Did you do that?

8          THE INTERPRETER:  Yes, Your Honor.  I would help

9   my brother, Artura.  And I conspired with my brother,

10  Artura.

11         THE COURT:  Okay.

12         Let me ask you this second:  Between 2000 and

13  2012, did you unlawfully, knowingly, and intentionally

14  combine, conspire, confederate, and agree, together with

15  other coconspirators, to unlawfully, knowingly and

16  intentionally distribute 50 grams or more of a mixture and

17  substance containing a detectable amount of methamphetamine,

18  which is a narcotic drug and controlled substance, intending

19  and knowing that such methamphetamine would be unlawfully

20  imported into the United States in violation of Title 21

21  United States Code?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  Okay.

24         A little more specifically, let me ask you this:

25  Between 2000 and your arrest on January 2008 by Mexican

19

```
 1   authorities, were you not one of the leaders of the Beltran
 2   Leyva organization?
 3              THE DEFENDANT:  No, sir.
 4              THE COURT:  You were not a leader?
 5              Were you a member of the organization?
 6              THE DEFENDANT:  I was a member of the Beltran
 7   Leyva organization.
 8              THE COURT:  All right.
 9              MR. BALAREZO:  Your Honor, if I just may interject
10   for one second.
11              THE COURT:  No.  This is -- no.
12              MR. BALAREZO:  Very well.
13              THE COURT:  Now, let me ask you this:  During that
14   time between 2000 and your arrest in 2008, did that
15   organization that you're a member of, to your knowledge,
16   help to finance shipments from Colombia, of cocaine, which
17   were transported to Mexico, with the intention of them later
18   being transported through Mexico to the United States?
19              THE DEFENDANT:  I would just help my brother,
20   Artura, sell it in Culiacán, with the knowledge that it
21   would get to the United States.
22              THE COURT:  All right.
23              So your organization was helping to finance those
24   shipments from Colombia to Mexico for transshipment to the
25   United States.  Is that a fair description?
```

164

20

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Okay.  And let me ask you one other

3     question:  During the same time period we've been talking

4     about, would it be accurate to say that your organization

5     also produced methamphetamine in Mexico for distribution,

6     ultimately, in the United States?  To your knowledge,

7     is that an accurate statement?

8          THE DEFENDANT:  Yes, Your Honor, I did have

9     knowledge of that as well.

10          THE COURT:  Okay.

11          So you're pleading guilty today because you are,

12     in fact, guilty; is that right?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  And you're pleading guilty

15     voluntarily; is that right?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  Now, do you have any questions that

18     you'd like to ask your counsel or the Court or both of us

19     before I accept your plea, recognizing, once I accept it,

20     I'm not likely to allow you to withdraw it.

21          So if you have any questions for your counsel or

22     the Court or both of us, this would be the time to ask them.

23          THE DEFENDANT:  Everything is fine, Your Honor.

24          THE COURT:  Very good.

25          So you still want to enter your plea of guilty;

1  is that right?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Okay.

4          It's the finding of the Court that the defendant

5  is aware of his rights under the Constitution of the

6  United States to a right for trial by jury and a right

7  against self-incrimination, and that he has chosen to waive

8  those rights.

9          The Court finds that he is aware of the maximum

10 possible punishment and the mandatory minimum for the

11 offense to which he is pleading guilty.

12         The Court finds that his plea of guilty is

13 knowing, voluntary, and supported by an independent basis,

14 in fact, as to each of the essential element of the offense.

15         So I'll accept your plea and enter a judgment of

16 guilty to Count 1 of the information as I've previously

17 indicated, with the motion that's been granted excised from

18 it, under the circumstances.

19         MR. BALAREZO:  Your Honor, just to clarify,

20 Count 1 of the indictment.

21         THE COURT:  Count 1 of the indictment.

22         MR. BALAREZO:  Not information.

23         THE COURT:  Of the indictment.

24         MR. BALAREZO:  Okay.

25         THE COURT:  Any reason not to set a sentencing

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )    CR No. 12-184
                                 )
                                 )    Washington, D.C.
       vs.                       )    July 20, 2016
                                 )    3:17 p.m.
ALFREDO BELTRAN LEYVA,           )
                                 )
            Defendant.           )
_____)
```

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:        ADRIAN ROSALES
                           AMANDA LISKAMM
                           ANDREA GOLDBARG
                           MARCIA HENRY
                           U.S. DEPARTMENT OF JUSTICE
                           Narcotic and Dangerous Drug
                           Section
                           145 N Street, NE
                           Second Floor, East Wing
                           Washington, D.C. 20530
                           (202) 598-2281

For the Defendant:         A. EDUARDO E. BALAREZO
                           Balarezo Law
                           400 5th Street, NW
                           Suite 300
                           Washington, D.C. 20001
                           (202) 639-0999
                           info@balarezolaw.com

1    That was the situation.  Pure and simple.

2              It's not like he was being deprived some benefit

3    of a plea agreement.  No such a thing would be accurate, nor

4    a fair representation on the record.

5              So he chose to plead straight-up on the eve of

6    trial.

7              MR. BALAREZO:  My client chose to plead to the

8    indictment.

9              And what I meant or I, perhaps, should have

10   clarified when I said "without the benefit of a plea

11   agreement," is that typically, when an agreement is reached

12   with the government, there are certain benefits that are

13   conferred, and, for example, agreements as to the

14   enhancements and various other things that the Court is

15   aware.  That's all I meant.  But it was my client's decision

16   to plead guilty to the indictment.

17             Now, based on what he pled guilty to -- and we

18   will concede that the Base Offense Level is a level 38 based

19   on the quantities that are involved here.  And a Base

20   Offense Level, assuming that that is what he will be

21   sentenced on, it's about -- 235 to 293 months is the

22   Guidelines.

23             Now, the government here is seeking an additional

24   12 points in enhancements, which takes the theoretical

25   Guidelines from what I just said from 20 to 25 years, up to

17

1    life.

2         I think -- our position is that it's a matter of

3    fundamental fairness and of due process to not only have a

4    hearing, but for the Court to have the witnesses themselves

5    present to testify so that the Court can make a

6    determination as to their reliability.

7         THE COURT:  Now, let's stop you right there.

8    There is no necessity for that under the Rules --

9         MR. BALAREZO:  Agreed.

10         THE COURT:  -- or the precedent in this circuit

11    whatsoever.

12         Indeed, one of the reasons, and one of the

13    benefits, frankly, to having a plea entered in a case is to

14    spare the witnesses, especially those who are incarcerated,

15    especially those whose lives would be at stake, from having

16    to be brought here and have all the attending security

17    issues that would arise in that context from having to take

18    place.  So there's no necessity of that under the law,

19    there's no necessity of it under the precedent in this

20    circuit or any other circuit, to my knowledge.  So that's

21    not happening.  The law specifically provides:  Hearsay is

22    admissible.

23         The case agent who's interviewed, I believe, all

24    of these witnesses firsthand is in a position, or should be,

25    he'll be subject to cross-examine, to know what it is that

18

1  they would testify to and how it was that they learned what

2  they learned.  And, you know, he'll be in a position to sit

3  in that chair under oath and testify and be cross-examined

4  as to what these witnesses would have said if they had been

5  called at trial.

6          Indeed, we've had proffers, but they were from the

7  government, they were from the lawyers.  And I agree with

8  you that that's not enough.  I don't agree with the

9  government that that's enough.

10          I think for the Court to make the findings it has

11  to make by a preponderance of the evidence, someone is going

12  to sit in that chair and testify, subject to cross-examine.

13  And hearsay is permissible.  So I guess the person they've

14  decided is the person to do it is the case agent, and that's

15  what it will be.

16          MR. BALAREZO:  Your Honor, I understand the case

17  law that hearsay is admissible in this proceeding or in the

18  sentencing proceeding and that it's not required that a

19  witness who was -- firsthand witness testified.

20          What I'm suggesting is that in this case, again,

21  where there's a 12-level enhancement that the government is

22  seeking that basically takes the Guidelines from the

23  20-some-year range to life in prison, that, again, is an

24  issue of due process; that the Court should have witnesses

25  here, because what the agent is going to testify to will be

19

```
1    what he heard these individuals say.  And sure, he'll be

2    subject to cross-examine, but our cross-examination

3    obviously is going to be very limited because we're going to

4    be stuck with his answers and/or whatever is in the

5    documents or the notes that were taken, the *Jencks* material.

6              THE COURT:  Well, I was going to say, as to the --

7    we haven't talked yet about this agent's testimony with

8    regard to the enhancements, we have not gotten into that

9    yet.  We're going to get to that in a second.

10             But as it relates to the four witnesses relating

11   to the forfeiture, the prosecutor has represented that she

12   has produced to date all of the discovery material that's

13   apposite as to those four witnesses whose testimony the

14   agent would be summarizing.  Is that consistent with your

15   understanding?

16             MR. BALAREZO:  Your Honor, I received

17   approximately 250 pages yesterday afternoon and about maybe

18   another 100 pages this morning of material that reports to

19   be the *Jencks* material for these witnesses.  It's heavily

20   redacted.  There are portions which address my client

21   specifically and any actions that he took that are redacted

22   within those portions.  So it's difficult to decipher who is

23   saying what about whom.

24             For example, it will say Alfredo sent 5,000 kilos

25   to Culiacán or from Culiacán.  Okay.  That's basically what
```

1    the *Jencks* is.  There's no information there in the material

2    as to exactly how these witnesses got -- found out that

3    information.  A lot of it is just information being thrown

4    out there.

5            THE COURT:  Well, of course, you can ask the

6    agent.

7            MR. BALAREZO:  Of course.

8            THE COURT:  The agent will -- hopefully, in his

9    testimony on direct, is going to provide some clarity and

10   some basis for his understanding, because, one, of course,

11   expects an agent, when interviewing witnesses of this kind,

12   especially witnesses who are incarcerated, who have a stake

13   in cooperating, that might help them to basically do his or

14   her level best to figure out the accuracy of these

15   statements, indeed, to the extent possible, to corroborate

16   them.

17           So he must have taken steps, one would assume, to

18   satisfy himself, at a minimum, of the accuracy of these

19   representations that this person was going to testify to in

20   this trial.  And you can inquire about what steps he took,

21   if any, to do that.  You'll be able to do that.

22           MR. BALAREZO:  I know that, Your Honor.

23           But I can tell you that the material that was

24   provided yesterday does not contain any of that information;

25   for example, what the agent did to corroborate.  So in a

1  sense, I'm going to be stuck with his answer.  I have no

2  other material beyond that, beyond what these witnesses said

3  about my client.

4        THE COURT:  Well, hopefully, on direct

5  examination, he's going to be asked some of these questions.

6        MR. BALAREZO:  I'm sure he'll be asked on cross.

7        THE COURT:  You would certainly think so.

8        And then depending upon what happens on direct,

9  your cross may or may not go in that direction or need to go

10  in that direction, right?

11        MR. BALAREZO:  Correct.

12        THE COURT:  So assuming a half an hour, which, to

13  me, seems ludicrously small for the forfeiture part, what

14  would you anticipate your cross-examination to take, a half

15  an hour, an hour, two hours?

16        MR. BALAREZO:  Your Honor, I would say at least a

17  few hours on cross-examination.

18        THE COURT:  That sounds like it might be right.

19        All right.  So in my own mind, I, as I think of

20  rescheduling this for a hearing, a full-blown hearing,

21  I'm going to be thinking in terms of two to three hours on

22  the forfeiture issue alone.  Hopefully, I'm wrong.

23        And is there any additional discovery on the

24  forfeiture issue you think you have a right to or need or

25  whatever?

22

1              MR. BALAREZO:  Your Honor, the ledgers that we

2    have discussed, those have been produced before, I have

3    access to that.

4              THE COURT:  That's good.

5              MR. BALAREZO:  And I don't know what else is in

6    the government's possession, but they felt that the

7    information that was provided yesterday met the requirements

8    of 18 U.S.C. 3500.  I will take them at their word and I

9    will work with that.

10             I don't know of any other material that exists

11   that would allow me to -- that I could review so that I can

12   prepare for the forfeiture aspect of this.

13             THE COURT:  Do you have any additional legal

14   arguments you need to make with regard to the scope of the

15   narcotics trafficking that might be the basis for any

16   calculation of the amount of the forfeiture that the

17   government is seeking?

18             MR. BALAREZO:  If I recall correctly, many of the

19   documents relate -- that were for Witnesses 3 and 4, in

20   particular, I believe, that have to do with the forfeiture,

21   also mentioned individuals that were involved in the

22   so-called Federacion, which would be the greater conspiracy,

23   if you will.

24             And I would say that based on --

25             THE COURT:  You mean the El Chapo operation,

23

1    Sinaloa?

2              MR. BALAREZO:  El Chapo, Mayo, Sinaloa, and other

3    individuals.

4              I would say, at least based on my understanding of

5    the Court's rulings and directives before, that the amount

6    should only be limited as to the Beltran Leyva Organization,

7    as the government and the Court have defined that,

8    I believe.

9              THE COURT:  No reason why I'm going to rule any

10   differently.

11             So it's going to have to be very clear, at least

12   to me, in any examination of the case agent, that we're

13   talking about quantities of narcotics that were related to

14   the Beltran Leyva Organization, not the Federacion, not the

15   Sinaloa Cartel.

16             And trying to keep straight, in situations where

17   there's a shipment to Culiacán that was being financed

18   jointly by Sinaloa Cartel and Beltran Leyva Cartel, trying

19   to keep straight, well, which portion of that shipment was

20   owned by Sinaloa and which part was owned by Beltran Leyva,

21   that may be very difficult to do, if not impossible to do.

22   I don't know.  We'll see.  Certainly, that would be a topic

23   for both direct and cross-examination, keeping those

24   straight, and not assuming, that any given shipment was

25   owned completely by Beltran Leyva Cartel.

24

1          So to the extent that that's what the government

2   has in mind, they're going to have to satisfy the Court that

3   they can keep straight the distinction between the two

4   operations as to attributing responsibility to only that

5   portion that is for the Beltran Leyva Cartel.

6          Do you have anything else?

7          MR. BALAREZO:  I don't, Your Honor, not with

8   respect to the forfeiture.

9          THE COURT:  All right.  Well, then let's go to the

10  next topic, which is the enhancements.

11         Ms. Goldbarg.

12         MS. GOLDBARG:  Yes, Your Honor.

13         THE COURT:  So your proposal is that you will have

14  one witness for all, let's see, there's three, four, five

15  different enhancements, right?

16         MS. GOLDBARG:  Correct.

17         There will be one agent testifying, and we will be

18  relying on the testimony of two witnesses for those

19  enhancements.

20         THE COURT:  Which two witnesses?

21         MS. GOLDBARG:  Consistent with the government's

22  request after the last hearing, we did present a list of

23  witnesses, Witnesses 1 through 4, and we would ask that they

24  be called 1 through 4 for purposes of the hearing.

25         We provided a list that we've provided to defense

25

1    counsel of who, when we say Witness 1, who we refer to.

2    I have a copy of this.  If the Court would like to see it,

3    I'm happy to provide one to the Court.

4            THE COURT:  Is it your hope and expectation that

5    this hearing will be a hearing where these people's names

6    aren't mentioned?

7            MS. GOLDBARG:  Yes, Your Honor.

8            THE COURT:  How can that be?  How can that be?

9            MS. GOLDBARG:  Happy to approach and --

10           THE COURT:  You're welcome to approach, but I'm

11   hard-pressed to understand how you think this can be done in

12   secrecy.

13           MS. GOLDBARG:  May we approach?

14           THE COURT:  This is an open sentencing.

15           MS. GOLDBARG:  Correct, Your Honor.

16           THE COURT:  This is not a closed-door sentencing.

17           MS. GOLDBARG:  We understand that, Your Honor.

18           THE COURT:  And you are laying out the evidence

19   that you're arguing is the basis for a life-prison term.

20           MS. GOLDBARG:  Correct, Your Honor.

21           May we approach, Your Honor?

22           THE COURT:  Sure.

23           (Ex parte, sealed bench conference)

24           THE COURT:  ███████████████████████████

25   ████████████████████████████████████████████████

177

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )     CR No. 12-184
                                   )
                                   )     Washington, D.C.
     vs.                           )     October 18, 2016
                                   )     2:30 p.m.
ALFREDO BELTRAN LEYVA,             )
                                   )
          Defendant.               )
_____    )

TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          AMANDA LISKAMM
                             ANDREA GOLDBARG
                             ADRIAN ROSALES
                             Assistant United States Attorney
                             555 4th Street, N.W.
                             Washington, D.C. 20036
                             (202) 252-7785
                             andrea.goldbarg@usdoj.gov


For the Defendant:           A. EDUARDO E. BALAREZO
                             Balarezo Law
                             400 5th Street N.W.
                             Suite 300
                             Washington, D.C. 20001
                             (202) 639-0999
                             info@balarezolaw.com

2

APPEARANCES CONTINUED:

Interpreter:                    Teresa Salazar


Court Reporter:                 William P. Zaremba, RMR, CRR
                                Official Court Reporter
                                U.S. Courthouse
                                333 Constitution Avenue, NW
                                Room 6511
                                Washington, D.C. 20001
                                (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

3

```
1                    P R O C E E D I N G S
2             DEPUTY CLERK:  All rise.  The United States
3    District Court for the District of Columbia is now in
4    session.  The Honorable Richard J. Leon presiding.  God save
5    the United States and this Honorable Court.  Please be
6    seated and come to order.
7             (Defendant entered.)
8             DEPUTY CLERK:  Your Honor, we have Criminal Action
9    12-184, United States of America versus Alfredo Beltran
10   Leyva.
11            Counsel, please approach the lectern and identify
12   yourselves for the record.
13            MR. ROSALES:  Good afternoon, Your Honor.  For the
14   government, Adrian Rosales.
15            Also with me at counsel table is Amanda Liskamm,
16   Andrea Goldbarg, and our paralegal specialist, Angela
17   Ancalle Jimenez.
18            THE COURT:  Are you having a convention here
19   today?  What's going on?  What is this?
20            MR. ROSALES:  And also Special Agent Britton Boyd
21   from the FBI.
22            THE COURT:  Ridiculous.
23            You've got the message, this isn't a sentencing.
24            Mr. Rosales, you got the message.
25            MR. ROSALES:  Yes, Your Honor.
```

180

4

```
 1          THE COURT:  What do you have all these people here
 2   for?  This is a legal discussion.
 3          What, do you people have nothing to do?
 4          MR. ROSALES:  These are members of the trial team.
 5   Ms. Goldbarg is not only in our office but was in town on
 6   another matter so she's here with us.
 7          THE COURT:  Okay.
 8          I know who you are.  Welcome.  Glad to see you
 9   without a collar.
10          MR. BALAREZO:  Thank you, Your Honor.  And I'm
11   here by myself today.
12          THE COURT:  Not quite.
13          MR. BALAREZO:  Well, with my client.
14          THE COURT:  No, not quite.
15          MR. BALAREZO:  I don't know who else.
16          THE COURT:  Well, there's a Mexican attorney
17   sitting out there, right?
18          MR. BALAREZO:  He's not counsel in this case,
19   though.
20          THE COURT:  I understand.  But was he able to get
21   in and see your client?
22          MR. BALAREZO:  We saw Mr. Beltran Leyva briefly
23   this morning.  Thank you for the order.
24          If there's a possibility, we may have to try to
25   see him after the hearing as well also, if possible.
```

5

| | |
|---|---|
| 1 | THE COURT:  That's fine. |
| 2 | MR. BALAREZO:  But for the transcript, |

Edward Balarezo on behalf of Mr. Beltran Leyva.  Thank you,
Your Honor.

3
4

| 5 | THE COURT:  Welcome back. |

6    All right.  This is a case that has taken, to say
7  the minimum, a lot of unexpected twists and turns, much --
8  almost to the point where it's surreal.  I've never seen
9  anything like it from either side's perspective,
10  particularly the government's.

11    This is not a plea agreement case, and yet here at
12  the eleventh hour and 58th minute on the eve of sentencing,
13  the government is trying to come up with some stipulation
14  between the parties on the issue of what the appropriate
15  Guidelines Range is.  God knows what its ulterior motives
16  are.  I could speculate, but I'm not going to.

17    MR. BALAREZO:  Your Honor --
18    THE COURT:  I'm speaking.
19    MR. BALAREZO:  Very well.
20    THE COURT:  You wait your turn.

21    Boy, you should know better after all these hours
22  of doing this.  You should know better, Mr. Balarezo.

23    MR. BALAREZO:  I apologize, Your Honor.
24    THE COURT:  Accepted.

25    The Court has gone and looked at the appellate

6

1   cases to the extent there are relevant District Court cases;

2   and, more importantly, has gone back and looked at the

3   Guidelines.  And if there's anything that is crystal clear,

4   crystal, in the words of Jack Nicholson, crystal clear,

5   is that the Court has an obligation, an obligation in

6   determining the appropriate Guidelines Range to make

7   findings of facts that are relevant and accurate in the

8   case.

9           The government, in this case, has repeatedly laid

10  out its proffers of what the evidence would show if the case

11  had gone to trial, repeatedly.  And in repeatedly laying

12  that out, the government has made it crystal clear this

13  man's not a manager, he's an organizer, that's a plus 4.

14  This man used and directed violence, that's a plus 2.

15          You've represented to this Court that he had

16  direct involvement in the importation in the drugs in

17  question, which are of a huge amount, into this country.

18  And you have represented to this Court that you have

19  witnesses that will testify to every one of these things,

20  that you can prove every one of these things.  And now

21  you're asking the Court to effectively turn a blind eye to

22  it, to these enhancements for the purposes of sentencing

23  based on a stipulation the two of you agreed to under

24  circumstances where there isn't even a plea agreement.

25  I don't get it.

7

1    I know you have ulterior motives, I know you've

2   got your own hidden agendas.  I'm not a crystal ball gazer,

3   I don't have the insight to know, nor am I going to

4   speculate, as to what your thinking is.

5    But I cannot and I will not just accept a

6   stipulation that stipulates away reality, reality that's

7   been laid forth in public not just in this courtroom but

8   before the public.

9    In your earlier stipulations -- excuse me, your

10  earlier pleadings that made proffers as to what your

11  evidence would show.

12    In your sentencing memorandum as recently as May

13  and now at the eleventh hour and 59th minute, you want to

14  stipulate this away.

15    If he is more than a manager, if he used and

16  directed violence, if he had direct involvement in the

17  importation of controlled substances, all of which you've

18  proffered you can prove, then it's not a 42, it's higher

19  than a 43.  And under the Guidelines, it's effectively

20  brought back to 43.

21    What you're asking this Court to do, it cannot do,

22  consistent with the spirit and the law regarding sentencing.

23  So the stipulation will not be accepted.

24    The Court must make an independent assessment

25  based on its understanding of the case.  You're going to

8

```
 1   have to put your witness on, and he is going to have to
 2   testify on these issues of enhancement, consistent with, I
 3   might add, your proffers to date, and subject to
 4   cross-examination.  If Mr. Balarezo wants to cross-examine
 5   him, he's welcome to do it, and he'll have the opportunity
 6   to do it.
 7        But the Court cannot turn a blind eye to reality.
 8   This case has been investigated ad nauseam.  It's been
 9   litigated ad nauseam.  And I am not going to be able to, in
10   good conscience, turn a blind eye to what the government has
11   proffered extensively that it has evidence, witnesses it can
12   prove beyond a reasonable doubt.  Can't do it.
13        So I appreciate your effort to try to bridge the
14   gap between 42 and 43, but, frankly, I just don't see any
15   way I can accept that or should in any way accept it.
16        Indeed, there is the additional concern about
17   acceptance of responsibility, as long as he continues to
18   deny that he was a leader, as long as he continues to deny
19   that he didn't use direct violence.
20        And if that's going to be his position, I'm not so
21   sure he's accepting responsibility here.  And if he doesn't
22   accept responsibility, which this Court has to make the
23   ultimate decision to whether he has or hasn't, then the two
24   points for acceptance is pulled, as is the third point,
25   which the government has complete control over, I'll
```

185

9

1   acknowledge that.  I'm not questioning the government's

2   authority on the third point.

3           So we're going to have a witness.  Your case agent

4   is probably the logical person, since he's the one who knows

5   the case the best, knows what evidence he found.  It was his

6   testimony that you were going to be using in the first place

7   before this eleventh hour and 59th minute came up to try to

8   do it this way.

9           Like I said, Mr. Balarezo can decide how much he

10  wants to cross-examine him or not cross-examine him, that's

11  his choice.  I have to make the findings, and that has to be

12  based on evidence and based on reality.

13          This is an unusual case in so many ways, because

14  the government has laid out jot and tittle, in open court,

15  the evidence that it can prove in this case it's proffered

16  in.  It can prove it beyond a reasonable doubt, it says.

17  It's got the witnesses who can do it.  Now, I'm not saying

18  you've got to call all the witnesses.  Obviously, you've got

19  a case agent that can summarize all that evidence.  I have

20  to make findings by a preponderance.

21          So I want to give Mr. Balarezo enough time to

22  prepare his cross-examine.  Obviously if I sprung this on

23  you two days ago, it wouldn't have been enough time.  Plus,

24  he was still recovering from his medical situation.

25          Can you do it in ten days?  Can you do it in a

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )   CR No. 12-184
                                    )
                                    )   Washington, D.C.
        vs.                         )   February 14, 2017
                                    )   11:30 a.m.
ALFREDO BELTRAN LEYVA,              )
                                    )
            Defendant.              )
_____)


TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        AMANDA LISKAMM
                           ANDREA GOLDBARG
                           ADRIAN ROSALES
                           Assistant United States Attorney
                           555 4th Street, N.W.
                           Washington, D.C. 20036
                           (202) 252-7785
                           andrea.goldbarg@usdoj.gov


For the Defendant:         A. EDUARDO E. BALAREZO
                           Balarezo Law
                           400 5th Street, NW
                           Suite 300
                           Washington, D.C. 20001
                           (202) 639-0999
                           info@balarezolaw.com

8

1          THE COURT:  Well, it's always been the Court's

2    practice to allow the case agent to be present for all other

3    witness's testimony.  If they're co-case agents,

4    Mr. Balarezo, then they both would have the benefit of that

5    status.

6          I'm not sure why you think there would be any

7    prejudice here that enure to your client's detriment with

8    regard to the --

9          MR. BALAREZO:  That's fine.  I'm just trying to

10   make my record on a few issues.  If I could have a moment,

11   I would just like to re-raise issues.

12         THE COURT:  Do not re-raise issues you've already

13   filed.

14         MR. BALAREZO:  Your Honor.  None, Your Honor.  It

15   has nothing to do with that, Your Honor.

16         THE COURT:  This case is by far and away the most

17   complicated, and unnecessarily complicated, I might add,

18   sentencing I've had in a plea situation.

19         Don't be raising any more issues that have already

20   been raised in your pleadings.  I've ruled on them.  I'm not

21   revisiting them.

22         Now, what do you have new?

23         MR. BALAREZO:  I'm not revisiting, Your Honor.

24         THE COURT:  New.

25         MR. BALAREZO:  The objection I have is with

9

```
1   respect to the government putting on the testimony of two
2   case agents in this case, which my understanding is going to
3   pertain to the -- they're going to testify as to the
4   proffers of three cooperating witnesses in this case.  The
5   witnesses themselves are not going to be present, although
6   I understand at sentencing, hearsay is admissible.  That's
7   not the issue.
8            I think that in a case such as this where the
9   government is seeking enhancements on my client that will,
10  in effect, put him at a life Guidelines, I think due process
11  requires that the Court get testimony directly from the
12  witnesses rather than secondhand from the --
13           THE COURT:  Do you have an opinion of the
14  D.C. Circuit -- let's start there.
15           MR. BALAREZO:  I do not, Your Honor.
16           THE COURT:  That requires that.
17           Okay.  Then let's go around the country.
18           MR. BALAREZO:  I don't know.
19           THE COURT:  Other than the Ninth Circuit, which is
20  reversed 80 percent of the time, do you have an opinion of
21  any other circuit that requires that?
22           MR. BALAREZO:  Your Honor, I do not have an
23  opinion from the Court.  I'm just making my record, and I'm
24  asking the Court to use its discretion in that case.  That's
25  all.
```

1          THE COURT:  Look.  I've been doing this 15 years,

2    and my understanding of the Guidelines is such that there's

3    no requirement whatsoever for that.

4          MR. BALAREZO:  Thank you.

5          THE COURT:  None.

6          MR. BALAREZO:  Anything else?  That's it for me.

7          THE COURT:  That's what I was going to ask you.

8          MR. BALAREZO:  I'm done.  Thank you.

9          THE COURT:  Mr. Rosales, do you want to call your

10   first witness?

11         MR. ROSALES:  Yes, Your Honor.  The government

12   calls Special Agent Tom Hatherley to the stand.

13         THE COURT:  All right.  He can come up and be

14   sworn.

15         (Witness is placed under oath.)

16         DEPUTY CLERK:  Please be seated.

17         MR. ROSALES:  Your Honor, before we begin, the

18   government has an exhibit binder for the Court, if the Court

19   would like one.

20         THE COURT:  Oh, okay.

21         MR. ROSALES:  And the exhibit that this witness

22   will be dealing with is Exhibit 6, which is at the end of

23   the binder.

24         THE COURT:  Okay.  Exhibit 6.

25         You may proceed.

13

```
1       A     Yes, sir.

2       Q     And is one of those witnesses Harold Mauricio

3    Poveda Ortega?

4       A     Correct.

5       Q     And is the other witness, Jesus Zambada Garcia?

6       A     Correct.

7       Q     Let's start by talking about Mr. Poveda.

8             Can you explain to the Court who Mr. Poveda is?

9       A     He's a Colombian drug trafficker that was residing

10   in Mexico.

11      Q     What role did Mr. Poveda play in the drug

12   trafficking world?

13      A     Mr. Poveda was a broker, and his role was to put

14   together Colombian cocaine suppliers with Mexican buyers of

15   that cocaine.

16      Q     Where is witness No. 1 currently?  I'm sorry,

17   where is Mr. Poveda currently?

18      A     He's incarcerated in the United States.

19      Q     What year was Mr. Poveda arrested?

20      A     It was 2010.

21      Q     And where was he arrested?

22      A     In Mexico.

23      Q     Has he been in custody since his arrest in 2010 in

24   Mexico?

25      A     Yes.
```

14

| | | |
|---|---|---|
| 1 | Q | What year did he arrive in the United States? |
| 2 | A | 2012. |

3    Q    And by what means did he arrive here in the United

4  States?

5    A    He was extradited here upon an indictment and a

6  warrant for his arrest in the United States.

7    Q    Do you know how many indictments he faced in the

8  United States upon his extradition?

9    A    Yes.  Three indictments.

10    Q    And in which jurisdictions were those indictments?

11    A    It was the Northern District of Texas, the

12  District of Columbia, and the Eastern District of New York.

13    Q    What were the charges that Mr. Poveda faced in

14  those three indictments?

15    A    The charges were conspiracy to traffic narcotics,

16  with the importation in the United States, continuing

17  criminal enterprise, and money laundering.

18    Q    Has Mr. Poveda entered a guilty plea to all three

19  indictments?

20    A    Yes, he has.

21    Q    Was he allowed to enter a guilty plea to all three

22  indictments in the Eastern District of New York?

23    A    Yes.

24    Q    And did he do so pursuant to a cooperation

25  agreement with the government?

15

1     A     Yes, he did.

2     Q     As part of his guilty plea, did Mr. Poveda admit

3  to a total number of kilos he helped to distribute and

4  import into the United States?

5     A     Yes.

6     Q     And approximately what was that total number of

7  kilograms of cocaine?

8     A     Approximately 1 million.

9     Q     Was it exactly a million or was it over a million

10 kilos?

11    A     There was over a million.

12    Q     What benefit does Mr. Poveda hope to obtain

13 pursuant to his cooperation agreement?

14    A     A reduced sentence.

15    Q     Without the benefit of a cooperation agreement,

16 what was the maximum sentence that Mr. Poveda faced?

17    A     Life imprisonment.

18    Q     And what was the minimum sentence that Mr. Poveda

19 faced without the benefit of a cooperation agreement?

20    A     20 years.

21    Q     Has Mr. Poveda been sentenced for his guilty plea

22 to the three indictments?

23    A     No, he has not.

24    Q     Have any promises been made to Mr. Poveda

25 regarding his sentence pursuant to his cooperation

16

1   agreement?

2       A    No.

3       Q    As a result of his guilty plea, did Mr. Poveda

4   agree to forfeit any money to the United States?

5       A    Yes, he did.

6       Q    How much money did Mr. Poveda turn over to the

7   United States?

8       A    Mr. Poveda surrendered $1 million.

9       Q    Has that money, in fact, already been surrendered

10  to the United States?

11      A    Yes.

12      Q    As part of his cooperation agreement with the

13  government, did Mr. Poveda obtain any immigration benefits?

14      A    Yes, he did.

15      Q    And what was the nature of those immigration

16  benefits?

17      A    The immigration benefits were for his family's

18  safety and welfare to reside in the United States.

19      Q    And are these immigration benefits typical

20  benefits offered for the safety of the families of

21  cooperators of individuals who cooperate with the

22  U.S. Government?

23      A    Yes.

24      Q    Has Mr. Poveda committed any crimes while

25  incarcerated in the United States?

17

1      A    Yes, he has.

2      Q    What crime did he commit?

3      A    He bribed a Bureau of Prisons' employee $2,000 for

4  extra visitation rights.

5      Q    Did he, in fact, pay any money to that Bureau of

6  Prisons' employee?

7      A    Yes, sir.  He paid him $2,000.

8      Q    Did he receive any visitation time in exchange for

9  that $2,000 payment?

10     A    No, he did not.

11     Q    Was Mr. Poveda charged with a crime for these

12 actions?

13     A    Yes.

14     Q    And can you explain for the Court what he was

15 charged with?

16     A    He was charged with public corruption.

17     Q    Did Mr. Poveda plead guilty to that charge?

18     A    Yes, he did.

19     Q    What is the maximum sentence that he can receive

20 related to that charge?

21     A    Ten years.

22     Q    And what is the minimum sentence that he can

23 receive related to that charge?

24     A    Four years.

25     Q    Have there been any promises made to Mr. Poveda

1  regarding his guilty plea in the public corruption case?

2       A    No.

3       Q    Has he been sentenced in the public corruption

4  case?

5       A    No, he has not.

6       Q    Can his sentence in the public corruption case run

7  consecutive to the sentence that he would receive pursuant

8  to his cooperation agreement?

9       A    Yes.

10      Q    Let's talk about the other prior bad acts of

11 Mr. Poveda.

12           During the course of your discussions with

13 Mr. Poveda, did you learn of other crimes that he committed

14 while he was out in Mexico?

15      A    Yes.

16      Q    Was he involved in any crimes of violence?

17      A    Yes.

18      Q    What types of crimes of violence was he involved

19 in?

20      A    He was involved in the murders of five people.

21      Q    Can you explain -- excuse me.

22           Let's talk about the first murder.  Can you

23 explain for the Court what Mr. Poveda's participation was in

24 that first murder?

25      A    Mr. Poveda paid someone $15,000 to have another

1  person killed that threatened his mother in Colombia.

2      Q   Can you explain his participation in the second

3  and third murders?

4      A   Yes.  Mr. Poveda Ortega was at a club and noticed

5  two rival drug trafficking organization workers.  He alerted

6  Artura Beltran Leyva of their presence because he thought

7  that they were there to kill him.

8      Q   When Mr. Poveda Ortega alerted Artura Beltran

9  Leyva of their presence, what did Mr. Poveda believe Arturo

10  would do?

11      A   Mr. Poveda believed that Arturo Beltran Leyva

12  would kill those workers.

13      Q   And were those workers, in fact, killed?

14      A   Yes.

15      Q   And who killed them?

16      A   Arturo Beltran Leyva's drug trafficking

17  organization members.

18      Q   Let's talk about the fourth and fifth murder.

19  Can you explain for the Court what the defendant's

20  participation was in those murders?

21      A   Mr. Poveda had a worker that, without his

22  authorization, rented an apartment for approximately

23  $500,000, and Mr. Poveda was out that $500,000.  He told

24  Artura Beltran Leyva, and a member of the Beltran Leyva drug

25  trafficking organization killed that worker, along with his

```
 1 | nephew that happened to be with him at that time.
 2 |     Q     And, again, what did Mr. Poveda expect to happen
 3 | when he told Artura Beltran Leyva about the indiscretion of
 4 | this employee of his?
 5 |     A     When Mr. Poveda told Artura Beltran Leyva, Arturo
 6 | told him, set up a meeting with him and we'll take care of
 7 | the matter; and, hence, Mr. Poveda set up a meeting, and
 8 | subsequently the worker was killed, along with a nephew.
 9 |     Q     Has Mr. Poveda ever used false documents to
10 | disguise his identity?
11 |     A     Yes, he has.
12 |     Q     Has he ever possessed weapons illegally?
13 |     A     Yes.
14 |     Q     Has he ever used those weapons against anyone?
15 |     A     No.
16 |     Q     Has he ever frequented prostitutes?
17 |     A     Yes.
18 |     Q     Has he paid any taxes for any of his
19 | drug-trafficking activities?
20 |     A     No.
21 |     Q     Did he ever send a gift to any of the prosecutors
22 | handling his cases in the United States?
23 |     A     Yes.  When he was incarcerated in Mexico, he sent
24 | a handmade picture frame to AUSA Goldbarg.
25 |     Q     Let's talk now about Mr. Poveda's background in
```

1   drug trafficking.

2           MR. BALAREZO:  Excuse me.  Could you have the

3   witness maybe sit back from the microphone.  I'm having a

4   little problem hearing.  Just kind of the sound gets

5   muffled.

6           THE COURT:  Well, I need to talk to counsel at the

7   bench.

8           You can step down, sir.

9           (Bench conference)

10          THE COURT:  I don't know where you're headed here,

11  obviously, Mr. Rosales, but if I understood the testimony

12  that this agent just gave, it had nothing to do with Alfredo

13  Beltran Leyva.

14          MR. ROSALES:  That's correct, Your Honor.

15          THE COURT:  So I don't want to waste any time

16  today on Arturo Beltran Leyva.  Zero.  I want testimony from

17  witnesses that is targeted and specific to this defendant,

18  what knowledge they have, either through direct knowledge or

19  hearsay, of this defendant's conduct.

20          MR. ROSALES:  Absolutely.

21          THE COURT:  I don't want to have what other people

22  did.

23          MR. ROSALES:  Absolutely, Your Honor.

24          THE COURT:  We're out of time for that.

25          MR. ROSALES:  Absolutely understood.

22

1      This was just to give Your Honor the defendant's

2  *Giglio* background laid out for the Court.  I'm now getting

3  into his drug --

4           THE COURT:  He was just testifying about what

5  Artura Beltran Leyva did, who was dead, I believe.

6           MR. BALAREZO:  (Nodding head.)

7           THE COURT:  And I, you know --

8           MR. ROSALES:  Understood.

9      And that was just to lay the background of the

10  witness; that he was involved in these five murders.  It was

11  not to impugn that to the defendant.  It was to show what

12  this witness had done in his past.

13           THE COURT:  The other thing is it's going to be a

14  lot easier for the Court if you're clear about what evidence

15  applies to which of the disputed enhancements so that I can

16  follow along.  Okay, what relates to him as an organizer

17  here, what relates to him as using dangerous weapons, what

18  relates to him as used or directed violence, what relates to

19  him involving bribing law enforcement.

20           MR. ROSALES:  Absolutely.

21           THE COURT:  And that way, it will be easier for

22  the Court to link, to the extent it can link, his testimony,

23  and whoever else is going to testify -- it would probably

24  make it easier for the defense to cross-examine him -- link

25  that testimony to the allegation that this enhancement

23

```
 1   applies and doesn't apply, because I have to make that --
 2   that's the ultimate decision I have to make here, obviously,
 3   is what applies and what doesn't apply, as I'm sure the
 4   whole defense is going to want to challenge those positions
 5   as it applies to these enhancements.  So I want to try to
 6   keep it succinct and clear.
 7           MR. ROSALES:  So I did plan, Your Honor, to give
 8   props to both the Court and the witness when we were going
 9   to discuss a particular enhancement.
10           And for Your Honor's edification, this next
11   segment we're going to discuss right now is going to deal
12   with the forfeiture portion of the sentencing hearing.
13           But I will prompt both the witness and the Court
14   to say this is now going to be evidence of importation.
15           THE COURT:  Yeah, you can -- I'm not -- there's no
16   jury here.  Obviously, I'm not going to have a problem with
17   you making a little introductory kind of, now we're going to
18   focus on this.
19           MR. ROSALES:  Okay.
20           THE COURT:  All right.  Have a seat.
21           (Open court)
22           THE COURT:  Now, come on back up.
23           All right.  You may proceed, consistent with the
24   discussion at the bench.
25   BY MR. ROSALES:
```

24

1      Q    Special Agent Hatherley, I now want to discuss how

2  Mr. Poveda became involved with the Defendant Alfredo

3  Beltran Leyva and what arrangement he had with him.

4          But first, I would like to start with some of the

5  background in terms of how the witness became involved in

6  the drug trafficking, with the organization.

7          Did Mr. Poveda work with various drug trafficking

8  organizations in Mexico?

9      A    Yes, he did.

10     Q    With which organization did he do his -- the

11  majority of his drug trafficking?

12     A    The Beltran Leyva drug trafficking organization.

13     Q    And which Beltran Leyva brothers did Mr. Poveda

14  work with?

15     A    He worked with Arturo Beltran Leyva, Hector

16  Beltran Leyva, and the Defendant Alfredo Beltran Leyva.

17     Q    And during his work with the Beltran Leyva

18  Organization, did he, in fact, meet in person with Alfredo

19  Beltran Leyva?

20     A    Yes, he did.

21     Q    And where did those meetings -- which city did

22  those meetings take place?

23     A    In Culiacán.

24     Q    And if you recall, approximately how many times

25  did Mr. Poveda meet with Alfredo Beltran Leyva in Culiacán?

25

```
 1        A     Several times.

 2        Q     Aside from meeting with Mr. Beltran Leyva in

 3   person in Culiacán, did this witness, Mr. Poveda, maintain

 4   communication with the defendant via phone or radio

 5   communications?

 6        A     Yes, he did.

 7        Q     When did Mr. Poveda begin working with the Beltran

 8   Leyva drug trafficking organization?

 9        A     Approximately 2002.

10        Q     And when did he stop working with the

11   organization?

12        A     Approximately 2010 upon his arrest.

13        Q     Upon Mr. Poveda's arrest?

14        A     Yes, sir.

15        Q     What was Mr. Poveda's role in relation to the

16   activities, the drug trafficking activities in the Beltran

17   Leyva Organization?

18        A     Mr. Poveda was a broker, and he brokered the

19   Colombian suppliers of cocaine to the Beltran Leyva

20   Organization buying the cocaine.

21        Q     And what was the Beltran Leyva drug trafficking

22   organization doing with the cocaine that was being supplied

23   to it by Mr. Poveda?

24        A     That cocaine was trafficked into the United States

25   either by the Beltran Leyva Organization, or the Beltran
```

```
 1              DTO is a drug trafficking organization.
 2              THE COURT:  Thank you, sir.
 3              THE WITNESS:  Yes, sir.
 4   BY MR. ROSALES:
 5      Q    What did it mean to have control of a city like
 6   Culiacán?  What was necessary to do that?
 7      A    When you have control of a city -- and a lot of
 8   times it will say control of a plaza.
 9              MR. BALAREZO:  Your Honor, objection.  Is this
10   coming from Mr. Poveda or is this the agent testifying about
11   his knowledge?
12              THE COURT:  All right.  Let's clarify that.
13              The objection is sustained.  Go ahead.
14   BY MR. ROSALES:
15      Q    Based on your interview of Mr. Poveda and also
16   your interview of Mr. Zambada, who we'll get to later, what
17   did it mean to have control -- what did they say it meant to
18   have control of a city like Culiacán?
19      A    Mr. Poveda explained, and also Mr. Zambada
20   explained, that control of a city applies outright that you
21   bought and corrupted the political officials, law
22   enforcement so that the trafficking of narcotics went
23   easier.  There were -- there should be no arrests, there
24   should be no seizures, and there should be no interference
25   from any officials.
```

28

1      Q     According to Mr. Poveda, did the defendant share

2   control of Culiacán with another drug cartel in Mexico?

3      A     Yes.  The defendant actually shared control with

4   the Sinaloa Cartel, which, at the time, comprised of

5   Mr. Chapo Guzman and Mr. Mayo Zambada.

6      Q     And did Mr. Poveda say whether or not Mayo Zambada

7   and Chapo Guzman used Culiacán as a basis of their

8   operations?

9      A     Yes.  Both lived there and operated out of

10  Culiacán.

11     Q     What was the defendant's role, according to

12  Mr. Poveda, in terms of the relationships with Mayo Zambada

13  and Chapo Guzman in Culiacán?

14     A     The defendant was a representative of the Beltran

15  Leyva Organization in Culiacán, and he worked with the

16  Sinaloa Cartel in joint ventures in narcotics trafficking.

17     Q     Now, let's talk about the cocaine shipments that

18  Mr. Poveda helped to broker between the Colombian sources of

19  supply and the Beltran Leyva Organization.

20          In preparing Mr. Poveda for trial and for the

21  sentencing hearing, did you talk to him about the shipments

22  of cocaine that he organized on behalf of the Beltran Leyva

23  Organization?

24     A     Yes.

25     Q     Did Mr. Poveda tell you the names or nicknames of

```
1   the various cocaine suppliers from Colombia that he used to

2   link with the Beltran Leyva Organizational?

3       A    Yes.

4       Q    Did Mr. Poveda give you the general time periods

5   that each of these suppliers supplied the Beltran Leyva

6   Organization?

7       A    Yes.

8       Q    Did he give you the methods used by each of

9   these -- the method of transport used by each of these

10  suppliers who supplied the Beltran Leyva Organization?

11      A    Yes.

12      Q    Did Mr. Poveda also provide you the approximate

13  amounts contained in each of those shipments?

14      A    Yes.

15      Q    And did Mr. Poveda tell you who invested in those

16  shipments?

17      A    Yes, he did.

18      Q    According to Mr. Poveda, what was the general

19  breakdown of investments in these cocaine shipments that he

20  brokered from Colombia?

21      A    The general breakdown was that the Colombians

22  invested, own part of the shipments, and the Mexicans

23  owned/invested the remaining part of those shipments --

24      Q    According to --

25      A    -- of cocaine.
```

1     Q     And for the shipments of cocaine, did Mr. Poveda,

2   in fact, sell the Colombian portion of those shipments to

3   the defendant?

4     A     Yes, he did.

5     Q     At what price did the defendant purchase those

6   kilograms of cocaine from Mr. Poveda?

7     A     He purchased them at the Mexico City price.

8     Q     And where did the defendant take possession of

9   those kilograms of cocaine?

10     A     In Mexico.

11     Q     According to Mr. Poveda, what did the defendant do

12   with those kilograms of cocaine once he took possession of

13   them in Mexico City?

14     A     After purchasing the cocaine in Mexico City, it

15   was transported to Culiacán, where it was transported into

16   the United States, or some of the cocaine was left in Mexico

17   City, held by the Beltran Leyva Organization.

18     Q     According to Mr. Poveda, was the price of the

19   kilogram of cocaine higher in Culiacán than it was in Mexico

20   City?

21     A     Yes, sir.

22     Q     How was Mr. Poveda paid for these shipments of

23   cocaine that he sold to the defendant?

24     A     Cash.

25     Q     In what currencies?

32

```
1        A    I'm sorry.  U.S. dollars.

2        Q    And where was that money given to Mr. Poveda?

3        A    It was given to him in Mexico City.

4        Q    And where was it transported from, according to

5    Mr. Poveda?

6        A    The defendant transported that money from Culiacán

7    to Mexico City to pay Mr. Poveda.

8        Q    Now, is that the defendant personally, or workers

9    controlled by the defendant?

10       A    It was the workers of the defendant.

11       Q    This arrangement in which Mr. Poveda sold the

12   Colombian portion of cocaine to the defendant, when did it

13   begin?

14       A    Approximately 2003.

15       Q    How did Mr. Poveda know that the cocaine that he

16   was selling to the defendant was being transported to the

17   United States or being sold to other customers who then

18   transported it to the United States?

19       A    I was -- Mr. Poveda learned that the defendant was

20   transporting the cocaine to the United States through the

21   clients of the defendant or clients of Mr. Poveda.  Also

22   Artura Beltran Leyva told him there was --

23            MR. BALAREZO:  Your Honor, objection.

24            I understand that hearsay is admissible at this

25   proceeding, but now the witness is talking about Poveda
```

1    learning from somebody else that we don't know -- so we have

2    different levels of hearsay here and they all should be

3    admissible somehow, not just what this witness is testifying

4    to.

5          So I object to these multiple layers of hearsay.

6    I think some foundation needs to be set, at the very least.

7          THE COURT:  Well, certainly, at a minimum, goes to

8    the strength of the evidence.

9          But let's be clear.  Let's sort it out as to who

10    told who what and what the basis for saying it was.

11          So let's be clear about that.  Go ahead.

12    BY MR. ROSALES:

13    Q    Did Mr. Poveda ever have a conversation or

14    conversations with the defendant about what the defendant

15    was doing with this cocaine?

16    A    Yes.

17    Q    And what did the defendant tell Mr. Poveda that he

18    was doing with the cocaine?

19    A    The defendant told Mr. Poveda that he was

20    transporting that cocaine up into the United States.

21    Q    Did he also tell Mr. Poveda that he was selling

22    some of that cocaine to customers in Culiacán?

23    A    Yes.  He told him he was selling some of the

24    cocaine to customers in Culiacán because it would receive

25    money quicker to pay for the costs.

34

```
 1        Q    And did the defendant offer, in these discussions,
 2   any services to Mr. Poveda?
 3        A    Yes, he did.
 4        Q    And what services did the defendant offer to
 5   Mr. Poveda during these conversations?
 6        A    The defendant offered Mr. Poveda routes to
 7   transport his cocaine into the United States.
 8        Q    You've mentioned Artura Beltran Leyva several
 9   times during your testimony today.  According to Mr. Poveda,
10   what relationship does Arturo Beltran Leyva have to the
11   defendant?
12        A    He's his brother.
13        Q    And according to Mr. Poveda, was Arturo Beltran
14   Leyva involved in these shipments that were organized by
15   Mr. Poveda?
16        A    Yes, he was.
17        Q    What did Artura Beltran Leyva tell Mr. Poveda that
18   the defendant was doing with the cocaine that Mr. Poveda was
19   selling to him?
20        A    Artura Beltran Leyva told Mr. Poveda that the
21   Defendant Alfredo Beltran Leyva was transporting the cocaine
22   using his routes into the United States.
23             MR. ROSALES:  I'm attempting to put up on the ELMO
24   Government's Exhibit No. 6, Your Honor.
25             THE COURT:  Okay.
```

41

1    general number, whatever that number may be.  And then I

2    took 65 percent of that as the Colombian portion of that,

3    and that's how I received 24,375.

4         Q    And was it Mr. Poveda who told you that the

5    Colombian portion of these -- of each speedboat shipment was

6    65 percent for the speedboat shipments sent by Piraña?

7         A    Yes, sir.

8         Q    And according to your previous testimony --

9              THE COURT:  Hold on a second.

10             So when you say "Colombian investment" --

11             THE WITNESS:  Yes, sir.

12             THE COURT:  -- that means the Colombians are going

13   to receive compensation for that portion of it?

14             THE WITNESS:  Yes, sir.

15             If there was 100 percent shipment, the Colombians

16   were invested for 65 percent, and that's why those numbers

17   reflect that.

18   BY MR. ROSALES:

19        Q    So as you previously stated, it was Mr. Poveda who

20   was in charge of that Colombian investment once it arrived

21   in Mexico City?

22        A    Yes, sir.

23        Q    So is it accurate to say that for these speedboats

24   sent by Piraña, just taking the low end of the numbers, the

25   15 -- approximately 15 speedboats at 2,500 kilograms per

56

1      Well, how would Mr. Poveda, I think that was his

2  name, how would he have any knowledge of what actually went

3  into either this defendant's bank account or into his hands?

4  Was he present when he put stuff in his bank?  Did he see

5  his bank account?  I mean...

6      MR. ROSALES:  Well, first, Your Honor, the

7  standard here is a preponderance of the evidence.  And I

8  think that --

9      THE COURT:  I understand that.

10      MR. ROSALES:  And I think the Court can make a

11  reasonable inference based on the information provided by

12  Mr. Poveda.

13      Mr. Hatherley has testified that Mr. Poveda, once

14  he received the Colombian portion of the cocaine in Mexico

15  City, it belonged to Mr. Poveda.

16      THE COURT:  Well, 35 percent of it did.

17      MR. ROSALES:  Maybe we can do this by way of an

18  example with the witness.

19  BY MR. ROSALES:

20      Q      Special Agent Hatherley, assuming, just to keep it

21  simple, that one of Piraña's shipment was 100 kilograms of

22  cocaine?

23      A      Okay.

24      Q      And that it was done via speedboat.  Was it

25  Mr. Poveda's testimony that 65 percent or 65 kilograms of

212

1   cocaine from that 100 kilos belonged to the Colombians?

2       A    Correct.

3       Q    And did that mean that at the moment that the 100

4   kilos left Colombia, the Colombians owned 65 kilos and

5   Mexican investors owned 45 kilos in that 100?

6            THE COURT:  35.

7   BY MR. ROSALES:

8       Q    I'm sorry.  35 kilos.

9            MR. BALAREZO:  I'm going to object to the leading

10  nature at this point.  I understand we're hearing -- the

11  witness should be able to answer.

12           THE COURT:  Don't worry.  I can sort it out.

13  Don't worry about it.

14           MR. BALAREZO:  That's what I'm trying to do,

15  Your Honor.

16           THE COURT:  That's fine.  Don't worry about it.

17  Relax.

18  BY MR. ROSALES:

19      Q    If the Colombians, according to this first series

20  of shipments, owned 65 percent of that 100-kilo shipment,

21  that means they owned 65 kilos?

22      A    Yes, sir.

23      Q    Mexican investors owned the remaining 35 kilos of

24  that 100-kilogram shipment --

25      A    Correct.

58

```
1      Q    -- is that correct?

2      A    Uh-huh.

3      Q    And that is from the time that it leaves Colombia?

4      A    Yes.

5      Q    When that 100-kilo shipment arrived in Mexico

6   City, which is where Mr. Poveda was located, who now owned

7   those 65 kilos that belonged to the Colombians?

8      A    Mr. Poveda owned that in Mexico City.

9      Q    And was that an arrangement that Mr. Poveda had

10  with the Colombians?

11     A    Yes.

12     Q    Did Mr. Poveda have to pay for those kilograms of

13  cocaine?

14     A    Yes, sir, he did.

15     Q    And at what price did Mr. Poveda have to pay for

16  each of those kilograms of cocaine?

17     A    Depending, sir -- I mean, if -- with the

18  transportation, when you're looking at buying kilos, sir,

19  the Colombians are selling in Colombia and then they're

20  transporting over, then they're going to charge the

21  percentage per -- they're going to charge a price per kilo

22  and then charge any transportation costs.

23     Q    But just to keep it simple, at what Mr. Poveda

24  paid the Mexico City price for those 65 kilos of cocaine?

25     A    Yes, he would.
```

1       Q    So now 65 kilos of cocaine are in Mexico City,

2   they are owned by Mr. Poveda; is that correct?

3       A    Correct.

4       Q    Was it his arrangement with the defendant to sell

5   those 65 kilos directly to the defendant?

6       A    Yes, that was the arrangement.

7       Q    Now, does that mean -- let's pause here for a

8   second.  Let's talk about the remaining 35 kilograms in this

9   100-kilo shipment.

10          According to Mr. Poveda, were the owners of that

11  portion people in Mexico?

12      A    Yes.

13      Q    Could that include the defendant and other members

14  of his organization?

15      A    Yes.

16      Q    But did Mr. Poveda know the exact breakdown of the

17  defendant's investments in that portion of the shipment?

18      A    No, he did not.

19      Q    But it was possible that he did own portions of

20  it?

21      A    Yes.

22      Q    Let's talk about the 65 kilograms of cocaine that

23  Mr. Poveda had with him in Mexico City.  What was his

24  arrangement with the defendant for those 65 kilos of

25  cocaine?

60

1      A    Those 65 kilos were sold directly to the

2  defendant.

3      Q    And at what price did Mr. Poveda sell those 65

4  kilos of cocaine to the defendant?

5      A    The Mexico City price.

6      Q    Did he up that price a little bit to make a

7  profit?

8      A    Yes.

9      Q    Once the defendant took possession of those

10  65 kilograms of cocaine in Mexico City, according to

11  Mr. Poveda's discussions with the defendant and Artura

12  Beltran Leyva, what did the defendant do with those

13  65 kilograms of cocaine?

14     A    The defendant bought those 65 kilograms of cocaine

15  and then transported that up to the United States.

16     Q    Did he first transport them to Culiacán?

17     A    Yes.

18     Q    Once the defendant had the 65 kilograms of cocaine

19  in this example in Culiacán, were they his?

20     A    Yes.

21     Q    He had paid for them, correct?

22     A    Once he bought them in Mexico City, he transported

23  them to Culiacán and they are his kilos now.

24     Q    So at that point he doesn't owe any Colombian for

25  those 65 kilograms of cocaine; is that correct?

61

```
1        A    No.

2        Q    Now, if the defendant sold those 65 kilograms of

3   cocaine in Culiacán, according to Mr. Poveda, he would have

4   sold them for approximately $16,000 per kilogram --

5        A    Yes.

6        Q    -- is that correct?

7        A    Yes.

8        Q    And whatever money the defendant received for

9   those kilograms of cocaine were now -- was now his money

10  because he possessed those, he owned those kilos and sold

11  these kilos; is that correct?

12       A    Yes.

13       Q    Now, that total amount of the 65 kilos times

14  $21,000 -- sorry, $16,000, for the total amount for the

15  gross receipts, would that take into consideration any money

16  spent in transporting those kilos, any money spent in

17  purchasing those kilos, or is that simply the gross

18  receipts?

19       A    No.  That's simply gross receipt.  There's no

20  other deductions.

21            MR. ROSALES:  And in terms of -- Your Honor, in

22  terms of the forfeiture hearing, we're dealing only in gross

23  receipts.  We're not dealing in terms of what profit margins

24  the defendant made, we're not dealing in terms of what the

25  Colombians were paid.
```

62

```
 1  BY MR. ROSALES:

 2      Q    If the defendant possessed these kilograms of

 3  cocaine and sold the kilograms of cocaine, how much did he

 4  receive?

 5          THE COURT:  Sold them to who?

 6          MR. ROSALES:  According to Mr. Poveda.

 7  BY MR. ROSALES:

 8      Q    According to Mr. Poveda, if the defendant sold the

 9  kilograms of cocaine in Culiacán, who would the defendant

10  sell them to?

11      A    The defendant would sell them to other drug

12  trafficking organizations.

13      Q    And what did the defendant tell Mr. Poveda that

14  those drug trafficking organizations would do with the

15  kilograms of cocaine?

16      A    The defendant told Mr. Poveda that these narcotics

17  bought by the other drug trafficking organizations were

18  transported and trafficked into the United States.

19      Q    Now, as you've testified before, Mr. Poveda said

20  that not only did the defendant sell the kilograms of

21  cocaine in Culiacán, but he also oversaw the transportation

22  of those kilograms on other occasions directly to the

23  United States for sale; is that correct?

24      A    Yes.

25      Q    Now, for purposes of making -- although we're
```

```
 1   failing here, Your Honor -- for the purposes of making this

 2   forfeiture hearing simple, did we take only the price per

 3   kilogram in Culiacán --

 4        A    Yes, we did.

 5        Q    -- to determine the gross receipts?

 6        A    Correct.

 7             THE COURT:  Hold on.

 8             Now, if I understood your most recent colloquy

 9   here with your witness, Mr. Poveda, when he got to Culiacán,

10   sold the 65-, in your hypothetical, kilos, to the defendant?

11             MR. ROSALES:  No, Your Honor.

12             THE COURT:  That's what he said.  He sold them --

13   Poveda sold them to the defendant?

14             MR. ROSALES:  In Mexico City.

15             THE COURT:  Yeah.  In Culiacán or Mexico City,

16   either one.

17             MR. ROSALES:  Mexico City.  Correct.

18             THE COURT:  Right.

19             So the Colombians, in your hypothetical, who

20   manufactured the cocaine and are bringing it to Mexico City,

21   instead of getting money for what they're giving the

22   defendant, are paying money to the defendant.  That makes no

23   sense.

24             MR. ROSALES:  No, Your Honor.

25   BY MR. ROSALES:
```

1     Q    Once Mr. Poveda obtained the money from the

2   defendant for the kilograms of cocaine that he sold to the

3   defendant, what would Mr. Poveda do with that money?

4     A    He turned around and paid that money directly to

5   the Colombians that sold that cocaine.

6          THE COURT:  So, Mr. Poveda, then, is selling the

7   65 kilos, in your hypothetical, to the defendant, right?

8          MR. ROSALES:  Correct.

9          THE COURT:  Okay.

10         Instead of paying him for the 65-, which is what

11  his testimony was.

12         Now, if he's selling them, he's getting in return

13  16,000 times 65-, right?

14  BY MR. ROSALES:

15    Q    Special Agent Hatherley, was the price per

16  kilogram in Mexico City lower than the price per kilogram in

17  Culiacán?

18    A    Yes, it was.

19    Q    And so upon selling each kilo to the defendant in

20  Mexico City, was Mr. Poveda making less than 16,000 -- was

21  Mr. Poveda receiving less than $16,000 per kilogram --

22    A    Yes, sir.

23    Q    -- that he sold to the defendant?

24         THE COURT:  Okay.  So why are we using the 16,000

25  number, for this chart's purposes, when it's a lesser number

1    in Mexico City?

2              MR. ROSALES:  Because, Your Honor, the defendant

3    sold his cocaine either in Culiacán or in the United States.

4              And for purposes of making the -- for purposes of

5    giving the Court a conservative estimate in terms of the

6    total gross receipts that the defendant would have received

7    for the sale of these kilograms of cocaine, we're using the

8    Culiacán price.

9              So what matters in the forfeiture proceeding is

10   what did the defendant receive when he sold the cocaine once

11   it was in his possession.  And that's what this chart

12   details, because the cocaine was in the possession of the

13   defendant in Culiacán.

14             And so, therefore, this chart says -- this chart

15   details, of course, if those kilos were sold in Culiacán by

16   the defendant, one, what was the price per kilo at the time

17   in Culiacán, Mr. Poveda says $16,000 per kilo if you were to

18   sell it.  If you take that number and multiply it by the

19   number of kilograms of cocaine that the defendant had in his

20   possession to sell, then you get the gross receipts.

21             How do we know that the defendant had those

22   kilograms of cocaine in his possession?  We know that

23   because the witness detailed every transaction that he had

24   in which there was a Colombian portion that he sold.

25             THE COURT:  So what is the significance in the

66

1    65 percent if he arrives, in your hypothetical, from

2    Colombia with 100 kilos, presumably, Mr. Poveda is going to

3    want the going rate for 100 kilos, not 65 kilos, 100 kilos.

4            What's the -- why is this 65 even in here?

5            MR. ROSALES:  Because, Your Honor, the government

6    has taken very seriously what Your Honor has said throughout

7    this case, and that is you want to hear testimony from

8    witnesses who have direct knowledge of their dealings with

9    the defendant and the defendant's activities.

10            The reason why we don't include 100 percent of the

11    shipment in this chart is because the witness can say, with

12    exact certainty, that for these shipments, he knows for a

13    fact that 65 percent of the shipment was sold to the

14    defendant.

15            Why can he say that?  He can say that because he

16    knows that, in this example, 65 percent of the shipments

17    belonged to -- were owned by the -- was owned by the

18    Colombians until it reached Mexico City.

19            His arrangement with the Colombians was that once

20    that 65 percent or the portion owned by the Colombians

21    arrived in Mexico City, this witness was now -- now took

22    possession of it, it was his; meaning that if it got stolen,

23    if it got lost, he still had to respond to the Colombians,

24    right?

25            What -- what Special Agent Hatherley has testified

67

1   to, is this witness, beginning in 2003, up until the time

2   that the defendant was arrested in 2008, had an arrangement

3   with the Beltran Leyva Organization and with this defendant

4   specifically so that this particular witness, instead of

5   having to find customers for those 65 kilos that he now owns

6   in Mexico City or elsewhere, or instead of having to

7   transport them directly to the United States, he had a deal,

8   he had a partnership with this defendant.  This defendant

9   was going to purchase that Colombian portion, which now is

10  owned by the witness, by Mr. Poveda, directly.

11          And that's why we stick with the percentages here,

12  the Colombian percentages here, because this witness can

13  give direct testimony about that.  He can directly say,

14  I know out of all of these -- out of these shipments, this

15  portion was absolutely going to the defendant, because that

16  was the arrangement I had with the Colombians, first of all,

17  to take custody of it, and that was the arrangement I had

18  with the defendant, to sell it to him.

19          Now, Your Honor's absolutely correct, in each of

20  these shipments, there's a Mexican portion of the investment

21  in which -- and if you'll allow me to ask Special Agent

22  Hatherley some questions about it, you will see, yes, the

23  defendant was likely invested in most, if not all of those

24  as well.

25          But because those portions of the cocaine

68

1  shipments did not belong to Mr. Poveda, he can't say with

2  absolute certainty whether or not this defendant received

3  those portions of the cocaine shipment, and Your Honor can't

4  make a logical inference as to whether or not the defendant

5  received the gross receipts for the sale of the Mexican

6  portion of this those cocaine shipments.

7              THE COURT:  All right.  Go ahead.

8  BY MR. ROSALES:

9      Q    So just for clarification for the Court, Special

10 Agent Hatherley, in using, again, this Piraña example, the

11 remaining 35 percent of these speedboat shipments --

12     A    Yes.

13     Q    -- according to Mr. Poveda, who owned that

14 remaining 35 percent?

15     A    The Mexicans owned, which could mean other drug

16 trafficking organizations and also the Beltran Leyva drug

17 trafficking organization.

18     Q    Did Mr. Poveda know whether or not the defendant

19 invested in each of these shipments in the Mexican portion

20 of the shipments?

21     A    He knew on the larger shipments that the Beltran

22 Leyva Organization invested in the shipments, but he didn't

23 know particularly how much.

24     Q    But did he know whether or not the defendant

25 specifically invested in some of those larger shipments?

1    A    Not specifically, no.

2    Q    In some instances, did he know whether or not the

3    defendant invested in those shipments?

4    A    In some if -- in some if they -- as I said, he

5    stated that larger shipments, the Beltran Leyva Organization

6    usually invested in those, the Mexican side of the

7    shipments.

8    Q    Did Mr. Poveda know the percentages of those

9    investments amongst the different Mexicans in Mexico?

10   A    No, sir.

11   Q    And so because of that, did you include the

12   Mexican portion of the investment in your calculation of the

13   gross receipts that the defendant would have received?

14   A    No, sir.  Just included what we knew was invested

15   to the defendant.

16        THE COURT:  So once he sold, he being Mr. Poveda,

17   once he sold his 65 percent to the Beltran Leyva

18   Organization, he was paid for it, he was -- it was paid for,

19   right, by the Beltran Leyva Organization, correct?

20   BY MR. ROSALES:

21   Q    Special Agent Hatherley, once Mr. Poveda sold the

22   Colombian portion of these shipments to the defendant, who

23   was responsible for paying the money for those kilos to

24   Mr. Poveda?

25   A    The defendant was responsible for paying

70

1   Mr. Poveda for those kilos.

2           THE COURT:  In Mexico?  Paid him in Mexico?

3           THE WITNESS:  In Mexico City, sir.

4           THE COURT:  And in cash?

5           THE WITNESS: Yes, sir.

6   BY MR. ROSALES:

7       Q      According to Mr. Poveda, what methods were used to

8   transport the kilos of cocaine from Mexico City to Culiacán?

9       A      The defendant organized and controlled the

10  transport from Mexico City to Culiacán, whether it be semi,

11  tractor-trailer or tanker trucks or any means necessary.

12      Q      And according to Mr. Poveda, what method was used

13  to transport the money from Culiacán to Mr. Poveda in Mexico

14  City?

15      A      It was the same thing, sir, just in repeat.  Semi

16  trucks, trailer trucks, tanker trucks, anything that would

17  transport that much money.

18      Q      Now, Special Agent Hatherley, I want to direct

19  your attention to page 2 of Government's Exhibit No. 6,

20  specifically to the supplier listed as Mono Willer.

21          I notice that for most of the other suppliers,

22  there's a date range in terms of when these shipments were

23  supplied to the Beltran Leyva Organization --

24      A      Correct.

25      Q      -- more specifically, the defendant.

1          Why is there not a date range for the Mono Willer

2     shipments?

3        A     Mr. Poveda could not remember the exact dates of

4     the shipments but he knows it happened within the time frame

5     of 2003 until 2008.

6        Q     And does the same go for the last page --

7     I'm sorry, page 3, for the suppliers named Comba and 06?

8        A     Yes, sir.

9        Q     Was there anything in particular that he said

10    about Comba in 06 that solidified that they occurred prior

11    to the defendant's arrest in 2008?

12       A     Yes, sir.  As you'll notice, first it's -- so it's

13    Chupeta and Comba sold 100 percent of the kilos to Alfredo

14    Beltran Leyva.

15       Q     Okay.  Before we get to that, Special Agent

16    Hatherley, related to the shipments by Comba and 06, shows

17    shipments don't have a date range; is that correct?

18       A     Correct.

19       Q     According to Mr. Poveda, did those shipments occur

20    prior to the defendant's arrest in 2008?

21       A     Yes, they did.

22       Q     Now, I'd like to just address another issue

23    related to this chart, and you started to talk about it now.

24          Looking at the supplier, Chupeta, also found on

25    page 3, if you go to the middle of the chart under the total

72

```
1    kilograms sold to the defendant column, the percentage

2    listed under both the high and the low is 100 percent?

3         A    Correct.

4         Q    Does that mean that Mr. Poveda sold the entire

5    shipment to the defendant?

6         A    Yes, he did.

7         Q    Does that also mean that the Mexicans had no

8    initial investment in that shipment?

9         A    That's correct.

10        Q    Why was that -- for someone like Chupeta, why was

11   there no Mexican investment?

12        A    Because Mr. Jupetta was, he did not allow Mexicans

13   to invest in these shipments.  He was selling them

14   100 percent from Colombia to the defendant.

15        Q    Well, he was giving them to Mr. Poveda in Mexico

16   City?

17        A    Correct.

18        Q    And then --

19        A    Under the idea that 100 percent of it would be

20   given to Mr. -- Colombia, a portion would be given to

21   Mr. Poveda Ortega.

22        Q    So for these particular segments, the entire

23   shipment was sold by Mr. Poveda to the defendant?

24        A    Correct.

25        Q    And the same goes for the shipments listed under
```

73

1    supplier Combo?

2         A    Yes.

3              MR. ROSALES:  One moment, Your Honor.

4              (Counsel conferred off the record.)

5    BY MR. ROSALES:

6         Q    Special Agent Hatherley, just to summarize, again,

7    the arrangement that Mr. Poveda had with both the Colombians

8    and the defendant, using the 100-kilogram shipment example,

9    is it fair to say that the moment the 100 kilograms left

10   Colombia, a portion was owned by the Colombians, and a

11   portion was owned by Mexican investors?

12        A    Yes, sir.

13        Q    And is it fair to say that once the 100 kilograms

14   arrived in Mexico City, the portion that was owned by the

15   Colombians was now owned by Mr. Poveda?

16        A    Correct.

17        Q    And it was Mr. Poveda's to control?

18        A    Yes.

19        Q    So if the Colombian portion was 50 percent of the

20   100 kilos, then once it arrived in Mexico City, Mr. Poveda

21   controlled 50 kilograms of cocaine?

22        A    That's correct.

23        Q    Which he had to pay for, he had to pay the

24   Colombians for those kilograms of cocaine; is that correct?

25        A    Yes.

74

1     Q    But Mr. Poveda's -- but Mr. Poveda had an

2  arrangement with the Beltran Leyva Organization, and, more

3  specifically, the defendant; is that correct?

4     A    Yes, sir.

5     Q    And that arrangement was that for those

6  50 kilograms of cocaine that he purchased from the

7  Colombians, the defendant would purchase those from

8  Mr. Poveda?

9     A    Correct.

10    Q    And Mr. Poveda would sell him those kilograms of

11 cocaine at the Mexico City price; is that correct?

12    A    Correct.

13    Q    It was the defendant's responsibility to transport

14 those kilograms of cocaine to Culiacán?

15    A    Correct.

16    Q    But once they were in Culiacán, they were owned by

17 the defendant?

18    A    Yes.

19    Q    Payment was made by the defendant for those kilos

20 of cocaine to Mr. Poveda; is that correct?

21    A    Yes.

22    Q    And that was in the form of U.S. currency?

23    A    Yes.

24         MR. BALAREZO:  Your Honor, can we hear the witness

25 testify?  This is extreme leading.

75

1           THE COURT:  Well, I'll agree with that.

2           Rephrase your question.

3    BY MR. ROSALES:

4      Q    Once the kilograms of cocaine were in Culiacán,

5    who owned the kilos?

6      A    The defendant owned the kilos.

7      Q    So if the defendant sold these kilos, who received

8    the gross receipts of those sales?

9      A    The defendant received the gross receipts.

10     Q    I now want to move on to the second witness that

11   you interviewed in preparation for trial and for this

12   hearing, Mr. Zambada Garcia.  Who is Mr. Zambada Garcia?

13     A    He's a Mexican narcotics trafficker.

14     Q    And what organization did he belong to?

15     A    He works for the -- I'm sorry.  He belongs to the

16   Sinaloa Cartel.

17     Q    And what role did he play on behalf of the Sinaloa

18   Cartel?

19     A    He organized and controlled the City of Mexico

20   City for narcotics trafficking.

21     Q    When was Mr. Zambada Garcia arrested?

22     A    He was arrested in approximately 2008.

23     Q    And where's he currently located?

24     A    He's incarcerated in the United States.

25     Q    When did he arrive in the United States?

76

1       A    2012.

2       Q    How did he come to arrive in the United States?

3       A    He was extradited on an indictment and a warrant

4    by the United States Government.

5       Q    Do you know which jurisdictions had him under

6    indictment?

7       A    Yes.  It was the Eastern District of New York and

8    the District of Columbia.

9       Q    Was -- has the defendant pled guilty to those two

10   indictments?

11      A    Yes, he's pled guilty.

12      Q    And did he plead -- in which jurisdiction did he

13   plead guilty?

14      A    He pled guilty in the District of Columbia.

15      Q    Did he enter a plea of guilt pursuant to a

16   cooperation agreement?

17      A    Yes, he did.

18      Q    What were the charges for which he was indicted?

19      A    The indictment, sir -- the charges were the

20   conspiracy to traffic narcotics with import into the

21   United States and also the continuing criminal enterprise.

22      Q    Without the benefit of cooperation, what is the

23   maximum sentence that he faces?

24      A    Life imprisonment.

25      Q    And without the benefit of cooperation, what is

77

```
 1   the minimum sentence that he faces?

 2       A    It would be 20 years.

 3            THE COURT:  When was that plea entered in?

 4            MR. ROSALES:  I'm sorry, Your Honor?

 5            THE COURT:  When was that plea entered?

 6   BY MR. ROSALES:

 7       Q    Special Agent Hatherley, do you know when that

 8   plea was entered?

 9       A    Yes.  It was 2013, I believe.

10            THE COURT:  What judge?

11            MR. ROSALES:  It was entered before

12   Judge Kollar-Kotelly, Your Honor.

13            THE COURT:  Okay.  Has he been sentenced yet?

14            MR. ROSALES:  He has not, Your Honor.

15            THE COURT:  Go ahead.

16   BY MR. ROSALES:

17       Q    Have any promises been made to Mr. Zambada Garcia

18   regarding his sentence?

19       A    No.

20       Q    As part of his guilty plea, did Mr. Zambada Garcia

21   agree to forfeit or give money to the United States?

22       A    Yes.  He agreed to forfeit $3 million.

23       Q    And has he given the United States $3 million?

24       A    Yes, he has.

25       Q    Did Mr. Zambada Garcia receive any immigration
```

78

1   benefits pursuant to his cooperation?

2       A    Yes, he did.

3       Q    What was the nature of those benefits?

4       A    The immigration benefits were to -- for the safety

5   and welfare of his family members to be in the

6   United States.

7       Q    And are those the types of immigration benefits

8   offered to cooperators generally if there is a safety

9   threat?

10      A    Yes, that is.

11      Q    Let's focus on Mr. Zambada Garcia's prior bad

12  acts.  Has he participated in acts of violence?

13      A    Yes, he has.

14      Q    What types of acts of violence?

15      A    Kidnapping, torture, and death.

16      Q    Can you explain for the Court what Mr. Zambada

17  Garcia's involvement was in those acts of violence.

18      A    Mr. Zambada Garcia coordinated the logistics of

19  finding rival drug trafficking organization members or

20  people that were aligned against the Sinaloa Cartel.

21      Q    And what would be done to those members or those

22  individuals once they were located?

23      A    Once they were located, they were kidnapped,

24  tortured, and murdered.

25      Q    And was that -- were those acts committed directly

79

1    by Mr. Zambada Garcia, or were they carried out by other

2    members of the organization?

3        A    No.    They were carried out by other Sinaloa Cartel

4    members.

5        Q    Did Mr. Zambada Garcia ever use drugs?

6        A    Yes, he did.

7        Q    What types of drugs?

8        A    Cocaine and marijuana.

9        Q    Did there ever come a time when his cocaine use

10   was on a daily basis?

11       A    Only approximately 2005 to 2006 for about six

12   months after his son was shot and paralyzed he used it on a

13   daily basis.

14       Q    Did Mr. Zambada Garcia ever use aliases or false

15   documents to hide his identity?

16       A    Yes, he did.

17       Q    Did he ever frequent prostitutes?

18       A    Yes, he did.

19       Q    Did he ever carry weapons illegally?

20       A    Yes, he did.

21       Q    Did Mr. Zambada Garcia provide any information to

22   you related to the defendant's involvement in importing

23   drugs into the United States?

24       A    Yes, he did.

25            MR. ROSALES:    Your Honor, at this point, this

1    testimony will focus on the importation enhancements for the

2    sentencing.

3    BY MR. ROSALES:

4        Q    I'd like to focus your attention to the State of

5    Chiapas in Mexico.

6            Is the State of Chiapas located in southern

7    Mexico?

8        A    Yes, it is.

9        Q    And which organization controlled the State of

10   Chiapas?

11       A    That was controlled by the Sinaloa Cartel.

12       Q    Did there come a time when the Beltran Leyva

13   Organization utilized the State of Chiapas to receive

14   cocaine shipments?

15       A    Yes, sir.

16       Q    And in doing so, did they rely on the

17   infrastructure set up by the Sinaloa Cartel?

18       A    Yes.

19       Q    When did the Beltran Leyva Organization begin

20   using the State of Chiapas to bring in cocaine shipments?

21           MR. BALAREZO:  Objection.  What's the basis here?

22   I don't know if the witness is testifying or testifying

23   about somebody else again.

24           THE COURT:  Please clarify.  Sustained.

25   BY MR. ROSALES:

81

```
 1        Q    Your previous answers, were those according to
 2   interviews that you conducted with Mr. Zambada?
 3        A    Yes, sir.
 4        Q    According to Mr. Zambada, when did the Beltran
 5   Leyva Organization begin using the State of Chiapas to
 6   receive cocaine?
 7        A    It was approximately 2003, 2004.
 8        Q    The State of Chiapas?
 9        A    Oh, I'm sorry.  State of Chiapas.  1998, '99 to
10   about 2004, 2005.
11        Q    And who organized, according to Mr. Zambada
12   Garcia, the cocaine shipments that were being received in
13   the State of Chiapas?
14        A    The Beltran Leyva Organization organized the
15   cocaine shipments, as well as the Sinaloa Cartel organizing
16   their cocaine shipments.
17        Q    Let's focus on the shipments organized by the
18   Beltran Leyva organization.
19             Once the cocaine arrived in Chiapas, according to
20   Mr. Zambada Garcia, what happened to the cocaine?
21        A    Once the cocaine arrived, it was shipped to Mexico
22   City.
23        Q    And what involvement did Mr. Zambada Garcia have
24   in the transport of the cocaine that belonged to the Beltran
25   Leyvas from Chiapas to Mexico City?
```

82

```
 1       A    Mr. Zambada Garcia arranged and controlled the

 2  shipment of all the cocaine to Mexico City from Chiapas.

 3       Q    According to Mr. Zambada Garcia, what role did he

 4  have in relation to the Beltran Leyva cocaine once it

 5  arrived in Mexico City?

 6       A    Once it arrived, once the cocaine arrived in

 7  Mexico City, Zambada Garcia sold it to the Beltran Leyva

 8  Organization, particularly the defendant.

 9       Q    Let me rephrase the question.

10            Once the Beltran Leyva portion of the shipments

11  arrived in Mexico City, what did Mr. Zambada Garcia do with

12  that cocaine?

13       A    The cocaine was shipped to Culiacán or was -- some

14  remained in Mexico City.

15       Q    The portion that was shipped to Culiacán,

16  according to Mr. Zambada Garcia, who was it shipped to?

17       A    It was shipped to the defendant.

18       Q    Let's focus on the cocaine that remained in Mexico

19  City.

20            According to Mr. Zambada Garcia, what happened to

21  the cocaine, the Beltran Leyva cocaine that remained in

22  Mexico City?

23       A    That cocaine was transported up into the

24  United States.

25       Q    How did Mr. Zambada Garcia learn that the cocaine,
```

83

```
1   the Beltran Leyva cocaine that remained in Mexico City was
2   being transported to the United States?
3       A    He learned because he asked his brother, Mayo
4   Zambada, why that cocaine was still in Mexico City because
5   he had buyers that would buy it, and that's when Mayo
6   Zambada told him that, no, that cocaine belonged to the
7   defendant, and the defendant sold that cocaine or trafficked
8   it up to the United States.
9       Q    And just to be clear, this is the cocaine that
10  remained in Mexico City?
11      A    Yes, sir.
12      Q    How did Mayo Zambada know that that's what the
13  defendant was, according to -- excuse me.
14          According to Mr. Zambada Garcia, how did his
15  brother Mayo know that the defendant was involved in
16  transporting the cocaine that stayed in Mexico City up to
17  the United States?
18      A    Because Mayo Zambada was friends with the
19  defendant, and the defendant told Mayo Zambada this is what
20  he was doing.
21      Q    And at the time, were both the defendant and Mayo
22  Zambada living in Culiacán?
23      A    Yes, sir, they both lived and operated out of
24  Culiacán.
25      Q    Aside from learning from his brother Mayo, did
```

84

1    Mr. Zambada Garcia learn anything from the defendant's

2    brother, Artura Beltran Leyva, about the cocaine that stayed

3    in Mexico City?

4        A    Yes.   Mr. Zambada Garcia was also in contact with

5    Artura Beltran Leyva, and Artura and he talked often, and

6    Artura Beltran Leyva told him that his brother, Alfredo,

7    would transport the cocaine up into the United States.

8        Q    According to Mr. Zambada Garcia, did Artura

9    Beltran Leyva tell him which routes were used by the

10   defendant to transport this cocaine from Mexico City to the

11   United States?

12       A    Yes, sir.

13            Artura Beltran Leyva told Mr. Zambada Garcia that

14   the routes were through Tamaulipas and Nuevo León, they were

15   two states that bordered Texas, the United States.

16       Q    And just for everyone's edification, you've said

17   before that the witnesses have told you that the defendant

18   was based in Culiacán, Sinaloa, Mexico; is that correct?

19       A    Correct.

20       Q    And is the State of Sinaloa on the Pacific Coast

21   of Mexico?

22       A    Yes, sir.

23       Q    You've just said that Tamaulipas and Nuevo León

24   border the State of Texas; is that correct?

25       A    Correct.

85

1     Q    So those states are further to the east?

2     A    Correct.

3     Q    Or in the eastern portion of Mexico;

4  is that correct?

5     A    Yes.

6          THE COURT:  Now, what did this "Zambada" witness,

7  what was his role vis-à-vis the Colombians?

8          THE WITNESS:  I'm sorry, sir.  The -- Mr. Zambada

9  Garcia.

10         THE COURT:  Before we got to Zambada Garcia, we

11  were talking about that other gentleman, Mr. Poveda, right?

12         THE WITNESS:  Correct.

13         THE COURT:  And he was involved where the cocaine

14  was manufactured in Colombia?

15         THE WITNESS:  Correct.

16         THE COURT:  And he was the broker from the

17  manufacturers into Mexico, right?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Okay.  When you started off describing

20  this fellow here, Zambada, he's not a broker?

21         THE WITNESS:  No, sir, he's not.

22         THE COURT:  No.  So he controls this area, Zambada

23  is that what it's called, Jupetta.

24         THE WITNESS:  Mr. Zambada Garcia controlled Mexico

25  City, sir.

86

```
 1              THE COURT:  But when the cocaine arrived from
 2    Colombia in --
 3              MR. ROSALES:  Chiapas.
 4              THE COURT:  That was the place.  Chiapas.  When it
 5    arrives in Chiapas --
 6              THE WITNESS:  Yes, sir.
 7              THE COURT:  -- who owns it at that point?
 8              The Colombians do, right?
 9              THE WITNESS:  Sometimes.
10              THE COURT:  If it's coming from Colombia.
11              THE WITNESS:  Yes, sir.  Sometimes the Mexicans
12    would buy it from Colombia and they would transport it
13    themselves, or sometimes it was bought into Colombia and it
14    was transported.
15              THE COURT:  So when it arrives in Chiapas?
16              THE WITNESS:  Yes, sir.
17              THE COURT:  This Zambada individual, he doesn't
18    have an ownership stake in when it arrives, does he?
19              THE WITNESS:  Mr. Zambada Garcia actually
20    organized and controlled the transportation end.
21              As I said before, sir, with Culiacán and the
22    defendant owning a plaza and controlling it, Mr. Zambada
23    Garcia controlled that plaza.  So working with --
24              THE COURT:  That's in Culiacán, though.  I'm
25    talking about Chiapas.
```

87

1          THE WITNESS:  I'm just giving you an example, sir.
2     Sorry.  He controlled Chiapas routes.

3          So Mr. Zambada Garcia, on behalf of the Sinaloa
4     Cartel, controlled the routes and controlled that port.  So
5     once the cocaine came in, it was safe, it would not be
6     seized or anybody would be harassed.  He paid all the
7     government officials, he paid the law enforcement.  And then
8     that cocaine was shipped to Mexico City, where, again, he
9     controlled Mexico City.

10          THE COURT:  So --

11          THE WITNESS:  So this is a different --

12          THE COURT:  -- going back to Mr. Poveda, did he
13     bring his cocaine in to that location, Chiapas?

14          THE WITNESS:  Mr. Poveda, I take it, had many
15     routes, sir.  Chiapas might have been one of them, but there
16     were so many different ports and so many routes from, as you
17     saw, the semisubmersibles, the fishing boats, and the fast
18     boats.

19          What I'm trying to say here is Mr. Zambada Garcia
20     told me that he was helping the Beltran Leyva Organization
21     take that cocaine from Colombia on the shore of Chiapas and
22     then transported it up to Mexico City where it could be then
23     distributed out.

24          Since he worked for the Sinaloa Cartel, they're
25     like a company that owned that area, and that the Beltran

88

1    Leyvas would use them for infrastructure just like a

2    shipping company.

3            THE COURT:  So they weren't rival gangs?

4            THE WITNESS:  Not at that time moment, sir.  Not

5    in that time frame.

6            THE COURT:  Not at that time?

7            THE WITNESS:  No, sir.

8            THE COURT:  So they were working in coordination

9    with one another, if I understand you correctly?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  Okay.

12           Well, we'll take a luncheon break.  See you back

13   here at 2:30.

14           You remain a witness under oath.  Don't discuss

15   your testimony so far or what it might be when you return

16   with anyone, okay?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  All right.  We'll see you back at

19   2:30.

20           DEPUTY CLERK:  All rise.

21           This Honorable Court will stand in recess until

22   the return of court.

23           (Recess from 12:58 p.m. to 2:45 p.m.)

24           DEPUTY CLERK:  All rise.  The United States

25   District Court for the District of Columbia is now in

1   session.   The Honorable Richard J. Leon presiding.   God save

2   the United States and this Honorable Court.   Please be

3   seated and come to order.

4           (Defendant entered.)

5           DEPUTY CLERK:   Good afternoon, Your Honor.

6   Recalling Criminal Case No. 12-184, the United States of

7   America v. Alfredo Beltran Leyva.   The defendant is present

8   in the courtroom.

9           The Probation Officer present for these

10  proceedings is Ms. Moses-Gregory.   The interpreters for

11  these proceedings, who have been sworn for the record, are

12  Ms. Salazar and Mr. Engelsberg.

13          For the government, we have Ms. Goldbarg,

14  Ms. Liskamm, and Mr. Rosales.

15          For the defendant, we have Mr. Balarezo and

16  Mr. Purpura.

17          THE COURT:   Thank you, sir.

18          The witness may resume the stand.

19          You remain under oath, sir.

20          Mr. Rosales, when you're ready, go ahead.

21          MR. ROSALES:   Thank you, Your Honor.

22                      - - -

23  TOM HATHERLEY, WITNESS FOR THE GOVERNMENT, HAVING BEEN

24  PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

25  FOLLOWS:

90

1              CROSS EXAMINATION (CONTINUED)

2                      - - -

3                      - - -

4   BY MR. ROSALES:

5        Q    Agent Hatherley, before we broke for lunch,

6   I believe we were talking about shipments that were

7   organized through the State of Chiapas in southern Mexico.

8   I'd like to focus your attention back to the shipments that

9   were organized through the State of Chiapas.

10            Which organization controlled the State of

11  Chiapas?

12       A    The State of Chiapas was controlled by the Sinaloa

13  Cartel.

14       Q    During your conversations with Mr. Zambada, did he

15  state whether or not the Beltran Leyvas ever used the State

16  of Chiapas as a port of entry for shipments of cocaine that

17  the Beltran Leyvas organized?

18       A    Yes, sir.

19       Q    When, according to Mr. Zambada, did the Beltran

20  Leyvas begin using the State of Chiapas to receive drug

21  shipments that they organized?

22       A    Approximately 1998.

23       Q    Aside from drug shipments that were organized by

24  the Beltran Leyvas coming in through Chiapas, did the

25  Sinaloa Cartel also organize drug shipments coming in

1    through Chiapas?

2        A    Yes, sir.

3        Q    And according to Mr. Zambada, did both

4    organizations allow each other to invest in their drug

5    shipments?

6        A    Yes, sir.

7        Q    For the purposes of today's hearing, I want to

8    focus solely on the drug shipments that were organized by

9    the Beltran Leyva Organization.

10            What happened during -- according to Mr. Zambada,

11    what happened to the cocaine for the Beltran Leyva drug

12    shipments that were brought in through the State of Chiapas?

13        A    They were transported to Mexico City.

14        Q    According to witness No. 2, what role -- according

15    to Mr. Zambada Garcia, what role did he play in the

16    transportation of their shipments from Chiapas to Mexico

17    City?

18        A    He controlled the transportation from the port of

19    Chiapas to Mexico City.

20        Q    And just for clarity, Mr. Zambada Garcia was based

21    in Mexico City; is that correct?

22        A    That's correct.

23        Q    Once the drug shipments arrived in Mexico City,

24    was Mr. Zambada Garcia charged with handling the Beltran

25    Leyva portion of those drug shipments?

92

1     A    Yes.

2     Q    According to Mr. Zambada Garcia, what would he do

3 with the portions of these drug shipments owned by the

4 Beltran Leyvas?

5     A    They were kept there in Mexico City under the

6 Beltran Leyva Organization.

7     Q    Did any of the -- did any part of those

8 shipments --

9     MR. BALAREZO:  At some point, can we get to what

10 this defendant had to do with those particular shipments or

11 are we talking about the Beltran Leyva Organization at

12 large?

13     MR. ROSALES:  That's my next question.

14 BY MR. ROSALES:

15     Q    Did any portion of these drug shipments that were

16 brought in through Chiapas -- excuse me.  Was there any

17 portion of those drug shipments that were brought in through

18 Chiapas sent from Mexico City to Culiacán to the defendant?

19     A    Yes, they were.

20     Q    And who was responsible for -- according to

21 Mr. Zambada Garcia, who was responsible for coordinating the

22 movement of that cocaine to the defendant in Culiacán?

23     A    That was the Defendant Alfredo Beltran Leyva.

24     Q    Now, as you stated earlier, Mr. Zambada Garcia

25 also said that sometimes those -- the Beltran Leyva portions

93

1    of these Chiapas cocaine shipments would remain in Mexico

2    City; is that correct?

3        A    Correct.

4        Q    Did Mr. Zambada Garcia know what was done with

5    those cocaine shipments that remained in Mexico City?

6        A    He wasn't at first until he asked his brother,

7    Mayo Zambada, who told him that the Defendant Alfredo

8    Beltran Leyva actually used those and transported those --

9    cocaine from Mexico City into the United States.

10       Q    So that the Court understands why Mayo Zambada

11   would tell this to --

12           MR. BALAREZO:  Your Honor, objection again.

13           You have layers of hearsay here.  Mayo Zambada, we

14   haven't heard anything about his role or who he is with

15   respect to any organization at this point.

16           THE COURT:  Who's this fellow, Mayo Zambada?

17   BY MR. ROSALES:

18       Q    Can you explain briefly who Mayo Zambada is?

19       A    Sure.

20           The Sinaloa Cartel, at the time, existed of

21   Mr. Chapo Guzman and Mayo Zambada.

22           MR. BALAREZO:  Objection.  Is this the witness's

23   testimony or is this the testimony or the information they

24   gathered from a witness that we've been talking about?

25           MR. ROSALES:  I'll rephrase the question,

94

1   Your Honor, for counsel's edification.

2   BY MR. ROSALES:

3       Q    Special Agent Hatherley, according to Mr. Zambada

4   Garcia, who is Mayo Zambada?

5       A    He is part of the Sinaloa Cartel, one of the

6   leaders of the Sinaloa Cartel.

7       Q    And what relationship -- what relations does --

8   what relationship does Mr. Zambada Garcia have to

9   Mayo Zambada?

10      A    Mayo Zambada is his brother in their family.

11      Q    And according to Mr. Zambada Garcia, where is

12  Mayo Zambada located?

13      A    He's located in Culiacán, Mexico.

14      Q    And is that the same area that is controlled by --

15  according to Mr. Zambada Garcia, is that the same area

16  controlled by the defendant?

17      A    Yes, it is.

18      Q    I believe that in your testimony earlier today

19  with regards to the information you learned from Mr. Pavedo,

20  you stated that Mr. Zambada -- excuse me, that Mayo Zambada

21  and the defendant worked together in the City of Culiacán;

22  is that correct?

23      A    That's correct.

24      Q    And that they worked together in joint drug

25  trafficking efforts; is that correct?

1       A    That's correct.

2       Q    And when you stated earlier that the Sinaloa

3  Cartel controlled the arrival of drug shipments through the

4  State of Chiapas, who are the leaders of the Sinaloa Cartel?

5       A    That is Mr. Chapo Guzman and also Mayo Zambada.

6       Q    In the beginning of your testimony with regard to

7  Chiapas, you stated that the Beltran Leyva Organization

8  relied on the Sinaloa Cartel infrastructure in Chiapas to

9  receive drug shipments; is that correct?

10      A    That's correct.

11      Q    So let's get back now to the statement that

12  Mayo Zambada made to his brother, Mr. Zambada Garcia.

13           You stated, and correct me if I'm wrong, that

14  Mayo Zambada told his bother, Mr. Zambada Garcia, that the

15  defendant would take the Beltran Leyva cocaine that was in

16  Mexico City and transport that to the United States;

17  is that correct?

18      A    That's correct.

19      Q    For the Court's knowledge, why did Mayo Zambada

20  tell Mr. Zambada Garcia that information?

21      A    Two reasons, sir.

22           Mr. Zambada Garcia stated that that cocaine is

23  sitting in Mexico City, and he knew buyers that could use

24  that cocaine.

25           It was also true -- so he asked his brother, Mayo,

1  why that cocaine was sitting there and if he could help sell

2  it.

3         Mayo Zambada told Mr. Zambada Garcia, he said, no,

4  that belongs to the Defendant Alfredo Beltran Leyva.  And

5  that's the defendant's cocaine, which he transports up into

6  the United States.

7         Mayo Zambada and the Defendant Alfredo Beltran

8  Leyva are friends and partners because they work together in

9  the City of Culiacán.

10        Q    Now, aside from learning this information from

11  Mayo Zambada, did Mr. Zambada Garcia speak to the

12  defendant's brother, Alfredo Beltran Leyva, about the

13  cocaine that was -- about the Beltran Leyva cocaine that was

14  stored in Mexico City?

15        A    Yes.

16        Q    And what did the defendant's own brother tell

17  Mr. Zambada Garcia would happen to that cocaine?

18        A    Artura Beltran Leyva said to Mr. Zambada Garcia as

19  well that that cocaine is being trafficked up into the

20  United States.

21        Q    In these discussions, did Artura Beltran Leyva

22  tell Mr. Zambada Garcia which routes were utilized by the

23  defendant in the transport of this cocaine?

24        A    Yes.  Mr. Artura Beltran Leyva told Mr. Zambada

25  Garcia that the routes used at this time were through the

 1   States in Mexico of Tamaulipas and Nuevo León.

 2       Q    And are those states, states that border the

 3   United States and border with Texas?

 4       A    Yes, sir.

 5       Q    You've previously stated that both Mr. Zambada

 6   Garcia and Mr. Poveda told you that the defendant's base of

 7   operations was in Culiacán, Siniloa; is that correct?

 8       A    That's correct.

 9       Q    And Culiacán, Siniloa is on the Pacific Coast of

10   Mexico?

11       A    Correct.

12       Q    You've now talked about routes that were

13   controlled by the defendant through the States of Tamaulipas

14   and Nuevo León; is that correct?

15       A    That's correct.

16       Q    Is it fair to say that those states are more

17   towards the eastern side of Mexico?

18       A    Yes.

19       Q    Did Artura Beltran Leyva explain to Mr. Zambada

20   Garcia why it was that the defendant was controlling routes

21   through states that were nowhere near Culiacán, Siniloa?

22       A    Mr. Zambada Garcia stated that Artura Beltran

23   Leyva stated to him that those areas that he and his brother

24   Hector Beltran Leyva could not go into because there was a

25   prosecutor in those states that was investigating them.  So

1    it was not safe for them to be there.

2          And Mr. Artura Beltran Leyva stated that the

3    Defendant Alfredo Beltran Leyva would use that area and

4    control the routes up into the United States.

5    Q    You stated earlier that the Sinaloa Cartel

6    essentially provided a service to the Beltran Leyvas of

7    allowing them to receive in Chiapas and helping them

8    transport their cocaine from Chiapas to Mexico City; is that

9    correct?

10   A    Correct.

11   Q    Was the Sinaloa Cartel, and more specifically, was

12   Mayo Zambada paid for these services?

13   A    Yes, they were.

14   Q    Did Mr. Zambada Garcia tell you what forms of

15   payment Mayo Zambada received for these receiving and

16   transportation services?

17   A    Yes.  Mr. Zambada Garcia stated that Mayo Zambada

18   would receive kilos in the United States or he would receive

19   some cash occasionally in Mexico.

20   Q    If he received cash for his services, what form of

21   currency did Mr. -- did the Sinaloa Cartel receive?

22   A    It was in U.S. dollars.

23   Q    And you stated earlier that another form of

24   payment was the receipt of kilograms of cocaine in the

25   United States; is that correct?

99

1       A     That's correct.

2       Q     Did Mr. Zambada Garcia tell you in which cities

3   those kilograms of cocaine were delivered to the Sinaloa

4   Cartel?

5       A     Yes.  In these cases, Mayo Zambada received kilos

6   of cocaine in Chicago, Atlanta, and New York.

7       Q     And who did Mayo Zambada receive those kilograms

8   of cocaine from in New York, Atlanta, and Chicago?

9       A     Those kilos went up through the defendant's

10  workers, the Sinaloa Cartel workers up in those cities on

11  behalf of Mayo Zambada would receive those kilos of cocaine.

12      Q     And was this further evidence -- was this further

13  evidence of the fact that the shipments of cocaine that were

14  arriving in Mexico City that were coming from Chiapas were

15  going to the United States?

16      A     Yes, it was.

17            MR. ROSALES:  Your Honor, this is going to relate,

18  this next -- these next few questions are going to relate

19  back to the forfeiture issue.  I know Your Honor had some

20  questions about prices in the United States and other areas

21  where the cocaine may be sold.

22            THE COURT:  Will they relate to the chart here or

23  not the chart?

24            MR. ROSALES:  It's not in the chart and we can

25  explain during arguments why it's not, but...

```
 1              THE COURT:  All right.
 2   BY MR. ROSALES:
 3       Q    As part of your investigation of this case and
 4   your discussions with Mr. Zambada Garcia, Mr. Poveda Ortega,
 5   as well as viewing databases from the DEA and HSI, can you
 6   explain to the Court or can you tell the Court approximately
 7   how much a kilogram of cocaine costs in New York?
 8              MR. BALAREZO:  Objection.  What time frame,
 9   Your Honor?
10              THE COURT:  I agree.  Sustained.  When?
11   BY MR. ROSALES:
12       Q    I'm sorry.  Today, approximately what's the cost
13   of cocaine today?
14       A    Today, the approximate would be about 34-, 35- to
15   about 40,000.
16       Q    How much would -- how much was a kilo of cocaine,
17   approximately, during the time frame of the conspiracy from
18   2000 until 2012?
19       A    It was a little less.  Let's say probably like 32-
20   to 36,000, approximately.
21       Q    And so that's for New York?
22       A    Yes, sir.
23       Q    Again, under the same basis, this investigation
24   and your interviews with these witnesses, what would the
25   cost of a kilo of cocaine, what would it have been in
```

101

```
 1   Atlanta during the time frame of this conspiracy,
 2   approximately?
 3        A     Approximately, Atlanta is a little less.  It's
 4   less farther to travel.
 5              MR. BALAREZO:  Again, what basis of knowledge for
 6   this particular testimony?
 7              THE COURT:  Uh-huh.
 8   BY MR. ROSALES:
 9        Q     Based on your discussions with Mr. Zambada Garcia?
10        A     Correct.
11        Q     Mr. Poveda Ortega, as well as your review of
12   reporting from various law enforcement agencies?
13        A     Correct.
14        Q     Can you give the Court an approximate cost for a
15   kilogram of cocaine in Atlanta during the time frame of this
16   conspiracy?
17        A     Approximate cost during the time frame was
18   probably around 27- to 30-, $31,000.
19        Q     And with the same basis of knowledge that we've
20   described now twice, can you give the Court an approximate
21   cost of a kilo of cocaine in Chicago during the time frame
22   of this conspiracy?
23        A     Yes, sir.  It was probably around 28- to 32-.
24        Q     And now I want to shift focus to the State of
25   Guerrero in Mexico.
```

102

1          MR. ROSALES:  And, Your Honor, this next portion
2    is going to be still related to the importation of cocaine
3    into the United States but also in relation to leadership,
4    the leadership enhancement.
5          MR. BALAREZO:  Can you repeat that?
6          MR. ROSALES:  It's going to be in relation to
7    importation of cocaine into the United States, as well as
8    the leadership enhancement.
9          MR. BALAREZO:  Thank you.
10   BY MR. ROSALES:
11       Q    Did Mr. Zambada Garcia ever organize the receipt
12   of cocaine on behalf of the Sinaloa Cartel in the State of
13   Guerrero?
14       A    Yes.
15       Q    And is the State of Guerrero also on the Pacific
16   Coast of Mexico?
17       A    Yes, it is.
18       Q    And it is further north than the State of Chiapas?
19       A    Yes.
20       Q    In approximately what year did Mr. Zambada Garcia
21   organize the receipt of cocaine in the State of Guerrero?
22       A    It was approximately 2003.
23       Q    Did Mr. Zambada Garcia have to seek permission
24   from anyone to receive shipments from the water in the State
25   of Guerrero?

1      A      Yes, he did.

2      Q      At the time that Mr. Zambada Garcia -- according

3  to Mr. Zambada Garcia at this time, who controlled the State

4  of Guerrero?

5      A      It was the Defendant, Mr. Alfredo Beltran Leyva.

6      Q      How did Mr. Zambada Garcia learn that the

7  defendant controlled the State of Guerrero?

8      A      The defendant, in the first meeting with

9  Mr. Zambada Garcia, stated to Mr. Zambada Garcia that he

10  could control the routes of trafficking cocaine up into the

11  United States.

12      Q      Let's take a step back.  Before meeting -- before

13  Mr. Zambada Garcia met with the defendant, who told

14  Mr. Zambada Garcia that in order to set up an operation in

15  Guerrero, he needed to meet with the defendant?

16      A      His brother, Mayo Zambada.

17      Q      And did Mr. Zambada Garcia, in fact, meet with the

18  defendant in order to establish an infrastructure in the

19  State of Guerrero?

20      A      Yes, he did.

21      Q      Who set up that meeting?

22      A      That meeting was set up by Mayo Zambada.

23      Q      And approximately what year did that meeting take

24  place?

25      A      That was approximately 2003.

104

1      Q    Who did Mr. Zambada Garcia say was present during

2  this meeting?

3      A    Present during this meeting was Mr. Zambada

4  Garcia, his brother, Mayo Zambada, the defendant, Fernando

5  Morales, Julio Beltran, among others.

6      Q    During this meeting, did Mr. Zambada Garcia seek

7  authorization from the defendant to operate in the State of

8  Guerrero?

9      A    Yes.

10     Q    And what was the defendant's response?

11     A    The defendant's response was, that's fine.

12     Q    Did the defendant also say that he would -- that

13  he would also need to consult with his brother, Artura

14  Beltran Leyva?

15     A    Yes.

16     Q    During this meeting, what assistance, if any, did

17  the defendant offer to Mayo Zambada -- I'm sorry,

18  Mr. Zambada Garcia?

19     A    The defendant offered -- again, the defendant

20  offered to deliver the cocaine or traffic the cocaine up

21  into the United States.

22          MR. ROSALES:  This next portion, Your Honor, is

23  going to go towards the weapons enhancement.

24          THE COURT:  Okay.

25  BY MR. ROSALES:

1     Q    During this meeting that Mr. Zambada Garcia had

2   with the defendant, did Mr. Zambada Garcia say whether or

3   not the defendant was armed?

4     A    Yes, he did.

5     Q    What type of weapon did Mr. Zambada Garcia say he

6   observed the defendant with?

7     A    The defendant was wearing a pistol.

8     Q    Aside from being armed with the pistol, were there

9   any other armed men at this meeting, according to

10  Mr. Zambada Garcia?

11    A    Yes, sir.  There were several armed men with --

12  all carrying weapons.

13    Q    Before we go further, because this will be

14  important for later on, who is Fernando Morales?

15    A    Fernando Morales was a narcotics trafficker that

16  was working with the defendant and also with Ray Zambada.

17    Q    That's Mr. Ray Zambada --

18    A    I'm sorry.

19    Q    -- being Mr. Zambada Garcia, correct?

20    A    Mr. Zambada Garcia, yes.

21    Q    What area did Fernando Morales operate out of?

22    A    He operated out of the Los Mochis, Guasave,

23  northern part of Siniloa area.

24         MR. ROSALES:  Your Honor, this next portion is

25  going to go towards the corruption enhancement.

106

1  BY MR. ROSALES:

2      Q    Agent Hatherley, I want to stay with the Guerrero

3  area.

4           After meeting with the defendant, was Mr. Zambada

5  Garcia able to set up an infrastructure in the State of

6  Guerrero to receive drug shipments?

7      A    Yes, he was.

8      Q    According to Mr. Zambada Garcia, what did he have

9  to do in order to set up an infrastructure in Guerrero?

10     A    Mr. Zambada Garcia had to set up the

11 infrastructure, around paying off politicians, paying off

12 law enforcement so the cocaine would not be seized or any

13 arrests were made.  So he had control of that plaza, of that

14 port.

15     Q    Did Mr. Zambada Garcia, in fact, begin receiving

16 shipments on behalf of the Sinaloa Cartel through Guerrero?

17     A    Yes, he did.

18     Q    Did there come a time after Mr. Zambada Garcia set

19 up the infrastructure in Guerrero that the Beltran Leyvas

20 requested assistance receiving cocaine in the State of

21 Guerrero?

22     A    Yes.

23     Q    Approximately when did this occur?

24     A    It was about approximately 2004 to about 2006.

25     Q    And according to Mr. Zambada Garcia, was the

```
 1   defendant involved in the shipments that were coming in

 2   through Guerrero?

 3        A    Yes, he was.

 4        Q    Once the Beltran Leyva Organization began using

 5   the Sinaloa Cartel's infrastructure in the State of Guerrero

 6   to receive drug shipments, cocaine shipments specifically,

 7   who became responsible -- who became responsible for paying

 8   the bribes to the law enforcement officials in that area?

 9        A    The defendant was responsible for paying the

10   bribes.

11        Q    Only the defendant?

12        A    No, sir.  There was also the Beltran Leyva drug

13   trafficking organization.

14        Q    Did Mr. Zambada Garcia ever get contacted by any

15   of the public officials regarding the bribes that the

16   Beltran Leyvas were supposed to pay to them?

17        A    Yes.  A public official contacted him because

18   there were several shipments that were -- the public

19   officials were not paid for, and they wanted their money.

20   So he contacted Mr. Zambada Garcia for that money.

21        Q    And during this conversation, Mr. Zambada Garcia

22   learned how much the outstanding debt was?

23        A    Yes, he did.

24        Q    And how much was owed to the public officials as

25   to any debt?
```

108

```
 1        A    The outstanding debt was approximately
 2   $15 million.
 3        Q    And did the public official tell Mr. Zambada
 4   Garcia over what course or what period of time this debt had
 5   been accumulated?
 6        A    Yes, sir.  There were many shipments in the last
 7   three or four months in -- except in the stop of Guerrero,
 8   and there were about 30 ship boats that had about
 9   3,000 kilos apiece, and the public official said that they
10   were owed about $500,000 per shipment, getting to the
11   15 million.
12        Q    So in a three-month period, the public official
13   said that the Beltran Leyvas had received 30 shipments?
14        A    Correct.
15        Q    And according to Mr. Zambada Garcia, how much
16   was -- what was the typical amount paid to these public
17   officials per shipment as bribery payment?
18        A    Approximately $500,000.
19        Q    And so that's how the $15 million debt was
20   accumulated?
21        A    Correct.
22        Q    Once Mr. Zambada Garcia spoke with this public
23   official, did he then contact Artura Beltran Leyva?
24        A    Yes, he did.
25        Q    In discussing the debt with Artura Beltran Leyva,
```

109

```
 1   did Artura Beltran Leyva tell the -- Mr. Zambada Garcia who
 2   was responsible for paying the debt?
 3        A    Yes, he did.
 4        Q    And who did Artura Beltran Leyva say would be
 5   responsible for paying the debt?
 6        A    Artura Beltran Leyva told Mr. Zambada Garcia that
 7   he himself, his brother, Hector Beltran Leyva, and the
 8   Defendant Alfredo Beltran Leyva, among others, would pay
 9   that debt.
10        Q    And, again, this debt was in terms of bribery
11   payments to the public officials in the State of Guerrero?
12        A    Yes.
13        Q    I want to now focus a little bit more on the
14   leadership enhancement.
15             Let's focus on the time period after the defendant
16   was arrested in 2008 and was in custody in Mexico.
17             Did Mr. Zambada Garcia provide any evidence or any
18   statements to you regarding the defendant's continued
19   leadership within the Beltran Leyva Organization after his
20   incarceration?
21        A    Yes, he did.
22        Q    How did Mr. Zambada Garcia know that the defendant
23   continued to lead members of the Beltran Leyva Organization?
24        A    After the defendant's arrest, Mr. Zambada Garcia
25   had paid the Prosecutor's Office to receive transcripts of
```

110

1    recordings of visitors that met with Mr. Alfredo Beltran

2    Leyva.

3         Q    And did Mr. Zambada Garcia review these

4    transcripts of the meetings that the defendant was having

5    with visitors at the jail?

6         A    Yes, he did.

7         Q    And what did these transcripts reveal to

8    Mr. Zambada Garcia?

9         A    Mr. Zambada Garcia stated these transcripts

10   revealed that the defendant was sending coded language to

11   other members of the --

12        MR. BALAREZO:  Objection.  I mean, this is now

13   beyond any kind of hearsay.  The transcripts have not been

14   produced.  If the government has them, I demand that they be

15   produced since there's testimony about this.

16        We have a witness who told this agent supposedly

17   that he had transcripts that say God knows what.

18        It's beyond hearsay at this point.  It's got to be

19   a limit, Your Honor.

20        THE COURT:  You're way ahead of this thing.

21        MR. ROSALES:  Your Honor, it's just to show

22   that -- I believe the witness's testimony will be that the

23   transcripts of the conversations the defendant was having

24   with people at the jail were revealing coded messages being

25   passed to other members of the organization, giving them

```
 1    instructions to continue with certain operations.
 2              THE COURT:  So this is based on his review of the
 3    transcripts?
 4              MR. ROSALES:  This is based on Mr. Zambada
 5    Garcia's review of the transcripts, yes.
 6              THE COURT:  Well, he's not going to attempt to
 7    decipher what was in a coded transcript?
 8              MR. ROSALES:  I'm sorry, I couldn't hear the
 9    question.
10              THE COURT:  He's not going to try to decipher what
11    was in a coded message?
12              MR. ROSALES:  No, Your Honor.
13              I believe the testimony will be that Mr. Zambada
14    Garcia reviewed the transcripts, and the transcripts
15    revealed messages were -- that messages were being passed to
16    certain individuals within the organization that gave
17    instruction to those individuals.
18              And the testimony is going to be very general in
19    this regard.
20              THE COURT:  All right.  Overruled.  You may
21    proceed.
22    BY MR. ROSALES:
23       Q    According to Mr. Zambada Garcia, what was the
24    general nature of the messages that the defendant was
25    passing along to other members of the organization?
```

112

```
 1        A    Mr. Zambada Garcia stated that the general
 2   messages were just, continue running the Beltran Leyva
 3   Organization for the defendant.
 4        Q    And were those messages passed to any specific
 5   individuals, according to Mr. Zambada Garcia?
 6        A    Yes, sir.  It was his son and also one
 7   Chapo Isidro.
 8        Q    I want to focus your attention now on
 9   Chapo Isidro.  Did you speak with Mr. Zambada Garcia about
10   an individual named Chapo Isidro?
11        A    Yes, I did.
12        Q    And according to Mr. Zambada Garcia, who is
13   Chapo Isidro?
14        A    Chapo Isidro was a worker for the defendant.
15        Q    And what aspect of the defendant's
16   drug-trafficking activities, according to Mr. Zambada
17   Garcia, did Chapo Isidro carry out?
18        A    Chapo Isidro worked out of the Los Mochis, Guasave
19   area producing methamphetamine, heroin.  And he, again, was
20   one of the ones controlling that area and that production.
21        Q    I want to take you back to Mr. Fernando Morales.
22             Did Mr. Zambada Garcia have conversations with
23   Fernando Morales about the defendant's involvement in
24   methamphetamine production?
25        A    Yes.
```

113

```
 1        Q    And did Fernando -- what did Fernando Morales tell
 2   Mr. Zambada Garcia about the defendant's involvement in the
 3   production of methamphetamine?
 4        A    Mr. Zambada Garcia stated that Fernando Morales
 5   told him during that first meeting and other meetings that
 6   Chapo Isidro was --
 7             MR. BALAREZO:  Objection.
 8             Objection withdrawn.
 9        A    -- manufacturing methamphetamine.
10        Q    I'm sorry, could you please repeat the answer to
11   the question.
12        A    Yes, sir.
13             Mr. Zambada Garcia stated that Fernando Morales
14   had told him that Chapo Isidro was manufacturing
15   methamphetamine in the Los Mochis Guasave area in the
16   Sinaloa.
17        Q    And did Fernando Morales also tell Mr. Zambada
18   Garcia that Chapo Isidro was an employee of the defendant?
19        A    Yes.
20        Q    Now, Fernando Morales, I believe you stated
21   earlier, was from the Los Mochis and Guasave area;
22   is that correct?
23        A    That's correct.
24        Q    Aside from the statements that were made -- I'll
25   withdraw that question.
```

1           Did Mr. Zambada Garcia talk to you about an

2   individual named Augustine Flores?

3       A    Yes, he did.

4       Q    And what involvement in drug trafficking did

5   Mr. Zambada Garcia have with Augustine Flores?

6       A    Mr. Zambada Garcia said to control Mexico City,

7   would receive for Augustine Flores, and he would receive

8   cocaine and the precursors for methamphetamine.

9       Q    And according to Mr. Zambada Garcia, who did

10  Augustine Flores work with in the production of

11  methamphetamine?

12      A    Augustine Flores was the cousin of Chapo Isidro

13  and working with him on the production of methamphetamine.

14      Q    So aside from hearing from Fernando Morales about

15  the methamphetamine production and Chapo Isidros'

16  involvement, is it accurate to say that Mr. Zambada Garcia

17  also helped Augustine Flores receive precursor chemicals for

18  the production of methamphetamine?

19      A    Yes.

20           MR. ROSALES:  I want to go back, excuse me, one

21  more area for the enhancements, Your Honor.  This is going

22  to be related to violence.

23           During the time frame of the conspiracy up until

24  the point when the defendant was arrested in 2008, according

25  to Mr. Zambada Garcia, was there a rival drug trafficking

1    organization or cartel that fought against the Sinaloa

2    Cartel and the Beltran Leyva Organization?

3        A    Yes, there was.  It was the Las Zetas Cartel.

4        Q    And was there -- according to Mr. Zambada Garcia,

5    who led the fight against the Las Zetas Cartel on behalf of

6    the Beltran Leyva Organization?

7        A    Mr. Zambada Garcia stated to me that Artura

8    Beltran Leyva had told Mr. Zambada Garcia that the defendant

9    was fighting Las Zetas up in the Sinaloa area of Mexico

10   several times.

11       Q    And did that fighting between the Beltran Leyva

12   Cartel and the Las Zetas Cartel result in deaths?

13       A    Yes.  Numerous.

14       Q    And the State of Sonora, is that a state that is

15   in the northern part of Mexico?

16       A    Yes, sir.

17       Q    Along the border with the United States?

18       A    Yes.

19       Q    Special Agent Hatherley, I want to go back to your

20   testimony from earlier this morning about the drug shipments

21   that were organized by Mr. Poveda Ortega.

22            According to both Mr. Poveda Ortega and

23   Mr. Zambada Garcia, did the Beltran Leyva drug trafficking

24   organization have other suppliers of cocaine other than

25   Mr. Poveda Ortega?

116

1    A    Yes.

2    Q    The chart that is in evidence as Government's

3  Exhibit No. 6, does this chart detail the gross receipts for

4  any of the shipments -- for any shipments that were

5  organized by anyone other than Mr. Poveda Ortega?

6    A    No, sir.

7    Q    Does it only detail the gross receipts for the

8  shipments organized by Mr. Poveda Ortega?

9    A    That's correct.

10    Q    So when you stated earlier today that this was a

11  conservative total of the gross receipts received by the

12  defendant for the sale of cocaine, this was not encompassing

13  any other cocaine supplied by any other drug trafficker

14  other than Mr. Poveda Ortega?

15    A    No, sir.

16    Q    We also heard testimony from you that the

17  defendant was involved in the production of methamphetamine

18  in Mexico for importation into the United States.  Does this

19  chart encompass any of the gross receipts earned by the --

20  or obtained by the defendant for the sale of

21  methamphetamine?

22    A    No.

23    Q    Based on your view of law enforcement reporting,

24  during the time frame of the conspiracy, what was the sale

25  price of a pound of methamphetamine at the border with the

117

```
 1   United States?
 2        A    It was approximately $2,500.
 3             MR. ROSALES:  One moment, Your Honor.
 4             Your Honor, at this time, we have no further
 5   questions for this witness.
 6             THE COURT:  All right.  I have a question for him
 7   about this chart.
 8             Where are the -- I believe in this investigation,
 9   there were seven shipments that were interdicted; is that
10   right?
11             THE WITNESS:  I think so, sir.  Approximately.
12   Yes.
13             THE COURT:  Where are they reflected on this
14   chart?
15             THE WITNESS:  They are not, sir.
16             THE COURT:  Why?
17             THE WITNESS:  Because looking at the money aspect
18   and giving an estimate, if the kilos were seized, then the
19   defendant, or whomever, would never see any money from those
20   kilos.  If those kilos were seized, it was product that
21   was -- there was actually a loss for whomever owned those
22   kilos, and no money could be made on those kilos because
23   there could be no sale.
24             THE COURT:  Do you know how many kilos were
25   represented by those seven interdictions?
```

1           THE WITNESS:  I don't want to make a number up,

2    sir, but I could tell you that it was in the thousands.

3           THE COURT:  Thousands of kilos?

4           THE WITNESS:  Thousands of kilos, sir.  Yes, sir.

5           THE COURT:  Okay.

6           MR. ROSALES:  I do have actually, Your Honor, just

7    one final follow-up question.

8    BY MR. ROSALES:

9       Q    I believe it's already in the record, but just to

10   make sure.

11          Let me, Special Agent Hatherley, hand to you again

12   Government's Exhibit No. 6.

13          I'd like you to take a look at the third page of

14   this exhibit at the bottom, page 3 -- page 3.

15      A    Thank you.

16      Q    At the bottom of the chart on page 3, did you

17   total the total amount of gross receipts for both the

18   low-end estimate and the high-end estimate for the shipments

19   that were organized by Mr. Poveda Ortega?

20      A    Yes.

21      Q    And does this total reflect the gross receipts

22   that were received by the defendant for his participation in

23   the sale of these kilos in Culiacán?

24      A    Yes, sir.

25      Q    What's the low-end total of those gross receipts?

119

```
 1      A      The low-end total of the gross receipt is
 2  5,021,600,000.
 3      Q      And what was the high-end total for those gross
 4  receipts?
 5      A      It was 7,518,400,000.
 6      Q      And just taking a look at the final page of the
 7  exhibits, I believe that you testified before that this
 8  second chart totaled the gross receipts based on the price
 9  of a kilo of cocaine at the border, which was $21,000?
10      A      That's correct.
11      Q      What was the low-end total for gross receipts
12  obtained by the defendant, assuming that all the kilos were
13  sold at the border?
14      A      The low end was 6,590,850,000.
15      Q      And what was the high-end amount?
16      A      9,426,900,000.
17             MR. ROSALES:  No further questions, Your Honor.
18             THE COURT:  All right.
19             Cross-examination.
20             MR. BALAREZO:  Thank you, Your Honor.
21             THE COURT:  All right.
22                        - - -
23                   CROSS-EXAMINATION
24  BY MR. BALAREZO:
25      Q      Good afternoon, Agent.
```

1    A    Good afternoon.

2    Q    I want to start off talking about your background

3    a little bit.  You've been with Homeland Security for seven

4    years, you said?

5    A    Yes, sir.

6    Q    And before that, you were with the -- where were

7    you working?  You said you were with the GSA working

8    financial crimes; is that correct?

9    A    Yes, sir.

10    Q    And how long were you there?

11    A    I was there about four years, sir.

12    Q    Exactly what does it mean, investigating financial

13    crimes?

14    A    GSA or OIG investigated contract fraud, any misuse

15    of government funds, to go from vehicles to buildings to

16    contracts to -- anything of that nature that government is

17    involved in.

18    Q    And you also worked for the Secret Service for six

19    years, right?

20    A    Yes.

21    Q    And the Secret Service is under Treasury;

22    is that correct?

23    A    No.  At the time I worked there, sir, I started in

24    2000, and we had -- we just switched over to the Department

25    of Homeland Security.

121

```
 1        Q    Were you working in financial crimes also with the
 2   Secret Service?
 3        A    Yes, sir, I was.
 4        Q    So you were there for six years.  So it's accurate
 5   to say that you were working financial crimes for about ten
 6   years or so?
 7        A    Yes, sir.
 8        Q    And you were trained, I assume, in working
 9   financial crimes?
10        A    Yes, sir.
11        Q    You were trained in what kind of investigations to
12   conduct, right?
13        A    Yes, sir.
14        Q    Would you say that you're a highly trained
15   financial crimes investigator?
16        A    Yes, sir.
17        Q    Now, in this particular case, you've been -- the
18   government indicated to the Court that you are a case agent;
19   is that right?
20        A    Yes, sir.
21        Q    And there's also another case agent in this case,
22   correct?
23        A    Correct.
24        Q    Who's that?
25        A    Mr. Peschka.
```

1      Q    And who's Britton Boyd?

2      A    He's an FBI agent that works out of Texas.

3      Q    And is he a case agent in this case?

4      A    I think so.  I'm not too sure, though, what his

5  name is on.

6      Q    Well, you're the case agent, that means you're

7  very familiar with the matter, correct?

8      A    Yes, sir.

9      Q    Wouldn't you know if Britton Boyd was a case agent

10  or not?

11      A    No.  Yes, sir.  But also Peschka took over for

12  him.

13      Q    I'm not talking Paul Peschka.  I'm talking about

14  Britton Boyd right now.

15      A    Yes, sir.

16      Q    Was he a case agent at any point in this case?

17      A    Yes, sir.  In the very beginning.

18      Q    At the very beginning being when?

19      A    Whenever this investigation started, sir.

20      Q    Do you know when the investigation started?

21      A    I'd have to look back at my records, sir.

22  I cannot recollect right now.

23      Q    Does 2009 ring a bell?

24      A    That might, sir.

25      Q    And that was an investigation that Britton Boyd

123

```
1    conducted in Washington State, correct?

2        A    Yes, I'm familiar with that.

3        Q    And, in fact --

4             MR. ROSALES:  I would object to this line of

5    questioning.  Britton Boyd was not part of the direct

6    examination.  I don't see the relevance of this line of

7    questioning.

8             THE COURT:  Yeah.  I'm straining to see the

9    relevance, but...

10            MR. BALAREZO:  That's fine, Your Honor.  I'll move

11   on.

12   BY MR. BALAREZO:

13       Q    Again, so as a case agent -- when did you become a

14   case agent in this case with respect to Mr. Beltran Leyva?

15       A    I started about late 2014, sir.

16       Q    2014.  So was that before or after Mr. Beltran

17   Leyva was extradited from Mexico?

18       A    That was -- if I remember correctly, that was

19   after.  Actually, I'd have to look, again, sir, at the

20   dates.

21       Q    You came prepared to testify today, right?

22       A    Yes, sir, I did.

23       Q    And you know Alfredo Beltran Leyva is here for

24   sentencing, correct?

25       A    Yes, sir, I do.
```

124

1      Q    And you can't tell the Court when you started
2  working on the matter?
3      A    No.  I started working, like I said, late 2014.
4  I just don't remember the exact date or year right now.
5      Q    I didn't ask for the exact date.  What was it that
6  you couldn't remember?
7      A    I'm just trying to remember that date that he was
8  extradited here to the U.S.
9      Q    Now --
10         MR. ROSALES:  Objection to the relevance of this
11  line of questioning again.
12         THE COURT:  I'll give him a little leeway.
13         Go ahead.
14  BY MR. BALAREZO:
15      Q    Now, as a case agent, it's accurate to say that
16  you're familiar with all the aspects of the case, correct?
17      A    Yes.  I mean, inasmuch as I can, sir, yes.
18      Q    Yes or no?
19      A    Yes.
20      Q    Okay.  So that means you would be familiar with
21  investigations that were done with respect to Mr. Beltran
22  Leyva, correct?
23      A    If I looked at notes and if I was briefed on them,
24  yes.
25      Q    Okay.  And you said, "looked at notes"?

125

1      A      Yes, sir.  If I --

2      Q      And notes, these would be, let's say, reports of

3  interviews with cooperators, correct?

4      A      They'd be ROIs or reports of investigation from

5  other agencies or from whoever else did the investigation

6  beforehand.

7      Q      So, for example, let's start with cooperators, in

8  particular.  The majority of the ROIs or reports of

9  investigation that you've reviewed were concerning

10  interviews with cooperators, correct?

11      A      Cooperators or witnesses, sir, yes.

12      Q      Well, were there any non-cooperating witnesses

13  that provided you information with respect to Mr. Beltran

14  Leyva pertaining to the --

15          MR. ROSALES:  Objection, Your Honor, to the line

16  of questioning.  The government's clearly put forth evidence

17  for two particular cooperators on this witness.  I don't see

18  the relevance of this line of questioning.

19          MR. BALAREZO:  It will become evident in a little

20  bit, Your Honor.

21          THE COURT:  I'll give you a little leeway, but not

22  much.

23          MR. BALAREZO:  I'll bring it back up at that

24  point, Your Honor, to keep going.

25  BY MR. BALAREZO:

1    Q    Now, as a trained financial investigator, you are

2    trained in where to look for evidence of financial crimes,

3    correct?

4    A    Yes, sir.

5    Q    You're trained to follow the money?

6    A    Yes, sir.

7    Q    And you're trained to look at evidence and find

8    evidence, correct?

9    A    Yes, sir.

10   Q    Okay.  Now, in this particular case -- well,

11   strike that.

12        As a trained investigator, period, you are aware

13   that there are various investigative techniques that can be

14   used to investigate a crime, correct?

15   A    Yes, sir.

16   Q    There's wiretaps, you've heard of those, correct?

17   A    Yes, sir.

18        MR. ROSALES:  Objection, Your Honor.  Again, I

19   don't see the relevance to this line of questioning.

20        MR. BALAREZO:  Your Honor, this goes to the

21   credibility of the witnesses and their bias, and I think

22   it's entirely relevant.

23        THE COURT:  I'll overrule it.  Go ahead.

24   BY MR. BALAREZO:

25   Q    Now, you're aware of surveillance being able to be

```
 1    used as an investigative technique; is that correct?

 2        A    That's correct.

 3        Q    You're aware of recordings, either consensual

 4    recordings or intercepts that can be made, correct?

 5        A    Yes.

 6        Q    With respect to this particular case and the

 7    testimony you've given today, did you obtain any of that

 8    information that you testified about from any investigative

 9    technique beyond speaking or reading notes pertaining to

10    what investigators told somebody else -- excuse me,

11    cooperators told somebody?

12        A    I'm sorry, could you repeat that.  I just want to

13    make sure.

14        Q    Didn't make sense to me either.  I'll rephrase it

15    for you.

16             With respect to your testimony today when you

17    testified concerning Mr. Poveda Ortega and Mr. Zambada --

18        A    Correct.

19        Q    -- does your testimony reflect solely your review

20    of notes pertaining to interviews of those two individuals?

21        A    No.  It's also discussions with other agents that

22    worked on the case, sir.

23        Q    And do you recall specifically which parts of that

24    testimony you gave today came from discussions with other

25    agents?
```

1      A     Some of it.  Some of it.  Lot of it came from the

2   notes I either took myself or reviewed, sir.

3      Q     I mean, let's be honest.  Mostly your testimony

4   came from the notes from interviews that these people gave,

5   right?

6      A     Yes, sir.

7      Q     There were no recordings involving Mr. Leyva

8   talking to Ray Zambada, correct?

9      A     Not that I physically saw, no.

10     Q     Or heard?

11     A     No.  Didn't hear.  No.

12     Q     And as case agent, you would know if they exist,

13  correct?

14     A     I should.

15     Q     There were no surveillance or videos of

16  Mr. Beltran Leyva meeting with Ray Zambada or Mr. Ortega,

17  correct?

18     A     There might have been, sir.  I'm just not aware of

19  them at this moment.  I'd have to look over my notes.

20     Q     Well, you knew you were going to testify today,

21  correct?

22     A     Yes, sir, I did.

23     Q     Did you ask anyone -- did you ask the prosecutors

24  at this table whether any videos or anything like that

25  existed?

129

1    A    We've talked about it before, sir.

2    Q    There aren't any, correct?

3    A    You know what, sir?  I really can't say.

4    Q    You don't know?

5    A    I'm sorry.

6    Q    Now, are you aware of any wiretaps which would

7    depict Mr. Beltran Leyva engaged in any narcotics activity?

8    A    At this moment, I'm not aware of any.

9    Q    And as case agent, of course you should or would

10   know, correct?

11   A    As much as I could when I started this case, sir.

12   Q    I got you.  And you've had two years to review all

13   these notes?

14   A    As much as possible, sir.  Yes, sir.

15   Q    And review the case file?

16   A    I reviewed as much as I can, and talked to as many

17   agents as I can.

18   Q    Now, with respect to your testimony here today, is

19   it accurate to say that none of your testimony was obtained

20   through your personal knowledge, meaning you were not

21   present, you did not see a video, you didn't listen to a

22   recording, correct?

23   A    No.  Nothing like that, sir.

24   Q    And with respect to the -- well -- strike that.

25        Were you present at any meetings or any proffer

1    sessions with Mr. Poveda Ortega?

2        A    Was I present at the proffer sessions?

3        Q    Yes.

4        A    Yes, sir.  I was taking the notes.

5            MR. ROSALES:  And, Your Honor, I'm going to mark

6    Defendant's Exhibit No. 1.

7            And if I could approach the witness.

8            THE COURT:  Okay.

9    BY MR. BALAREZO:

10       Q    That's Exhibit No. 1.  Just take a look at it and

11   let me know when you're ready to continue.

12       A    I'm ready.

13       Q    And do you recognize the individual?

14           MR. ROSALES:  Sorry.  I didn't get a chance to

15   look at the exhibit.

16           And I also just want to put on the record that the

17   government asked for a copy of all exhibits before this

18   hearing; we weren't shown these exhibits.

19           MR. BALAREZO:  Your Honor, number one, until the

20   time I did my cross, I wasn't aware what I was going to use.

21   I have no obligation to give the government my exhibits.

22   This is a picture -- well, let me ask the witness.

23   BY MR. BALAREZO:

24       Q    Can you identify the individual in the picture?

25       A    Yes, sir.

131

```
 1        Q      Who is this?

 2        A      That's Mr. Poveda Ortega.

 3        Q      And is that the -- his nickname is Conejo?

 4        A      Yes, sir.

 5        Q      Okay.

 6               MR. BALAREZO:  Your Honor, does the government

 7     have any issue with a picture of your witness?

 8               MR. ROSALES:  No, Your Honor.

 9               MR. BALAREZO:  I move it into evidence,

10     Your Honor.

11               THE COURT:  May I see that, please?

12     BY MR. BALAREZO:

13        Q      Now, let's talk --

14               THE COURT:  All right.  It will be.

15               MR. ROSALES:  May I approach the bench?

16               THE COURT:  Sure.

17               (Bench conference)

18               MR. ROSALES:  I admit not having seen any of these

19     exhibits beforehand, I don't think the government is

20     comfortable with having a photograph of the cooperator as

21     part of the public record.  I don't know what defense

22     counsel hopes to establish through this introducing this

23     photograph into evidence.  And I think what he was trying to

24     do was get the witness to say he couldn't recognize a

25     photograph, but clearly that failed.
```

132

```
 1              MR. BALAREZO:  No.

 2              MR. ROSALES:  I don't see why this needs to be in

 3   evidence.

 4              THE COURT:  Yeah.  What's the relevance of it to

 5   anything?  Once he's looked at it and identified him, you

 6   now have verification that he's actually met him.

 7              MR. BALAREZO:  Your Honor, the government is

 8   seeking 12 to 14 points of enhancements for my client, which

 9   will result in a life sentence, if the Court accepts it.

10              This witness's testimony pertained to contact he

11   had with this witness and the other witness outside of the

12   courtroom.  The government chose not to put those witnesses

13   on.

14              I think at the very least, we're entitled to have

15   the witness identify the person that he's talking about.

16   Perhaps it's a difference for Ortega that my client knows.

17   I don't know.

18              I think this is entirely proper.  If the

19   government is trying to protect the witnesses, that's the

20   government's concern, that's not my concern.

21              MR. ROSALES:  And that's why --

22              MR. BALAREZO:  It's a public hearing.  The

23   witnesses have been publicly named.

24              THE COURT:  Do you have any reason to believe that

25   this witness never met the real Poveda?
```

133

```
1            MR. BALAREZO:  I don't know, Your Honor, because
2   when I got --
3            THE COURT:  I asked you if you had any reason.
4            MR. BALAREZO:  Your Honor, I can't, and I'm going
5   to tell you why.
6            When I received the notes, the meeting notes,
7   which I don't know who took, because everything is blacked
8   out.  And I can show you.  I don't know who was present at
9   these meetings.  I don't know who took the notes,
10  I don't know who -- when these events happened.  So I think
11  it's fair cross-examination at least to find out whether
12  this guy knows.
13           MR. ROSALES:  Your Honor, we've represented to
14  both the Court and to defense counsel on numerous occasions
15  that we were putting on witnesses who were at the meetings,
16  at the proffer sessions with these witnesses.
17           The witness himself has testified that he
18  interviewed Mr. Zambada as well as Poveda Ortega.
19           THE COURT:  Identification of the witness is on
20  the record.  There's no debate about whether he actually met
21  with or was in a proffer session with that person.  So
22  I'm going to -- that's in the record.
23           But the actual photograph, I'm not going to allow
24  to be publicly available.  So I'll put that under seal.
25           MR. BALAREZO:  That's fine.
```

134

1          MR. ROSALES:  That's fine, Your Honor.

2          THE COURT:  It's part of the record, but it's

3    under seal.

4          MR. BALAREZO:  And, Your Honor, obviously, for our

5    record, I object, because this is, again, it's a public

6    hearing, the witnesses have been named, the fact that their

7    picture is in the record, I don't see what the consequence

8    is.  Those individuals are widely named in the media as drug

9    traffickers, as cooperators.  There's no secret here.  So I

10   don't understand what the government is trying to protect.

11         MR. ROSALES:  If I may, Your Honor, I think it's

12   disingenuous of defense counsel to say this, because prior

13   to today's hearing, we made it known to defense counsel that

14   we were going to use the statements of his client that he

15   made to the government when he was attempting to cooperate.

16   Statements were made under *Miranda*, after waiving *Miranda*.

17         Defense counsel asked the government if we would

18   be okay with his request to the Court to seal that portion

19   of the testimony to protect his client because he didn't

20   want any harm to come to his client.

21         Counsel can't now turn around and say that because

22   these cooperators have already been outed in the media, that

23   their lives don't mean as much as his client's life does.

24   I think it's unfair to say, well, defendant's statements

25   shouldn't be out in the public record, because he was

1    attempting to cooperate, that may cause him harm.

2              The government has a responsibility to its

3    cooperators.  And to the extent possible, we have a

4    responsibility to make sure to keep those cooperators safe.

5    Just like we respect that same right with the defendant.

6    We're not here --

7              THE COURT:  Well, look.  The reason why I'm not

8    allowing you to use anonymous monikers today is because

9    I didn't allow you to use anonymous monikers when we had the

10   pretrial conference, where you were required to lay out the

11   evidence that you expected to put on in the course of the

12   trial; however, later I allowed that transcript to be put

13   under seal.  I might very well allow this transcript to be

14   put under seal for the same reasons.

15             So I haven't made a decision on that yet, but my

16   point is the same.  Certain hearings, in my judgment, are

17   preferable to be in the public -- whoever shows up can hear

18   it.

19             Now, the decision of what to do with that

20   transcript afterwards is a separate decision.

21             MR. ROSALES:  Understood.

22             THE COURT:  And just like I made a decision as to

23   the proffer session that we had, so to speak, in the

24   pretrial conference, I'll make a separate decision as to

25   this hearing today or however long it goes.  So don't be

1    concerned.

2            MR. BALAREZO:  If the Court is going to keep it

3    unsealed, obviously I object to it, but we can continue.

4            THE COURT:  Let's continue.

5            MR. BALAREZO:  Okay.

6            (Open court)

7            THE COURT:  You may continue, consistent with the

8    discussion at the bench.

9            MR. BALAREZO:  The government asked for just a

10   moment while they consult, Your Honor.  So if I could just

11   have a second.

12           THE COURT:  Sure.

13   BY MR. BALAREZO:

14       Q    Now, the -- agent, are you fluent in Spanish?

15       A    No, I'm not, sir.

16       Q    Do you understand Spanish?  Are you

17   conversational?

18       A    I'm trying to learn it right now, sir.

19       Q    So it would be accurate to say that you do not

20   speak Spanish, correct?

21       A    That's correct, sir.

22       Q    You don't understand it that well either, correct?

23       A    No, sir.

24       Q    And when these sessions were held with

25   Poveda Ortega, the individual that was in Defendant's

1    Exhibit No. 1, he spoke to the government in what language?

2          A     He spoke to them in Spanish, sir.

3          Q     In Spanish.

4                And I assume there was a translator, an

5    interpreter?

6          A     Yes, sir, there was.

7          Q     Do you know who the interpreter was during any of

8    these meetings?

9          A     It was various interpreters, sir.

10         Q     Did you know anything about the interpreters?

11         A     I knew that they were interpreting for that

12   proffer, and that they were hired by the government to

13   interpret.

14         Q     Did you know anything about their qualifications?

15         A     No.  Except the fact that they were there.

16         Q     They just showed up basically, right?

17         A     They were hired by the government to work.

18         Q     Now, about how many meetings did you have with Mr.

19   -- Your Honor, could I call them Conejo?  That's the

20   nickname, it's just easier, if that's all right, or does the

21   Court wish me to mention the names?

22               THE COURT:  No.  We have a transcript.

23               MR. BALAREZO:  I'll keep mentioning his name.

24               THE COURT:  We've been constructive for the last

25   two hours and a half.

1          MR. BALAREZO:  I won't change, Your Honor.

2          THE COURT:  We're referring to these people by the

3  names that they are in the transcript.  I don't want to

4  change the course in the middle of the stream.  Just use his

5  name.

6          MR. BALAREZO:  Name.

7          THE COURT:  He has two names.  If you want to say

8  "Poveda" -- is that how you pronounce it -- "Poveda" --

9          MR. BALAREZO:  Something like that.

10          THE COURT:  -- or Zambada, use one or the other.

11  You don't need to use both Zambada Garcia and --

12          MR. BALAREZO:  It's a bad habit, Your Honor.

13          THE COURT:  Well, I understand, but you're

14  extremely skilled in both Spanish and English.

15          MR. BALAREZO:  I don't know.

16          THE COURT:  So this should be easy for you to do.

17          MR. BALAREZO:  I do take --

18          THE COURT:  Very easy to do.

19          MR. BALAREZO:  I object to that characterization,

20  Your Honor, but I'll continue.

21          THE COURT:  Oh, I know.  My guess is it will be on

22  your wall someday, but go ahead.

23          MR. BALAREZO:  Wall of shame.

24          THE COURT:  Go ahead.

25  BY MR. BALAREZO:

139

1      Q    How many interviews that you -- strike that.

2           How many proffer sessions of Mr. Poveda were you

3    present for?

4      A    I can't give you an exact number because I'd have

5    to look at my notes, but dozens.

6      Q    Dozens?

7      A    Yes, sir.

8      Q    24, 36, 48?  I mean, give us something.

9      A    I'm thinking, in all, in the last couple of years,

10   probably 24 to 32 maybe.

11     Q    And you were present for all of them?

12     A    The ones I took the notes for, sir?  Yes.  Yes.

13     Q    Let me start it this way.

14          Were you present for all 24 to 32 proffer sessions

15   with Mr. Poveda?

16     A    If that's a correct number, yes.  When I took the

17   notes, I was present.  And then I was, at other times, I was

18   present when someone else had been taking the notes.

19     Q    So does that mean that you took the notes for 24

20   to 32 proffer sessions?

21     A    If my recollection is correct.

22     Q    How many other proffer sessions were you present

23   at where you did not take notes?

24     A    Several.

25     Q    10, 20?

1    A    No.  I don't know.  Between five and 10, sir.

2  I'm not --

3    Q    So then, based on my math, which is kind of like

4  your chart, you've got about 29 to 42 estimated proffer

5  sessions with Mr. Poveda?

6    A    There were a lot.

7         I don't want to pinpoint a number.  I just know

8  there were numerous proffers.

9    Q    And about how many of those did you take notes on?

10    A    Again, sir, I'd have to look --

11         MR. ROSALES:  Objection; asked and answered.

12         THE COURT:  Asked and answered.  Come on.

13  BY MR. BALAREZO:

14    Q    Well, do you know if any of these proffer sessions

15  with Mr. Poveda were recorded in any way?

16    A    Just me taking notes, sir.

17    Q    Or somebody else taking notes?

18    A    Or -- if that was the case.

19    Q    Okay.  And do you have any particular skill in

20  stenography?  I mean, did you handwrite these notes or

21  did you use a machine like the court reporter?

22    A    There were some handwritten and mostly by

23  computer.

24    Q    Laptop, correct?

25    A    Yes, sir.

1      Q    So it's accurate to say that when you were taking

2  notes, that basically you were the one that was deciding

3  what to write down, correct?

4      A    Yes, sir.  They were my notes.

5      Q    Because you didn't take down everything verbatim;

6  is that correct?

7      A    I'm sorry.  Verbatim?

8      Q    Word for word?

9      A    No.  I understand that, sir.  I'm just -- I took

10  down as much as I could.

11      Q    All right.

12      A    So if it was the witness's words, I took that

13  down, sir, yes.

14      Q    Now -- and for these particular proffer sessions

15  where you took notes, you relied on the interpretation of

16  the interpreter for what you were writing down, correct?  It

17  wasn't what you heard from him?

18      A    Right.  If he was speaking Spanish and the

19  interpreter was interpreting for me, I took down what I

20  heard from the interpreter.

21          MR. BALAREZO:  Now -- and, Your Honor, I just want

22  to clarify one thing.

23  BY MR. BALAREZO:

24      Q    Your testimony today, you said, came from the

25  meetings where you were present, your notes, correct?

142



1    A    Yes, sir.

2    Q    And meetings with other agents?

3    A    Yes, sir.

4    Q    Is that the universe of the information from which

5  you derived your testimony here today?

6    A    I think for the most part.  I mean, from what

7  I can remember right now.

8    Q    Now, let's talk about the chart that we spent

9  quite a bit -- Government's Exhibit No. 6?

10    A    Okay.

11    Q    You have it in front of you?

12    A    Yes, sir, I do.

143

1    ███    Nothing that I'm familiar with, although there

2    ███████.

3    Q    Other than what?

4    A    Nothing that I'm familiar with.

5    Q    So is it accurate to say, then, that the sole

6    basis for the information that's contained in this

7    particular chart, Government's Exhibit 6, is the information

8    provided to you by Mr. Poveda and notes that you might have

9    reviewed; is that correct?

10    A    And other witnesses or any other corroborative

11    evidence that may have come in.

12    Q    Other cooperators, correct?

13    A    Yes, sir.

14    Q    And that information is reflected in this chart?

15    A    As to the names, like Dr. Chaparro or Chapeta is

16    known to be a narcotics trafficker.  I'm saying in that

17    circumstance.

18         So Mr. Poveda provided me this information.  What

19    I'm saying is that other cooperating witnesses have

20    mentioned these names before, showing that there's not just

21    him making these names up.

22    Q    I'm not trying to be dense.  I'm talking about

23    Government's Exhibit No. 6.

24    A    Yes, sir.

25    Q    Let's look, for example, that first row where you

1    have someone by the name of -- well, it's written as Piraña,

2    but it's actually Piraña, right?

3         A    Yes, sir.

4         Q    Like the fish with the teeth, right?

5         A    Yes, sir.

6         Q    That row, the information that came -- that is on

7    that document for that row, where it says, low 2,500, high

8    3000, low 15-, high 20-, et cetera --

9         A    Yes, sir.

10        Q    -- those numbers came from Mr. Poveda, correct?

11        A    Yes, sir, it did.

12        Q    No one else?

13        A    No.

14        Q    Now, as a case agent, as a financial crimes

15   investigator, and as just someone with common sense, don't

16   you think it's a good idea to try to verify information that

17   you're going to testify about?

18        A    Yes, sir, it is.

19        Q    And in this particular case, that particular row,

20   the first row for Piraña, Piraña refers to an individual by

21   the name of Leyner Valencia Espinosa, correct?

22        A    That's correct.

23        Q    Right?

24        A    Yes, sir.  If I remember correctly, it is.

25        Q    You know that's who you're talking about, correct?

1    A    Yes, sir.  I'm just saying that's the full name,

2  yes.

3    Q    Now, Leyner Valencia Espinosa has been arrested,

4  correct?

5    A    I think so, sir.  I'm not positive.

6    Q    Well, again, did you ever check to see if Leyner

7  Valencia Espinosa has been arrested?

8    A    If I didn't check, sir, it was probably another

9  agent that checked and then we probably had a discussion

10  about it.

11    Q    Are you aware if any other agent checked?

12          MR. ROSALES:  Your Honor, I don't understand the

13  relevance of this kind of question.

14          MR. BALAREZO:  It will become relevant.

15  BY MR. BALAREZO:

16    Q    You know as the case agent in this case that

17  Leyner Espinosa is cooperating with the government, correct?

18          MR. ROSALES:  Objection, Your Honor.  May we

19  approach?

20          THE COURT:  Uh-huh.

21          (Bench conference)

22          MR. ROSALES:  This has been a pattern throughout

23  this entire case, Your Honor.

24          The defense counsel seems to go out of his way to

25  out cooperators left and right.  Leyner Valencia was never

1    someone who we had on the list as a witness in this case.

2            The government never confirmed some of the lies of

3    people who were cooperating, and the fact that defense

4    counsel is now in court shouting to the world that this

5    individual is cooperating, I think that he has to show some

6    basis for doing that, first of all.

7            And, secondly, he should be prevented from doing

8    that.

9            THE COURT:  Couldn't hear what you just said.

10           MR. ROSALES:  I think he should be prevented from

11   outing other individuals as potential cooperators.

12           THE COURT:  Well, at a minimum, I would permit him

13   to inquire whether, since these were the suppliers of these

14   loads in this line here, was Mr. Piraña, whatever his,

15   that's his code name, I guess.

16           MR. BALAREZO:  His nickname.

17           THE COURT:  I think it's fair to ask if any of the

18   information contained in this row came from that person or

19   if he verified any of the information.

20           MR. BALAREZO:  That's exactly the point, because

21   I can tell you he's a cooperator, and the government has the

22   opportunity to go back to Mr. Piraña or Leyner Valencia and

23   confirm, is this information correct.  As far as I know,

24   they didn't do that.  I think that's fair cross-examination

25   because I will still ask him.

147

```
 1              THE COURT:  If you ask him the question if he did
 2    that, you'll have your answer.
 3              I think you're pretty confident you know the
 4    answer to that question, don't you?
 5              MR. BALAREZO:  I think that the answer is --
 6              Plus, also the point is, Your Honor --
 7              THE COURT:  But in order to do that, you don't
 8    need to focus on Leyner.
 9              MR. BALAREZO:  Your Honor, I don't want the record
10    to appear --
11              THE COURT:  So to speak.
12              MR. BALAREZO:  -- that they didn't do it because
13    they couldn't.  They absolutely could.  And that's the same
14    for Leyner Valencia, for Chayanne, for La Maquina, for 06,
15    for half of these people, who are government corporators.
16              THE COURT:  Hold on.  I think you're mixing apples
17    and oranges.
18              MR. BALAREZO:  All right.
19              THE COURT:  What you want you can get without
20    asking him if the person is a cooperator.  You can ask him
21    if you check with this person, you can ask him if any of the
22    information was verified by this person.  And if he were to
23    say, hypothetically, which he's probably not going to, well,
24    I didn't have access to him, I couldn't get access to him.
25              MR. BALAREZO:  But then --
```

1          THE COURT:  But then you can say, well, wait a

2    minute, how do you know you didn't have access.  You didn't

3    have to out the fact that he's a cooperator.

4          MR. BALAREZO:  All right.  I'll --

5          MR. ROSALES:  But also, Your Honor, defense

6    counsel, what he wants to do has already been accomplished.

7    He asked the witness whether or not all the information from

8    this chart came from Mr. Poveda Ortega, and he said yes.  He

9    asked the witness if he verified the information with any

10   other witness, and the witness again repeated the

11   information came from Mr. Poveda Ortega.

12         Counsel can make the argument -- it's in the

13   record.  Counsel can make the argument all he wants during

14   the argument portion of the sentencing, that there's no --

15   that government didn't speak to any other witnesses

16   regarding these shipments.

17         THE COURT:  Look, I'm willing to give you a little

18   latitude on this.  I don't want unnecessarily outing the

19   cooperators.  It's not fair to their safety and to the

20   government.

21         But I certainly think he's more than permitted to

22   question as to whether any of the information contained in

23   this schematic here came from that person or was verified by

24   this person.  That's perfectly fair.

25         MR. BALAREZO:  Okay.  I will refrain from doing

149

```
 1    that.
 2              THE COURT:  And if he were to somehow, which
 3    I just don't think is going to happen, say something like,
 4    well, I couldn't talk to them or I couldn't get access to
 5    them, then maybe we have an issue.  He's not going to do
 6    that, at least I don't think he is.
 7              Let's take a ten-minute break.
 8              MR. BALAREZO:  Thank you.
 9              THE COURT:  My court reporter has been working
10    very hard here.
11              MR. BALAREZO:  And I'll try to slow down,
12    Your Honor.  I think he's making signs at me.  Take Spanish.
13              THE COURT:  Well, we're going to be here for days.
14              MR. BALAREZO:  Days?
15              THE COURT:  Days.  I mean, we're going to go to
16    5:30 today.  But it doesn't sound to me like -- how much
17    longer do you have, an hour, two hours?
18              MR. BALAREZO:  Quite a bit.
19              THE COURT:  We're not going to finish today.  So
20    let's pick a day next week and reconvene.
21              MR. ROSALES:  This is going to be --
22              THE COURT:  You have one more witness still.
23              MR. ROSALES:  One of my other questions,
24    Your Honor, are you planning on reconvening us tomorrow for
25    the continuation of the hearing or --
```

1    THE COURT:  I wasn't planning on doing it

2   tomorrow, but I can look at my schedule.

3    MR. BALAREZO:  I'm sorry.  I spoke with

4   Ms. Goldbarg earlier.  If the matter was continued -- it's

5   just, you know, the Court scheduled this matter, and I

6   already have various matters on my calendar.  So I mean if

7   it's next week --

8    THE COURT:  I could do something on Friday

9   afternoon.

10    MR. BALAREZO:  I'm going to be out of town,

11   Your Honor.

12    THE COURT:  You're out of town on Friday.

13    MR. ROSALES:  And the only reason why I asked,

14   Your Honor, is that this particular witness has preplanned

15   vacation scheduled for tomorrow, and so we wanted to make --

16    THE COURT:  How about tomorrow afternoon?

17    MR. BALAREZO:  No.  He won't be around tomorrow.

18    MR. ROSALES:  The witness is scheduled to go on

19   vacation tomorrow morning.

20    THE COURT:  Oh.

21    MR. ROSALES:  And so if you were not going --

22    THE COURT:  When does he get back?

23    MR. ROSALES:  I'll have to ask him that.  But if

24   he were to get off the stand today, then we would just have

25   to work on that schedule.

```
 1              THE COURT:  Well, next week, the 23rd, I have a
 2    wide-open day, wide open.  Hopefully, both of you guys will
 3    have a wide-open day.
 4              All right.  Let's take a break.
 5              MR. BALAREZO:  Thank you.
 6              (Open court)
 7              THE COURT:  All right.  We're going to take a
 8    15-minute recess.  My reporter richly deserves a break.  So
 9    we'll be returning.
10              You remain a witness under oath so don't discuss
11    your testimony with anybody so far or what it will be when
12    you return, okay?
13              All right.  We'll see you in 15 minutes, Counsel.
14              DEPUTY CLERK:  All rise.
15              (Recess from 3:57 p.m. to 4:21 p.m.)
16              DEPUTY CLERK:  All rise.  The United States
17    District Court for the District of Columbia is now in
18    session; the Honorable Richard J. Leon presiding.  God save
19    the United States and this Honorable Court.  Please be
20    seated and come to order.
21              THE COURT:  The witness can resume his seat.
22              (Defendant entered.)
23              MR. BALAREZO:  May I proceed, Your Honor?
24              THE COURT:  You may when you're ready.
25              MR. BALAREZO:  Thank you.
```

152

1    BY MR. BALAREZO:

2        Q    Agent, back to that first row that refers to a

3    Piraña 2004 to 2007 on Government's Exhibit No. 6?

4        A    Yes, sir.

5        Q    Did you -- let's start with you personally.

6    Did you personally confirm any of this information that's on

7    that chart with Leyner Valencia Espinosa?

8        A    No, not personally.

9        Q    Are you aware of whether any of your colleagues,

10   other agents confirmed that information with Leyner Valencia

11   Espinosa?

12       A    Not at this moment.

13       Q    Are you aware whether or not any of the

14   prosecutors here confirmed that information with Leyner

15   Valencia Espinosa?

16       A    I'm assuming they did, yes.

17       Q    You're assuming, but you don't know?

18       A    I think they did, yes.

19       Q    Now, with respect to this individual called La

20   Vega, 2005 to 2007, which is the next -- that would be the

21   next?

22            THE COURT:  Yeah, well, hold on.  That raises a

23   question.

24            The next two rows there, semisubmersibles and

25   fishing vessels, those still come under the Piraña, right?

153

```
1              THE WITNESS:  Yes, sir, that does.

2              THE COURT:  Okay.  Good.

3   BY MR. BALAREZO:

4      Q    And that's the same scenario for the first of the

5   chart, correct?

6              MR. ROSALES:  Your Honor, if I may, I don't

7   believe the witness has a copy of the exhibit before him.

8              MR. BALAREZO:  I'm sorry.  I thought you did.

9              THE COURT:  Oh.  Make sure he gets it.

10             MR. BALAREZO:  Sorry about that.

11             THE WITNESS:  No.  That's okay.  I actually took

12  it back because I didn't want to leave it there.

13  BY MR. BALAREZO:

14     Q    Now, again, just to be clear with respect to

15  Leyner Valencia, your testimony does not take into account

16  anything, any information from Leyner Valencia, right?

17     A    That I proffered?

18     Q    Right.

19     A    No, I did not, sir.

20     Q    With respect to La Vega, 2005 to 2007, where

21  there's notations for speedboats and fishing vessels, did

22  you -- since you're testifying here, did you have -- did you

23  confirm any of this information with La Vega?

24     A    No, I did not confirm personally.

25     Q    With respect to Dr. Chaparro, 2004 to 2008, were
```

154

```
 1  │  you able to confirm any of that information with him or her,
 2  │  whoever that is?
 3  │      A    No, not personally, sir.
 4  │      Q    With respect to Diego Montoya, 2004 to 2008, were
 5  │  you able to confirm any of that information on that chart
 6  │  with Diego Montoya?
 7  │      A    No, sir.
 8  │      Q    Page 2, I'll ask you the same question with
 9  │  respect to Chayanne, Dr. Victor, Mono Willer, and
10  │  La Maquina?
11  │      A    Yes, sir.
12  │      Q    Were you able to confirm any of the information
13  │  that was --
14  │      A    Not personally, sir.  No.
15  │      Q    And on page 3, with respect to Sebastian, Espena,
16  │  La Monja, Ramon Quintero, Chupeta, Comba, and 06, were you
17  │  able to confirm or did you confirm any of that information
18  │  with those individuals?
19  │      A    No, not personally, sir.
20  │      Q    Now -- so basically what you're telling us is that
21  │  you, as you sit here today, did not do anything to
22  │  corroborate what Mr. Pavedo, the information that Poveda
23  │  gave you that's on this chart, correct?
24  │      A    I think the corroboration came from other agents
25  │  or through the AUSA's office or through investigation, sir.
```

310

155

```
 1        Q     What other agents did you corroborate with?

 2        A     I've talked to Mr. Peschka or Mr. Boyd or --

 3        Q     Okay.  Well, let's start then.

 4              With respect to Leyner Valencia, the very first

 5   one, who did you corroborate the information with?

 6        A     No.  What I'm saying is I didn't personally.  I --

 7              MS. GOLDBARG:  Objection, Your Honor.  The witness

 8   has already testified numerous times that the information

 9   from this chart came directly from Mr. Ortega only.

10              MR. BALAREZO:  Well, now he's saying he

11   corroborated with other people, and that's what I'm getting

12   into.

13              THE COURT:  Frankly, I'm confused as to who he

14   corroborated with.  So I'll give you a few more questions to

15   clear this up, frankly.

16   BY MR. BALAREZO:

17        Q     For example, Leyner Valencia, the first one again.

18        A     I'm sorry, I just want to clarify.  It's not that

19   I corroborated with other agents, it's I'm sure other agents

20   corroborated this information or the investigative team,

21   sir.

22        Q     Just to be clear, you're testifying here today,

23   not other agents?

24        A     Yes, sir.

25        Q     I'm asking, did you corroborate any of the
```

156

```
 1   information that Poveda gave you that appears in this chart
 2   with anyone else?
 3        A    No, not personally, sir.
 4        Q    So when you created this chart, you took Poveda's
 5   word at face value, correct?
 6        A    Yes, sir.
 7             THE COURT:  Yeah, but hold on now.  Poveda didn't
 8   provide the information as to all these other ones, did he?
 9             MR. BALAREZO:  That's what the witness said,
10   Your Honor.
11             I'll ask him.
12   BY MR. BALAREZO:
13        Q    Now, Agent -- and I'll name them slowly again.
14   Lana Valencia, La Vega, Dr. Chaparro -- I have to say that
15   in Spanish:  (Speaking in Spanish.)
16             Diego Montoya, Chayanne, Dr. Victor, Mono Willer,
17   La Maquina.
18             On page 3 now, Sebastion, Espena, La Monja, Ramon
19   Quintero, Chupeta, Comba, and 06, all the information, all
20   these numbers that appear across from their names on this
21   chart, is it correct that you got that information from
22   Mr. Poveda?
23        A    Mr. Poveda gave me this information, sir, yes.
24        Q    All of the information on this chart?
25        A    Yes.  Except calculating the numbers.
```

157

```
 1      Q    Right.  Is that -- okay.

 2           And, again, you, as the agent who created this

 3    chart and is testifying, did not corroborate or seek to

 4    support the numbers that Mr. Poveda gave you in any way,

 5    correct?

 6      A    Not personally.  I know through the investigation

 7    that was the case.

 8      Q    You're testifying here.  I'm talking about you?

 9      A    Yes, sir.  No.  I understand.

10      Q    And the answer is no?

11      A    No, sir.

12      Q    And as I said in my last question before the Judge

13    had a question, was that you took Mr. Poveda's word for what

14    he was telling you, correct?

15      A    Yes, sir.

16      Q    Now, you've been an agent with Homeland Security

17    for how long?

18      A    About seven years, sir.

19      Q    And during that time, you've dealt with a lot of

20    cooperators, correct?

21      A    Yes, sir.

22      Q    And you are aware that cooperators sometimes may

23    shade the truth in order to benefit themselves, correct?

24      A    At times, sir.

25      Q    And in this particular case, Mr. Poveda has
```

158

```
1    already pled guilty to multiple indictments;

2    is that correct?

3        A    Yes, sir.

4        Q    And I believe you said that he was facing anywhere

5    from 10 to life in prison; is that right?

6        A    Yes, sir.  Like 20 to life.

7        Q    20 to life?

8        A    Yes, sir.

9        Q    And Mr. Pavedo, as -- strike that.

10            And as it was, you're aware that Mr. Poveda was

11   allowed to plead guilty to a non-mandatory life offense,

12   correct?

13       A    Yes, sir.

14       Q    Which, in fact, he was facing, right?

15       A    I'm sorry, he was facing a mandatory life offense?

16       Q    Yes.

17       A    Yes, sir.

18       Q    Correct?

19       A    Yes, sir.

20       Q    But that charge was taken off the table and he

21   pled to an offense that carries 20 to life, right?

22       A    Yes, sir.

23       Q    So Mr. Poveda got a benefit right there;

24   is that correct?

25       A    Yes, sir.
```

1        Q     So this individual who acknowledged at least a

2   million dollars, a million kilos only got that forfeiture.

3             Now, the government has also provided immigration

4   benefits to his family, correct?

5        A     Yes, sir.

6        Q     Now, this individual whose word you took for chart

7   in Exhibit No. 6, this guy is responsible for ordering the

8   murder of at least five people, that you're aware, correct?

9        A     Yes, sir.

10       Q     And, of course, that number, five people that he's

11  responsible for the murder of, that's a number that he gave

12  you, correct?

13       A     Yes, sir.

14       Q     So, for example, if he had murdered another 100

15  people and didn't mention those, it didn't happen, right?

16       A     Not necessarily so.  It could.

17       Q     Well, did you, Agent, as you testify here, did you

18  personally do any investigation to see whether or not this

19  individual, Poveda, had been involved in any other murders?

20       A     No, not my personal investigation, sir.

21       Q     Now, he was also charged, and I believe you said

22  pled guilty, for bribing a guard in the U.S.; is that

23  correct?

24       A     Yes, sir.

25       Q     And that's a Bureau of Prisons guard at whatever

162

1   facility he was at?

2        A    Yes, sir.

3        Q    Now, is bribing a guard in a BOP facility, to your

4   knowledge, is that a crime?

5        A    Yes, sir, it is.

6        Q    And he pled guilty to it?

7        A    Yes, sir, he did.

8        Q    And was convicted?

9        A    He was.  He pled guilty but he was not sentenced

10  yet.

11       Q    Hasn't been sentenced yet?

12       A    No, sir.

13       Q    Is he cooperating in that case, too, against the

14  guard?

15       A    I -- I wasn't part of that investigation, sir.

16       Q    Now, isn't it -- you're familiar, as a case agent,

17  with his plea agreement, correct?

18       A    Yes, sir.

19       Q    And you are familiar with the fact that in most

20  plea agreements, there's a provision that says that if the

21  individual commits a crime, the plea agreement is basically

22  off the table, correct?

23       A    Yes, sir.

24       Q    And isn't there such a provision in his

25  plea agreement?

1    A    There might be, sir.  I can't remember right now.

2    Q    Let me show you what I'll mark as

3 Defendant's Exhibit No. 2.  And this is the Bates labeled

4 14333 through -- well --

5         (Counsel conferred off the record.)

6         MR. BALAREZO:  Your Honor, the government, I

7 withdraw Exhibit No. 2.  The government will stipulate to

8 the fact that in the plea agreement for Mr. Pavedo, in one

9 of the plea agreements for Mr. Poveda, there is a provision

10 that if he commits a crime, the plea agreement can be

11 withdrawn, is that inaccurate?

12        (Counsel conferred off the record.)

13        THE COURT:  How do you spell Poveda?

14        MR. BALAREZO:  P-o-v-e-d-a.

15        (Counsel conferred off the record.)

16        MR. BALAREZO:  The government stipulates that in

17 one of the plea agreements that Mr. Poveda signed and pled

18 guilty under, there's a provision that if he commits or

19 attempts to commit any crimes, that the plea agreement can

20 be withdrawn, as well as the government may be released from

21 its obligations.  Is that a fair stipulation?

22        MR. ROSALES:  The government will stipulate to

23 that, Your Honor.

24        THE COURT:  Okay.

25 BY MR. BALAREZO:

164

1     Q    Have you heard that stipulation?

2     A    Yes, sir, I did.

3     Q    So in one of the plea agreements that Mr. Poveda

4 signed, there was a provision that said that if he commits

5 any crime, the plea agreement could either be withdrawn or

6 the government will be released from its obligations under

7 the plea agreement.  Do you understand that?

8     A    Yes, sir, I do.

9     Q    Are you aware, as you sit here today, whether the

10 plea agreement has been withdrawn or the government has

11 indicated to Mr. Poveda that he will not be receiving any

12 benefits under that plea agreement?

13    A    No, I'm not aware of that right now, sir.

14    Q    Now, this particular incident or offense that he

15 committed with the guard, is that something that he admitted

16 to you or to the government, let me say?

17    A    I wasn't present when he -- he never admitted it

18 to me, sir.

19    Q    He didn't admit it to you.

20         Are you aware, just generally, how the government

21 became aware of that offense?

22    A    I'm not positive, sir.

23    Q    Now, also while he was -- and, of course, that

24 bribery offense took place while he was under the

25 plea agreement, correct?

165

1      A     I don't know, sir.

2      Q     Do you know when that offense took place?

3      A     Actually, sir, I don't know -- recollect the date.

4            MR. ROSALES:  Judge, I will stipulate that it took

5      place while he was in the plea agreement.

6            THE COURT:  I'll accept it.

7      BY MR. BALAREZO:

8      Q     And, Mr. Pavedo, to your knowledge, has admitted

9      to you that he used false passports; is that correct?

10     A     Yes, sir, he did.

11     Q     And also used weapons; is that correct?

12     A     Yes.

13     Q     Now, did you personally ever investigate any

14     narcotics activity by Mr. Poveda?

15     A     Did I personally investigate any narcotics?  No,

16     sir, I did not.

17     Q     Now, are you aware that Mr. Poveda, in fact, was

18     the principal cocaine supplier for Artura Beltran Leyva?

19     A     I was aware he did supply cocaine to Artura, yes,

20     sir.

21     Q     And Artura Beltran Leyva, just to be clear, is now

22     a deceased brother of my client, Alfredo Beltran Leyva?

23     A     Yes, sir.

24     Q     And so, in fact, Mr. Poveda worked for Arturo and

25     not for Alfredo, correct?

167

1      Q     Yes.

2      A     I was trying to remember.  Maybe personally?

3      Q     Yes.

4      A     Maybe three times, two or three times, sir.

5      Q     And what was the timeframe that Mr. Poveda claims

6   that he had any involvement with Mr. Alfredo Beltran Leyva?

7      A     The dates that I'm looking at I remember was

8   around 2000, 2002 to 2008, when Mr. Alfredo Beltran Leyva

9   was arrested.

10     Q     So 2000 to 2008?

11     A     I'm thinking 2002 to 2008, sir.

12     Q     So about six years?

13     A     It sounds about right, sir.

14     Q     And during that six-year time frame that you have

15   indicated Mr. Poveda described some involvement with Alfredo

16   Beltran Leyva, you're saying that he only had three personal

17   meetings with Alfredo Beltran Leyva?

18     A     From what I recollect, yes, sir.

19     Q     And do you recall what the circumstances of those

20   meetings were?

21     A     If I recall correctly, they were meetings on

22   narcotics trafficking, on just to meet each other, first a

23   greeting, and then also to meet about running the

24   organization.

25     Q     Do you recall whether or not Mr. Poveda mentioned

1  whether or not Arturo was present at these meetings?

2      A    I think -- again, I'd have to look at my notes,

3  sir, but I think there was one of them he might have been

4  present for.

5      Q    At one of the meetings only?

6      A    Maybe a couple, sir, but, again, I'd have to look

7  at my notes.

8      Q    And earlier we talked about ledgers.  You said

9  there weren't any.  Did Mr. Poveda provide you with any sort

10 of documentation, any records or any sort of information to

11 support the fact that he claims he met with Alfredo Beltran

12 Leyva three times?

13     A    No.  I never personally saw any ledgers from

14 Mr. Ortega from --

15     Q    I said ledgers as an example.

16     A    Right.  Yes.

17     Q    Did Mr. Poveda provide you with any information

18 besides his words to support the fact that those meetings

19 allegedly occurred?

20     A    I don't -- I'm not aware of right now.

21     Q    Did he tell you whether or not any other

22 individuals were present at those meetings?

23     A    Yes, he did.

24     Q    Okay.

25     A    And I -- no names.  I'm trying to remember right

169

1    now if I remember any names that maybe he was with.

2        Q    Did you do anything to confirm with any of these

3    individuals whether or not those meetings, in fact, took

4    place?

5        A    Through other proffers or trying to talk to other

6    witnesses that would confirm that.

7        Q    This is when you did?

8        A    If we had proffers and we met someone that was a

9    witness and could testify or could corroborate that evidence

10    and then, yes, that's what we did.

11        Q    You said "if."

12             But as you sit here today, can you tell the Judge

13    of those three meetings, was there any one that you were

14    able to corroborate beyond what Mr. Poveda said to you?

15        A    Yeah.  I'm sorry.  I'd have to look at my notes

16    again to see if there's anything.

17        Q    So you can't right now?

18        A    Right now, no.

19        Q    Now, Poveda was a -- well, strike that.

20             You testified that Poveda was basically a broker,

21    right?

22        A    Yes, sir, I did.

23        Q    And a broker in the drug trafficking world is

24    somebody who basically has a supplier and has buyers;

25    is that correct?

173

1    20 the next?  What does that mean exactly?

2        A    It could be -- the high -- basically what he said

3    is he couldn't remember.  It could be about 15 to 20

4    shipments at that time.

5        Q    So he could have given you any number and you

6    would have put it down, correct?

7        A    If it was something he said and it was accurate,

8    yes, we would.

9        Q    And this is the individual who's seeking a benefit

10   from the government, correct?

11       A    Yes, sir.

12       Q    Who committed crimes and lied by using false

13   passports and was involved in killing five people.  You just

14   took what he said and wrote it down.  So whatever you said,

15   you put down on this chart; is that right?

16       A    Right now, sir, yes.

17       Q    Not right now.  That's what happened, right?

18       A    Well, a lot -- yes, I put down what he said;

19   I took his statement.

20       Q    So my question was, again, just with the speedboat

21   right now, let's say -- let's go with the high.  The

22   3,000 kilos was sent on some date, right?

23       A    Yes, sir.

24       Q    A percentage of that would have gone to

25   Mr. Beltran, according to your testimony, right?

188

1    opportunity to see the photograph.

2    BY MR. BALAREZO:

3         Q    Can you not see the picture?

4         A    No, I can see the picture, sir.  And that's

5    Mr. Zambada.

6         Q    Thank you.

7              Now, how many times -- how many meetings did you

8    have with -- were you present with Mr. Zambada giving

9    information to the government?

10        A    Mr. Zambada, again, was numerous times, and I know

11   you're probably going to ask for a number.

12        Q    Your best estimate?

13        A    A couple dozen times.

14        Q    A couple dozen.  In what time frame?

15        A    If I remember correctly, sir, it was probably late

16   2014 till 2000 -- early 2016.

17        Q    So approximately two years, there were a few

18   dozens meetings with him?

19        A    If I recollect correctly, yes, sir.

20        Q    And did you take notes in all those meetings with

21   Mr. Zambada?

22        A    Yes.  I'm trying to think if there was an earlier

23   meeting I met him and I didn't take notes, but I'm pretty

24   sure I took notes in most of them.

25        Q    And I take it once again that Mr. Zambada gave

189

1    that information in Spanish?

2        A    Yes, sir.

3        Q    And I take it again that at the time that you

4    spoke with Mr. Zambada, you still didn't speak Spanish?

5        A    That's correct, sir.

6        Q    And you had to rely on the services of an

7    interpreter?

8        A    Yes, sir.

9        Q    And you don't recall who the interpreter was?

10       A    Not at the moment, sir.

11       Q    And, again, it was just somebody that was hired,

12   correct?

13       A    Yes, sir.

14       Q    You didn't know their qualifications or anything

15   else, correct?

16       A    No, sir.

17       Q    Now, were any meetings with Mr. Zambada recorded

18   beyond somebody taking notes either by hand or on a

19   computer?

20       A    Not that I'm aware of, sir.

21       Q    Now, in your approximately, what, 17 years as an

22   agent --

23       A    Yes, sir.

24       Q    -- wouldn't it be a good idea to record these

25   meetings?

1      A    Possibly.

2      Q    Well, if you were to record, either video record

3  or audio record, these meetings, wouldn't you have a

4  verbatim statement of what the witness is saying?

5      A    Yes, sir, you would.

6      Q    Wouldn't that be more accurate than handwritten

7  notes or computer-taken notes?

8      A    Yes, sir.  I'm sure it could be.

9      Q    Well, because, again, you didn't take a verbatim

10  account of what he said with your handwritten notes,

11  correct?  You took bullet points, basically, right?

12      A    No.  I tried to write down as much as I possibly

13  could hear and understand and --

14      Q    So now, your notes, did they reflect 100 percent

15  of what Mr. Zambada said?

16      A    To the best of my ability to write down what

17  he said, yes, sir.

18      Q    And if you chose to put the pen down at one moment

19  and he was saying something, didn't write, that just won't

20  make it into your notes, right?

21      A    If it's something important, then we usually put

22  that in the notes, sir.

23      Q    And nobody else was taking notes during these

24  meetings, any of the other agents or prosecutors or

25  whomever?

192

```
1        A    During the last couple years, sir?

2        Q    Well, the time frame that you've been testifying

3   about, whatever that was.

4        A    Yes.  Oh, I'm sorry.  Yes, sir.

5             So what time frame are we talking about?

6        Q    Well, what was the time frame that you testified

7   about regarding Ray Zambada?

8        A    Approximately 1998 to 2008.

9        Q    All right.  From 1998 to 2008, based on what

10  Mr. Zambada said, because that's what you're testifying

11  about, correct?

12       A    Yes.

13       Q    And any of these things that Mr. Zambada said, did

14  you do anything to corroborate those things?

15       A    I -- no, not personally I didn't, except what I

16  did with Mr. Poveda Ortega.

17       Q    Right.  You took the notes and you came here and

18  you read the notes and testified, right?

19       A    No.  There was -- there were -- I know there were

20  other evidence that corroborates seizures or corroborates

21  any other witnesses or corroborators, sir.

22       Q    Well, one thing that caught my attention was you

23  said that Ray Zambada had indicated that he had possession

24  of some transcripts.  Do you remember that?

25       A    Yes, sir.
```

193

1     Q    And if I remember correctly, what you testified

2   was that Ray Zambada told you that after Mr. -- or Alfredo

3   Beltran Leyva was arrested in 2008?

4     A    Correct.

5     Q    That he continued to communicate with -- his son

6   was one of the people?

7     A    Yes, sir.

8     Q    And other individuals presumably related to

9   narcotics trafficking, correct?

10    A    Yes.

11    Q    And Mr. Zambada indicated to you during these

12  meetings that he had gotten transcripts of these

13  conversations with either his son or whomever it was that

14  was talking with him at that time, right?  Talking with

15  Alfredo at that time?

16    A    Yes, sir.

17    Q    And, in fact, he told you that he had paid a bribe

18  in order to obtain those transcripts; is that right?

19    A    Yes, sir.

20    Q    And he also told you that he got the transcripts

21  from this organization in Mexico with the anagram, if --

22  I don't even know if that's the right word -- the initials,

23  S-i-e-d-o, Siedo?

24    A    Yes, sir.

25    Q    And Siedo is a Mexican law enforcement

1  organization?

2      A    I'm aware of, sir.

3      Q    In your testimony as an agent, have you had any

4  involvement with them?

5      A    No, not personally, sir.

6      Q    Now, as the case agent in this case, you've got

7  Mr. Zambada telling you that he purchased these transcripts,

8  which purportedly implicate Alfredo Beltran Leyva in

9  narcotics activity.

10         Did you at any time contact Siedo in Mexico to try

11  to obtain these transcripts?

12     A    No, sir, I did not.

13     Q    Are you aware if anyone did?

14     A    I'm not aware, sir.

15     Q    I'm sorry?

16     A    I'm not aware anyone did.

17     Q    As you sit here today testifying under oath,

18  do you even know if they actually existed ever?

19     A    No, sir, I don't.

20     Q    But you testified about it because Mr. Zambada

21  said they existed, right?

22     A    Yes, sir.

23     Q    Now, Ray Zambada, as we were saying, was part of

24  the Sinaloa Cartel?

25     A    Yes, sir.

195

1    Q    And now you've testified that the time frame of

2    your testimony for Zambada was from '98 to 2008, a period of

3    ten years?

4    A    Yes, sir.

5    Q    During that time, the Beltran Leyva DTO, as you've

6    been describing it, were they a part of the Sinaloa Cartel

7    at any point during that time?

8    A    They worked in conjunction with the Sinaloa

9    Cartel.

10    Q    It's correct that they were an independent

11    organization, correct?

12    A    The Beltran Leyva Organization?

13    Q    Yes.

14    A    Yes, sir.

15    Q    They did not -- although you say that Zambada says

16    that they interacted or had some kind of coordination, they

17    were completely independent; you already testified that the

18    Beltran Leyva Organization was headed by Arturo --

19    A    Yes, sir.

20    Q    -- right?

21    A    Yes, sir.

22    Q    Now, you mentioned something about Guerrero, the

23    State of Guerrero in Mexico.  Do you remember that?

24    A    Yes, sir.

25    Q    And what you indicated was that Guerrero was

196

1    controlled by Alfredo Beltran Leyva?

2        A    That's correct, sir.

3        Q    And that Ray Zambada had told you that they --

4    that the Sinaloa wanted to move product in Guerrero so they

5    had to get approval from Mr. Alfredo Beltran Leyva;

6    is that correct?

7        A    Yes, sir.

8        Q    Now, do you remember what years those were?

9        A    That was -- I think it was approximately 2003 and

10    until about 2006.

11        Q    And during 2003 to 2006, who was the head of the

12    Beltran Leyva Organization?

13        A    I would say Mr. -- the defendant, Mr. Alfredo

14    Beltran Leyva.

15        Q    So Arturo is no longer the boss?

16        A    He was still around.  And then it was the Beltran

17    Leyva brothers, sir.  It was the --

18        Q    Let me --

19        A    -- Hector.

20        Q    I'm sorry.

21            I'm sorry.  So go ahead finish up.

22        A    The Beltran Leyva Organization comprised of the

23    defendant, his brother Hector, and his brother Arturo, who

24    all had components of that organization, were all leaders in

25    their own right.

```
 1        Q    Do you want to correct your testimony of earlier
 2   where you said that you agree that Arturo was the head of
 3   the Beltran Leyva Organization?
 4             MR. ROSALES:  Objection, Your Honor; the witness
 5   has already answered this question.
 6             MR. BALAREZO:  He's testifying to something else.
 7             THE COURT:  Overruled.  He can answer it, if he
 8   can.
 9             THE WITNESS:  No.  He is the head of that
10   organization and --
11   BY MR. BALAREZO:
12        Q    So there was one head, and, presumably, Alfredo
13   worked for Arturo; is that correct?
14        A    Not to my understanding, sir.  When I --
15        Q    Well, then, why would Alfredo, according to
16   Zambada, have to ask Arturo permission to go do something?
17        A    I believe it was like a --
18        Q    I don't want you to believe.  What do you know?
19        A    Then what I understand is that from Mr. Zambada
20   Garcia telling me these, is that the Beltran Leyvas all talk
21   to each other and connect with each other to run the
22   organization.
23             And I say Hector is in charge of it; he was the
24   most well-known.
25        Q    Hector?
```

198

```
1        A      I'm sorry.  I apologize.  Arturo Beltran Leyva.

2        Q      And who's Hector?

3        A      Hector is the other brother of the defendant and

4   Arturo Beltran Leyva.

5        Q      And he was also -- he was a co-leader, then, is

6   that what you're saying?

7        A      So, sir, one of the things I learned from the

8   proffers was that Mr. Artura Beltran Leyva handled a lot of

9   the organization of the shipments coming in from Colombia.

10              And also Hector Beltran Leyva organized a lot of

11  the bribery and the corruption.

12              And then the defendant, Mr. Alfredo Beltran Leyva,

13  handled the trafficking of cocaine into the United States

14  out of Culiacán.

15              But they all talked to each other and they all

16  were the same organization.

17       Q      Now, during these proffer sessions -- and I'm

18  going to go back in a second -- for a second to Mr. Poveda.

19  You testified that Mr. Poveda told you that when he gave the

20  drugs or had them transferred to Mr. -- to Alfredo Beltran

21  Leyva -- right --

22       A      Right.  Yes.

23       Q      -- he was paid for those drugs then;

24  is that correct?

25       A      Yes.
```

200

```
 1     Q     That's 65 kilos?

 2     A     Yes, sir.

 3     Q     And would Alfredo pay him then for those drugs?

 4     A     If not then, soon after.

 5     Q     How soon thereafter?

 6     A     It depends.  If he had the money, sir, or when the

 7   money was coming down from the United States or from

 8   wherever it was sold.

 9     Q     Well, isn't it correct that typically the way

10   these things work is that when a deal is made, the cash

11   doesn't change hands right away, the drug has to make it

12   somewhere to be sold, correct?

13     A     Correct.

14     Q     So typically somebody doesn't have, for example,

15   those $390 million to turn over for 24,374 kilos, correct?

16     A     That's correct.

17     Q     So what price did Poveda sell the drugs to Mr. --

18   to Alfredo for?

19     A     My understanding is that from talking to

20   Mr. Pavedo, he sold at the Mexico City price.

21     Q     Which was what?

22     A     At that time, I want to approximate around 11- to

23   $12,000.

24     Q     And then Alfredo turned around and sold it for

25   $16,000?
```

332

201

1    A    To the defendant, yes.

2    Q    He sold it for -- no, now I'm confused.

3         Poveda sold it to Alfredo for the Mexico City

4    price?

5    A    The defendant bought the kilos from Poveda Ortega

6    for the Mexico City price.

7    Q    Which was?

8    A    Approximately 11-, $12,000.

9    Q    And then your testimony was that Poveda said that

10   Alfredo then sold it in Culiacán for 16,000?

11   A    Yes, according to the conservative estimate chart.

12   Q    So according to that conservative estimate chart,

13   the, quote/unquote, profit that would have been made by

14   Alfredo would have been 4,000, 5,000 a kilo?

15   A    Yes.  If we're talking about this example, that

16   sounds about right.

17   Q    Now, from any of these, looking at the Leyner

18   Valencia loads, can you tell us which, if any, of these

19   loads actually made it into the United States?

20   A    No, sir, I can't.

21   Q    I'm sorry?

22   A    I'm sorry, I can't, no.

23   Q    Okay.

24   A    I'm not aware.

25   Q    Can you tell us which of those -- which of those

202

1    loads, if any, were actually sold in Culiacán?

2        A    I'm not aware of any, sir.

3        Q    Can you tell us which kilos or a quantity of kilos

4    of that load, if any, were sent to Europe?

5        A    I'm not aware, sir.

6        Q    I'll ask you that same question with respect to

7    La Vega and all the other individuals here.

8        A    Yes, sir.

9        Q    Can you tell this Court whether or not any of

10   these particular loads actually made it into the

11   United States?

12       A    No, sir, no.  Right now, I'm not aware.

13       Q    Right now or --

14       A    I'm just not aware, sir, I'm sorry.

15       Q    You don't know, correct?

16       A    I'm just not aware if they made it in or not, sir.

17       Q    Did you review any material before you came to

18   testify today?

19       A    I reviewed my notes.

20       Q    Just your notes?

21       A    Yes, sir.

22       Q    You didn't review any other notes involving

23   Alfredo Beltran Leyva?

24       A    Other notes of the -- I mean, the investigation

25   notes, sir.

203

1     Q    You're the case agent?

2     A    Yes, sir.

3     Q    You had all the case information at your disposal,

4 correct?

5     A    Yes, sir.

6     Q    So when you came to testify today, the only thing

7 you prepared with was reading Poveda's notes with respect to

8 these questions?

9     A    Poveda's notes and other notes that were relevant

10 to this hearing, sir.

11     Q    With whatever it is that you reviewed prior to

12 testifying today, can you tell the Court whether or not any

13 of these drugs were shipped to the United States by Alfredo

14 Beltran Leyva?

15     A    I'm not aware of any, sir.

16     Q    And, again, we talked about the first loads, the

17 first row of Valencia.

18     With respect to any of these other loads that are

19 depicted here, can you tell the Court, with any certainty,

20 that those were actually sold in Culiacán?

21     A    I'm not aware, sir.

22     Q    Can you tell the Court whether any of these kilos

23 were sent somewhere else besides the United States?

24     A    No, sir, I'm not aware.

25     Q    Can you tell the Court, with respect to any of

1    these particular loads, whether or not Alfredo Beltran

2    Leyva, in fact, managed to sell them anywhere and got money

3    in return?

4        A    I don't recollect, sir.  I'm not aware.

5        Q    You don't recollect or you don't know?

6        A    I'm not aware of it.

7        Q    Which means you don't know?

8        A    No.  It just means I'm not aware of it right now,

9    sir.

10            MR. BALAREZO:  Your Honor, I'm sorry, if I can

11    inquire, it's about 5:20.  This might be a good stopping

12    point, because I may be done, but I just need to review all

13    the notes.

14            THE COURT:  Take a minute.

15            MR. BALAREZO:  I'm sorry?

16            THE COURT:  Take a minute.  Look at your notes,

17    I'd like to finish with this witness, if possible, today.

18            MR. BALAREZO:  Sure.

19            (Pause)

20    BY MR. BALAREZO:

21        Q    Now, you testified, on a couple instances, where

22    you -- where Ray Zambada told you that he got information

23    from his brother, Mayo, concerning Alfredo, correct?

24        A    Yes, sir.

25        Q    And one of those bits of information was that --

205

1    and, Mayo, according to you, told Ray Zambada that

2    Mr. Beltran, the defendant, was sending cocaine from Mexico

3    City to the United States; is that correct?

4        A    Yes, sir.

5        Q    To your knowledge, how close to the border of the

6    United States is Mexico City?

7        A    In miles, sir?

8        Q    It's far away, isn't it?

9        A    It is.  I couldn't tell you miles right now.

10       Q    You'd probably fly, not drive, correct?

11       A    I would.

12       Q    Yeah, that makes sense, right?

13       A    Right.

14       Q    Now, do you have any -- did you corroborate any of

15   that information that Ray said Mayo told him about Alfredo

16   sending cocaine to the United States from Mexico City?

17       A    I don't recollect.  I'm not aware right now.

18       Q    This is your chance, so...

19       A    So, I'm sorry, say -- could you repeat the

20   question again then.

21       Q    Did you corroborate in any way what Ray Zambada

22   said that Mayo Zambada said about Alfredo Beltran Leyva

23   sending cocaine from Mexico City to the United States?

24       A    I don't recollect, sir.  I'm not aware right now.

25       Q    You also testified that Ray Zambada indicated at

206

```
 1   some point that at some meeting he had with Alfredo, that

 2   Alfredo was armed.  Do you recall that?

 3        A    Yes, sir, I do.

 4        Q    How many meetings did Ray Zambada tell you he

 5   personally had with Alfredo?

 6        A    I'm only aware of that one, sir.

 7        Q    One meeting?

 8        A    Yes, sir.  It might have been maybe another, but

 9   I'm just aware of that one.

10        Q    So one or two possibly?

11        A    Possibly.  It was definitely one, though.

12        Q    And he just said that Alfredo was armed, correct?

13        A    Yes, sir.

14        Q    Now, have you been in Mexico?

15        A    Yes, sir, I have.

16        Q    And -- well, where was that meeting, where did it

17   take place, between Ray and Alfredo, that one or two

18   meetings?

19        A    That meeting, if I remember correctly, I want to

20   recollect, it was in Acapulco.

21        Q    Acapulco?

22        A    Or Cuernavaca.  I'm trying to remember my notes

23   right.

24        Q    Somewhere in Mexico?

25        A    Yes, sir.
```

207

```
 1        Q    Doesn't really matter, right?

 2        A    Sometimes it does.

 3        Q    Sometimes.

 4             Now, did you do anything to corroborate this

 5   statement that Ray Zambada gave to you that Alfredo Beltran

 6   Leyva was armed during this one or two meetings that he had

 7   with him?

 8        A    Not that particular statement, sir, no.

 9        Q    I'm sorry?

10        A    No, sir, not that statement.

11        Q    Now, you also testified about Ray Zambada telling

12   you that Alfredo had paid bribes, I believe?

13        A    Yes.

14        Q    That is what you testified?

15        A    Yes, sir.  For?

16        Q    I'm sorry?

17        A    I'm sorry.  For what context, sir?

18        Q    Well, what bribes did Ray Zambada say that Alfredo

19   paid?

20        A    Are you talking about controlling the plaza --

21        Q    Right.

22        A    -- and law enforcement --

23        Q    Illegal bribes.

24             Law enforcement.

25        A    Politicians.
```

1    Q    President, senator, judges, whomever?

2    A    Right.  That's correct.

3    Q    What did he tell you about those bribes?

4    A    He said that Mr. Zambada Garcia stated that in

5  order to control a plaza, that, because he himself did, you

6  had to pay bribes to make sure that narcotics weren't seized

7  or your workers weren't arrested.

8    Q    And did Ray Zambada tell you that Alfredo Beltran

9  Leyva paid bribes for any of these reasons?

10    A    I don't recollect that, sir.

11    Q    Did he specify for you whom he may have bribed?

12    A    No, I don't recollect that either, sir.

13    Q    And do you recall corroborating in any manner what

14  Ray Zambada said with respect to Mr. Beltran Leyva paying

15  bribes?

16    A    No, except -- you mean the particular --

17    Q    Yes.

18    A    -- what you're asking about?

19        No, not that particular statement, no.

20    Q    So what you have is Ray Zambada's word?

21    A    In the words of other cooperators or witnesses.

22    Q    Well, are you prepared to provide me information

23  on those other cooperators or witnesses?

24    A    Not right now, sir.

25    Q    You're testifying about Ray Zambada;

1   is that correct?

2        A    Yes, sir, I am.

3             MR. BALAREZO:  And, Your Honor, this is an issue

4   we have.

5             To the extent that this witness is testifying

6   about what Ray Zambada said, I don't know how much of his

7   testimony is, in fact, contaminated by knowledge of other

8   individuals.

9             So if he is relying on this testimony here -- for

10  his testimony here on the information given by other

11  individuals, I request that *Jencks* be provided for those

12  individuals.

13            MR. ROSALES:  Your Honor, to respond to defense

14  counsel's objection, the witness's repeatedly stated that

15  the information he's testified about that came from

16  specifically Ray Zambada or Mr. Ortega, defense counsel, in

17  his cross-examination, has tried to contaminate that

18  statement by repeatedly asking if the witness spoke to any

19  other witnesses and whether or not he prepared to testify

20  about what these other witnesses said here today, and we've

21  made it absolutely clear that the testimony from this

22  witness is relying upon the interviews conducted of

23  Mr. Ortega and Mr. Ray Zambada.

24  BY MR. BALAREZO:

25        Q    So with respect to the information that

210

```
 1   Ray Zambada gave you, you were not able to corroborate or
 2   did not corroborate what he told you with respect to paying
 3   bribes, correct?
 4            MR. ROSALES:  Objection.
 5            THE COURT:  Asked and answered.
 6   BY MR. BALAREZO:
 7       Q    Well, in particular, you talked about some public
 8   official that was owed $15 million --
 9       A    Yes, sir.
10       Q    -- correct?
11       A    Yes, sir.
12       Q    Who was that public official?
13       A    I do not know, sir.
14       Q    Did you ask him, Zambada?
15       A    Yes, sir.  He could not recall.
16       Q    So some unknown public official was owed
17   $15 million?
18       A    Yes, sir.
19       Q    And Alfredo Beltran Leyva was responsible for
20   paying it?
21       A    Yes, sir.
22            THE COURT:  All right.  We'll take the evening
23   recess.
24            MR. BALAREZO:  Thank you, Your Honor.
25            THE COURT:  How much more do you have on cross?
```

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CR No. 12-184 |
| | ) | |
| | ) | Washington, D.C. |
| vs. | ) | February 23, 2017 |
| | ) | 12:10 p.m. |
| ALFREDO BELTRAN LEYVA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      AMANDA LISKAMM
                         ANDREA GOLDBARG
                         ADRIAN ROSALES
                         Assistant United States Attorney
                         555 4th Street, N.W.
                         Washington, D.C. 20036
                         (202) 252-7785
                         andrea.goldbarg@usdoj.gov

For the Defendant:       A. EDUARDO E. BALAREZO
                         Balarezo Law
                         400 5th Street, NW
                         Suite 300
                         Washington, D.C. 20001
                         (202) 639-0999
                         info@balarezolaw.com

```
 1   supposedly told to him by Mayo Zambada, his brother,

 2   correct?

 3        A    That's correct, sir.

 4        Q    Now, you know that -- you know who Vicente Zambada

 5   is?

 6        A    Yes, sir, I do.

 7        Q    Okay.  Vicente Zambada is Mayo's son, correct?

 8        A    Yes, sir.

 9        Q    Ray Zambada's nephew, correct?

10        A    Yes, sir.

11        Q    And Vicente Zambada was a top deputy to his

12   father, Mayo, correct?

13        A    I don't know if he qualified as a top deputy, but

14   he was --

15        Q    He was a member of --

16        A    He was a member of the cartel, sir, yes, sir.

17        Q    Right.  A drug trafficker, correct?

18        A    Yes, sir.

19        Q    Now, and you know that Vicente is in Chicago,

20   right?  He has a case pending in Chicago and he's pled

21   guilty?

22        A    Yes, sir.  I am aware of that.

23        Q    And you know -- you are aware that Vicente is

24   available to the government, correct?

25        A    Yes, sir.
```

16

```
 1              MR. ROSALES:  Objection, Your Honor.

 2              MR. BALAREZO:  It's a public filing, Your Honor.

 3              THE COURT:  Yeah.  Overruled.

 4    BY MR. BALAREZO:

 5         Q    You're aware that Vicente is cooperating, correct?

 6         A    Yes, sir.

 7         Q    All right.  Did you personally, Agent Hatherley,

 8    did you contact Vicente?

 9         A    No, I didn't personally contact him.

10         Q    All right.  Did you -- are you aware if any other

11    agents contacted Vicente to confirm whether or not any of

12    this information that Ray Zambada said was correct or if he

13    had any knowledge of it?

14         A    No, I'm not aware of that, sir.

15         Q    Now, you also indicated that -- or you testified

16    that Ray Zambada had mentioned there were two routes through

17    Tamaulipas, T-A-M-A-U-L-I-P-A-S, and Nuevo León?

18         A    Correct.

19         Q    And those were supposed to be routes into the

20    United States that were used by my client, Mr. Beltran

21    Leyva, correct?

22         A    Those areas, yes, were -- had routes in them that

23    would enter the United States, sir.

24         Q    And I think you also said that Ray Zambada

25    indicated that Mr. Beltran would traffic through those areas
```

343b

18

1      Q    That's fine.

2           Now, during that period, though, the Sinaloa

3    Cartel was a powerful cartel in and of itself, correct?

4      A    Yes, sir.

5      Q    And to your knowledge, the Sinaloa Cartel had

6    direct routes into the United States itself, correct?

7      A    I'm assuming so, sir.

8      Q    All right.  So did Ray Zambada explain to you why

9    Mr. Beltran Leyva had to traffic for the Sinaloa Cartel

10   through Tamaulipas and Nuevo León?  Did they ever give him

11   an explanation for that?

12     A    Not that I'm aware of right now, sir.

13     Q    Did you ever follow up, have any questions about

14   it?

15     A    No, sir.

16     Q    Now, you also indicated that Ray Zambada told the

17   government that drugs arrived in Chiapas at some period of

18   time.

19          Do you remember that?

20     A    Yes, sir.

21     Q    And Chiapas is the southernmost department,

22   I guess, or province of Mexico, state, excuse me, of Mexico,

23   right?

24     A    Yes, sir.  It's lower half.

25     Q    Now, who was the source of the cocaine that was

19

1    coming into Chiapas?

2        A    You know, I'm sorry.  I can't recollect right now

3    on who that was.  It was so many years.

4        Q    Ray also testified that he's the one that

5    controlled the transport from Chiapas to Mexico City.

6             Do you remember that?

7        A    Yes, sir, I do.

8        Q    Now, you also testified that Ray Zambada told the

9    government that Alfredo Beltran, my client, controlled Nuevo

10   León and Tamaulipas, what I asked you a little earlier,

11   right?

12       A    Yes, sir.

13       Q    All right.  Now, you also said, though, that Ray

14   Zambada said that Hector and Arturo, my client's brothers --

15       A    Yes.

16       Q    -- were not able to go into those two states,

17   correct?

18       A    Yes, sir.

19       Q    And the reason was because there was a -- they

20   were basically afraid of a prosecutor that was after him --

21   after them?

22       A    Yes, sir.  There was a prosecutor that was looking

23   for them.  And they -- she wanted to -- or the prosecutor

24   wanted to arrest them.  So they stayed away from her state,

25   sir.

22

```
1        A      Just those two, sir.

2        Q      And which one -- who was using which one?

3        A      Right now it looks like they're -- both of them

4    are using about similar ones.

5        Q      That's not answering the question.  Which group

6    was using which port?

7        A      Well, I'm telling you, sir, that both ports -- Ray

8    Zambada used Ixtapa-Zihuatanejo ports, but also there were

9    possibly other small ports that were used by the Beltran

10   Leyvas.

11       Q      Well, but if they already had their own port,

12   though, to -- where they could receive cocaine, why did they

13   need assistance from the other group?

14       A      I'm -- right now I'm not aware, sir.  It's just

15   that there was a lot of cocaine in, and I'm assuming that --

16       Q      Well, I don't want you to assume.  What

17   do you know?

18       A      I know what I testified to last week, is that each

19   one has permission to use for different ports.

20       Q      You also mentioned that Ray talked about a debt of

21   $15 million that were owed to a public official of some

22   kind, correct?

23       A      Yes, sir.

24       Q      Was that public official ever identified by Ray?

25       A      No, sir, he was not.
```

23

1       Q    So there was obviously, then, no follow-up with

2   the public official, correct?

3       A    I'm not aware of any, sir.

4       Q    Do you have any corroboration as to that assertion

5   by Ray Zambada that a public official was owed $30 million

6   by the Beltran Leyvas?

7       A    I'm not aware right now, sir.

8       Q    Now, you are -- just one moment.

9            You know who Edgar Valdez is, correct, also known

10  as La Barbie?

11      A    Yes, I do, sir.

12      Q    You know that, from your investigation, that he

13  was -- I guess they call him the armed wing of Arturo

14  Beltran, correct?

15      A    If I recollect, I know he was part of the Zetas,

16  sir.

17      Q    I'm sorry?

18      A    I know he was part of the Los Zetas cartel group.

19      Q    Who was, La Barbie?

20      A    Yeah, La Barbie, sir.  Yes, sir.

21      Q    Well, if the government --

22           MR. BALAREZO:  And, Your Honor, can I mark this as

23  Defense Exhibit 3?  I'll just show it for identification.

24  BY MR. BALAREZO:

25      Q    Do you recognize that picture, Defense 3?

24

1    A    Yes, sir, I do.

2    Q    And who's the gentleman?

3    A    That's whom you're speaking about, sir, La Barbie.

4    Q    Now, I'll give you a second or a minute or so to

5    reconsider that answer of yours where you indicated that he

6    was a member of the Zetas.  Are you certain of that, or

7    do you need to look at your notes.

8    A    No.  That's what I -- that's what I learned

9    through just discussions.

10    Q    Okay.  And the Zetas were enemies of the Beltran

11    Leyvas?

12    A    I think at one point, sir, yes, towards the end.

13    Q    And at which point -- when the Zetas were the

14    enemies of the Beltran Leyvas, was La Barbie a member of

15    Los Zetas at that point or when they weren't the enemies

16    Beltran?

17    A    No.  I'm sorry.  I don't know that, sir.

18    Q    You don't know that?

19    A    No.

20    Q    Okay.  Now, you mentioned a little earlier an

21    individual by the name of -- well, strike that.

22         Your testimony last week focused a lot on the

23    chart where the price of cocaine -- do you remember

24    Government's 6, Exhibit 6?

25    A    Yes, sir, I do.

32

```
 1              Counsel has failed to establish that this witness
 2    was present for that interview.  In fact, the witness was
 3    not present for that interview.
 4              MR. BALAREZO:  I'm asking to admit it independent
 5    of the witness.  This is a document that the government has
 6    produced in discovery.
 7              THE COURT:  We'll deal with that at another time.
 8              MR. BALAREZO:  Very well.  Very well, Your Honor.
 9              THE COURT:  The objection is sustained.  Move on
10    to your next topic.
11    BY MR. BALAREZO:
12        Q    Now, Agent, with respect to Ray Zambada, I think
13    it's safe to say that you personally did not corroborate
14    anything that he told you, correct?
15        A    Right now, no -- not -- no.
16        Q    Well, not right now.  You didn't, correct?
17        A    No.  No.
18        Q    And, in fact, your purpose in testifying today was
19    about -- to testify about what Ray Zambada said to the
20    government, correct?
21        A    That's correct, sir.
22        Q    And your entire testimony is based solely on what
23    Ray Zambada said at these proffer sessions with the
24    government, correct, that you were present at?
25        A    Yes.  I mean, I've taken the notes and through the
```

349

33

1   investigation and collaboration with others, yes.

2       Q    Well, you've indicated that you last time -- when

3   you were here last week, you said you sometimes had to

4   corroborate it or -- didn't say corroborate.  You spoke with

5   other investigators.

6            Do you remember that?

7       A    Correct.

8       Q    Do you know who you talked to about these things?

9            MR. ROSALES:  Objection, Your Honor.

10           Again, the witness has testified both on direct

11  and on cross-examination that his testimony in this hearing

12  has been from the witnesses Poveda Ortega and Zambada

13  Garcia.  The only evidence in the record at this time of

14  information that came from any other source -- and the Court

15  can review the transcripts ad nauseam on this -- is the

16  information that the witness testified to with regards to

17  the sale of a kilo of cocaine at the border, which I believe

18  his testimony was at $21,000, and the prices of kilos of

19  cocaine in New York, Atlanta, and Chicago.

20           Defense counsel is asking questions that I think

21  are joining several questions in one when he's asking where

22  the information came from.

23           What is in the record is exactly what I've stated,

24  that the information has come from Poveda Ortega, from this

25  witness's interviews with Poveda Ortega, as well as from

34

```
 1  Zambada Garcia.

 2          The only evidence in the record that the

 3  information came from anywhere else was with regards to the

 4  prices of cocaine at the border and in those three U.S.

 5  cities.

 6          MR. BALAREZO:  Well, Your Honor, if the government

 7  is conceding that this witness' testimony comes solely from

 8  information provided by Ray Zambada and Mauricio Poveda

 9  during the relevant proffer sessions and from nowhere else,

10  then I have no further questions.  If that's what the

11  government is conceding, then I have no further questions.

12          THE COURT:  Is that what you're conceding?

13          MR. ROSALES:  That is correct, Your Honor.  That

14  is what the Court has instructed us to do, and that is what

15  this witness was prepared to do.

16          MR. BALAREZO:  Then I have no further questions.

17          THE COURT:  Okay.  Redirect?

18          MR. ROSALES:  May I just have a few minutes,

19  Your Honor, to gather some thoughts before I start the

20  redirect?

21          THE COURT:  No.

22          MR. ROSALES:  Your Honor, may I approach the

23  witness?

24          THE COURT:  You may.

25
```

41

| | |
|---|---|
| 1 | A    Yes, sir. |
| 2 | Q    Yet you didn't become a part of the case until |
| 3 | approximately late 2014; is that correct? |
| 4 | A    Yes, sir. |
| 5 | Q    And are you aware that around late 2014 is when |
| 6 | the defendant was extradited from Mexico? |
| 7 | A    Yes, sir.  I'm -- |
| 8 | Q    Was your sole responsibility as one of the case |
| 9 | agents in this case to help prepare two witnesses for trial |
| 10 | testimony? |
| 11 | A    Yes, sir. |
| 12 | Q    And were those two witnesses Mr. Zambada Garcia |
| 13 | and Mr. Poveda Ortega? |
| 14 | A    That's correct. |
| 15 | Q    Now, there were other agents who were involved in |
| 16 | preparing this case for trial; is that correct? |
| 17 | A    Yes, sir. |
| 18 | Q    As well as other agents involved in investigating |
| 19 | the case leading up to the indictment; is that correct? |
| 20 | A    Yes, sir. |
| 21 | Q    But your testimony here during this hearing is |
| 22 | based solely on your interviews of those two witnesses; |
| 23 | is that correct? |
| 24 | A    Yes, sir. |
| 25 | Q    With the exception of the prices of cocaine at the |

62

1          MR. BALAREZO:  Actually, I will do that,

2    Your Honor.

3    BY MR. BALAREZO:

4        Q    Mr. -- Agent Hatherley, you reviewed material

5    with -- or information that was given by Mr. Poveda in

6    preparation for this hearing?

7        A    Yes, sir.

8        Q    And do you recall that Mr. Poveda told the

9    government that Alfredo, AKA El Mochomo, would receive and

10   sell all the drug trafficking organizations' merchandise in

11   Culiacán?

12       A    I think I might recollect that, sir, yes.

13       Q    I'm sorry?

14       A    I might recollect it, but it didn't sound like my

15   writing.

16       Q    Looking at Mr. Poveda's statements given to the

17   government to refresh your recollection --

18          MR. ROSALES:  Objection, Your Honor.  Counsel has

19   not laid a foundation.  These notes are actually this

20   witness's.

21          MR. BALAREZO:  Does it refresh his recollection,

22   Your Honor.

23          THE COURT:  If it's to refresh him, you can look

24   at it and take it back.

25

63

1   BY MR. BALAREZO:

2       Q    Would you take a look at that line that's

3   highlighted in pink.

4            Does reviewing this document,

5   Defendant's Exhibit No. 7, refresh your recollection as to

6   whether or not Mr. Poveda told the government Alfredo,

7   AKA El Mochomo, would receive and sell all the drug

8   trafficking organizations' merchandise in Culiacán?

9       A    That's what the document says, sir.

10           MR. BALAREZO:  Thank you, Your Honor.

11           THE COURT:  You're excused.

12           MR. ROSALES:  Again, Your Honor, I object to that

13  testimony.  It was improper refreshing of recollection.

14  He didn't establish whose notes they were, when they were

15  taken, whether or not this witness was even there during the

16  statement.  And, again, we've --

17           THE COURT:  You can refresh someone's recollection

18  with a ham sandwich, Mr. Rosales.

19           You're excused.  You can step down.

20           Call your next witness.

21           MS. LISKAMM:  The government calls FBI Special

22  Agent Peschka.

23           DEPUTY CLERK:  Please raise your right hand.

24           (Witness is placed under oath.)

25           DEPUTY CLERK:  Please be seated.

65

1      Q     Do you participate in the original indictment of

2    the defendant?

3      A     No, I did not.

4      Q     When were you brought onto this investigation?

5      A     In approximately July 2014.

6      Q     Was that before the defendant was extradited from

7    Mexico?

8      A     Yes.

9      Q     What was the function of you being brought into

10   the team?

11     A     I was brought in to assist with the -- once he was

12   extradited, with the pretrial preparations, preparing

13   witnesses.

14     Q     Did you participate in the interview of every

15   single potential witness the government intended to call in

16   this trial?

17     A     No.

18     Q     Were there some witnesses that you spent more time

19   with than others?

20     A     Yes.

21     Q     Did you participate in any of the investigation

22   that led to the indictment in this case?

23     A     No.

24     Q     For today's purposes, could you describe for the

25   Court what preparation you took on?

77

1    going to bring in statements that he made, I think he can

2    explain why he made those statements, number one.

3           Number two, then I would ask that if he does, then

4    that his examination be limited solely to those statements,

5    because then we're going to open up into a whole world of

6    other things that are not relevant to these particular

7    issues.

8           THE COURT:  They're not referring to this as a

9    cooperation interview.  They're not referring to this as

10   some kind of -- it's just a -- it's a pre-plea Mirandized

11   interview.

12          MR. BALAREZO:  Your Honor --

13          THE COURT:  It doesn't say anything, on its face.

14          MR. BALAREZO:  Ray Zambada claimed that

15   Mr. Beltran had something to do with the murder of his son

16   before his name was even published as a cooperator in this

17   case, because it was expected that he was cooperating.

18          The government made a huge deal about their

19   witness security and all these other things.  I have not

20   done anything in this courtroom that was not allowed by the

21   rules or by the Court.  I have mentioned names because they

22   were public.  I have mentioned cooperation agreements

23   because they were public.  This was done as a confidential

24   meeting with the government for the purposes of cooperation.

25          Now what they want to do is they want to dirty him

80

```
 1   relationship with anyone in particular in the Beltran Leyva

 2   drug trafficking organization?

 3        A    Yes.  With the defendant's brother, Arturo Beltran

 4   Leyva.

 5        Q    Approximately when did this witness start working

 6   for the Beltran Leyva Organization?

 7        A    I believe it was after the year 2000.

 8        Q    Dead Mr. Villarreal plead guilty to his

 9   involvement in the Beltran Leyva Organization?

10        A    Yes, he did.

11        Q    What charges did he plead guilty to?

12        A    Money laundering and drug trafficking conspiracy

13   charges.

14        Q    What is the maximum penalty that Mr. Villarreal

15   faces?

16        A    Life in prison.

17        Q    Has this witness been sentenced yet?

18        A    No, he has not.

19        Q    Has anyone in the United States Government given

20   this witness any promises as to what his sentence will be

21   based on his cooperation?

22        A    No.

23             THE COURT:  What court did he plead guilty in?

24             THE WITNESS:  Southern District of Texas.

25   BY MS. GOLDBARG:
```

1    Q    But the witness is cooperating with the hopes of

2    receiving a reduced sentence, correct?

3    A    That's correct.

4    Q    Aside from the drug trafficking conspiracy and the

5    money laundering, did this witness provide the government

6    information about any of his other illegal activities?

7    A    Yes.

8    Q    What did this witness tell the government that he

9    participated in, other illegal activities?

10    A    As part of the DTO, he participated in

11    kidnappings, was present when individuals were tortured and

12    murdered.  He did not pay any taxes on any of the illegal

13    proceed from his activities.  Carried false identification

14    and provided false identification.

15    Q    Can you slow it down just a little bit.

16    A    Sure.  I'm sorry.

17        False identification and also provided false

18    identification to others, including his family members.

19        He drank alcohol and used cocaine on occasion,

20    among other things.

21    Q    Did this witness make payments on behalf of the

22    Beltran Leyva Organization related to corruption?

23    A    Yes, he did.

24    Q    Did this witness have any involvement in the

25    procurement of weapons for the organization?

1      A     In approximately 2005.

2      Q     Where did the witness meet the defendant?

3      A     Culiacán, Sinaloa.

4      Q     Did the witness explain under what circumstances

5   the witness met the defendant?

6      A     Yes.  He explained that Arturo Beltran Leyva sent

7   him Culiacán, Sinaloa, to do an evaluation of the

8   defendant's security apparatus there.

9      Q     What was happening in Culiacán in 2005?

10     A     At that time, there was a war between the Beltran

11   Leyva DTO and the Zeta DTO.

12     Q     Was the Beltran Leyva Organization aligned with

13   anyone else in this war against the Zetas?

14     A     Yes; with the Sinaloa Cartel.

15     Q     Why did Arturo Beltran Leyva send one of his top

16   guys to Culiacán to be with the defendant?

17     A     Arturo Beltran was concerned for his brother's

18   safety.  He was concerned that his brother would be targeted

19   by the Zetas, and it was also he wanted to make sure he

20   wasn't captured by law enforcement or military.

21     Q     This is information provided to you by

22   Mr. Villarreal, correct?

23     A     Correct.

24     Q     And at the time that Arturo Beltran Leyva sent the

25   witness to Culiacán to see the defendant, what role did

1  Arturo Beltran Leyva play within the Beltran Leyva

2  Organization?

3      A    Arturo was the head of the Beltran Leyva DTO at

4  that time.

5      Q    Just to clarify for the record, what familial

6  relationship is there between the Arturo and the defendant?

7      A    They're brothers.

8      Q    And where is Arturo currently?

9      A    Arturo Beltran Leyva is deceased.

10     Q    Approximately how long did the witness remain in

11  Culiacán?

12     A    Approximately three to six months.

13     Q    During this time, how frequently would the witness

14  meet with the defendant in Culiacán?

15     A    The witness said he would meet with the defendant

16  on almost a daily basis.

17     Q    When the witness said "almost a daily basis," were

18  there instances in which the witness explained why the

19  witness was not with the defendant?

20     A    Yes.  The witness explained that there were times

21  the defendant would fly up to the mountains outside of

22  Culiacán to meet with Chapo Guzman.

23     Q    Did the witness go to the mountains --

24     A    No.  The witness --

25     Q    -- with the defendant?

1      A    No, he did not.

2      Q    Did the witness have any conversations with Arturo

3  Beltran Leyva about what role the defendant played within

4  the Beltran Leyva Organization?

5      A    Yes; that he was the head of the Beltran Leyvas

6  for the Culiacán area.

7          MR. PURPURA:  Judge, can the witness please speak

8  nice, loud, and clear or just come closer to the mic.  We

9  can't hear him back here at all; he trails off.

10        THE COURT:  Speak into the microphone louder.

11        THE WITNESS:  Sure.

12        MR. PURPURA:  Yeah, we missed the answer to that.

13  BY MS. GOLDBARG:

14      Q    We'll try that again.

15      A    Okay.

16      Q    Did the witness have any conversations with Arturo

17  Beltran Leyva as to what role the defendant played in the

18  Beltran Leyva Organization?

19      A    Yes.

20      Q    What was that?

21      A    Arturo Beltran Leyva explained that his brother,

22  the defendant, was the head of the Beltran Leyvas in

23  Culiacán, Sinaloa.

24      Q    What did it mean to be the head of the Beltran

25  Leyva Organization in Culiacán?  Did the witness explain

93

1      A    There were morning breakfast meetings.

2      Q    Who was present during these morning breakfast

3   meetings?

4      A    The defendant; the witness, Mr. Villarreal; an

5   individual named Osama; Wacho, another individual; and

6   Rayito.

7      Q    Without providing the witness' names, is there

8   other part of the investigation that the name Osama came up?

9      A    Yes.

10     Q    According to Mr. Villarreal, what was Osama's role

11  with the defendant?

12     A    Osama was the right-hand man, the secretary for

13  the defendant.

14     Q    How frequently was Mr. Villarreal present with the

15  defendant and Osama during these morning breakfast meetings?

16     A    I'm sorry.  Can you say that again.

17     Q    How frequently was the witness, Mr. Villarreal,

18  how frequently was he present with Osama and the defendant?

19     A    On an almost-daily basis.

20     Q    What did Mr. Villarreal describe happened during

21  those morning meetings between the defendant, Osama, and

22  Mr. Villarreal?

23     A    During the morning meetings, the plaza bosses from

24  the United States-Mexico border would call in and report to

25  the defendant on what drugs had successfully entered the

1    for?

2        A    Either news reports, media reports, or paperwork

3    from the attorneys.

4        Q    From attorneys in the United States?

5        A    Correct.

6        Q    Were there other -- was there other information

7    provided over these daily calls, the radio calls, as to how

8    the drugs were getting to the United States and how the

9    money was coming back from the United States?

10       A    Yes.

11       Q    What did the witness hear?

12       A    The witness heard the plaza bosses reporting the

13   use of tunnels to introduce the drugs into the United States

14   and for the money to return back from the United States

15   through those same tunnels.

16       Q    According to Mr. Villarreal, what was Osama's role

17   during these daily calls?

18       A    He would take notes and log down what was being

19   reported by the plaza bosses.

20       Q    I want to step back one second, Special Agent

21   Peschka.  Do you have any law enforcement authority in

22   Mexico?

23       A    No.

24       Q    Could you simply go across the border and try and

25   seize evidence in Mexico as an FBI agent?

97

1     A     No, I could not.

2     Q     Could you interview people if you wanted to as

3  part of the investigation?

4     A     Not independently, no.

5     Q     When Mr. Villarreal discussed the ledgers that

6  Osama was keeping, did you take any efforts to try and

7  locate those ledgers?

8     A     No.

9     Q     Why not?

10    A     Because I don't know where Osama is or where I can

11  locate him.  I don't know who he is.

12    Q     Are there any other limitations to you trying to

13  get evidence in Mexico?

14    A     Yes.  I'm not permitted to go in there and do that

15  by myself.

16    Q     Aside from discussing the specifics of drugs and

17  money, did Mr. Villarreal overhear the defendant and Osama

18  discussing where the drugs were going to in the

19  United States?

20    A     Yes.

21    Q     Can you --

22    A     Yes.

23    Q     -- recall any of these cities?

24    A     Los Angeles, Tucson, Phoenix, Chicago, New York,

25  Atlanta, and others.

1      Q    You stated that one of the principal reasons that

2    Mr. Villarreal went Culiacán was to evaluate the situation

3    and that Mr. Villarreal was in charge of corruption.  What

4    was some of the initial analysis that Mr. Villarreal did of

5    the defendant's organization in Culiacán?

6      A    Mr. Villarreal asked the defendant who he had

7    bribed in that area.

8      Q    What did the defendant tell Mr. Villarreal with

9    regards to who he, the defendant, had bribed?

10     A    He said that -- the defendant had told

11   Mr. Villarreal that he had bribed the municipal police,

12   state police, federal police, federal highway police,

13   prosecutors, and members of the military in that area.

14     Q    Did the witness explain -- did Mr. Villarreal

15   explain why it was important to have almost all levels of

16   the government bribed?

17     A    To ensure that drugs were not seized and that the

18   DTO members weren't arrested, to provide protection.

19     Q    You mentioned lot of people in the public sphere

20   that were under -- that were being bribed.  Was there anyone

21   that wasn't being bribed in the area of Culiacán?

22     A    Yes.

23     Q    Who was that?

24     A    A general that was in charge there.

25     Q    Do you recall the name of that general?

1    Q    You stated that one of the principal reasons that

2   Mr. Villarreal went Culiacán was to evaluate the situation

3   and that Mr. Villarreal was in charge of corruption.  What

4   was some of the initial analysis that Mr. Villarreal did of

5   the defendant's organization in Culiacán?

6    A    Mr. Villarreal asked the defendant who he had

7   bribed in that area.

8    Q    What did the defendant tell Mr. Villarreal with

9   regards to who he, the defendant, had bribed?

10    A    He said that -- the defendant had told

11   Mr. Villarreal that he had bribed the municipal police,

12   state police, federal police, federal highway police,

13   prosecutors, and members of the military in that area.

14    Q    Did the witness explain -- did Mr. Villarreal

15   explain why it was important to have almost all levels of

16   the government bribed?

17    A    To ensure that drugs were not seized and that the

18   DTO members weren't arrested, to provide protection.

19    Q    You mentioned lot of people in the public sphere

20   that were under -- that were being bribed.  Was there anyone

21   that wasn't being bribed in the area of Culiacán?

22    A    Yes.

23    Q    Who was that?

24    A    A general that was in charge there.

25    Q    Do you recall the name of that general?

1      A    Yes.

2      Q    I'm not going to go into it at this point in time.

3           What happened with regards to this general?

4      A    The defendant, Chapo Guzman, and Mayo Zambada each

5      contributed $1 million for a total of $3 million that was

6      offered to the general as a bribe.

7      Q    Did the general, in fact, accept the bribe?

8      A    No, he did not.

9      Q    Did the general pass back a message to these three

10     individuals?

11     A    Yes, he did.

12     Q    What was that message?

13     A    The general sent a message back saying that if

14     they attempted to bribe him again, he would have them

15     arrested.

16     Q    How did the defendant react, according to

17     Mr. Villarreal, when the general rejected the bribe?

18     A    According to Mr. Villarreal, the defendant was

19     very upset and wanted to kill the general.

20     Q    Did the defendant, in fact, kill the general?

21     A    No, he did not.

22     Q    Who prevented the defendant from killing the

23     general?

24     A    His brother, Arturo Beltran Leyva.

25     Q    Does Mr. Villarreal know whether or not the

102

```
 1   defendant took any other retaliatory actions against the
 2   general?
 3        A    Yes.
 4        Q    What did he do?
 5        A    The defendant ordered some stray dogs to be picked
 6   up.  They were killed and thrown outside the barracks where
 7   the general was.
 8        Q    Was anything other than the dead animals placed in
 9   the barracks?
10        A    Yes.  He also instructed --
11        Q    He who?
12        A    The defendant.  Sorry.
13             The defendant instructed that threatening messages
14   be placed outside of the barracks along with the dead
15   animals.
16        Q    What eventually happened to the general?
17        A    He was transferred out of the Culiacán area.
18        Q    According to Mr. Villarreal, what was the
19   importance of the defendant, Chapo Guzman, and Mayo Zambada
20   pooling together their money to bribe a general in the area
21   of Culiacán?
22        A    It showed that they were working together and that
23   they were on the same page, same equal footing.
24        Q    What other roles did Mr. Villarreal observe the
25   police play in the defendant's drug trafficking organization
```

1  in Culiacán?

2      A    According to Mr. Villarreal, the police would also

3  look for contras.  They would look for suspicious vehicles,

4  stop those vehicles; and if they were not -- if they were

5  contras, would turn those people over to the defendant's

6  men.

7      Q    So the police, in fact, helped the defendant and

8  his organization identify the contras and kidnap them?

9      A    Yes.

10     Q    Was Mr. Villarreal ever present when the defendant

11 himself spoke to any of these public officials?

12     A    Yes, he was.

13     Q    What did the witness describe?

14     A    The witness described that the defendant would

15 meet with some of the police and prosecutors at a small --

16 at a plaza outside of a small church in Culiacán about every

17 15 to 30 days.

18     Q    I'm sorry.  Could you repeat how frequently the

19 defendant met with these officials that you bribed?

20     A    About every 15 to 30 days.

21     Q    And in your capacity as an FBI agent, did you

22 attempt to try and locate any of these corrupt police

23 officers in Mexico?

24     A    No.

25     Q    Why not?

104

```
 1        A     It would be fruitless.  There would be no point.
 2   They wouldn't talk to me.
 3        Q     What about the general that refused the bribe
 4   payment?
 5        A     No, I did not.
 6        Q     Why not?
 7        A     I don't know.
 8        Q     Did the witness play any role in modernizing the
 9   security forces of the defendant in Culiacán?
10        A     Yes, he did.
11        Q     What did Mr. Villarreal do?
12        A     Mr. Villarreal, after evaluating his security,
13   made some suggested changes, including limiting his
14   exposure.  The defendant was previously traveling in larger
15   convoys of vehicles; and he wanted him to reduce his
16   exposure, his -- the attention that was being drawn by those
17   large convoys.
18        Q     Why was Mr. Villarreal concerned about the
19   defendant traveling in a large convoy?
20        A     It brought undue attention to him.  It let others
21   know where he was.  It was just hard to hide him.
22              THE COURT:  This would be a good time for an
23   afternoon recess?
24              MS. GOLDBARG:  Anytime you want.
25              THE COURT:  Okay.  We're going to take a
```

111

1   a pistol and an AK-47.

2       Q   How frequently would Mr. Villarreal see the

3   defendant carrying a pistol or a larger weapon?

4       A   According to Mr. Villarreal, he was always

5   carrying weapons.

6       Q   Were there any times that the witness,

7   Mr. Villarreal, saw the defendant carrying any other types

8   of weapons?

9       A   Yes.  He said that he would -- when the defendant

10   returned from the mountains, the trips up to see

11   Chapo Guzman, he saw him wearing a tactical vest, including

12   that had grenades on it.

13       Q   How frequently would Mr. Villarreal see the

14   defendant wearing a tactical vest carrying grenades on it?

15       A   If I recall correctly, he said that the defendant

16   would go up to the mountains to see Chapo every seven to ten

17   days.  So once a week, approximately.  Every seven to ten

18   days.

19       Q   So frequently?

20       A   Yes.

21       MS. GOLDBARG:  May I approach, Your Honor?

22       THE COURT:  You may.

23   BY MS. GOLDBARG:

24       Q   I've just shown you what's been marked as

25   Government's Exhibit 3.

1        Before going into the details of that, did the

2   United States Government make a request, a formal request of

3   the Mexican government, to provide a copy of pictures of

4   items obtained during the defendant's arrest in Mexico in

5   2008?

6        A    Yes.

7        Q    Is what you have in front of you a copy of that

8   report that came from the Mexican government?

9        A    Yes, it is.

10       Q    Have you had a chance to review it?

11       A    Yes, I have.

12            MR. PURPURA:  Your Honor, we object to the

13   document coming in.  Could we take a look at it first?

14            THE COURT:  Uh-huh.  You haven't seen it?

15            MR. PURPURA:  I don't have a view of it.  Do you

16   have it?

17            THE COURT:  I have it right here in my exhibits.

18            MR. PURPURA:  Obviously, this is a sentencing

19   proceeding, and hearsay evidence is admissible.  It's

20   my understanding that FBI Agent Peschka was simply -- and

21   it's not even a Spanish name -- was simply going to testify

22   as to his debriefing of Mr. Villarreal.  And now it looks

23   like he's going to go into a whole huge amount of hearsay

24   involving a Mexican investigation, which may or may not be a

25   Mexican investigation.  I'm not even sure.

1          MS. GOLDBARG:  Your Honor, they're going to be

2    very few and limited questions about the weapons seized.

3          MR. PURPURA:  The bottom line is we have no idea

4    how these weapons were seized because there's no one here to

5    verify how they were seized.

6          And this is not information that he received from

7    any of the cooperators.  This is information that he's just

8    received somehow from Mexico.  And apparently Mexico,

9    according to the agent, doesn't coordinate with the

10   United States authorities in these investigations.

11         MS. GOLDBARG:  So --

12         THE COURT:  Well, the agents reviewed this report.

13   He's familiar with the report, apparently.

14         MR. PURPURA:  Well, this may be the only report

15   that he's familiar with.  And I'm not sure if he speaks

16   Spanish, but it's in Spanish.

17         MS. GOLDBARG:  You can ask him.

18         THE COURT:  I just noticed that.

19         But it has photographs of things that were seized

20   at the time of the arrest.  I assume that's why.

21         MR. PURPURA:  Yeah.  That's --

22         THE COURT:  That's the reason why this is being

23   offered.

24         MS. GOLDBARG:  Yes, Your Honor.

25         MR. PURPURA:  That's correct.

114

1            And how do we know?

2            THE COURT:  I have no problem with -- to the

3    extent that he can verify what this is and that these are

4    photographs --

5            MR. PURPURA:  Judge, I --

6            THE COURT:  -- that were taken in connection with

7    the his arrest; that's fine.

8            MR. PURPURA:  The basis of knowledge would simply

9    be in this case under Rule 602, the fact that he's been

10   given this packet and he's been instructed that this is what

11   the Mexicans allege was found on the date he was arrested.

12   That's the best he can say.

13           He's done no independent verification whatsoever.

14   As a matter of fact, if this case went to trial, the

15   government could not have brought -- they were not going to

16   present this information because they don't have witnesses

17   to verify it.

18           MS. GOLDBARG:  Your Honor --

19           MR. PURPURA:  But, again, it is a sentencing

20   hearing, and I'll defer to the Court.

21           MS. GOLDBARG:  Your Honor, the government would

22   argue, first of all, that it's a self-authenticating

23   document that came as a result of the official request,

24   number one.

25           Number two the government is attempting to

1    corroborate what witnesses are telling us.  So it seems as

2    though it's somewhat had disingenuous for defense counsel to

3    try and object to the government providing any type of

4    evidence that would corroborate the information that's

5    provided by the cooperating witnesses.

6         And the government's intent on producing and

7    introducing this document is limited to a few photos that

8    I'm going to ask specific questions about, and we're not

9    going through every single page of the document.

10        But when the government -- the United States

11   Government did make a request to obtain the Mexican -- a

12   copy of the photographs of evidence obtained from the

13   Mexican government that they took at the time the defendant

14   was arrested in 2008, this was a result of what was

15   provided.

16        We think for purposes of sentencing, it meets the

17   evidentiary standards.

18        THE COURT:  For that limited purpose, I'll permit

19   it.

20        MS. GOLDBARG:  Thank you.

21        THE COURT:  Go ahead.

22        I'm not letting the whole document in, though.

23        MS. GOLDBARG:  Not at all, Your Honor.

24   BY MS. GOLDBARG:

25        Q    Special Agent Peschka, I would like to draw your

116

1    attention to the images on Bates stamp numbered pages 20 and

2    21.

3         Can you describe for the Court what we're looking

4    at on page 20?

5         A    It's a "semi-automatic pistol with custom pistol

6    grips."  There appears to be gold in color on the grips,

7    with an eagle -- image of an eagle on it.

8         Q    And turning to page 21, what are we looking at

9    on --

10        MR. PURPURA:  Bates stamp numbers on this?

11        MS. GOLDBARG:  20 and 21.  Those are the red

12   numbers on the bottom of the page.  It actually is --

13        MR. PURPURA:  There's numbers on the top of the

14   page recognized in colors and numbers on the box, so which

15   numbers are you using?

16        MS. GOLDBARG:  The actual correct full Bates stamp

17   number is ABL00000000020 for simplification, I will just

18   refer to the last number.

19   BY MS. GOLDBARG:

20        Q    Now, turn to page 21 of the typed number on the

21   bottom.  Can you describe what we see in this image?

22        A    Yes.  It's a close-up shot of the slide where you

23   can see the words "El Aguila" inscribed on the pistol.

24        Q    Special Agent Peschka, based on your pronunciation

25   of that word, what language is that engraving in?

117

```
 1        A    In Spanish.

 2        Q    How would you describe your ability to speak and

 3   read Spanish?

 4        A    I'm proficient.

 5        Q    Do you know what the word "El Aguila,"

 6   A-G-U-I-L-A, what that means in English?

 7        A    Yes, I do.  It means "the eagle."

 8        Q    Is that similar to the depiction of what's in what

 9   appears to be the gold-plated part of the grip of the

10   weapon?

11        A    Yes.

12        Q    In your investigation, did you learn of any other

13   aliases that were used by the defendant other than Mochomo?

14             MR. PURPURA:  Objection.  I'm going to ask we have

15   a basic knowledge of 602.  I would object in spite of the

16   fact this is still a sentencing hearing.  There's some due

17   process we need.

18             THE COURT:  He can provide his basis for

19   knowledge.

20             Go ahead.

21             THE WITNESS:  As part of the investigation, I

22   learned that another nickname --

23             MR. PURPURA:  Objection.  What part of the

24   investigation?  There has to be a foundation, Judge.

25
```

1    BY MS. GOLDBARG:

2        Q    Did other members --

3            THE COURT:  I said he can provide the basis for

4    his understanding.  He was in the process of doing that.  He

5    hasn't done it yet.

6            MR. PURPURA:  It's part of the investigation,

7    concluding "El Aguila" is Alfredo.

8            MS. GOLDBARG:  He didn't get to that part yet.

9            MR. PURPURA:  Yeah.  Okay.

10   BY MS. GOLDBARG:

11       Q    Did you learn -- are there any other aliases that

12   some of the cooperating witnesses referred to the defendant

13   as, aside from Mochomo.

14       A    Yes.

15       Q    What were some of those other aliases?

16       A    El Aguila.

17       Q    Do you recall whether or not Mr. Villarreal was

18   one of those?

19       A    I believe so, yes.

20       Q    Did Mr. Villarreal discuss whether or not the

21   defendant played any role in producing methamphetamine?

22       A    Yes, he did.

23       Q    What did Mr. Villarreal state with regards to the

24   defendant's involvement in the production of

25   methamphetamine?

1      A    Mr. Villarreal said that the defendant would

2   receive ephedrine, one of the precursor chemicals used to

3   make methamphetamine, from his brother, Hector Beltran

4   Leyva.

5      Q    What would the defendant do after he received

6   ephedrine from his brother, Hector Beltran Leyva?

7      A    He had laboratories, or "cocinas," which means

8   "kitchens" in Spanish, that would produce the

9   methamphetamine in the Culiacán, Sinaloa area.

10     Q    Did the witness ever see these methamphetamines

11  laboratories?

12     A    Yes, the witness did.

13     Q    Did the witness go with the defendant to look at

14  these laboratories?

15     A    Yes, he did.

16     Q    Were there ever instances in which, during the

17  morning meetings, there were complaints of the quality of

18  the methamphetamine that the defendant was sending into the

19  United States?

20     A    Yes.

21     Q    Can you tell the Court what Mr. Villarreal said

22  with regards to that?

23     A    According to Mr. Villarreal, he was present during

24  one of these morning meetings when the border plaza bosses

25  called in to report that some of the customers were

120

1    complaining that the crystal methamphetamine was arriving

2    crushed, and they didn't believe that the quality was as

3    good as it should be.

4        Q    As a result of this complaint, what did the --

5    what, if anything, did the defendant do?

6        A    The defendant, along with the witness, went to the

7    labs to speak to the cooks or the workers that were making

8    the methamphetamine.

9        Q    Did Mr. Villarreal describe the meth labs that he

10   had personally seen with the defendant?

11       A    Yes, he did.  He said they were very large.  They

12   looked like pools.

13       Q    Did the witness state what kind of pools?

14       A    Like swimming pools.  Excuse me.

15       Q    What does that indicate to you, that the meth labs

16   were the size of swimming pools?

17       A    They're very large.

18       Q    Did the witness learn, through this visit to the

19   meth lab and with his conversations with the defendant, what

20   the defendant was doing with these swimming pools of meth?

21       A    Well, I mean, once the methamphetamine was

22   produced, it was being shipped to the United States.

23       Q    Did the defendant describe the process in which

24   the methamphetamine was being taken from these laboratories

25   to the United States?

121

1     A     Via aircraft.

2     Q     What did the defendant tell Mr. Villarreal?

3     A     That the meth was put on planes and was shipped

4   from the Culiacán, Sinaloa area up to the border states with

5   the United States-Mexico border.

6     Q     Once the methamphetamine reached the U.S.-Mexico

7   border, according to the defendant, what would happen to the

8   meth?

9     A     It would be crossed in the U.S. via tunnels and

10  then put on tractor trailers on the United States side for

11  distribution throughout the United States.

12    Q     Now, Mr. Villarreal stated that -- or informed you

13  the reason they went to the math lab was because there was

14  complaints about the quality.

15          Was there Mr. Villarreal present with the

16  defendant when anyone in the lab explained anything about

17  the quality of the methamphetamine that was being produced

18  on the defendant's lab?

19    A     Yes.  The workers explained that the meth was

20  fine.  It was pure.  But it was broken up.  It must have

21  been broken up in transport.  There was nothing wrong with

22  the purity of the drug itself.

23    Q     Was there any further discussion as to why the

24  methamphetamine was being broken up when it was transported?

25    A     Because it wasn't being handled properly in

122

1    transport.

2         Q    Was this described or discussed in any detail?

3         A    Yes.  The witness later observed when he was

4    present when there was drugs being loaded onto the planes,

5    that he noticed that the methamphetamine was handled

6    carefully as compared to other drugs like cocaine.

7         Q    How did Mr. Villarreal observe the cocaine being

8    loaded onto these planes?

9         A    He said that -- the witness said that the cocaine

10   was being thrown onboard the planes; whereas, the crystal

11   meth was being handled much more carefully.

12        Q    Did the defendant tell Mr. Villarreal anything

13   about the cost of making these tunnels to get the

14   methamphetamine into the United States?

15        A    Yes.

16        Q    What did the defendant tell Mr. Villarreal?

17        A    The defendant told Mr. Villarreal that it costs

18   between 1 to 3 million United States dollars to construct

19   these tunnels.

20        Q    Did the defendant indicate to Mr. Villarreal

21   whether or not he was concerned by this large amount?

22        A    No, he was not concerned.  The defendant told

23   Mr. Villarreal that with one to two crossings of drugs, he

24   could recoup his investment in the tunnel.

25        Q    What conclusion were you able to draw from the

140

1   say, December 16th, 2009?

2       A     Yes.

3       Q     And we know that on January 28th, 2008, Alfredo's

4   arrested; is that correct, sir?

5       A     I believe that's the correct date, yes.

6       Q     It is.

7             And let me talk about the security, because in

8   2005, specifically, Arturo -- and Arturo was kind of -- he's

9   kind of a dangerous, dangerous character, wasn't he?

10      A     He was the head of a violent drug trafficking

11  organization.

12      Q     He killed people, didn't he?

13      A     Yes, he did.

14      Q     And you got that right from Mr. Villarreal, right?

15      A     Correct.

16      Q     If people screwed up, he had them killed, right?

17  Come on, you can say it.

18      A     Yeah, it's a fair statement.

19      Q     Now, so he's hired for security for Alfredo,

20  right?

21      A     He was not hired for that purpose.  He already was

22  working for Arturo, working in security and making bribery

23  payments.

24      Q     2005, Arturo wants him to take care of Alfredo's

25  security, correct?

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )    CR No. 12-184
                                   )
                                   )    Washington, D.C.
     vs.                           )    March 1, 2017
                                   )    11:30 a.m.
ALFREDO BELTRAN LEYVA,             )
                                   )
          Defendant.               )
_____    )

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        AMANDA LISKAMM
                           ANDREA GOLDBARG
                           ADRIAN ROSALES
                           Assistant United States Attorney
                           555 4th Street, N.W.
                           Washington, D.C. 20036
                           (202) 252-7785
                           andrea.goldbarg@usdoj.gov

```
 1            P R O C E E D I N G S

 2            DEPUTY CLERK:  All rise.  The United States

 3   District Court for the District of Columbia is now in

 4   session; the Honorable Richard J. Leon presiding.  God save

 5   the United States and this Honorable Court.  Please be

 6   seated and come to order.

 7            (Defendant entered.)

 8            DEPUTY CLERK:  Your Honor, calling Criminal Case

 9   No. 12-184, the United States of America v. Alfredo Beltran

10   Leyva.

11            The defendant is present in the courtroom,

12   Your Honor.

13            The interpreters present for these proceedings are

14   Mr. Engelsberg and Ms. Salazar.  They have been sworn for

15   the record.

16            Will counsel for the parties please approach the

17   lectern and identify yourself for the record.

18            MR. ROSALES:  Good morning, Your Honor.

19   Adrian Rosales for the government, along with

20   Amanda Liskamm, Andrea Goldbarg, and Paralegal Specialist

21   Angela Ancalle-Jimenez.

22            And also Special Agent Peschka from the FBI.

23   He was still on the stand.

24            THE COURT:  Welcome back.

25            MR. BALAREZO:  Good morning, Your Honor.
```

5

1   Eduardo Balarezo and William Purpura on behalf of

2   Mr. Beltran Leyva.

3            THE COURT:  Welcome back.

4            MR. BALAREZO:  Thank you.

5            THE COURT:  The witness can resume the stand.

6            You remain under oath, Agent.

7            THE WITNESS:  Yes, sir.

8            MR. PURPURA:  With the Court's permission,

9   thank you.

10           THE COURT:  Welcome.

11                      - - -

12  SPECIAL AGENT PAUL PESCHKA, WITNESS FOR THE GOVERNMENT,

13  HAVING BEEN PREVIOUSLY SWORN, RESUMED THE STAND AND

14  TESTIFIED FURTHER AS FOLLOWS:

15                      - - -

16               CROSS-EXAMINATION(CONTINUED)

17  BY MR. PURPURA:

18      Q    Special Agent Peschka, let's -- I'm not sure you

19  remember where we left off.  I certainly don't, so I'm going

20  to segue to something else quickly.

21           Government's Exhibit No. 3 --

22           MR. PURPURA:  Your Honor, do you have the

23  Government's Exhibits up there, by any chance?

24           THE COURT:  Yes, I do.

25           MR. PURPURA:  Good.

```
 1   BY MR. PURPURA:
 2        Q    Government's Exhibit No. 3, I hope, Special Agent
 3   Peschka, is going to be the gun.  Do you remember --
 4             MR. PURPURA:  May I approach?
 5             THE COURT:  No, no.  It's a very thick document
 6   that's the -- in Spanish.
 7             MR. PURPURA:  I apologize.  Judge, it's on page
 8   Bates-stamped 20 and 21.  So at the bottom of the page,
 9   there will be the Bates stamp numbers of that document.
10             THE COURT:  So it's part of 3?
11             MR. PURPURA:  3 is just pages 20 and 21, is
12   my understanding.  That's been admitted.
13             THE COURT:  Hold on a second.
14             MS. GOLDBARG:  Your Honor, the government moved to
15   admit all of the Exhibit 3, which is a total of --
16             THE COURT:  It's a lot of pages.
17             MS. GOLDBARG:  -- 50 pages, Your Honor.  But we
18   published them and the witness testified as to pages --
19   Bates stamp page number 20 and 21.
20             THE COURT:  So 20 has got a pistol with a gold
21   hand holder.
22             MR. PURPURA:  Correct.
23             THE COURT:  It's black, but it's got a
24   gold-colored --
25             MR. PURPURA:  Correct.
```

```
 1              THE COURT:  -- grip.

 2              And then 21 looks like -- basically it looks like

 3    the same pistol.  I can't tell, but is this what we're

 4    talking about?

 5              MR. PURPURA:  It is, Judge.  It is.

 6              And just, not at this point, but at some point, we

 7    are going to -- we'd like to address the complete document

 8    coming in.  It was my understanding only pages 20 and 21 of

 9    that document came in.  But obviously it's a sentencing

10    hearing, and the Court can probably look at anything you

11    want to look at in this particular matter.

12              THE COURT:  Well, most of the documents are in

13    Spanish I can't even read it.  I don't know --

14              MR. PURPURA:  I'm with you on that.

15              THE COURT:  -- what it says.

16    BY MR. PURPURA:

17      Q    Obviously, Special Agent Peschka, you do know what

18    we're talking about as far as his Colt, is that correct,

19    sir, Colt .45?

20      A    That weapon in the photo, yes.

21      Q    Yes.  And you've testified to that before on

22    direct examination; is that correct, sir?

23      A    Yes.

24      Q    Sure.  Would you like to look at a copy of it?

25      A    Yes, I would.
```

```
 1              MR. PURPURA:  Thank you.

 2              May I approach, Your Honor?

 3              THE COURT:  You may.

 4   BY MR. PURPURA:

 5      Q    I'm showing you Government's Exhibit No. 3,

 6   pages 20 and 21.

 7              Now, in your experience, it's not unusual for

 8   people from Latin America, South America, Central America of

 9   wealth to have decorative guns; would that be fair to say?

10      A    I don't know how to answer that question.

11      Q    Do you have any experience with that?

12      A    No, I don't.

13      Q    Okay.  Fair enough.  Fair enough.

14              In this particular case, do you have any personal

15   knowledge of this particular weapon?  Did you ever

16   physically touch the weapon or see the weapon?

17      A    No, I did not.

18      Q    The most you have is what we have, is a picture of

19   it; is that correct, sir?

20      A    That is correct.

21      Q    Do you know if that weapon, from your own personal

22   knowledge or from any investigation whatsoever, was the

23   weapon merely decorative or was it operative?

24      A    I don't know.

25      Q    Do you know if that weapon on Government's Exhibit
```

1    Page 20 and 21 was loaded?  "Loaded" meaning did it have

2    bullets that could be shot?

3        A    By examining the picture, it does not.  I can't

4    tell -- I can't answer that question.

5        Q    Do you know if that weapon was ever fired?

6        A    I do not.

7        Q    Did you ever investigate to determine whether any

8    ballistic testing was ever done to that particular weapon to

9    match it up against, let's say, a homicide?

10       A    I did not.

11       Q    Were you present when the gun was seized?

12       A    No.

13       Q    Did you interview personally anyone who was

14   present when the gun was seized?

15       A    I did not.

16       Q    Do you know the proximity, if at all, to any

17   illegal substance in that particular gun?

18       A    I'm sorry?

19       Q    Was the gun sitting on a kilo of cocaine, to your

20   knowledge?

21       A    I don't know where it was when it was seized.  If

22   it was on cocaine or his person, I'm not sure.

23       Q    And apparently, there is, on page 21, there is a

24   name on the gun?

25       A    It's an inscription.

```
 1        Q     Inscription.  And say it in Spanish.  What is it?

 2        A     El aguila.

 3        Q     El aguila.  And in English, el aguila is the

 4   eagle; is that correct?

 5        A     Correct.

 6        Q     And you received information from Mr. Villarreal

 7   that, in fact, Alfredo Beltran Leyva has a nickname of

 8   The Eagle in English; is that correct, sir?

 9        A     Yes.

10        Q     Did you corroborate that with the Mexican

11   authorities?

12        A     I did not.

13        Q     Are you familiar with the indictment in this

14   particular case?

15        A     I -- no.  I was not part of the investigation that

16   led up to the indictment.

17        Q     Well, let me know show you what has been marked

18   for identification as Defense 8, just the front page of the

19   indictment.

20              MR. BALAREZO:  9.

21              MR. PURPURA:  9, excuse me, for identification.

22              May I approach, Judge?

23              THE COURT:  You may.

24              MR. PURPURA:  Thank you.

25   BY MR. PURPURA:
```

11

1      Q     I'm going to show you what purports to be the

2  indictment of United States versus Alfredo Beltran Leyva.

3            Do you see that, sir?

4      A     Yes.

5      Q     Now, you're familiar with indictments themselves;

6  is that correct, sir?

7      A     Yes.

8      Q     And oftentimes indictments list nicknames as well;

9  is that correct, sir?

10     A     Yes.

11     Q     In this particular indictment, when Alfredo

12  Beltran Leyva was indicted, he had a nickname;

13  is that correct, sir?

14     A     Yes.

15     Q     And what is that nickname?

16     A     Mochomo.

17     Q     And that roughly is "the desert ant"; fair to say?

18     A     Repeat.

19     Q     It's not "the eagle," right?

20     A     No.

21     Q     And you don't see that on that indictment page at

22  all, do you, sir?

23     A     Not on the face of this indictment, no.

24     Q     But, again, the information that you have comes

25  from Mr. Villarreal; is that correct, sir?

1           That his nickname is The Eagle?

2     A     Yes.

3     Q     Thank you, sir.

4           Now, you indicated on direct examination that you

5     were prepared to testify -- I'm sorry.  I apologize.

6           When you came into this case in 2014, a large

7     portion of your job in this particular case was to debrief

8     and to prepare Mr. Villarreal as a witness in this

9     particular case; is that correct, sir?

10    A     That was one of my duties, yes.

11    Q     And was that just one of your duties, or is that

12    one of the major duties you had in this particular case?

13    A     It was one of the major duties, yes.

14    Q     And you were questioned the other day, and you

15    were asked if you reviewed the reports of Mr. Villarreal.

16    Do you remember that?

17    A     Yes.

18    Q     And you indicated, yes, you did; is that correct,

19    sir?

20    A     I did.

21    Q     And that's what you would do, because obviously

22    your 10 and a half years of experience, correct?

23    A     Yes, 10 and a half years.

24    Q     And if you're going to prepare a witness, you want

25    to read all the reports; is that correct, sir?

1   the prosecutor takes as opposed to the role that the actual

2   agent takes in the preparation.

3           THE COURT:  That seems relevant.  Keep going.

4   BY MR. PURPURA:

5       Q    The bottom line is you looked into Mr. Villarreal

6   as *Giglio* word or bad acts; is that correct, sir?

7       A    We asked him about his bad acts; that's correct.

8       Q    And Ms. Goldbarg, she basically kind of ran

9   through that with you on direct examination;

10  is that correct, sir?

11      A    She asked me questions about his bad acts, yes.

12      Q    You know that, ballpark, Mr. Villarreal was about

13  47 years old; sound about right?

14      A    Approximately.

15      Q    Did you ever Google his background?

16      A    I didn't personally, no.

17      Q    Did you just simply rely upon what Mr. Villarreal

18  told you?

19      A    No, not simply what he told me but also other

20  aspects of the investigation, what others told me about him.

21      Q    Did you know that he started his criminal career

22  as a car thief?

23      A    I don't -- that doesn't sound familiar to me, no.

24      Q    Did you know that when he was age 20, he became a

25  police officer?

17

```
 1        A    I don't know at what age he became a police
 2   officer, but he was a police officer, yes.
 3        Q    At first, he became a police officer in a local
 4   judicial police; does that sound about right?
 5        A    Sounds about right.
 6        Q    But even at that young age when he was a local
 7   judicial police officer, he was also corrupt at that point?
 8        A    That's what he admitted to, yes.
 9        Q    So at that point, he was able to wear a local
10   judicial police officer and aid others in crimes while he is
11   supposedly protecting people; is that correct, sir?
12        A    That's correct.
13        Q    And even in Mexico, they do swear an oath to
14   protect; is that correct, sir?
15        A    I assume they do.
16        Q    So that would be a violation of that oath;
17   is that correct, sir?
18        A    It would be.
19        Q    And then he moved on from the judicial police
20   because, from '93 to 1997, he was a federal police officer;
21   is that correct, sir?
22        A    I'm not sure -- I may have confused the two.
23   I thought that was one and the same.  I don't remember.
24        Q    Well, you know, there's the local police.
25        A    Yeah, I know, correct.
```

18

```
1        Q    And the federal police --
2        A    Yes.
3        Q    -- is a higher standing?
4        A    Yes.
5        Q    And from '93 to '97, at least according to the
6   Giglio supplied by the government, he was a federal police
7   officer, right?
8        A    Yes.
9        Q    And you know that the federal police are led by
10  the Attorney General of Mexico; is that correct?
11       A    I believe so, yes.
12       Q    And you know that Mr. Villarreal, while he was
13  part of the federal police -- and the federal police also
14  interacts with the DEA, correct?
15       A    I believe so.
16       Q    Well, you know they interact with the FBI?
17       A    Yes.
18       Q    Okay.  So while he's in that position, in a
19  position where he's interacting with the DEA and the FBI and
20  he's working under the Attorney General in Mexico, he's also
21  conducting business with the Juarez Cartel, isn't that
22  correct, sir, according to his own admissions?
23       A    I can't say if he was personally interacting with
24  the DEA.  But, yes, he was working with the Juarez Cartel
25  during that time; that's correct.
```

1      Q    In addition, while he's a federal police

2   officer -- and, again, sworn an oath to uphold the law,

3   correct?

4      A    I assume so, yes.

5      Q    -- he's working for the Los Zetas, which are an

6   ex-military and very violent group as well;

7   isn't that correct, sir?

8      A    I don't remember him saying he worked for the

9   Zetas.  I'd have to look at my reports.

10     Q    Well, let me see.  Will the -- hold on one second.

11  Maybe I can help you out.

12          I'll get back to that in a moment.

13     A    Okay.

14     Q    Let's move on.

15          He did admit multiple shootouts; is that correct?

16     A    Yes.

17     Q    He admitted that he bribed law enforcement

18  multiple payments, correct?

19     A    Yes, he did.

20     Q    He admitted that he assisted Arturo Beltran Leyva

21  in escaping law enforcement, correct?

22     A    Yes, he did.

23     Q    Not Alfredo, correct?

24     A    He described numerous instances where he helped

25  Arturo escape.

```
1        Q      Arturo?

2        A      Yes, Arturo.

3        Q      And my question follow-up, which is not Alfredo,

4    correct?

5        A      I don't remember him saying that, no.

6        Q      Do you remember telling, him telling authorities

7    that while he was a federal judicial police officer, he was

8    present when Choky, who's Amado Carrillo's right-hand man,

9    boss of the Juarez Cartel, tortured and killed individuals?

10       A      Yes, he did.

11       Q      So he's present but he never admits that he

12   participated in the torture or killing, did he, sir?

13       A      Not with those murders or tortures and murders,

14   no, he did not.

15       Q      Did you believe him?

16       A      I didn't have any reason not to.

17       Q      Well, he's head of security and he's present and

18   he's a 6-foot-7-and-a-half person and he's just watching

19   these things happen?  And you just believe that?

20       A      (No verbal response.)

21       Q      He also said that in 2009, that he was present

22   when Arturo Beltran Leyva killed two women and killed

23   Alberta Pineda Villa, correct?

24       A      Yes.

25       Q      And, again, he didn't say he did anything violent
```

```
 1  in that exchange, did he, sir?

 2      A    No.

 3      Q    In fact, he said he was ordered to find Mario

 4  Pineda.  He went to his house, got him, brought him back,

 5  and Hector executed him, correct?

 6      A    According to the witness, that's correct.

 7      Q    The witness is Mr. Villarreal, correct?

 8      A    Yes.

 9      Q    And, again, he denies that he participated in any

10  of these murders; is that correct, sir, again?

11      A    Yes.

12      Q    In 2007 -- excuse me one second.

13           In 2007, he told you that his brother was

14  kidnapped; is that correct, sir?  That's Mr. Villarreal's

15  brother was kidnapped; is that correct, sir?

16      A    I don't remember the date, but he did say his

17  brother was kidnapped; that's correct.

18           MR. PURPURA:  Can I approach briefly with

19  Defense Exhibit No. 9, just for identification?  Just for

20  Giglio, just to see if it refreshes his recollection?

21  Page 15.

22           Judge, may I approach?

23           THE COURT:  What is this?

24           MR. PURPURA:  This is the Giglio letter.

25  I'm going to show it to him to see if it refreshes his
```

```
 1   recollection as to the date only.

 2             THE COURT:  Okay.

 3             THE WITNESS:  Okay.

 4   BY MR. PURPURA:

 5       Q    Does that refresh your recollection, sir?

 6       A    Yes.

 7       Q    So when I asked you in 2007 that Mr. Villarreal's

 8   brother was kidnapped, that would be the year;

 9   is that correct, sir?

10       A    Yes.

11       Q    And in response, what this witness did,

12   Mr. Villarreal, he kidnapped an accountant and a police

13   officer, is that correct, sir?

14       A    He kidnapped an accountant.  I don't know if he

15   was a current or former police officer, but, yes, he

16   kidnapped two people in response --

17       Q    Well, listen, police officers --

18             MR. PURPURA:  May I approach again, Your Honor?

19   Thank you.

20             THE COURT:  Yes.

21             THE WITNESS:  Sure.

22             THE COURT:  Okay.

23   BY MR. PURPURA:

24       Q    So it does say "police officer"; is that correct,

25   sir?
```

23

1    A    Yes, that's what the letter says.

2    Q    You should probably assume that I have the facts

3    when I have those questions.

4        And what he says, what this witness said, what

5    Mr. Villarreal said is that he began to beat the accountant

6    with a broomstick.  And he beat him to the point where the

7    accountant gave up, apparently, a location where he could

8    find cocaine; is that correct, sir?

9    A    Yes.

10   Q    But, again, he denies killing the accountant,

11   right?

12   A    Yes, he does deny that.

13   Q    And he says he eventually released them;

14   is that correct, sir?

15   A    Yes.  He released them, the two individuals in

16   exchange for his brother and for the cocaine that he had

17   taken.

18   Q    And, again, you believe him at that point that he

19   did not kill these individuals for kidnapping his brother;

20   is that correct, sir?

21   A    I have no reason not to.

22   Q    In fact, in the 12 debriefings sessions, which

23   we've been through, Mr. Villarreal denied killing anyone;

24   isn't that correct, sir?

25   A    Yes.

27

```
 1              MS. GOLDBARG:  Thank you, Your Honor.
 2              (Open Court)
 3              THE COURT:  All right.  You may proceed,
 4    consistent with the discussion at the bench.
 5              MR. PURPURA:  Judge Leon, thank you, sir.
 6    BY MR. PURPURA:
 7        Q    Cooperating Witness No. 5, without disclosing his
 8    name, if you know it, the FBI received information from him
 9    in a debriefing; is that correct, sir.  I assume -- I'm just
10    going to have to say yes.  I don't know.  I don't know who
11    Cooperating Witness 5 is?
12              THE COURT:  Why don't you, do you have his name
13    written down?
14              MR. PURPURA:  I don't have his name at all.  No.
15              THE COURT:  All right.  Why don't you get his name
16    and show it to -- just put it on a piece of paper and show
17    it to the witness.
18              (Counsel confer off the record.)
19              THE COURT:  Without saying -- he can see it, but
20    don't -- just say he's Cooperating Witness 5.
21              Does that refresh your recollection, Agent, as to
22    who this person is?
23              THE WITNESS:  I remember the name.
24              THE COURT:  Okay.
25    BY MR. PURPURA:
```

```
 1      Q    Okay.  The bottom line is, in preparation for your
 2   testimony, you looked and you tried to find out all the bad
 3   acts of Mr. Villarreal; is that correct, sir?
 4      A    During pretrial, yeah.  During pretrial, yes.
 5      Q    And you've reviewed the Giglio information in this
 6   particular case, I would hope; is that correct, sir?
 7      A    As pertains to Mr. --
 8      Q    Mr. Villarreal.
 9      A    -- Villarreal, yes.
10      Q    Okay.  And so part of the Giglio information is
11   that another witness, this Cooperating Witness No. 5,
12   indicated that Mr. Villarreal was receiving planes with
13   cocaine at an airport and he killed several airport workers.
14           Is that a fact, sir?  If you don't remember, I can
15   show it to you.
16      A    I do not remember.
17           MR. PURPURA:  Okay.  May I approach, Judge?
18           THE WITNESS:  I don't remember --
19           THE COURT:  Okay.
20           THE WITNESS:  Personally speaking.
21           MS. GOLDBARG:  Objection, Your Honor.  I'm not
22   sure that this witness has a basis with which to answer that
23   question since this witness never interviewed or
24   participated in any brief of the Cooperating Witness No. 5.
25           THE COURT:  Hold on now.
```

```
1              Would the information that Mr. Purpura's asking
2    about have been in one of those 12 reports he's admitted to
3    reviewing?
4              MS. GOLDBARG:  No, Your Honor.  That information
5    would have been provided through the debriefs and reports of
6    Witness Cooperating No. 5.
7              THE COURT:  So you can ask him if he's -- you've
8    got to establish foundation.  Did he interview this fellow?
9              MR. PURPURA:  Judge, I understand.
10             I asked him specifically did he review the *Giglio*
11   bad acts supplied by the government, and he said yes.  This
12   is a *Giglio* bad act on Mr. Villarreal supplied by the
13   government.
14             THE COURT:  So the document in your hand --
15             MR. PURPURA:  Yes.
16             THE COURT:  -- that you're pointing to --
17             MR. PURPURA:  Yes, sir, which is
18   Defense Exhibit No. 9, I believe -- 10.  10.
19             THE COURT:  Agent, did you review the document in
20   his hands?
21             Show him the document, please.
22             MR. PURPURA:  Yes, I will.
23             THE COURT:  Show him the document.
24             Take your time.  It's a lot of pages there.
25             THE WITNESS:  (Witness complies.)
```

30

```
 1   BY MR. PURPURA:
 2       Q    Just specifically look at Mr. Villarreal's bad
 3   acts, sir.
 4            MR. ROSALES:  He is looking at the documents.
 5            MR. PURPURA:  Excuse me, Counsel.  He has to look.
 6            THE WITNESS:  (Witness complies.)
 7   BY MR. PURPURA:
 8       Q    Okay?
 9       A    Okay.
10       Q    Do you remember reviewing the bad acts as given to
11   defense counsel by the government of Mr. Villarreal?
12       A    Yes.
13       Q    Very good.
14            Now, specifically, sir, I'm going to ask to you
15   what I've asked you about three or four times already about
16   information received from Cooperating Witness No. 5.  I'll
17   stand right with you while you look at this.
18            THE COURT:  No.  You've got to question from the
19   podium.
20            MR. PURPURA:  Will do.  I apologize.  You can keep
21   it.
22   BY MR. PURPURA:
23       Q    Let me see if I can get my copy here.
24            And that he killed, that Villarreal himself killed
25   several workers; is that correct, sir?  That's the
```

405

1  information received from CW5, correct?

2      A    Yes.

3      Q    And CW5 further stated that Mr. Villarreal

4  literally decapitated these workers and left notes on their

5  bodies; is that correct, sir?

6      A    That's what -- yes.

7      Q    And that's from another cooperator;

8  is that correct, sir?

9      A    Correct.

10     Q    That's someone just like Mr. Villarreal who is

11 giving the government information; is that correct, sir?

12     A    Yes.

13     Q    That CW5 further went on to say that

14 Mr. Villarreal had a hit squad; is that correct, sir?

15     A    That's what it says, yeah.

16     Q    And by "hit squad," that's a death squad, that

17 people are murdered, correct, sir?

18     A    Yes.

19     Q    And, you know, it looks like the FBI actually

20 questioned Mr. Villarreal about, No. 1, killing workers at

21 the airport; No. 2, decapitating workers at the airport;

22 and, No. 3, having a hit squad.  The FBI said, "We've

23 received information that you did these things," correct?

24     A    Correct.

25     Q    And Mr. Villarreal said, "I didn't do it," right?

32

```
 1      A    He denied -- yes.

 2      Q    Now, I'm sure, to your knowledge, the FBI looked

 3   into this, correct.

 4           I mean, you have one cooperator --

 5      A    Right.

 6      Q    -- saying one thing, and pretty serious

 7   allegations, right?

 8      A    Yes.

 9      Q    I mean, maybe not in this case, but pretty serious

10   allegations, right?

11           And you've got another cooperator saying, "I never

12   killed anybody."  That's Mr. Villarreal, the one Judge Leon

13   has to believe in.

14      A    Yes.  Mr. Villarreal denied it, and he also said

15   that there were false -- if I remember correctly, he said

16   that there were false stories planted about him in the

17   newspapers.

18      Q    And did you ever look to see anywhere in the

19   investigation at all as to whether workers were killed at an

20   airport, whether they were decapitated?  Did you call

21   Mexican authorities up and say, "Hey, look, I'm FBI El Paso,

22   Organized Crime, Mexico"?

23      A    I did not.

24      Q    CW5, or at least another cooperator --

25   I'm not sure if it's CW5.
```

```
 1              THE COURT:  Be sure you've got the right
 2   cooperator now.
 3              MR. PURPURA:  Will do, Judge.
 4   BY MR. PURPURA:
 5      Q    I believe it's CW5, that Mr. Villarreal, he
 6   suggested, murdered the head of a taxi union.
 7   Do you remember that?  That's the next paragraph.
 8      A    Yes, I do remember that.
 9      Q    And Mr. Villarreal, again, denied this;
10   is that correct, sir?
11      A    Yes, he did.
12      Q    Did you or any other FBI agent in this case,
13   Britton Boyd or anybody else, ever investigate to see if the
14   head of a taxi union in Mexico, in Culiacán, or Mexico City
15   or wherever it was, was murdered?
16      A    I remember discussing it with the witness, yes.
17      Q    Other than listening to Mr. Villarreal, Moses on
18   Mount Sinai, did you ever do any independent investigation?
19      A    I did not.
20      Q    Obviously, to Mr. Villarreal, as brought out on
21   direct examination by Ms. Goldbarg, he wanted to avoid
22   apprehension; is that correct?  He didn't want to get
23   caught?
24      A    Correct.
25      Q    All right.  Fair enough.
```

1      A     Correct.

2      Q     But you do know that the FBI has their largest FBI

3  attache office in the world in Mexico City?

4      A     I don't know if it's the largest, but we do have a

5  large office there.

6      Q     Well, let me ask you this.  I'm going to show you

7  Defense Exhibit Number 11.

8           You're familiar with the FBI national -- this is

9  Google again.

10          The FBI national press release, you're familiar

11  with those?

12          The FBI puts out a national press release, right?

13     A     Yes.

14     Q     And they do it because they want the public to see

15  what the FBI is up to and what we're doing, because it's

16  taxpayers money, right?

17     A     Sure.

18     Q     Government's Exhibit No. 11, purports to be, and

19  is --

20          THE COURT:  Defense exhibit?

21          MR. PURPURA:  Defense.

22          MS. GOLDBARG:  I got copies.

23          THE COURT:  Do you have a copy for the Court?

24          MR. PURPURA:  I do, Judge.  And I gave the

25  government my copy, darn it.

1              THE COURT:  Well, you've got to give them one.

2              MS. GOLDBARG:  Yes.  The government will return

3      its copy for the Court.

4              MR. PURPURA:  I apologize.

5              THE COURT:  Thank you, John.

6      BY MR. PURPURA:

7          Q    So December 3rd, 2015, national press release.

8      The FBI published -- and you're the FBI 10 and a half years

9      in El Paso, right on the darned border, right?

10         A    Yes.

11         Q    With Mexico, right?

12         A    Correct.

13         Q    "The FBI, in 2015, celebrated her 75th anniversary

14     of a legal attaché program in Mexico City, the FBI's oldest

15     foreign law enforcement relationship."

16              Do you see that?

17         A    I do.

18         Q    And the FBI went on to say that the purpose of the

19     agency is to share information on matters of mutual

20     interest; is that correct?

21         A    That's what it says.

22         Q    And that's what they do, right?

23         A    Yes.

24         Q    FBI and the Mexican authorities try to work hand

25     in hand on issues which involve both countries;

39

1    is that correct, sir?

2        A    That's the purpose of this, yes.

3        Q    The FBI -- because, honestly, "The FBI and Mexican

4    authorities have been working together to investigate crimes

5    since the late 1910s," right?

6        A    That's what it says.

7        Q    And it says, "The natural partners, due to the

8    proximity and the emergence of international crime that has

9    impacted both countries.  Since its opening, our office,"

10   FBI office, "in Mexico City has grown to become our largest

11   overseas post."

12            That's as of 2015; is that correct, sir?

13       A    That's what it says.

14       Q    And it goes on to say, "Throughout the 75-year

15   history of the Mexican and FBI relationship, the FBI and

16   Mexican authorities have collaborated on training programs

17   and have worked together to combat drug trafficking."

18            Right?

19       A    That's what the document reads, yes.

20       Q    So you are accurate that you don't -- you can't go

21   down -- get in your car from El Paso, drive over the border,

22   and do anything independent.  You can't do that, can you,

23   sir?

24       A    No, I cannot.

25       Q    But certainly, sir, when you're involved in an

411

1    organized crime investigation like you are and the unit you

2    are in, you can work with your local FBI in Mexico City to

3    verify information, to apprehend fugitives, and to aid the

4    Mexican authorities; isn't that correct, sir?

5        A    In some cases, yes.

6        Q    In addition to the FBI in Mexico, the DEA, drug

7    enforcement agency, has offices, attaché, same as FBI, in

8    Mexico; is that correct, sir?

9        A    They do.

10        Q    And the DEA works jointly with Mexican

11    authorities, just like the FBI does, to combat international

12    crime, crime between the United States and Mexico;

13    is that correct, sir?

14            MR. ROSALES:  Objection.

15            Whether or not the witness has a foundation to

16    know the relationship between the another agency and the

17    Mexican authorities.

18            MR. PURPURA:  I'd be shock if you didn't, Agent.

19            THE COURT:  You can rephrase the question.

20    BY MR. PURPURA:

21        Q    Do you know?  Does the agency have an office in

22    Mexico, sir?

23        A    The FBI does have an office in Mexico.

24        Q    Does the FBI work, just like the -- does the DEA

25    work, just like the FBI does, with Mexican authorities to

41

```
 1   combat drug interdiction?
 2       A    I know they work with Mexican authorities.
 3   I don't know the specifics as to how they work.
 4       Q    Not how they but on combating international drug
 5   trafficking; is that fair to say, sir?
 6       A    That's their mission.
 7       Q    That is their mission.  Good.
 8            Now, that's a resource that the FBI can contact as
 9   well, correct?  Can't you?
10       A    Yes.  Sure.
11       Q    Just go back to that gun, for example.  Could you
12   have contacted the DEA or the local FBI and say,
13   "Do you have a nickname?  Do you have Alfredo, any
14   information that he's The Eagle?"
15            You could have done that, right?
16       A    As part of the investigation, it wasn't just -- my
17   recollection is it wasn't just this witness that said that
18   he was The Eagle.  There were others that said that as well,
19   but I don't remember who it was, because there's more than
20   one person that called him The Eagle.
21       Q    You didn't answer my question.
22            My question was, did you try to corroborate that
23   through local authorities, Mexican authorities?
24       A    I did not.
25       Q    Mexican authorities?
```

413

43

1    your recollection?

2         A    That sounds about right, yes.

3         Q    And would you agree with me that someone -- what

4    type of vehicles were they?

5         A    Typically, they're armored vehicles.

6         Q    So they're large vehicles; is that correct, sir.

7         A    They don't have to be large, but they're armored.

8         Q    Armored.  The type of vehicles, if you're in a

9    convey of ten vehicles, that would normally attract

10   attention; is that fair to say?

11        A    Yes.

12        Q    So the follow-up question is, did you attempt to

13   corroborate with DEA Mexico, your local FBI in Mexico,

14   and/or Mexican authorities if they had any verification of

15   this type of convoys traveling around in the area that

16   Alfredo would be in?

17        A    I did not.

18        Q    DEA and FBI in Mexico also have access to the eye

19   in the sky, is that fair to say, satellites?

20        A    I don't know.

21             MS. GOLDBARG:  Objection.

22   BY MR. PURPURA:

23        Q    If you know.  You don't know that?

24        A    I don't know.

25        Q    How about helicopters?

WilliamPZaremba@gmail.com

414

44

1          A     Access to helicopters?

2          Q     Yes.  In Mexico.

3          A     The DEA and FBI, I don't know if they have any of

4     those assets.  I'm not sure.

5          Q     Did you contact anybody in DEA Mexico or FBI in

6     Mexico as part of this investigation?

7          A     I did not, no, that I can remember.

8          Q     We heard testimony, again from Mr. Villarreal,

9     which we must believe, that Alfredo sent four tons of

10    cocaine from Culiacán to the border in ten planes.

11    Do you remember that?  In multiple planes.  We discussed

12    that already, right?

13         A     Yes.

14         Q     And the bottom line -- I already asked these

15    questions -- was there is no -- there has never been a plane

16    which has been interdicted, involved in -- with Alfredo's

17    drugs on it like what he's talking about?  Any verification

18    that way?

19         A     Not that I'm aware of.

20         Q     What he did say in that same debriefing, that at

21    least he thought -- and he expressed it to you -- that when

22    Alfredo was arrested, he was home alone and had one pistol

23    and one rifle.  Do you remember that?

24         A     I do.

25         Q     Just one second, please.

415

1        You were present when Agent Hatherley testified as

2   to what Mr. Poveda told him; is that correct, sir?  Were you

3   present when Special Agent Hatherley testified?

4        A    I was present in the courtroom, yes.

5        Q    And do you recall that Special Agent Hatherley

6   suggested that Poveda told him that the price of a kilo of

7   cocaine in Culiacán was $16,000?  Do you remember that?

8        A    I believe that's right, yeah.

9        Q    And then on April 14th, 2015, when Mr. Villarreal

10  is debriefed about his knowledge of the price of a kilogram

11  of cocaine in Culiacán, on page 7, he says a kilo was being

12  sold at approximately 11,500 in Culiacán.

13       A    Okay, if that's what it says on there.

14       Q    Yeah.

15       A    Yep.

16       Q    Did you ever question him as to the difference

17  between 11,500 and your other cooperating witness' testimony

18  that it's 16,000?  That's a $5,500 difference.

19       A    I didn't, because that wasn't Mr. Villarreal's

20  role in the organization, to know the price of cocaine.  He

21  was in charge of security and public corruption payments.

22       Q    So he was just wrong when he said that?

23       A    Or he -- or that was the price at that time.

24  I don't know.

25       Q    Because you didn't follow up on that, did you?

46

```
 1        A    With him?

 2        Q    Yes.

 3        A    That wasn't his role, so no.

 4        Q    Also in that same debriefing and in testimony,

 5   Mr. Villarreal said that Alfredo would talk on phones and

 6   give instruction by radio to transport drugs for Mayo and

 7   Chapo.  Do you remember that?

 8        A    Yes.

 9        Q    Did you check with the federal authorities in

10   Mexico or the FBI in Mexico or the DEA in Mexico if they

11   ever had any intercepts of these conversations?

12        A    I did not.

13        Q    And you do know that Mexican authority does have

14   wiretap capability where they can intercept not only

15   landlines but cellular phone calls as well?

16        A    Yes.

17        Q    Okay no verification whatsoever from 2012, 2013,

18   or before, right?

19             Let me take you back.

20             From 2005, 2006, 2007, 2008, until the arrest of

21   Alfredo, no intercepts?

22        A    I personally did not, no.

23        Q    You also testified -- you were asked in

24   questions -- that there were drug seizures.  And Alfredo

25   Beltran Leyva was shown paperwork from attorneys in the
```

417

1    I guess, by you, because you were conducting that particular

2    debriefing, "Do you ever recall Alfredo Beltran Leyva

3    killing anybody?"  Do you remember that?

4        A    I do.

5        Q    And Mr. Villarreal said "no"?

6        A    Yes.  He said he did not recall ever seeing the

7    defendant kill anyone.

8        Q    August 2nd, he told you that -- is it Mochomo?

9        A    Hmm?

10        Q    Mochomo?  Is that --

11        A    Mochomo.

12        Q    Mochomo.

13             Mochomo, the desert ant, has control of municipal

14    police, state police?  Do you remember that?

15        A    I do.

16        Q    Okay.  Again, the question is, did you check with

17    Mexican authorities or the FBI or the DEA for any

18    verification?

19        A    As to their corrupt activities?  No.

20        Q    Yes.

21             At the same date, I believe, was August 21st,

22    2015, we received from Mr. Villarreal information about

23    General Hidalgo.  Do you remember that?  You testified to

24    that as well?  Do you remember that?

25             MS. GOLDBARG:  Objection.  May we approach,

```
 1   Your Honor?
 2          THE COURT:  Uh-huh.
 3          (Bench conference)
 4          MS. GOLDBARG:  The government specifically did not
 5   ask or put in the public record the name of the general for
 6   obvious reasons.  This is the very few people that actually
 7   did not -- was not susceptible to the bribery payments.
 8          The witness said he knew the name.  We did not ask
 9   for it so that I ask that to be removed.
10          MR. PURPURA:  I have no objection.  I didn't
11   realize that -- you don't have to -- just say it next time.
12   Let's seal that for the record.  And I'll just say "a
13   general."
14          THE COURT:  You can rephrase the question.
15          MR. PURPURA:  I will.  That's what I'm saying.
16   I will.
17          MS. GOLDBARG:  Thank you, Your Honor.
18          (Open Court)
19   BY MR. PURPURA:
20      Q    There was information given to you, which you
21   testified to, concerning a particular general in Mexico.
22   Do you remember that?
23      A    I do.
24      Q    And that there was an attempt to bribe this
25   particular general with a sum of $3 million, I think,
```

50

1    monthly?

2        A    Correct.

3        Q    And this general, according to Mr. Villarreal,

4    refused; is that correct, sir?

5        A    Yes.

6        Q    Did you, sir -- without giving us his name, did

7    you ever try to contact this particular general to verify

8    this?

9        A    No.

10       Q    In addition, Mr. Villarreal said this particular

11   general was sent to an embassy in a distant country?

12       A    Yes.

13       Q    Do you remember that?

14       A    I do.

15       Q    Did you ever -- that seems like something that's

16   pretty easy to verify with Mexican authorities.  Did you

17   ever try to verify that?

18       A    No, I did not.

19       Q    Mr. Villarreal, in the same 302, said, while in

20   jail, Alfredo passed notes to people through his sister.

21   Do you remember that?

22       A    I remember him saying that he passed messages,

23   yes.

24       Q    Did you ever check -- this is when he's been

25   arrested.  He was in jail from January 28th, 2008, in

1    Mexico, through November 15th, 2014.  Did you ever check

2    with the jail authorities to see if they ever seized any

3    notes from the cell of Alfredo Beltran or any notes that

4    were intercepted that he passed?

5        A    No, I did not.

6        Q    Did you ever check to do if there was any

7    contraband whatsoever, including a cell phone or any other

8    type of device used to communicate with others, found by the

9    Mexican police during the six years that he was in jail in

10   Mexico?

11       A    I did not.

12       Q    Did you check with the local DEA or FBI about

13   this?

14       A    No.

15       Q    You do know that their phone system apparently is

16   much like our jail system's phone system, that when you make

17   a call, the call is recorded, correct?

18       A    I don't know that.

19       Q    Well, September 11th, 2015, when you were taking

20   notes, jail calls were played for yourself and

21   Mr. Villarreal and the U.S. Attorneys.  Do you remember

22   that?

23       A    Jail calls from the United States.

24       Q    Those were United States jail calls?

25       A    Correct.

1      Q    Okay.

2           And so you have some jail calls, even from the

3    United States; is that correct?

4      A    Yes.

5      Q    Did you ever attempt to get any jail calls that

6    would be recorded from the phones in Mexico?

7      A    No.

8      Q    The jail calls from the United States, which were

9    intercepted, right -- in other words, you looked at them;

10   you reviewed them, correct?

11     A    Correct.

12     Q    They haven't been played here for His Honor,

13   Judge Leon, have they?

14     A    Not to my knowledge, no.

15     Q    Now, when Alfredo was arrested, at least according

16   to Mr. Villarreal, Arturo wanted to take some action to get

17   him out of jail.  Do you remember that?

18     A    Yes, I do.

19     Q    And Alfredo said "no," according to

20   Mr. Villarreal; is that correct, sir?

21     A    Yes, that's correct.

22     Q    And, again, according to Mr. Villarreal, Arturo

23   came up with two plans for Alfredo to escape, correct?

24     A    Yes.

25     Q    And, again, according to Mr. Villarreal, Alfredo

56

```
 1       Q     And then you were further questioned and the
 2  witness said, through you, "They're very large," right?
 3       A     Yes.
 4       Q     So the picture, at least the picture -- I'm asking
 5  you what you have in your mind, when this is described by
 6  Villarreal, so it's a large swimming pool filled with
 7  methamphetamine.  And there's multiple, because he has
 8  multiple cocinas -- cocinas, kitchens, right?
 9       A     I'm sorry.  Can you say that again.  Or ask it
10  again.
11       Q     Villarreal said that Alfredo had multiple
12  kitchens?
13       A     He said -- yes.
14       Q     So we have multiple kitchens with these large
15  swimming pools, right?
16       A     I don't know if all of them were large swimming
17  pools, but there was at least one that he described as
18  having large swimming pools.
19       Q     Any verification by helicopter, satellite, any
20  aerial videos whatsoever of a swimming pool filled with
21  methamphetamine?
22       A     No.
23       Q     Let's try Mexican police.  Mexican police ever
24  seize from 2005, 2006, 2007, 2008 a swimming pool filled
25  with methamphetamine?
```

421

57

```
 1        A    I don't know.

 2        Q    Because you didn't ask?

 3        A    I didn't ask.

 4        Q    And you didn't ask your brother in the FBI

 5   locally, either?

 6        A    No.

 7        Q    And you didn't ask the DEA either?

 8        A    I did not.

 9        Q    We have Villarreal and Villarreal alone, correct?

10        A    That was his statement.

11        Q    And then he told us about tunnels.  And he said

12   that this man spent $3 million for these tunnels, his

13   tunnels, Alfredo's tunnels, for the methamphetamine, right?

14        A    1 to 3 million dollars.

15        Q    1 to 3 million, correct.

16        A    And not just for the methamphetamine, no.

17        Q    Were these tunnels seized, found out, located?

18        A    According to the witness, he said that some of

19   them were seized.

20        Q    Did you ever verify that?

21        A    I did not.

22        Q    He said he had engineers who were dedicated and

23   worked on these tunnels.  Did you ever find out who these

24   engineers were?

25        A    No.
```

```
1              THE COURT:  All right.

2              MR. PURPURA:  With the Court's permission, I'll

3    continue briefly.

4              THE COURT:  All right.  Witness remains under

5    oath.

6              THE WITNESS:  Yes, sir.

7              MR. PURPURA:  Thank you, Your Honor.

8    BY MR. PURPURA:

9         Q    Agent, the last few questions, in the Giglio

10   information, it appears that Mr. --

11             MR. PURPURA:  Page 15, counsel, last paragraph.

12   BY MR. PURPURA:

13        Q    -- that Mr. Villarreal came in contact with

14   Mr. Poveda and another individual, Mr. Kesla, while in

15   transit.  Do you see that?

16        A    Yes, I do.

17        Q    To your knowledge, did anyone, you or any other

18   agents, follow up to see the length of contact that

19   Mr. Villarreal had with Mr. Poveda Ortega, another witness

20   who testified through an agent?

21        A    I don't remember the exact amount of time they

22   were together, no.  It was in transit, so I'm not sure if it

23   was -- I don't know how long it would be --

24        Q    Well, that's why I guess I'm asking you.  Because

25   transit, in the BOP, could be they could take someone from
```

```
 1   New York to the transition place in Oklahoma and then from

 2   there to somewhere else.  And they could stay in Oklahoma

 3   for a month or two months.  And so --

 4        A    If I remember correctly, it was in transit to this

 5   courthouse, from whatever facility they were here.

 6             So it would have been whatever facility in this

 7   region that they were being housed at, it was in transit to

 8   this courthouse.

 9        Q    Well, let me just follow up with the following

10   questions, then.

11             Did you ever verify with -- you or any other

12   agent, verify with the Bureau of Prisons the extent of their

13   contact?

14        A    I didn't, but I can't answer as to what the other

15   agents did.  I don't remember.

16        Q    And obviously it's important that people who

17   cooperate are kept separate; is that fair to say?

18        A    Yes.

19        Q    Because you don't want them exchanging stories;

20   is that fair to say?

21        A    Sure.

22        Q    I should say "information" rather than "stories."

23             Now, finally, would you agree or not that the

24   testimony of someone who was cooperating should be

25   considered with caution?
```

1   of information, when the pages 31 -- 31, 32, and 33 would

2   seem to answer some of the questions that he posed.

3          MR. PURPURA:  Judge, the bottom line on this is

4   that the only thing you have before you, it would be the

5   same thing as admitting a police report of an incident

6   without the police officers being present.  I know this is a

7   sentencing hearing, but there has to be some consideration

8   of due process in this particular case.

9          This agent, as I indicated before, has no basis of

10  knowledge to know if this is accurate or not.  So what you

11  have there is a series of police reports which come from

12  Mexico and nothing more than that.

13         THE COURT:  Well, that certainly would go to

14  weight.

15         But in terms of it being a self-authenticating

16  document, it is that for certain.

17         With regard to relevancy, it would seem to clearly

18  have relevancy.

19         MR. PURPURA:  Only if this agent can say where

20  these bullets were found from some basis, either from

21  Villarreal, which he's testified to, or some other

22  independent investigation.

23         THE COURT:  Well --

24         MR. PURPURA:  Or else it doesn't have relevance.

25         THE COURT:  Well, the report presumably is saying

73

```
 1   about the defendant's aliases used?

 2        A    Yes.

 3        Q    And I believe defense counsel showed you the cover

 4   page of the indictment.  Do you recall those questions?

 5        A    I do.

 6        Q    In preparation for trial, did law enforcement

 7   learn of additional aliases that the defendant went by?

 8        A    Yes.

 9        Q    What was one of those additional aliases?

10        A    El Aguila.

11        Q    And that was not known at the time of the

12   indictment?

13        A    To my knowledge, no.

14        Q    So it would be fair to say that this is new

15   information?

16        A    Correct.

17        Q    Was -- do other witnesses aside from

18   Mr. Villarreal provide that nickname?

19        A    Yes.

20        Q    I believe you stated on cross-examination you

21   weren't exactly sure which other witnesses?

22        A    That's correct.

23        Q    Defense counsel asked a series of questions about

24   the investigative follow-up that you personally did or

25   others did within this trial preparation.
```

1    A    They would have to either conduct liaison or ask

2  one of the investigating agencies in the host country.  In

3  this case, Mexico.

4    Q    So they would have to ask Mexican police officers

5  to help with their investigation; is that you understanding?

6    A    Yes.

7    Q    Okay.  Defense counsel asked you questions about

8  whether or not you or anyone in U.S. law enforcement and

9  Mexico City corroborated any of the corruption allegations

10  in Culiacán.

11        Do you recall those questions?

12    A    I do.

13    Q    Did you ask the FBI attachés in Mexico City to

14  reach out to the police officers or the authorities in

15  Culiacán to ask them about the corruption?

16    A    No.

17    Q    Can you explain to the Court why not?

18    A    It would be -- it would be impossible to do that.

19  I mean, you could, but to get any kind of truth out of it

20  would be next to impossible.

21    Q    Why?  Just --

22    A    Because they're already corrupt.  I mean, if

23  they're already on the payroll and they're being bribed,

24  then expecting them to give an honest answer about their

25  corrupt activities is highly unlikely.

1      Q    Defense counsel asked you questions about the
2   witness' knowledge of the defendant's involvement in
3   violence.  Do you recall those questions?
4      A    Yes.
5      Q    And I believe defense counsel asked you whether or
6   not the defendant -- the witness stated that the defendant
7   never killed anybody.  Do you recall that?
8      A    Yes; that he never witnessed him kill anyone,
9   correct.
10     Q    So Mr. Villarreal never witnessed the defendant
11  kill anyone, correct?
12     A    That's correct.
13     Q    And that came from the witness himself?
14     A    Yes.
15     Q    Did the witness ever, was the witness ever present
16  when the defendant ordered people to be murdered?
17     A    Yes.
18     Q    Just to clarify, I believe on cross-examination,
19  defense counsel asked you about the corruption payment to
20  the general?
21     A    Yes.
22     Q    I believe defense counsel said it was a $3 million
23  payment on a monthly basis.  Do you recall that?
24     A    I do.
25     Q    Was that the arrangement with the police officer,

81

1    Agent Hatherley the last two hearings, correct?

2        A    Yes.

3        Q    Do you recall whether or not any of the

4    information provided by Mr. Villarreal was corroborated by

5    the information of Mr. Zambada and Mr. Poveda?

6        A    (No verbal response.)

7        Q    Do you recall whether or not the witness -- that

8    Mr. Villarreal's testimony was consistent with regards to

9    the defendant's role as a leader within the Beltran Leyva

10   Organization?

11       A    Yes.

12       Q    Was the information provided by Mr. Villarreal

13   consistent with information provided by Mr. Zambada?

14            MR. PURPURA:  Objection, Your Honor.  This is

15   simply leading.  It's extremely broad.  As to what

16   information?

17            THE COURT:  You can rephrase the question.

18   BY MS. GOLDBARG:

19       Q    Specifically regarding the use of weapons, was the

20   information provided to you by Mr. Villarreal consistent

21   with the information provided by Mr. Zambada as to the

22   defendant's use of weapons?

23       A    Yes.

24            MR. PURPURA:  Again, basis of knowledge.  Is he

25   relying upon in-court testimony at this point?  Is that what

1    he's relying on with the debriefings that he attended.

2    BY MS. GOLDBARG:

3        Q    You heard the testimony of Special Agent

4    Hatherley, correct?

5            THE COURT:  I thought the question was premised on

6    what he heard the other agent testify to.

7            MS. GOLDBARG:  Correct.

8            THE COURT:  He was in court listening.

9            Go ahead.

10           MS. GOLDBARG:  Thank you.

11   BY MS. GOLDBARG:

12       Q    Specifically regarding the issue of violence, was

13   the information provided to you by Mr. Villarreal during

14   trial preparation consistent with the information that

15   Mr. Zambada provided, according to the testimony of Special

16   Agent Hatherley?

17       A    Yes.

18       Q    Was the information provided to you by

19   Mr. Villarreal in trial preparation consistent with what

20   Mr. Hatherley testified with regards to the payment of

21   briberies by the defendant?  And was that consistent with

22   Mr. Poveda as well as Mr. Zambada?

23       A    Yes.

24       Q    So was there -- according to you, was there

25   corroboration of Mr. Villarreal's testimony from other

83

```
1    witnesses in the government's case?
2         A    Yes.
3              MS. GOLDBARG:  May I have a moment, Your Honor?
4              (Government counsel confer off the record.)
5              THE COURT:  You may.
6              MS. GOLDBARG:  No further questions, Your Honor.
7    Thank you.
8              THE COURT:  All right.  We'll take the luncheon
9    recess.
10             You're excused.  Agent, may step down.
11             After -- are you going to have any other
12   witnesses?
13             MS. GOLDBARG:  No, Your Honor.  There's one --
14   there's one side issue that we'd raised last time.
15             THE COURT:  Well, we'll deal with that when we
16   come back.
17             Are you all calling any witnesses for the defense?
18             MR. PURPURA:  I'm sure.
19             MR. BALAREZO:  Possibly one, Your Honor.
20             THE COURT:  Possibly one?  And how long would
21   direct go?
22             MR. BALAREZO:  It would depend on how this side
23   issue that the government is talking about is resolved.
24             THE COURT:  All right.  Well, we should be able
25   to, I would think, resolve the side issue in a matter of
```

431

1    15 minutes or less, I would hope.

2          All right.  So we'll reconvene at 2:30.  See you

3    then.

4          MS. GOLDBARG:  Thank you, Your Honor.

5          THE WITNESS:  Your Honor, am I still under oath?

6          THE COURT:  No.

7          THE WITNESS:  I'm excused?

8          THE COURT:  You're excused.

9          DEPUTY CLERK:  All rise.

10         This Honorable Court now stands in recess until

11   the return of court.

12         (Recess from 1:10 p.m. to 2:43 p.m.)

13         DEPUTY CLERK:  All rise.  The United States

14   District Court for the District of Columbia is again in

15   session; the Honorable Richard J. Leon presiding.  God save

16   the United States and this Honorable Court.  Please be

17   seated and come to order.

18         (Defendant entered.)

19         MR. PURPURA:  Judge Leon, I don't know if you

20   allow recross; but if you did, I'd have five minutes' worth.

21   If not, I'll sit down.

22         THE COURT:  Well, it's limited to redirect.

23   Something said on redirect?

24         MR. PURPURA:  Yes, sir.

25         THE COURT:  All right.

87

1      A     That's what he said, yes.

2      Q     Thank you.

3            Now, when you were shown -- on redirect

4     examination, you were asked to look at Government's

5     Exhibit 3A, and you don't have that.

6            THE COURT:  No.  It was 3.

7            MR. PURPURA:  3?

8            THE COURT:  Exhibit 3, pages 31 through 33.

9            MR. PURPURA:  All right.

10    BY MR. PURPURA:

11     Q     Very good.  And I will direct your attention to

12    Government's Exhibit 3 --

13            MR. PURPURA:  May I approach the witness,

14    Your Honor?

15            THE COURT:  Yep.

16    BY MR. PURPURA:

17     Q     -- to page 32.  And can you please look at the

18    cartridge head stamp.  It's difficult.  But if you look at

19    the cartridge head stamp on that particular page, page 32 --

20     A     Which photo are you -- the top right?

21     Q     Yes.  Anywhere you can see the head stamps.

22    There's only one photograph of the head stamp.

23     A     That one?  Yeah.

24     Q     Okay.  Good.  That would be top right.

25            So when you look at that photograph and you look

433

88

```
 1   at the head stamp, the head stamp obviously is the rear of
 2   the cartridge casing.  If you look at the head stamp,
 3   there's markings on it.  And the markings on it is 762 by
 4   39, correct?  Take a good look.
 5       A    That appears to be right.
 6       Q    And then you can look at the projectiles, the
 7   cartridges which are directly on the other picture.  And
 8   they look like they are 762 by 39s, which are large
 9   cartridges, which are for semi-automatic rifles and rifles,
10   correct?
11       A    Correct.
12       Q    And it is not .45 ammunition, correct?
13       A    No.  Doesn't appear to be.
14       Q    And just one more question on that.
15           MR. PURPURA:  If I can just retrieve that,
16   Your Honor.  May I approach the witness again, please,
17   briefly?  Thank you.
18           THE COURT:  You may.
19   BY MR. PURPURA:
20       Q    Government Exhibit 3, again, the very last page,
21   your attention was directed to, again, and that's 33.
22   I'm going to ask you to look at that.
23           Now, did you -- again, you did not contact the
24   Mexican authorities to discuss the arrest of Alfredo Beltran
25   Leyva; is that correct?
```

434

1    It was Arturo Beltran Leyva, who controlled the

2    organization of these shipments; it was Hector Beltran

3    Leyva, who primarily controlled the political aspect of it;

4    and it was the defendant, who primarily controlled the

5    actual receipt and transportation and sale of the cocaine.

6    It's not to say that they didn't each delve into

7    the other's roles, but that was the testimony of Special

8    Agent Hatherley.

9    Witness Villarreal, who was testified to by

10   Special Agent Peschka, stated, again, the defendant was the

11   head of the organization in Culiacán; that -- I think it was

12   key testimony about the succession plan that Arturo Beltran

13   Leyva instructed Mr. Villarreal that if something were to

14   happen to Arturo, this defendant would be second in line

15   next to take command of the organization, followed by the

16   other brother, Hector.

17   Villarreal also testified that the defendant

18   controlled the movement of drugs through the states of

19   Durango, Sonora, Sinaloa, as well as Baja California.  That

20   control -- control of various states was corroborated by

21   Zambada Garcia, who stated that the defendant controlled

22   shipments of cocaine, not only through Culiacán, which is in

23   the state of Sinaloa, but also through the states of

24   Tamaulipas and Nuevo León, which are on the eastern side of

25   Mexico, more towards the north, along the border with Texas.

```
 1              This --
 2              THE COURT:  Remind me:  When the cocaine came in
 3    from Colombia, where did it first arrive?
 4              MR. ROSALES:  So typically, the general testimony
 5    was --
 6              THE COURT:  Chiapas.
 7              MR. ROSALES:  If came through Chiapas, which is in
 8    the southern part of Mexico, it would travel up to Mexico
 9    city and, from Mexico City, be distributed Culiacán or to
10    the border.  That was for one type of shipment.
11              THE COURT:  Chiapas is right near Guatemala.
12              MR. ROSALES:  That is correct, Your Honor.
13              In terms of leadership again, you heard testimony
14    that the defendant was basically in a power-sharing
15    agreement for the City of Culiacán with members of the
16    Sinaloa Cartel, to include the top-level members,
17    Mayo Zambada and Chapo Guzman.
18              You heard that from Mr. Villarreal, who I believe
19    used the word -- or Special Agent Peschka used the words
20    power-sharing agreement with those two individuals.
21              Poveda, the testimony from Poveda was that the
22    defendant controlled Culiacán, paid officials in Culiacán to
23    control the area, and shared Culiacán with Chapo Guzman and
24    with Mayo Zambada and had -- I believe that the exact words
25    were "joint ventures" with those two individuals, those two
```

1    heads of the Sinaloa Cartel.

2         In terms of leadership, Your Honor, I don't think

3    that there's any doubt that this defendant deserves a

4    4-point enhancement here.  He was the leader of one of the

5    largest cartels in Mexico.  If there's any doubt as to how

6    large this cartel was, the fact that he basically was cozy

7    with Chapo Guzman and Mayo Zambada, the heads of the Sinaloa

8    Cartel, if you remember, we sort of fought tooth and nail

9    throughout the course of getting this case ready for trial

10   about whether or not the Sinaloa Cartel was even relevant to

11   these proceedings.

12         And defense counsel, to his credit, tried his best

13   to keep the Sinaloa Cartel out of these proceedings.  But

14   I think, Your Honor, we all learned during the sentencing

15   hearing why it was so important to incorporate the Sinaloa

16   Cartel in the government's case.

17         They were one and the same because they shared

18   cocaine loads; they shared the infrastructure; they shared

19   control of major cities that were used to move this cocaine

20   eventually to the United States.

21         Mr. Zambada Garcia testified that in Chiapas,

22   which was the southern part of Mexico, the Sinaloa Cartel

23   controlled that, but the Beltran Leyvas requested permission

24   to receive their own shipments through there.  And these

25   were the shipments that eventually Mr. Zambada provided

1          The head of the Beltran Leyva Organization, as

2     it's been described, was Arturo Beltran Leyva, Mr. --

3     Alfredo's older brother.  Arturo ran the organization until

4     his death in December of 2009.

5          Much of what was said here by the agents and these

6     cooperators is information that could pertain just as easily

7     to Alfredo, i.e., that he controlled Durango, Sonora,

8     Sinaloa, Baja California, that he controlled shipments.

9          The Court has absolutely no way of knowing, no way

10    of verifying, no way of confirming the truth of what these

11    individuals say.

12         The only corroboration that the government can

13    offer up to the Court is they might have asked one of these

14    cooperators one question, and they may have asked the same

15    question to the other cooperators; so, therefore, they're

16    saying something similar and that should serve as

17    corroboration.

18         I would submit to the Court that if we were in a

19    trial, obviously, the standard would be beyond a reasonable

20    doubt.  We're not.  It's preponderance of the evidence.

21         But I would submit to the Court that if the Court

22    were considering a case where money is an issue and not my

23    client's liberty, that the Court wouldn't even accept this

24    as having met a preponderance of the evidence.

25         There is no way to corroborate these individuals.

```
 1   They are all providing information for gain.  You can
 2   already see the benefit that they've received in the case of
 3   Poveda Ortega, who supposedly acknowledged having shipped
 4   over 1 million kilograms of cocaine.  His -- he had three
 5   indictments, I believe, was allowed to plead in a combined
 6   fashion.  His forfeiture was allowed to be $1 million -- and
 7   we'll get to that part separately for my client; whereas,
 8   they're seeking 100 times that or a thousand times that for
 9   my client for less drugs.
10          So I'm at a loss almost to credibly argue, because
11   I can't, Your Honor.  I just have these statements from out
12   of court.
13          Again the biggest thing that the Court should
14   consider, in my opinion, is that none of these individuals
15   are corroborated in any way.
16          With respect to some of these shipments, as I
17   mentioned during the cross-examination, the government has
18   cooperators who participated in those shipments.  They could
19   easily have put on a witness to testify about what they
20   said.  They could have put the witnesses on themselves to
21   testify and literally corroborate what these individuals
22   say.  They failed to do that.
23          There's no evidence here that Mr. Beltran was a
24   leader or an organizer.  He said at the time that he pled
25   guilty.  The Court asked him if he was a leader of the
```

115

1   investigations are conducted.

2         How is the government of the United States

3   supposed to conduct investigations when, as you heard

4   testimony here, almost every single one of these individuals

5   is corrupt?

6         If the government of Mexico is investigating

7   someone on the scale of this defendant who's bringing in

8   tens of thousands of kilograms of cocaine a month -- and I

9   say a month because I'll bring you back to the 90,000 kilos

10  of cocaine that came in in a three-month period in the state

11  of Guerrero that they owed the debt for, a month.

12        All the corruption payments had gone into that,

13  into securing that cocaine, making sure that law enforcement

14  is not seizing it, not arresting the individuals involved.

15        How can we possibly be expected to corroborate --

16  first of all, you didn't hear much evidence of seizures

17  Mexico.  Why not?  Because all the police officers and all

18  the higher-level law enforcement officials are corrupt.

19        If they're paying these individuals to protect

20  their cocaine shipments, you're not going to have very many

21  seizures.

22        And I bring the Court back to the seizures that

23  the government was going to present at trial.  I believe

24  Your Honor asked Special Agent Hatherley on the stand about

25  the seven interdictions and how many kilograms of cocaine

440

1          I wouldn't even normally allow this.  But it's not

2     going to go outside the scope of what his reply was.

3          Now, if you've got something specific to his

4     reply, you can state it; otherwise, have a seat.

5          MR. BALAREZO:  I do, Your Honor.

6          THE COURT:  Focus.

7          MR. BALAREZO:  I am, Your Honor.

8          THE COURT:  Focus.  No, you're not.  You think you

9     are.

10         MR. BALAREZO:  That's right, Your Honor.  I will

11    sit down, Your Honor.

12         THE COURT:  Focus.

13         MR. BALAREZO:  That's fine.  I'll sit down.

14         THE COURT:  Focus.

15         MR. BALAREZO:  Thank you, Your Honor.

16         THE COURT:  All right.

17         Next enhancement, please.  Dangerous weapons

18    possessed or dangerous weapon possessed.

19         MR. ROSALES:  And, Your Honor, as to the weapons

20    enhancement, you heard testimony from the agents, from

21    Special Agent Peschka related to Mr. Villarreal, who, one,

22    testified that the defendant controlled these group of --

23    the defendant controlled two individuals named Wacho and

24    Rayito, who themselves controlled a group of 100 hitmen, who

25    each were called to carry out killings and other -- other

1  acts of violence.

2         The Court can find that the defendant, because one

3  of his co-conspirators possessed these weapons, also

4  possessed a weapon.

5         But beyond that, you also heard testimony about

6  the security rings that were formed around the defendant

7  with these armed individuals carrying AK-47s and pistols.

8         THE COURT:  What about the fact that when he was

9  arrested, there was nobody there?  Where's all the security

10  stuff?

11         MR. ROSALES:  Well, I think -- I think that

12  there's a key distinction here.

13         Mr. Villarreal was not there for his arrest.  So

14  how he could know or not know whether or not there was

15  anyone there at the time of his arrest, it's difficult to

16  say and what his basis of knowledge was for saying there was

17  no one there.

18         The evidence that's in the MLAT, however, seems to

19  be contrary to that, because the evidence in the MLAT shows

20  that there were multiple individuals who were arrested;

21  multiple -- multiple firearms that were seized, including

22  the firearm that the witness -- that the government

23  presented with the eagle on it and the inscription

24  "el aguila," or "the eagle" in Spanish.

25         I think that -- I think the MLAT itself, the

```
 1   official documents from the government of Mexico,
 2   corroborates the fact that the defendant was often
 3   surrounded by a large security ring, often -- not often, but
 4   those individuals always carried firearms.  They carried
 5   longarms.  They carried pistols.  That's borne out in the
 6   evidence that's in the MLAT itself.
 7           THE COURT:  And he was -- he was captured with a
 8   pistol and a rifle, apparently.
 9           MR. ROSALES:  According to what Mr. Villarreal
10   said, he believed that the defendant was arrested with a
11   pistol and a rifle.  And I think the testimony, as it came
12   out, was based on the reference to the reports, that the
13   defendant was at home by himself.
14           THE COURT:  All right.
15           MR. ROSALES:  But even setting aside whether or
16   not he was surrounded by these gunmen, I think it's still
17   consistent.  One, Mr. Villarreal says he was arrested with a
18   pistol and a rifle; and, two, you at least have at a minimum
19   evidence of a pistol that by preponderance of the evidence
20   could be attributed to the defendant because it was
21   recovered at the time of his arrest.  It has the eagle
22   insignia on it, and it has "el aguila" printed on the barrel
23   of the firearm.
24           You also heard testimony through Mr. -- through
25   Special Agent Peschka from Mr. Villarreal that the defendant
```

122

1    was responsible for acquiring weapons which he then

2    delivered to Arturo Beltran Leyva in Mexico City or, again,

3    showing the unique relationship that this defendant had with

4    the Sinaloa Cartel to Chapo Guzman and Mayo Zambada there in

5    Culiacán.

6           The description of these weapons, I believe, was

7    that Mr. Villarreal saw tanker trucks full of AK-47s,

8    AR-15s, M-16s, .50-cals, and pistols, all which the

9    defendant was responsible for acquiring on behalf of both

10   organizations, the Sinaloa Cartel and the Beltran Leyva

11   Organization.

12          You also heard testimony that Mr. Zambada observed

13   the defendant armed with a pistol during the meeting in

14   Guerrero, which is consistent, again, with, one, the pistol

15   that was recovered during the time of his arrest, the

16   defendant's arrest, and, two, the information provided by

17   Mr. Villarreal that the defendant was often armed -- or that

18   the defendant was arrested with a pistol and with a longarm.

19          You also heard testimony that Mr. Villarreal --

20   sorry, that Mr. Zambada observed numerous gunmen at the

21   meeting in Guerrero that he had with the defendant and with

22   Mayo Zambada, Julio Beltran and Fernando Morales.  That,

23   again, is consistent with the security rings that the

24   witness, Villarreal, was -- gave information about, was

25   responsible for helping to coordinate and set up.

444

127

1    So just to be very clear, that information that

2    came out during the testimony by Mr. Villarreal, was on

3    cross-examination, only after he was pointed -- Special

4    Agent Peschka was pointed to a report that said the

5    defendant was arrested with a longarm and with a pistol.

6    With -- going back to corroboration issue, I mean,

7    defense seems to want it both ways here.  They want evidence

8    for Mexico.  They want -- they want the government to get

9    all this investigative evidence from Mexico, work with these

10   officials in Mexico to investigate cases against major drug

11   traffickers who have their hands in many aspects of these

12   political and law enforcement officials.  Yet when the

13   government produces that evidence, they want the Court to

14   find no value in it.  You sort of can't have it both ways.

15   If you're asking for the evidence when you're

16   shown the evidence -- now, granted, this is a preponderance

17   of the evidence standard.  Had this been a trial, of course,

18   if the government wanted to introduce that firearm or that

19   photograph of that firearm, we'd have to bring in several

20   witnesses to do so.  There's no doubt about that.  But

21   that's not the standard.  That's not our burden here.

22   This is by preponderance of the evidence.  The

23   Court has accepted the document into evidence as a

24   self-authenticating document, since it was given over to the

25   United States by the governor of Mexico.

445

1          You can't have it both ways here.  You're finally

2     confronted with evidence from Mexico, and they ask the Court

3     to disregard it.  So, again, for these reasons, we feel that

4     the two-point enhancement is definitely warranted here.

5          THE COURT:  How about the next one, used or

6     directed violence?

7          MR. ROSALES:  So that ties in, again, with the

8     evidence that we've summarized for the Court with regards to

9     the defendant's employees, Wacho and Rayito, and the

10    numerous gunmen that they controlled.

11         You heard testimony from Mr. Villarreal that there

12    were morning meetings in which these individuals were

13    reporting to the defendant about people who had been killed,

14    rival drug traffickers who had been killed.

15         In fact, Mr. Villarreal admitted that he was the

16    person responsible for setting up a new system for the

17    organization.  And that was, instead of just going and

18    killing everyone and not gaining anything from it, why don't

19    you kidnap them, torture them, get some information out of

20    them, and then you can kill them?

21         That was very clear.  You know, defense counsel,

22    I think, tried to insinuate that Mr. Villarreal put himself

23    out there as someone who had clean hands.  I don't think

24    that there's any doubt that if Mr. Villarreal were on trial

25    for murder of these individuals, that he helped the Beltran

 1   arrested, during that time frame, Mr. Poveda had a contract,
 2   so to speak, with the defendant to sell him all the cocaine
 3   that was in his possession from these shipments that were
 4   coming from Colombia.

 5          Mr. Poveda testified that the defendant personally
 6   told him that he sold some of that cocaine in Culiacán to
 7   other drug traffickers who were going to transport it to the
 8   United States.  And he himself, the defendant himself, also
 9   transported portions of that to the United States.

10          There's some evidence of that based on the fact
11   that the money that was coming back to Mexico City was in
12   U.S. currency.

13          You also had testimony from Zambada related to the
14   Chiapas shipments.

15          There were -- once the Beltran Leyvas organized
16   the shipment through Chiapas, the cocaine was transported up
17   to Mexico City by the Sinaloa Cartel and stored there to be
18   turned over to the Beltran Leyvas.

19          There was a point that I clarified on redirect
20   with Special Agent Hatherley.  The cocaine that we were
21   talking about in Mexico City that was given to the defendant
22   by Mr. Zambada was the cocaine that belonged to the Beltran
23   Leyva Organization.  It wasn't sold to the defendant.  It
24   was cocaine that was -- that had been negotiated with the
25   Colombians and belonged to the Beltran Leyvas.

1           The numbers that the government is advocating for

2    are so extraordinary.

3           MR. ROSALES:  Not without precedence in this

4    courthouse, Your Honor.

5           THE COURT:  Well, that may be, but -- that may be.

6    I'm not quarreling with that.  But I think I'm going to need

7    some -- I'm going to need a little time to think through

8    that and then also to hear arguments on the calculations

9    that you guys have come up with and the premises that are

10   built into those calculations, that -- you know, obviously

11   you've had an agent talk about what Mr. Poveda's

12   recollection is.

13          Mr. Poveda, I don't know Mr. Poveda.  I've never

14   met him.  Obviously, I've never seen his 302s.  But based on

15   the little I've heard about him and about his, what he was

16   doing, it sounded to me like he was a pretty busy guy.  He's

17   a broker, basically, for the cocaine manufacturers in

18   Colombia.  And he's brokering lots and lots and lots of

19   shipments from Colombia to Mexico for ultimate distribution

20   in the United States.

21          It's hard for me at first blush to think that

22   without records, Mr. Poveda can have clarity in his

23   recollection as to how many kilograms, high and low, were

24   being brought in by speedboat and fishing vessels and other

25   things years ago.

```
1          You know it's one thing if he's got records that
2    he can point to that he kept contemporaneous.  But, you
3    know, I'm not -- what I'm not -- I want to be clear.
4    I'm not saying that I have doubt.  I don't have doubt that
5    he had -- Mr. Poveda had recollection of facilitating these
6    drug importations.  I don't have any doubt about that based
7    on what I've heard.
8          I think it's clearly more probable than not, using
9    that lower standard, a preponderance standard that he
10   facilitated those things.
11         But how to calculate what the amounts were and the
12   calibration of the high and low -- there was a dispute that
13   Mr. Balarezo raised, I think -- actually, maybe both
14   Mr. Balarezo and Mr. Purpura raised, about the amount in
15   Culiacán per kilogram, one of the witnesses was saying
16   11,000, I think it was 500, and the other was saying 16,000.
17   Mr. Poveda, I think was saying 16-.
18         So there's disputes there potentially.  There's
19   questions in my mind about what he can really realistically
20   recall.
21         MR. ROSALES:  I think --
22         THE COURT:  To me, that's a very -- and, of
23   course, the other thing is that I have no reason to
24   believe -- it's like this is a situation where you all have
25   located, I think -- what you are asking for $10 billion or
```

1   defendant was receiving half of the shipments per their

2   agreement that Mr. Poveda was involved in organizing; that

3   he was purchasing half of those shipments.

4           It's very actually consistent with the number --

5   or the numbers that are in the chart.  In fact, I think it

6   even bears out the idea that while Mr. Poveda's conspiracy

7   plea was for a little bit longer period of time, the time

8   period that he was -- had this contract with the defendant

9   was from 2003 to 2005.  If you look at the numbers, the

10  amounts of cocaine -- the amount of cocaine that the

11  defendant was receiving from Mr. Poveda during that time was

12  around 300,000 kilos on the low end, total, to about

13  400,000 kilos, on the high end, fairly consistent with

14  Mr. Poveda's admission of guilt to being responsible for

15  over a million kilograms of cocaine during his time as a

16  drug trafficker in Mexico.

17          Now --

18          THE COURT:  Was he sentenced already?

19          MR. ROSALES:  He has not been sentenced yet.

20          And I understand that the Court has the questions

21  about, Well, how did he remember the specific breakdowns of

22  these shipments and the specific suppliers?

23          I think that the argument can be made for a couple

24  reasons.  One, this is his livelihood.  And really, this is

25  his life, because if he mishandles even one kilogram of

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )    CR No. 12-184
                                   )
                                   )    Washington, D.C.
      vs.                          )    March 8, 2017
                                   )    2:45 p.m.
ALFREDO BELTRAN LEYVA,             )
                                   )
            Defendant.             )
_____     )


TRANSCRIPT OF FORFEITURE HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        ADRIAN ROSALES
                           AMANDA LISKAMM
                           U.S. DEPARTMENT OF JUSTICE
                           Narcotic and Dangerous Drug
                           Section
                           145 N Street, NE
                           Second Floor, East Wing
                           Washington, D.C. 20530
                           (202) 598-2281
                           adrian.rosales@usdoj.gov
                           amanda.liskamm@usdoj.gov


For the Defendant:         A. EDUARDO E. BALAREZO
                           Balarezo Law
                           400 5th Street, NW
                           Suite 300
                           Washington, D.C. 20001
                           (202) 639-0999
                           info@balarezolaw.com

```
 1                    P R O C E E D I N G S

 2            DEPUTY CLERK:  All rise.  The United States

 3   District Court for the District of Columbia is now in

 4   session; the Honorable Richard J. Leon presiding.  God save

 5   the United States and this Honorable Court.  Please be

 6   seated and come to order.

 7                 (Defendant entered.)

 8            DEPUTY CLERK:  Your Honor, calling Criminal Case

 9   No. 12-184, the United States of America v. Alfredo Beltran

10   Leyva.  The defendant is present in the courtroom.

11            The interpreters present for these proceedings are

12   Mr. Englesburg and Ms. Blumberg-Lorenzana.  They have both

13   been sworn for the record.

14            Counsel, please approach the lectern and identify

15   yourselves for the record.

16            MR. ROSALES:  Good afternoon, Your Honor.

17   Adrian Rosales for the government, along with

18   Amanda Liskamm, and Paralegal Specialist Angela

19   Ancalles-Jimenez.

20            THE COURT:  Welcome back.

21            MR. BALAREZO:  Good afternoon, Your Honor.

22   Edward Balarezo on behalf of Alfredo Beltran Leyva.

23            THE COURT:  Welcome back.

24            All right, Counsel.  Let me give you -- start off

25   with my findings on the enhancements, and then we'll focus
```

1    on the arguments that you have regarding the forfeiture

2    amount.

3              Of course, everyone agrees at the outset that 38

4    is the base level for the offense.

5              You can have a seat there, sir.

6              Sir, you can have a seat.

7              MR. BALAREZO:  Thank you, Your Honor.

8              THE COURT:  38 is the base level for the offense,

9    because the defendant imported for distribution more than

10   450 kilograms of cocaine.

11             The first enhancement the government seeks is

12   organizer or leader, which is a plus-4 enhancement.  The

13   standard for this enhancement under Section 3B1.1 is that

14   the defendant was more responsible for the conduct of the

15   drug trafficking organization as compared to others.  For

16   instance, the enhancement applies if the defendant had

17   decision-making authority or recruited accomplices or had a

18   right to a larger share of profits or had a high degree of

19   participation in planning the operations or a high degree of

20   control over others in the organization.  I find that the

21   standard has been met in this case.

22             All three cooperating witnesses, Poveda, Zambada,

23   and Villareal, reported that the defendant was the top

24   authority in charge of controlling various geographic areas

25   in Mexico that were critical to the Beltran Leyva drug

1   trafficking organization.

2           Poveda's and Villareal's reports corroborate each

3   other with respect to the defendant's control in Culiacán.

4   They also corroborate each other with respect to the

5   defendant meeting with El Chapo and Mayo Zambada.  Those

6   meetings indicate defendant's authority to speak on behalf

7   of the Beltran Leyva Organization.

8           I find these reports credible for the additional

9   reason that the witnesses had firsthand knowledge.  Poveda

10  had personal knowledge of the ultimate authority that the

11  defendant exercised over critical pieces of the drug trade

12  because he was in charge of supplying drugs to the

13  organization.  Villareal had personal knowledge of the

14  importance of the defendant's position because his job was

15  to work with defendant's security employees to secure the

16  defendant.

17          Defendant has presented no evidence that is

18  inconsistent with any of these reports.

19          As to the defense's arguments it says are

20  applicable to each enhancement, aside from questioning in a

21  rather general way the witnesses' motive and

22  trustworthiness, defendant gave me no reason to doubt the

23  reliability of the evidence that the agents presented.  That

24  general problem is not enough, of course, to survive the

25  preponderance-of-the-evidence standard that applies at

 1   sentencing, when there is no specific evidence that the

 2   facts were different than how the witnesses described them.

 3            The defendant also argued that the reports of the

 4   cooperating witnesses were not corroborated independently,

 5   but I'm relying here on facts that were at least partially

 6   corroborated by multiple of the three witnesses attested to

 7   here.

 8            These three reports were also generally consistent

 9   with each other, such as when Zambada knew that Poveda was a

10   main supplier of cocaine to the Beltran Leyva Organization.

11            MR. BALAREZO:  Your Honor, I'm sorry, I can't hear

12   the Court, if --

13            THE COURT:  I'll speak a little louder then.

14            That general consistency allows me to find the

15   indicia of reliability, as one of the witness's reports,

16   that witness had firsthand knowledge.

17            I, therefore, find the defendant should receive 4

18   points for being an organizer or leader of the Beltran Leyva

19   Organization which imported controlled substances to the

20   United States.

21            The second enhancement the government seeks is

22   dangerous weapon possessed, that's a 2-point enhancement.

23   The government presented strong evidence that, at the very

24   least, the defendant himself was armed with a pistol as he

25   conducted drug trafficking business.  Both Zambada and

1   Villareal said they witnessed it, and the Mexican report of

2   evidence recovered at the time of arrest is consistent with

3   those reports.

4        The defense raised some questions as to whether

5   the pistol inscribed with the words for "the eagle" really

6   referred to the defendant.  But given the testimony of

7   Agent Peschka that the overall investigation yielded

8   information that "the eagle" refers to defendant and that

9   there were, at most, only a few other people present when

10  the defendant was arrested and that pistol was recovered, I

11  find, by a preponderance of the evidence, that the pistol

12  might have belonged to him, and that the defendant used the

13  pistol in furtherance of drug trafficking activity.  So I

14  will grant those 2 points.

15       The third enhancement the government seeks is used

16  or directed violence, plus 2.  This is the one enhancement

17  for which the defendant put forward some affirmative

18  evidence.  The defendant was alleging that defendant was not

19  responsible for carrying out an order to kill Julio Beltran.

20  However, the government did not rely on that particular act

21  of violence at the evidentiary hearing.  Rather, the

22  government presented evidence that both Zambada and

23  Villareal knew that the defendant ordered his employees to

24  fight and kill members of rival drug trafficking

25  organizations, specifically the Zetas.  Once again, I found

1    these reports to have the indicia of reliability because

2    they corroborate each other and because Villareal's personal

3    knowledge was in the area of security and the threat of

4    violence in this ongoing conflict between the rival

5    organizations.  I, therefore, find that the defendant used

6    or directed violence and that this enhancement applies.

7         The next enhancement the government seeks is bribe

8    law enforcement to facilitate offense, it's a plus-2

9    enhancement.  Once again, all three cooperating witnesses

10   reported that the defendant was the authority in charge of

11   securing geographic areas for use in the drug trade, and

12   that securing an area required bribing law enforcement

13   officials who otherwise might interfere.  These reports

14   corroborate each other and tend to show, by circumstantial

15   evidence, that the defendant bribed these officials.

16        Additionally, Villareal was a firsthand witness to

17   bribery when the defendant met with government officials

18   every 15 to 30 days and when he saw -- and when he witnessed

19   the police would turn rivals over to the defendant's

20   employees.

21        Defendant presented no evidence to the contrary.

22   I, therefore, find the bribery enhancement also applies.

23        The next one is, if an organizer, then he was

24   directly involved in the importation of the illegal

25   substance.  This is a plus-2 enhancement.

1    Witness Villareal had firsthand knowledge of

2    defendant's direct involvement in getting controlled

3    substances across the border because he was present for the

4    daily calls when the bosses at the border reported whether

5    shipments across the border had been successful.  Villareal

6    reported that the defendant was an active participant in

7    these calls.  And this report is generally consistent with

8    Poveda's report the defendant told him that his cocaine

9    supply would be imported to the U.S. and Zambada's

10   understanding that the defendant controlled the route

11   through Mexico to the U.S. border.

12        There being no evidence to the contrary, the Court

13   finds that direct involvement -- the defendant had direct

14   involvement in the importation, and this enhancement, of

15   course, applies as well.

16        At this point with all these enhancements added,

17   we are at about 50 points.  Well, not about, we are at 50

18   points.  Because the maximum Guidelines sentence is reached

19   at 43 points, I will make no further factual findings, even

20   though I'm aware that the government presented evidence that

21   the defendant used airplanes and laboratories.

22        I do, however, need to make a ruling on whether

23   the defendant qualifies for a 3-point acceptance of

24   responsibility.  The standard for acceptance of

25   responsibility under Section 3E1.1 is that the defendant

1    truthfully admits the offense conduct and does not falsely

2    deny other relevant conduct.

3                I will expect each side to present arguments at

4    our next hearing as to whether defendant meets the standards

5    of accepting responsibility in this particular case.

6                So that's the Court's ruling to assist you in

7    preparing for the sentencing arguments that will take place

8    at our next hearing.

9                I would like to devote the remainder of today's

10   hearing to the arguments from both sides with regard to the

11   amount of money that the Court should issue for forfeiture

12   in this particular case.

13               I'll hear from the government first.

14               MR. ROSALES:  Your Honor, as the Court is aware,

15   the government is requesting forfeiture in the amount of

16   $10 billion.

17               The primary evidence that the Court heard during

18   the testimonial phase came from Special Agent Thomas

19   Hatherley and his interviews of Mr. Poveda.

20               I would like to focus the Court's attention on

21   Government's Exhibit No. 6, which is a chart that was

22   created by the government, with the help of Mr. Poveda's

23   information, which details all of the suppliers that

24   Mr. Poveda worked with during the time period of

25   approximately 2003 until the time of the defendant's arrest

1   in 2008, keeping in mind that the span of the conspiracy for

2   which the defendant was charged ranges from 2000, which is

3   three years before the period indicated in the chart, until

4   2012, which is four years after the period indicated in the

5   chart.

6           So in just this four- to five-year period, from

7   what Mr. Poveda provided the government, the government

8   calculates the total amount of gross receipts that the

9   defendant received anywhere from $5,021,600,000, up to

10  $7,518,400,000, based on just the information provided by

11  Mr. Poveda for this five-year period.

12          Now, I'd like to --

13          THE COURT:  This is assuming a price per kilo in

14  Culiacán at the time of $16,000, correct?

15          MR. ROSALES:  That's correct, Your Honor.

16          So the total number of kilos times $16,000, which

17  is the sale -- the price that a kilo of cocaine could be

18  sold at in Culiacán.

19          THE COURT:  He had no -- Poveda had no actual

20  knowledge, though, of what it was actually sold for?

21          MR. ROSALES:  If you remember, Your Honor, the

22  testimony from Mr. Hatherley was that Poveda learned -- the

23  reason why we use the $16,000 price is because Poveda

24  learned from the defendant himself that $16,000 was the

25  price at which the defendant was selling each kilo that he

12

 1   sold in Culiacán.

 2          Again, there was also testimony that there was

 3   cocaine going to the United States from these shipments.

 4   But to be conservative in our estimate, we took the price

 5   that Mr. Poveda learned from the defendant per kilo, if it

 6   was sold in Culiacán, which was $16,000.  That, again, is

 7   very conservative, because, as Your Honor just found, the

 8   defendant was responsible for the importation of cocaine

 9   into the United States.

10          There was also testimony from

11   Special Agent Hatherley that came from Mr. Zambada about

12   specific locations, where the Sinaloa Cartel would receive

13   cocaine from the Beltran Leyva Organization in the

14   United States for certain services provided by --

15          THE COURT:  So to use the, for an example, the

16   first item on Exhibit 6, where it says speedboats, during

17   the period of '04 to '07, the estimate that Mr. Poveda

18   provided was a low of 2,500 kilos and a high of 3,000 kilos,

19   right?

20          MR. ROSALES:  Per speedboat.

21          THE COURT:  Right.  Per speedboat.

22          Now -- sorry, I lost my place here.

23          So with regard to -- let's take a given speedboat

24   load, the 16,000 -- let's, for the sake of discussion, say

25   it had 2,500, the low number, okay.  His estimate was that

13

1   it would have at least 2,500, something in that area, at a

2   minimum.

3          So when Mr. Poveda was being deposed -- or not

4   deposed, excuse me, interviewed and debriefed, whatever, he

5   was representing to the agent, if I understand it correctly,

6   that Mr. Beltran Leyva, on behalf of the organization, was

7   paying him, Poveda, who's the broker on behalf of the

8   Colombian manufacturers, he was paying him $16,000 per kilo?

9          MR. ROSALES:  No, Your Honor.

10          THE COURT:  What was he paying him?

11          MR. ROSALES:  I don't recall the exact amount or

12   what was in the testimony, but I believe it was about

13   $12,000 per kilo.

14          So to back up a minute or just to back up a little

15   bit in the process, the cocaine, according to Mr. Pavedo,

16   would arrive in Mexico City, which is where Mr. Poveda was

17   located at that point, looking only at the speedboat

18   shipments from Piraña.

19          THE COURT:  Well, start with that one.

20          MR. ROSALES:  So at that point, taking the

21   2,500 kilos that are on that speedboat, Mr. Poveda's

22   testimony, or the information he provided, was that for the

23   Piraña speedboats, 65 percent of the shipment belonged to

24   the Colombians, the remaining 35 percent belonged to Mexican

25   investors, which included members of the Beltran Leyva

14

1    Organization, and may have also included the defendant, his

2    brothers, and potentially even members of the Sinaloa

3    Cartel.

4              THE COURT:  So 65 percent of the 2,500.

5              MR. ROSALES:  Which would be 1,625 kilos belonged

6    to the Colombians.

7              Now --

8              THE COURT:  Let me -- "belonged to."

9              When you say, "belonged to the Colombians"...

10             MR. ROSALES:  Meaning that when the boat left

11   Colombia before it reached Mexico --

12             THE COURT:  Right.

13             MR. ROSALES:  -- 65 percent of the 2,500, which

14   would be 1,625, were owned by the Colombians.

15             Now, if you recall, the specific testimony from

16   Mr. Poveda was that once the entire shipment arrived in

17   Mexico City, that 65 percent, or 1,625 kilos, which belonged

18   to the Colombians, now belonged to Mr. Poveda, because he,

19   in essence, would purchase that amount from the Colombians.

20   He would then sell that amount directly to the defendant,

21   not to the organization, but to the defendant.

22             THE COURT:  Well, did he have any way of knowing

23   where the defendant was getting the money?

24             MR. ROSALES:  There was nothing in the -- well, he

25   would, because there was some testimony that once cocaine

1  was sold from these shipments, money would return to Mexico

2  City for the purchase of new shipments, and that money was

3  being sent by the defendant to Mr. Poveda for the next

4  shipment that arrived.

5          So for --

6          THE COURT:  So when Poveda sold the 1,625 kilos to

7  this defendant, this defendant would give him, in cash, the

8  equivalent, I think you said, of $12,000?

9          MR. ROSALES:  Per kilogram.

10         THE COURT:  Per kilo.

11         MR. ROSALES:  That is correct.

12         THE COURT:  So Poveda attested to actually not

13 only selling but receiving from this defendant?

14         MR. ROSALES:  Correct.

15         And if you recall, the testimony described the

16 movement of the cocaine and money from Culiacán in Mexico

17 City via tanker trucks.  I believe the testimony was that

18 cocaine would go out of these tanker trucks, and, in the

19 same tanker trucks, money would return.

20         Now, I think Special Agent Hatherley even said,

21 sometimes the order was reversed.  Sometimes cocaine would

22 be sent out and then paid for after the fact, and sometimes

23 money would be sent in advance for a shipment before it was

24 sent to Culiacán.

25         But the kilos of cocaine that are described in

16

1    this exhibit, there --

2         Let me try to make it a little bit simpler.

3    Let's look at it from the perspective of when the cocaine

4    all arrives in Mexico City.

5         THE COURT:  Well, I'm -- that's -- I'm trying to

6    break this down to make sure I understand it.

7         And if I've got, so far, this correct, you have a

8    witness who's attesting to selling 65 percent of 2,500

9    estimated amount directly to this defendant, and receiving

10   from this defendant the equivalent of $12,000 per kilo.

11   I don't have a calculator in front of me, but 12,000 times

12   1,625, that's a lot of cash.

13        MR. ROSALES:  So --

14        THE COURT:  That's well over a million dollars.

15        MR. ROSALES:  That would be $19,500,000.

16        THE COURT:  In cash.

17        MR. ROSALES:  In cash.

18        THE COURT:  Right.

19        So -- and that's for one --

20        MR. ROSALES:  Shipment.

21        THE COURT:  One shipment.

22        MR. ROSALES:  That's correct.

23        THE COURT:  And his estimate here was a low of 15

24   speedboat shipments --

25        MR. ROSALES:  That's correct.

17

```
 1              THE COURT:  -- and a high of 20.

 2              MR. ROSALES:  That's correct.

 3              And that $12,000, though, in terms of calculating

 4    the -- it's not the accurate number to use in calculating

 5    the forfeiture, because the forfeiture deals with how much

 6    money did the defendant receive for the sale of the cocaine.

 7              THE COURT:  That's what I want to go to next.

 8              How does Mr. Poveda know what it was that this

 9    defendant actually received for those 1,625 kilos

10    thereafter?  How would he know that?  He wasn't present for

11    that sale.

12              MR. ROSALES:  He was not.  But the testimony in

13    the record is that Mr. Poveda learned directly from the

14    defendant that when he sold the cocaine in Culiacán, he sold

15    it at $16,000 per kilo.

16              Now, again, this is a

17    preponderance-of-the-evidence standard.  I would imagine

18    that when the defendant was telling this to Mr. Poveda ten

19    years ago, he wasn't contemplating Mr. Poveda coming before

20    a judge to explain that, yes, this is what the defendant is

21    selling -- or this is what I'm selling the cocaine for per

22    kilo in Culiacán.  So the reliability -- there's a great

23    sense of reliability there.

24              Plus, you know, we also have to look at the fact

25    that 16,000 is the low end of what he was receiving per
```

18

1    kilo, because you also have testimony in the record, and

2    I believe it's the last page of Exhibit 6, that if the

3    cocaine were sold at the border -- and there was evidence

4    from -- there was direct evidence from Mr. Villareal that

5    cocaine was sold, at a minimum, at the border, or across the

6    border into the United States.

7         You heard evidence that the per-kilo price for the

8    sale of one kilo of cocaine at the border was $21,000.  And

9    you also heard further evidence that when the cocaine was

10   sold in Chicago, Atlanta, and New York, the prices would go

11   up as the cocaine went further north.  I believe the higher

12   end of the range was around $40,000, which is in the record,

13   once it was sold in New York.

14        So this chart doesn't take into account the

15   additional amount of money that the defendant was making if

16   he were selling these kilos of cocaine in the United States.

17        There is evidence in the record that he was doing

18   so.  There is evidence in the record that Mr. Poveda knows

19   that the defendant was taking some of these kilos and

20   selling them in the United States.

21        But for the ease of calculation and to give a

22   conservative estimate, we're simply assuming that all of the

23   kilos that the defendant received from Mr. Poveda were being

24   sold in Culiacán.  And we all know that that's just an

25   assumption because there's evidence in the record --

```
 1              THE COURT:  Who was he selling them to in

 2    Culiacán?

 3              MR. ROSALES:  So there's evidence in the record

 4    that he was selling them to other drug traffickers or other

 5    drug trafficking organizations, and there's also evidence in

 6    the record --

 7              THE COURT:  Other than the Beltran Leyva

 8    Organization?

 9              MR. ROSALES:  Correct.

10              Potentially also members of the Sinaloa Cartel,

11    who controlled Culiacán as well.

12              There's evidence in the record that the defendant

13    knew that those individuals were also taking the cocaine to

14    the United States.

15              So, again, looking at this chart, this is a subset

16    of all of the trafficking that the defendant did in

17    Culiacán.

18              We also had testimony from Mr. Zambada that, as

19    early as 1998, the defendant was involved in shipments of

20    cocaine coming in through Chiapas.  Then beginning in -- up

21    until -- from '98 until 2005 through Chiapas.  Then again in

22    2003, in the State of Guerrero, up until about 2006.

23              So this is just a subset of his cocaine

24    trafficking, and this gives him the benefit of the doubt

25    that he's selling everything in Culiacán.
```

1   is in multiple billions of dollars.

2        I mean, what -- first of all, you have no reason

3   to think there are any assets that would even begin to

4   approach a billion dollars down there.

5        MR. ROSALES:  Well --

6        THE COURT:  You don't have a basis to believe

7   that.

8        MR. ROSALES:  Well, there is some basis to believe

9   that, Your Honor, because while the government -- while the

10  U.S. Government may not have access to seizing these assets,

11  there is some basis to believe that assets do exist in the

12  billions of dollars.

13       There's ample evidence that we found through our

14  investigation and just through our cartel investigations in

15  Mexico in general that oftentimes these individuals will

16  launder their funds through legitimate businesses.

17       THE COURT:  Through what?

18       MR. ROSALES:  Through legitimate businesses in

19  Mexico.

20       I mean, it's one of the reasons why OFAC, which is

21  the Office of Foreign Asset Control, was created, was to

22  stop drug traffickers from laundering their funds through

23  these legitimate businesses.

24       While we may not, being the U.S. Government, may

25  not be able to go out and seize these properties, OFAC could

22

1    certainly investigate, as could the U.S. Marshals, the

2    existence of these properties and businesses that are tied

3    to not only the defendant but also to the organization.  And

4    while the U.S. Government may not be able to seize these

5    assets, the government of Mexico may be able to based on a

6    U.S. court order.

7            I think it's important, though, to go back to what

8    the Court said during one of our hearings leading up to the

9    actual testimonial phase of the sentencing hearings, and

10   that is that the Court wanted all the information that the

11   government had in its possession regarding enhancements and

12   any other sentencing factors against this defendant, because

13   the Court had to make a determination, based on all of the

14   information, what responsibility this defendant -- what

15   standard -- or for what this defendant should be responsible

16   for.

17           And I think just automatically cutting the number

18   of forfeiture just because it's maybe a cleaner calculation

19   using the $12,000 --

20           THE COURT:  But you're building certain

21   assumptions into your chart here.  One assumption is that

22   the $16,000 that he mentioned, he meaning the defendant,

23   mentioned to Mr. Poveda on at least one or more occasions,

24   would be an amount that was the amount he received each time

25   he sold one of these loads of cocaine up in Culiacán.  Now,

1    the Beltran Leyva Organization, right, managed its assets,

2    both from the point of view of making purchases for the

3    organization and from the point of view of dealing with the

4    cash it would intake for selling -- for the sale of the

5    drugs that it imported into the United States on behalf of

6    the organization?  Was there a centralized accounting

7    practice?  Was there -- were there any kind of bank accounts

8    that would indicate how the profits were split between the

9    brothers and the other leaders of the organization or...

10           MR. ROSALES:  So I can say that, first off, there

11    were no bank accounts used, because they're dealing strictly

12    in cash that's being stored in clandestine locations.

13           But Mr. Poveda had his own set of accountants who

14    would account for the cocaine shipments that he was

15    responsible for organizing.

16           And what Mr. Poveda said and what our

17    investigation revealed, corroborated by other witnesses, was

18    that if Mr. Poveda was able to organize, we'll use

19    100 kilograms as just as an example, organize a 100-kilogram

20    shipment of cocaine on behalf of Arturo Beltran Leyva and

21    the Beltran Leyva Organization, 35 -- and let's say it was

22    with Piraña and it was going to be on a speedboat.

23           Piraña, as the Colombian supplier, would allow the

24    Beltran Leyva Organization, or whoever was part of the

25    shipment, to invest in 35 percent of that shipment.

28

1          THE COURT:  Invest?

2          MR. ROSALES:  Invest.

3          Which means that, as I explained before, it means

4   that they would send money down to Colombia to purchase

5   35 kilos in Colombia at the Colombian price, which could

6   range between 2,500 and $3,500 per kilo.  The remaining

7   65 kilos on that shipment were owned by the Colombians.

8          So let's focus on those 35 kilos.  Mr. Poveda,

9   through his discussions with Arturo Beltran Leyva, who was

10  located with him in Mexico City, the defendant, and other

11  members of the organization would take a collection for

12  those 35 kilos.  And in that, he would note Arturo is

13  invested for 20 kilos, the defendant is invested for 10

14  kilos, and someone else is invested for 5 kilos, meaning

15  they would purchase those kilos at the Colombian price.  So

16  the moment that boat leaves Colombia, those kilos are owned

17  by -- those 35 kilos are owned by the Mexicans, to include

18  the defendant.

19         So Mr. Poveda would keep accounts of that so that

20  he could collect the money and transmit it to Colombia to

21  purchase those kilos of cocaine.  He would also keep

22  accounts of that, because once the kilos arrived in Mex. --

23  once those 35 kilos arrived with the larger shipment in

24  Mexico City, he would have to know how to distribute those

25  35 kilos.  So if 20 of those belonged to Arturo, he would

1  away.

2         MR. ROSALES:  So Mr. Poveda's testimony was not

3  that, okay, for these 65 kilos when I receive them in Mexico

4  City, I had an agreement to sell them to the organization

5  and, therefore, they were sent to Culiacán, and the

6  defendant gave me some money for them, Arturo gave me some

7  money for them, Hector gave me some money for them and

8  others, no.  His testimony, or his information, was, I had

9  an agreement to sell to the defendant, and it was the

10 defendant who sent the money to me.

11        Unlike the other scenario with the 35 kilos, where

12 there's a Mexican investment from the beginning,

13 Mr. Poveda's collecting the money from the different

14 investors so he could -- so Arturo would give him some, the

15 defendant would give him some, Hector would give him some.

16 That's not what happened with the remaining 65 percent.  The

17 only person who would give money to the defendant for the

18 remaining 65 percent, money to Mr. Poveda from the remaining

19 65 percent, was the defendant, because his deal was directly

20 with the defendant.

21        Now --

22        THE COURT:  So under what circumstances, based on

23 your investigation, is there a difference between purchasing

24 cocaine by the organization, using the organization's money,

25 and purchasing cocaine by this defendant with his personal

1   just produced evidence during the forfeiture phase that Cano

2   Flores is a member of this organization, he controlled this

3   plaza, but the entire organization trafficked in -- I

4   believe it was a $22 billion forfeiture -- or 15 billion, we

5   were very conservative and said 15 as opposed to 22.  We

6   said, $15 billion' worth of gross profits that the

7   organization received.

8         What the D.C. Circuit has said is, no, you can't

9   attribute all of the gross receipts received by the

10   organization to a defendant simply because he's a part of

11   the conspiracy.

12         THE COURT:  Well, then stop there.

13         My point is that Poveda is in no position to know,

14   or I should say, was in no position to know to what extent,

15   if any, the 65 percent he sold to this defendant was 65 --

16   was all his, a portion of his, a portion of his brother's,

17   a portion of someone else, he had no way of knowing that,

18   Poveda did.

19         MR. ROSALES:  No.  I disagree with that --

20         THE COURT:  How would he know it?

21         MR. ROSALES:  Because the testimony was that

22   Poveda had an agreement specifically with the defendant.

23   So...

24         THE COURT:  Yeah.  But he doesn't know -- you

25   don't see my point.

43

1    created based on the information provided by Mr. Villareal.

2         Mr. Villareal's estimate was that from the three-

3    to six-month period, per week, on the low end, there were

4    seven airplanes flying out to the border, and on the high

5    end, there were 20 airplanes flying out to the border.

6    According to Mr. Villareal, per week, there were anywhere

7    between 2,100 kilograms of cocaine, up to 7,000 kilograms of

8    cocaine being transported to the border via this method.

9         The estimate that the government has for the gross

10   receipts for these shipments totaled between, on the low

11   end, half a billion dollars, to the high end, $3.5 billion,

12   for just a three- to six-month period of time.

13        I'm glad that the Court brought Mr. Villareal back

14   into focus here, because we also heard testimony from

15   Mr. Villareal that the defendant was present for these

16   shipments.  So we know, again, that he was responsible for

17   them.  But also that the Court asked about the government's

18   investigation in terms of how the organization handled these

19   shipments.

20        It may not have come out in the testimony provided

21   from the information for Mr. Poveda or Mr. Villareal, but

22   because the Court's asking for what the investigation

23   revealed --

24        THE COURT:  Well, before you go to that, hold on

25   that thought.  I want to close the loop here on this

45

```
 1              THE COURT:  I see.  Okay.

 2              MR. ROSALES:  Would be much less successful if

 3   they were doing that.

 4              But they were using the tunnels to clandestinely

 5   bring the cocaine into the United States and other methods.

 6              THE COURT:  But Villareal's testimony was, the

 7   purpose of the flight was to get it up to the border for

 8   introduction into the United States.

 9              MR. ROSALES:  Correct.

10              THE COURT:  Whereas Poveda doesn't have knowledge,

11   other than in general terms, as to what -- where the cocaine

12   he was selling to the defendant was actually going to go

13   thereafter.

14              MR. ROSALES:  Other than the defendant himself

15   saying that the defendant was either selling it in Culiacán

16   or sending it to the U.S., and other than Arturo Beltran

17   Leyva confirming that the defendant was either selling it in

18   Culiacán or sending it to the U.S., Mr. Poveda can't say

19   these exact amounts were going to the U.S., being sent by

20   the defendant for these shipments, which is why we use,

21   again, the $16,000 price per kilo in Culiacán.

22              THE COURT:  I understand.

23              MR. ROSALES:  The investigation did reveal one,

24   I think, important fact.  And I'm only saying this, again,

25   because the Court's asked what the investigation revealed,
```

1    not necessarily what's in evidence.

2           But what many of the witnesses said was that once

3    the cocaine arrived in Culiacán, whether it was the cocaine

4    that the defendant purchased for Mr. Poveda or the

5    organization's cocaine, the defendant was the owner of it,

6    he purchased it from the remaining individuals of the

7    organization, and then he was responsible for that cocaine

8    from there forward.  So it was his.

9           So technically speaking, going back to that

10    100-kilogram shipment, if that entire 100-kilogram shipment

11    made its way to Culiacán, the defendant owned all of it.

12           In terms of --

13           THE COURT:  Now, hold that thought a second.

14           I'm under the impression, and maybe I've got the

15    wrong impression here, that there was a period of time, with

16    regard to this organization, where the defendant's brother,

17    not the defendant, was the head of the organization, right?

18    That's the impression I have.

19           Now, at some point, he was killed, the defendant's

20    brother.  So prior to his being killed, for lack of a better

21    way of putting it, was he not the head of the organization?

22           MR. ROSALES:  He was.

23           And let me explain it in terms of, again, the risk

24    management.

25           Similar to the way that the Colombians wanted some

```
 1   investment from the Mexicans in these shipments, sort of to
 2   manage -- to mitigate their risks, once the cocaine arrived
 3   in Mexico, members of the organization would mitigate their
 4   risks as well.  So even if, when the cocaine arrived in
 5   Mexico, Arturo owned a portion, or other members of the
 6   organization owned a portion, the way that they would
 7   mitigate their risk would be to just sell the portion to the
 8   defendant in Culiacán so that now the defendant is in
 9   control of it.  So if it gets seized --
10              THE COURT:  Why would they put the guy who's not
11   the head of the organization in charge of all the cocaine?
12              I mean, if Arturo -- if my recollection is correct
13   that Arturo was the head of it for a period of time before
14   he died, before he got killed, why would the other people at
15   the senior level of the organization be basically giving
16   this defendant, you know, to be totally in charge of the
17   cocaine for the organization?
18              MR. ROSALES:  One, because of his strategic
19   location in Culiacán.
20              For whatever reason, Arturo --
21              THE COURT:  Weren't the other brothers in
22   Culiacán, wasn't Hector?
23              MR. ROSALES:  Arturo resided --
24              THE COURT:  Excuse me, Arturo.
25              MR. ROSALES:  Arturo resided in Mexico City, which
```

50

```
 1   chart.

 2             THE COURT:  All right.  Well, let's give

 3   Mr. Balarezo a chance to address some of these issues, and

 4   then maybe I'll have some more questions for you.

 5             Mr. Balarezo.

 6             MR. BALAREZO:  Thank you, Your Honor.

 7             Your Honor, I think we -- at first, we need to

 8   start with what the standard is here.  Obviously, the Court

 9   can consider the evidence and -- by the preponderance

10   standard.  But I think the case law is clear that there has

11   to be some indicia of reliability to the evidence that the

12   Court is considering.

13             Government Exhibit 6, which is this chart that the

14   Court and the government have spent quite a bit now

15   discussing, the testimony of Agent Hatherley, not

16   Mr. Poveda, as the government kept saying -- there was no

17   testimony from Mr. Poveda, because obviously the government

18   did not put him on -- the chart, according to

19   Agent Hatherley, the information that came that is on that

20   chart came entirely from Mr. Poveda, nothing else, no

21   further investigation, no corroboration, nothing.  Twice on

22   cross-examination he said he took the word of Mr. Poveda at

23   face value.

24             As I mentioned and I crossed him on, there are

25   several individuals on the chart, beginning with Piraña,
```

51

1    more than half of them, that I am aware of, are cooperating

2    with the government.  It would have been extremely simple

3    for the government to go to one of these witnesses and try

4    to, at a basic level, corroborate any of this information.

5    The government failed to do so.

6            At best, this chart engages in speculation.

7    At worst, I don't know what comes -- what's worse than the

8    speculation, Your Honor.

9            I think it is ludicrous for the government to sit

10   here and argue with a straight face that, for example, with

11   respect to Piraña and the speedboats, that a low of

12   $390 million and a high of $624 million passed through my

13   client's hands and, therefore, he should be held liable for

14   that under forfeiture; similarly, for all the amounts that

15   are covered.  It's amazing that these trials attorneys from

16   NDDS, with all the information that they have, seem to have

17   a very little understanding of the drug trafficking world.

18           There's no drug trafficker who is going to sell

19   anybody 2,500 kilos and get paid whatever the commensurate

20   amount in dollars right away.  The money takes time.

21           So for the government to say that when Mr. Beltran

22   received these shipments, he paid Poveda the, whatever,

23   hundreds of millions of dollars at any one time.

24           For example, if you just take the first one, the

25   speedboats, 2,500 kilos, which is the low, and that's

1    generous, obviously, and Mr. Beltran Leyva supposedly owned

2    65 percent, that would be 1,600 kilos.  At the $16,000 rate,

3    which the government still continues to insist was the rate

4    in Culiacán, that would be $26 million.

5              THE COURT:  In cash.

6              MR. BALAREZO:  In cash.  In cash.

7              There's no drug trafficker who's going to have

8    $26 million to pay Mr. Poveda upon exchange of those drugs

9    or to send it down to him.  That's not how his business

10   works, number one.

11             Number two, you can see how ludicrous this is,

12   Your Honor, when the government says, well, out of that low

13   of 2,500 kilos that were sent on one of these speedboats,

14   and that's just an example, 35 percent belonged to

15   investors, and those investors were either Alfredo, Arturo,

16   or Hector, and they each own some number of kilos of that.

17             The rest --

18             THE COURT:  Well, they said there could be other

19   people too.

20             MR. BALAREZO:  Or other people.

21             But they said my client was one of those

22   investors.

23             But then they also said, well, those investors

24   bought those kilos at the cheap --

25             THE COURT:  Right.

1   cannot provide it to you.

2           To say -- the government claims an investigation,

3   and, again, we -- there is no investigation, Your Honor.

4   The investigation was interviews with these cooperators.

5           For the government to say that between 313,850 and

6   448,900 kilograms of cocaine, which were my client's

7   65 percent investment in all these loads, again, the only

8   word is ludicrous.

9           Anyone with any knowledge of the Mexican

10  trafficking and Colombian trafficking could easily see it

11  just doesn't make sense, Your Honor.

12          In New York, for example, they have charged

13  Mr. Guzman, Chapo Guzman with being the leader of the

14  federation.  He's charged with Mayo Zambada, who made an

15  appearance in this trial, he was mentioned.  He was charged

16  with Arturo Beltran, who's Mr. Beltran's brother.  He was

17  charged with various other individuals as the federation,

18  let's say.  And in that particular case, the government was

19  seeking 14 billion -- is seeking 14 billion in forfeiture

20  from the federation.  And that would just, I think, tend to

21  show the Court that the numbers that the government is

22  throwing around in this particular case are pie in the sky.

23          These numbers could be anything.  We're engaging

24  in speculation.  Well, there's a low of 2,500, there's a

25  high of 3,000; there's a low of 15 shipments, there's a high

```
 1              Villareal testified to being present and actually
 2    witnessing airplanes full of cocaine being flown up to the
 3    border so that it could be secreted over the border into the
 4    United States.
 5              And now -- granted it was only for a three- or
 6    four-month period, roughly, but he was -- he, the agent
 7    testified, he was there at the site where the planes
 8    departed.  He had -- he was told by this defendant that they
 9    were going up to the border for insertion into the
10    United States.  And he had firsthand knowledge of it.  And
11    he had discussed it with the defendant, and the defendant
12    told him that.  Now, that's a far cry from the Poveda
13    evidence.
14              What is the issue or concern you would voice as to
15    that evidence?
16              MR. BALAREZO:  Your Honor, if I remember
17    correctly, I think the testimony from the agent was that my
18    client owned 40 airplanes, and they were sending out
19    airplanes one after another to the border, I believe.
20              THE COURT:  I thought he said a low of seven trips
21    a week and a high of 20.
22              MR. BALAREZO:  On 40 planes.  That's what I
23    remember.
24              And I remember, I laughed, because, again,
25    that's -- the problem I have with that, beyond the fact that
```

58

```
1   it is completely uncorroborated, completely uninvestigated,
2   completely devoid of any independent verification of what
3   Mr. Villarreal said, Mr. Villarreal being a killer, an
4   individual who is obviously seeking major benefits from the
5   government for his cooperation.
6           Your Honor, those planes could have been Hector,
7   could have been Arturo.  We have no evidence beyond what the
8   Court says, his personal meetings, his personal
9   recollections.  There's no records of these planes.
10          Your Honor, it's not just -- it's not like a plane
11  just goes up loaded with cocaine and lands -- goes up
12  whenever it wants to and lands whenever it wants to.  It's
13  not how it works.  I mean, there are processes that these
14  people undergo.  It's, again, as I said last week, this is
15  like shooting a ghost, because Mr. Villareal and Mr. Poveda,
16  Mr. Zambada Garcia could say anything, and it's up to us to
17  try to rebut what they say.
18          So if the Court says, what is the problem that I
19  have with that, again, because there's no support for it
20  besides what this individual, who has major benefits to
21  gain, has said.
22          And it's not credible that, again, just based on a
23  few months, the government is claiming that half a billion
24  dollars, up to three and a half billion dollars, passed
25  through my client's hands.
```

59

1          That's really all I can say, Your Honor.  It just

2     does not jive with reality of the trafficking world.

3          You know, Mr. Beltran Leyva was supposedly part of

4     the organization, but now he is basically the one who's

5     receiving the majority of the cocaine personally for

6     Mr. Poveda, who, by all accounts, was the main cocaine

7     supplier for Arturo Beltran Leyva and the organization, if

8     you will, not Alfredo.

9          So I don't know if the Court has any other

10    questions, but that's really all I can say about this,

11    Your Honor.

12         THE COURT:  Okay.  Very good.

13         Mr. Rosales, do you have any rebuttal discussion

14    you'd like to make?

15         MR. ROSALES:  I'll try to keep this brief,

16    Your Honor.

17         THE COURT:  Well, start with the Villareal part,

18    because that's what we were just talking about.

19         MR. ROSALES:  In terms of the testimony from

20    Mr. Villareal, first of all, the Court has already found his

21    testimony to be credible, at least with respect to the

22    enhancements.  And in doing so, the Court found credible the

23    amounts of kilograms of cocaine that were being flown to the

24    border, found credible that the defendant was in control of

25    those kilos of cocaine, and found credible that those kilos

of cocaine were being imported into the United States.

So to say that he should be found credible for all those things but not credible for the total amounts that --

THE COURT: The estimates.

MR. ROSALES: The estimates, I think is -- I don't see how that correlates.

With regards to Mr. Balarezo's constant statements about, well, there's no evidence of these planes, there's no corroborations of these planes, Judge, we're talking about small aircraft, Cessnas and the like, we're talking about aircraft that are leaving from clandestine airstrips in Sinaloa, and are landing in clandestine airstrips along the border.

And even if they were arriving in airports, which, in this investigation, they were not, because they were completely landing and taking off from clandestine airstrips. Even if they were landing in airports, the record is replete with testimony about the types of corruption that was occurring throughout the course of this conspiracy.

So even if the aircraft were landing in airports, more than likely those aircraft would have been flying without a flight plan, the tower would have been paid, and no one would have known about those aircraft. Drug traffickers aren't in the habit of making public records of

 1   what they're doing.

 2          Going back to the corroboration issue, defense

 3   counsel has gone through the list of all the suppliers that

 4   supplied Mr. Poveda, and on cross-examination asked

 5   Special Agent Hatherley if he did anything to follow up on

 6   these issues.  Well, the answer was, Special Agent Hatherley

 7   didn't, but Special Agent Hatherley was here just to testify

 8   about Mr. Poveda.

 9          If the Court will note, in the Government's

10   Exhibit No. 6, I'd like to point the Court's attention to

11   page No. 2, supplier whose name is Mono Willer.  If the

12   Court remembers, there were a number of seizures that the

13   government was going to produce evidence of at trial that

14   were seized by either the United States Coast Guard or by

15   Colombian officials.  I believe those seizures -- there were

16   seven seizures, totaling over 50,000 kilograms of cocaine.

17          If you note in the number of shipments from the

18   Mono Willer category, there are asterisks by four and five.

19   And the key at the very end of the exhibit says that, on

20   page 3 of the exhibit, that this denotes that the numbers

21   are adjusted to not include shipments that were seized.

22          One of the seizures, as established by the

23   government's witnesses, including Mr. Poveda, was the

24   seizure of Gatun, which was a seizure that was going to be

25   introduced at trial, which, if my memory serves me, carried

1  on it approximately 18,000 kilograms of cocaine.  That's one

2  shipment.  That is very much in line with the amounts that

3  are being discussed here for these larger shipments.  The

4  Gatun was a large vessel.  It wasn't a speedboat.  So the

5  amount was much larger.

6          And if you look at the amounts that are ascribed

7  to the Mono Willer shipments, Mr. Poveda was very

8  conservative to say that they were between 7,000 and

9  9,000 kilograms.  The Gatun shipment was upwards of that

10 amount.

11         You can also look on page 3, towards the bottom of

12 the chart, the supplier that Mr. Poveda knows as Ramon

13 Quintero, there was an estimated number of shipments to be

14 17.  And there's an asterisk there.  The government was

15 going to produce a witness who had ledgers related to those

16 shipments at trial.

17         With regards to Chapeta, the supplier who was

18 underneath Mr. Ramone Quintero, you notice another asterisk

19 there by the number of shipments.

20         If you recall, Chapeta was the individual that we

21 fought about in terms of the ledgers that he possessed and

22 which portion of the ledgers should be included at trial,

23 because for one portion, he was physically present in

24 Colombia with the accountant, and for another portion, he

25 was not.

```
 1              Those ledgers indicated, I believe, ten shipments
 2     of cocaine that were going to the Beltran Leyva Organization
 3     in Mexico, and I believe that they bore out that the
 4     approximate amounts were what Mr. Poveda said that they
 5     were, between 8- and 10,000 kilos each.
 6              And, in fact, several of the seizures that were --
 7     there was a grouping of boats, if Your Honor recalls, that
 8     were part of what the government considered one seizure, and
 9     I believe these are the ones that were seized by the
10     Colombians, or off the coast of Colombia, that the
11     government was going to introduce at trial as well.
12              So to say that the government would not have been
13     able to corroborate these things, I think, is incorrect,
14     based on not only the motions we put forward but also the
15     preview of the evidence that we gave to the Court prior to
16     the trial.
17              Again, this hearing was very limited in its scope.
18     And so we put forth only witnesses who had direct knowledge
19     of the interviews of certain -- we put forth agents who had
20     direct knowledge of certain witness interviews, but it's not
21     to say that the government could not have corroborated the
22     information otherwise.
23              And, again, I point to probably the biggest form
24     of corroboration, which obviously the government would not
25     have used at trial, but -- because it wouldn't have applied
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )    CR No. 12-184
                                   )
                                   )    Washington, D.C.
      vs.                          )    April 5, 2017
                                   )    3:30 p.m.
ALFREDO BELTRAN LEYVA,             )
                                   )
            Defendant.             )
_____)


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          ADRIAN ROSALES
                             AMANDA LISKAMM
                             ANDREA GOLDBARG
                             MARCIA HENRY
                             U.S. DEPARTMENT OF JUSTICE
                             Narcotic and Dangerous Drug
                             Section
                             145 N Street, NE
                             Second Floor, East Wing
                             Washington, D.C. 20530
                             (202) 598-2281


For the Defendant:           A. EDUARDO E. BALAREZO
                             Balarezo Law
                             400 5th Street, NW
                             Suite 300
                             Washington, D.C. 20001
                             (202) 639-0999
                             info@balarezolaw.com

1    Eduardo Balarezo on behalf of Alfredo Beltran Leyva.

2            THE COURT:  Welcome back.

3            MR. BALAREZO:  Thank you.

4            THE COURT:  All right, Counsel.  Before I hear

5    argument on the issue that remains, which is acceptance of

6    responsibility, and then hear your arguments on what the

7    appropriate sentence is here, let me give you my ruling on

8    the forfeiture issue and my factual finding as to the

9    appropriate amount for the forfeiture order.

10            Pursuant to the forfeiture statute and our

11    Circuit's precedent in *U.S. versus Cano-Flores*, 796 F.3d 83,

12    I must make a finding as to what amount of proceeds the

13    defendant received or obtained individually from the crime

14    with which he is charged.

15            Here, the charged crime is a conspiracy to

16    distribute for importation into the United States large

17    amounts of cocaine, of course.

18            The government's two witnesses testified as to the

19    knowledge of several co-conspirators that the defendant

20    worked with in this regard.  They put in evidence a

21    conservative amount of cocaine that defendant purchased from

22    Colombia and transported to Culiacán.

23            The government asked the Court to assume that all

24    of this cocaine was for importation ultimately to the

25    United States, although there is certainly some testimony

1  indicating that the co-conspirators thought that some or

2  most of it was headed, indeed, to the United States, it was

3  not enough evidence on that point to make a factual finding

4  as to the amount actually heading -- the actual amount

5  heading to the United States.  Instead, I find that that

6  evidence about the defendant's cocaine supply is

7  corroborating evidence for the amount of cocaine that he

8  sent to the U.S. border for importation.

9            On this point, the government offered the

10  statements of the cooperating witness, Villareal.  Villareal

11  told Agent Peschka that he was actually present and

12  witnessed defendant oversee and direct the air shipments of

13  cocaine to the border of the United States.  Government's

14  Exhibit 5 is a summary of what he remembers seeing.  And

15  according to what Villareal reported to the agents, he saw

16  and accompanied the defendant and witnessed at least seven

17  planes a week to the Mexican side of the border, and those

18  planes contained at least 300 kilograms of cocaine each.

19            Because Villareal was with the defendant for at

20  least 12 weeks, I find there is evidence by the standard

21  appropriate here to support the defendant sent 25,200

22  kilograms of cocaine to the border for importation to the

23  United States, and received the proceeds associated with the

24  sale of that cocaine.  I reach that total by being extremely

25  conservative in crediting only the shipments an eyewitness

1   saw and adopting his most conservative recollection.

2            This amount of cocaine is easily corroborated by

3   the statements by Poveda who supplied the defendant with the

4   cocaine from Colombia.

5            I find that the defendant had proceeds from this

6   transaction of at least $21,000 per kilogram, because that

7   was the price the DEA knows to have been the street price on

8   the Mexican side of the border.  Again, this is a

9   conservative finding, because there is evidence that

10  defendant was responsible for building tunnels into the

11  United States, where he would be able to sell the cocaine at

12  a higher price.  Moreover, the $21,000 per-kilogram price is

13  supported by the fact that the defendant would have to

14  obtain a significant profit margin over the Culiacán price

15  in order to justify the entire operation that he oversaw.

16            So making all of the aforementioned factual

17  findings, I conclude that the defendant obtained proceeds of

18  at least, at least $529,200,000, and I will order the amount

19  of forfeiture in that amount.  All right.  An order to that

20  effect will be entered today.

21            Now, with regard to the sentencing, I have

22  received supplemental memoranda, I have reviewed them, and I

23  will hear argument from the parties on the issue of

24  acceptance of responsibility.

25            The Court has already gone over with the parties

7

1   its calculation with regard to the Guidelines except for

2   acceptance of responsibility.  And those calculations,

3   taking into consideration all of the enhancements that the

4   government has advocated for and that the Court has found

5   for, brings us up to 50.  So now the only question is any

6   acceptance-of-responsibility points to deduct from the 50.

7         So I'll hear the arguments of the government and

8   from the defense on that, and then I'll give you my final

9   calculation, so to speak, and then I'll hear argument from

10  both sides as to the appropriate sentence in this case.

11        Mr. Rosales.

12        MR. ROSALES:  Your Honor, I'll be brief as to this

13  point.

14        As stated in our -- in the numerous papers filed

15  in this case, we do not believe that the defendant deserves

16  any reduction for acceptance of responsibility; we do not

17  believe he has, in fact, accepted responsibility.

18        The Court should recall that, on two occasions,

19  the defendant has attempted to withdraw his guilty plea; on

20  one related to the matter of the Rule of Specialty issues,

21  which were litigated before this Court; and then, finally,

22  on the eve of sentencing again attempted to withdraw his

23  guilty plea, stating other reasons that were in his filings.

24        I direct the Court's attention to *United States*

25  *versus Berkeley*, 567 F.3d 703, in this circuit, in which the

```
1   Court held that the defendant's motion to withdraw his plea
2   basically negated any points off for acceptance of
3   responsibility.  We'd ask the Court to follow that precedent
4   in this case and deny any reduction for acceptance of
5   responsibility.
6              THE COURT:  That was McGee, right?
7              MR. ROSALES:  Berkeley, United States versus
8   Berkeley.
9              THE COURT:  All right.
10             Now, as a practical matter, though, even if the
11  Court were to agree with the defense, it would bring it down
12  to 47 -- well, actually, 48, because the government has to
13  move for the one point, which it is not moving for, am I not
14  correct?
15             MR. ROSALES:  That's correct.
16             THE COURT:  Yeah.
17             So it would bring it down to 48, which would still
18  put it above the 43 limit for a life sentence.
19             MR. ROSALES:  I agree that, in theory, Your Honor,
20  it's academic, but it also goes towards the weight of the
21  government's argument for a life sentence in this case to
22  keep him at a level 50.
23             THE COURT:  Very good.  Thank you.
24             MR. BALAREZO:  Thank you, Your Honor.
25             Your Honor, as I understand the government's
```

 1   argument, it indicates or it argues that Mr. Beltran did not

 2   accept responsibility because of his post-plea litigation,

 3   and, in fact, his motion to reconsider the Rule of Specialty

 4   or the application of the Rule of Specialty, and his motion

 5   to withdraw the plea.

 6        I will point the Court to the time when

 7   Mr. Beltran pled guilty, it was, I believe, the week that

 8   the trial was supposed to start; however, we notified the

 9   Court the week before the trial was supposed to start that

10   he intended to plead guilty.

11        THE COURT:  My recollection is it was a few days

12   before the trial started.

13        MR. BALAREZO:  Within a few days; within a week,

14   I would say.

15        THE COURT:  Not quite a week.  It was days before

16   trial was to start.  The Court had already asked the

17   government to give a proffer, which it did, of the evidence

18   it intended to prove, which was an extensive proffer, it

19   took hours to make.

20        MR. BALAREZO:  Correct.

21        THE COURT:  And their evidence.  So the government

22   had done all the preparation for trial --

23        MR. BALAREZO:  Correct.

24        THE COURT:  -- and had made its proffer.  So

25   that's well-established here.

```
 1              MR. BALAREZO:  Yeah.  We're not disputing that at
 2   all, Your Honor.  I'm just trying to -- more than the
 3   specific events, I'm trying to set the timeline for the
 4   Court.
 5              THE COURT:  Sure.
 6              MR. BALAREZO:  And by the time that Mr. Beltran
 7   had already -- had decided to plead guilty, the Court had
 8   already denied his initial motion to enforce the Rule of
 9   Specialty.
10              Now, when he filed the motion to reconsider the
11   Court's denial of his Rule of Specialty motion, it was
12   because the Court had indicated in its denial that he had
13   waived that argument based on the unconditional plea.  So he
14   made the argument in order -- in an attempt to try to
15   preserve his legal argument with respect to the Rule of
16   Specialty.
17              And under the Guidelines, the Guidelines, the
18   application notes do indicate that somebody who puts the
19   government to their test, for example, in order to preserve
20   a legal argument may be entitled to the three points or the
21   two points, at least, for acceptance of responsibility.  In
22   this particular case, we do believe he warrants, at the very
23   minimum, the two.
24              I would point out that even after he pled
25   guilty --
```

```
 1              THE COURT:  Well, there's no option for the third;
 2    the government has to move for that.
 3              MR. BALAREZO:  I understand.
 4              But I will point out that the government, after he
 5    pled guilty, did tell the Court that they believe that he
 6    merited the third point.  Obviously, that's their
 7    prerogative.  They're not going to file for it so we're not
 8    going to argue it.
 9              Now, if the Court will remember, in response to
10    each of the Court's questions during his plea hearing, he
11    knowingly -- he truthfully answered every single one of the
12    Court's questions.
13              The Court's questions were limited.  He pled
14    guilty to the indictment as it was, which was a nonspeaking
15    indictment.  When the Court asked him was he -- did he work
16    for the so-called BLO, he indicated that he worked for his
17    brother, Arturo.  He indicated that he sold drugs in
18    Culiacán, with the knowledge that they would be -- some of
19    them at least would be sent to the United States.  And that
20    really is all that the indictment charged him with.
21              Now, the nonspeaking indictment and his plea to it
22    does not require him -- as the Guidelines applications note,
23    do not require him to volunteer or affirmatively admit
24    relevant conduct beyond the offense of conviction.  There's
25    nothing here that he has denied; there's nothing here that
```

1    he's taken back with respect to what he pled to.

2            Additionally, the application notes also indicate

3    that he may remain silent in respect to relevant conduct

4    beyond the offense of conviction without affecting his

5    ability to obtain a reduction under the subsection.

6            Again, he doesn't have to proffer any more to the

7    Court beyond what the Court asked him.  The fact that he

8    litigated legal issues I don't think should count to his

9    detriment, because he was trying to preserve a legal

10   argument.

11           The motion to withdraw the plea that he eventually

12   filed a couple weeks ago was, again, a result of the Court

13   saying that he had waived the argument -- the argument with

14   respect to the Rule of Specialty because of his

15   unconditional plea, and he was trying to put himself back

16   where he would have been had he not pled.  It wasn't that he

17   was denying what he said that he did before the Court, it

18   was just him trying to preserve an issue.

19           So I believe that the Guidelines would allow him

20   to receive at least the two points for acceptance of

21   responsibility, and we urge the Court to reduce the total

22   amount by that.

23           THE COURT:  What about his denial of all of the

24   enhancements that the Court found him to be -- found that

25   there was more than enough evidence to demonstrate that the

```
 1   enhancements were appropriate in this case?

 2              He denied being a leader of the -- organizer and

 3   leader of the organization, he denied using dangerous

 4   weapons, he denied using and directing violence, he denied

 5   and challenged the fact of the allegation -- excuse me, of

 6   bribing law enforcement authorities, and he denied being

 7   directly involved in the importation of narcotics into the

 8   United States.  And the Court found in each and every one of

 9   those instances that there was more than enough evidence.

10              The Court's findings have resulted in the

11   calculation being at a 50 level right now.  He certainly

12   hadn't accepted responsibility as to those facts.

13              MR. BALAREZO:  Your Honor, I believe that he is

14   required to accept responsibility as to the offense of

15   conviction, which is the conspiracy to distribute and

16   possess with the intent to distribute the 5 kilograms or

17   more in the methamphetamine, knowing and intending that it

18   would come to the United States.  Again, the indictment

19   itself did not contain any of those allegations.  The fact

20   that he denied them does not negate the fact that he

21   accepted responsibility.

22              Now, the Court did accept the government's

23   evidence, if you want to call it that, with respect to the

24   12 levels.  Again, the standard was a preponderance of the

25   evidence.
```

1        In this particular case, Your Honor, I think the

2   only thing that is certain is Mr. Beltran Leyva pled guilty

3   to the indictment; that based on what he said to the Court

4   at that time, that he was responsible for 450 kilos or more.

5   All that the Court knows for certain is that his Guidelines

6   level is a 38, and that his sentencing range -- or

7   Guidelines sentencing range is 235 to 293 months.

8        The government sought the enhancements on him,

9   again, based on what we still consider to be uncorroborated

10  and hearsay evidence which originates from individuals,

11  which, quite frankly, have done far worse things than

12  Mr. Beltran Leyva.

13       The Court, notwithstanding our request that these

14  individuals be presented in court so that the Court could

15  see them and assess their credibility, the government merely

16  relied on two agents' testimony, and what they said was that

17  they had interviewed the witnesses in preparation for trial,

18  taken notes, and that their testimony here in court was

19  based solely on that.  The government even conceded that the

20  agent's testimony was based solely on the proffer sessions

21  and nothing else.

22       The individuals that the Court did not hear from,

23  Your Honor -- and I will remind the Court that one of the

24  witnesses was Mauricio Poveda, alias Conejo -- and I'll

25  remind the Court that he pled guilty to three separate cases

1    in the Eastern District of New York, D.C., and, I believe,

2    the Northern District of Texas.

3         The government allowed -- to let him plead to an

4    offense which would carry the 20-to-life, as opposed to a

5    mandatory-life offense.

6         The government required him to forfeit a million

7    dollars; however, he acknowledged to the government having

8    trafficked over a million kilograms of cocaine, which, by

9    his own admission, is already more than what the Court has

10   found here on Mr. Beltran Leyva.

11        The government provided immigration benefits to

12   his family.  He conceded having ordered the murder of at

13   least five individuals.  He admitted to having bribed the

14   guard in a U.S. jail.

15        While under cooperation -- under a cooperation

16   agreement with the government, he did not disclose that he

17   was aware of criminal activity by his cell mate.

18        He used false passports.  He used weapons.  He was

19   a large-scale drug supplier to Mr. Beltran's brother,

20   Arturo, not to Alfredo.

21        The other witness that you didn't hear from but

22   from whom you got some information was Jesus Zambada, also

23   known as Rey.  He admitted to having engaged in acts of

24   political and law enforcement corruption, participated in

25   kidnapping and murders.

1          He passed information to his brother, Mayo, to

2   kidnap people who posed a threat, and to extract information

3   and interrogate them.  Many of those individuals were

4   killed.

5          He arranged for the transfer of three Zetas,

6   a rival cartel, for them to be tortured and killed.

7          He was responsible for the murder of two

8   individuals who kidnapped other people.

9          He used false Mexican passports, which, I guess,

10  is the least of his crimes.

11         The third individual whom the Court didn't have

12  the benefit of hearing from Sergio Barragan, also known as

13  El Grande, pled guilty to an international distribution of

14  money laundering conspiracy in Texas.  He was a former

15  police officer and became engaged in this activity.

16         He was involved in multiple shootouts.  He himself

17  made bribery payments to officials, to the media.  It is

18  well-known in Mexico and I believe he has admitted that he

19  would pay off the media so as to mitigate his activity and

20  exacerbate the activities of rivals.

21         He was present at tortures and murders.  He

22  kidnapped a police officer.  He has three pending criminal

23  cases in Mexico.  He was accused of having decapitated

24  several airport workers.  And he's accused of murdering the

25  head of a taxi union.

```
 1              So it is these individuals whom, again, the Court
 2   did not have the benefit of listening to in person, whom the
 3   government wants the Court to rely upon to enhance
 4   Mr. Beltran Leyva by 12 levels.
 5              THE COURT:  The enhancement issue is behind you.
 6              MR. BALAREZO:  It's behind me.
 7              THE COURT:  You're not re-litigating that, sir.
 8              MR. BALAREZO:  I'm not, Your Honor.
 9              THE COURT:  It sounds like you are.
10              MR. BALAREZO:  Your Honor, the Court --
11              THE COURT:  It sounds like you are.
12              MR. BALAREZO:  The Court, under the 3553
13   factors --
14              THE COURT:  Move on.
15              MR. BALAREZO:  -- can still take those factors
16   into account, not just for the enhancements; you can take
17   those into account under 3553(a) factors.
18              The Guidelines in this case, Your Honor, are
19   merely a starting point.  The Court has found those
20   enhancements by a preponderance of the evidence.  That does
21   not mean that the Court has to apply a sentence within that
22   Guidelines Range.  The Court has broad discretion here.  And
23   what I'm trying to point out to the Court is that the
24   evidence for which -- which was relied upon for that is
25   simply not credible.
```

1          And, again, what the Court knows for certain is

2     that Mr. Beltran Leyva was sitting at a level 38.  Beyond

3     that, you don't know.  You're taking the words of murderers,

4     drug -- major drug traffickers, who have admitted their

5     offenses, who have done things much worse than Mr. Beltran

6     Leyva ever did.  And I think that is something that the

7     Court can definitely consider.

8          Now, we believe that the 25-year sentence that we

9     are requesting --

10         THE COURT:  We're only here to argue on acceptance

11    of responsibility.  You're making your sentencing argument.

12         MR. BALAREZO:  Okay.  That's fine.

13         That's all I have with respect to acceptance of

14    responsibility.  He was preserving a legal argument in

15    response to the Court's ruling on his motion to enforce the

16    Rule of Specialty.

17         THE COURT:  Mr. Rosales.

18         MR. ROSALES:  I think Your Honor can see past the

19    argument that the defendant was just preserving a legal

20    argument.

21         If the Court looks back at the second motion to

22    withdraw his guilty plea and the ex parte filings, which I

23    will not go into because we're in a public setting, upon

24    reviewing those, there's no way that defense counsel can

25    stand up here with a straight face and say the defendant was

1    merely preserving a legal argument.

2          He went to great lengths to try to pull the wool

3    over the Court's eyes in that motion to withdraw his guilty

4    plea by concocting this story as to how he came about coming

5    to the conclusion to plead guilty in this case, proclaiming

6    his innocence, and saying that he was basically -- he

7    involuntarily pled guilty.  That does not sound like someone

8    who has accepted responsibility in this case.

9          If, perhaps, defense had stopped at their first

10   motion to withdraw the guilty plea related to the Rule of

11   Specialty and had not concocted these other reasons as to

12   why the guilty plea was involuntary, then, perhaps,

13   Mr. Balarezo's argument would carry some weight.  But as

14   such, it should not.

15         I believe that the Court read that final motion

16   with the same eyes that the government read it, and that

17   this is not a man who is accepting responsibility for his

18   actions and he should not get the two points, and the

19   government is not going to allow him to have the third

20   point.

21         THE COURT:  All right.  This is a classic example

22   of, yet again, of where the Guidelines seek to rule us from

23   the grave, although they are, of course, advisory in nature.

24   After *Booker*, we are, nonetheless, required to make

25   findings, which, in this case, for example, have no real

1  consequences in the final analysis, because the

2  Guidelines Range that we're in starts with a 43 calculation.

3  And if I even grant the two points to the defendant in this

4  case, the best he'll be at is 48.

5       So it's tempting to grant a Pyrrhic victory to

6  avoid an appellate review, frankly.  But I can't, in good

7  faith, do that, in good conscience do that here.

8       I think, looking at this record in its totality,

9  the Court is not convinced at all that he has accepted

10 responsibility; indeed, just the opposite.  I think he has

11 sought to avoid responsibility, to the extent that he could,

12 and minimize his involvement and role here.

13      The Court found, in reaching its conclusion on the

14 enhancements, that he was, indeed, an organizer and a leader

15 of one of the largest drug cartels, one of the largest drug

16 trafficking organizations in the world, a rival to the

17 Sinaloa Cartel that El Chapo famously was in charge of.

18      The Court found that he, indeed, used dangerous

19 weapons.  The Court found, indeed, that he used and directed

20 violence, including murder and torture against people who

21 were opposing his operation.

22      The Court found that he bribed law enforcement

23 officials regularly in Mexico, both public officials and law

24 enforcement officials.

25      And the Court found that he was directly involved

```
 1  in the importation of illegal substances into the
 2  United States, and, in particular, the 29,000 -- excuse me,
 3  27 tons, 27.9 tons of cocaine that he personally directed,
 4  using the most conservative of calculations, over the Texas
 5  border.  So -- from Mexico over the Texas border.
 6          So the Court will not give him the two points.
 7  Not that it would matter in the final analysis anyway.  But
 8  the Court will stay with the calculation of 50.  That'll be
 9  the basis for the Guidelines calculation in this case.
10          And I'll hear arguments on the appropriate
11  sentence, applying the 3553 factors, from the government
12  first, which is the Court's practice, and from, then, the
13  defense counsel, and the defendant, if he wishes to address
14  the Court, will be welcomed to do so.
15          MR. ROSALES:  Judge, again, I'll try to be brief
16  as to the factors here, because we've briefed this up
17  enough, and the Court has heard loads of evidence against
18  the defendant.
19          To begin with, in terms of the nature and
20  circumstances of the offense, as the Court has stated again
21  today and has -- even Mr. Balarezo stated again today, the
22  number of factors which have enhanced this defendant's
23  sentence speak to the nature and circumstances surrounding
24  the offense.
25          This is an individual that controlled political
```

1   officials, law enforcement officials in Mexico, controlled

2   drug trafficking routes, used violence, killed people or

3   ordered the deaths of people in Mexico, ordered the

4   importation of, the government would argue, over a million

5   kilos of cocaine into the United States.

6           THE COURT:  The Court was being extremely

7   conservative for the purposes of the forfeiture order.

8           The Court would gladly acknowledge the fact that

9   there was lots and lots of evidence of much, much more than

10  that.

11          MR. ROSALES:  In the seizures alone, which the

12  government proposed to put in at trial, the government

13  showed that there were 50,000 kilos seized alone over the

14  course of maybe three or four separate seizures throughout

15  this entire 10-year -- 12-year conspiracy.

16          You know, the defendant, on top of handling those

17  amounts of cocaine, handled hundreds of individuals who were

18  below him, as is evidence by the fact that he was given a

19  4-point enhancement as a leader and did not hesitate to use

20  violence to continue his grip on the drug-trafficking trade

21  throughout Mexico.

22          And I think, more importantly, as the Court has,

23  perhaps, learned throughout the course of these proceedings,

24  I know there was some hesitancy in the beginning to lump

25  this defendant into the Sinaloa Cartel, the dealings of the

1    Sinaloa Cartel, but I believe that the Court has enough

2    evidence before it to know by now that this defendant is on

3    the level of someone like Chapo Guzman.  There's no question

4    about that based on the evidence that came out during the

5    proffer of the government's evidence in preparation for

6    trial, and there's no question of that fact given the

7    government's evidence presented at the sentencing hearing.

8            This is an individual who was -- who worked hand

9    in hand with Chapo Guzman and Mayo Zambada, the leaders of

10   the Sinaloa Cartel in Culiacán.  The mere fact that he was

11   able to share the same territory as those individuals should

12   show how high up and how responsible he was for all of the

13   things that the Beltran Leyva Drug Trafficking Organization

14   was doing in Mexico, and in the United States, for that

15   matter, in their importation of tonnage quantities of

16   cocaine and methamphetamine into the United States.

17           We don't believe that someone on this level can be

18   adequately deterred from continuing his life of crime.  This

19   is an individual who has spent his entire life in the drug

20   trade.  His entire family is in the drug trade or was in the

21   drug trade.

22           There's no evidence that would suggest that this

23   defendant, upon release from incarceration in the

24   United States, would return to Mexico and lead the life of a

25   normal citizen.  There's no evidence that he could ever go

1  back to Mexico and do anything other than be a drug

2  trafficker and really do anything other than be the leader

3  of a large-scale drug trafficking organization.

4        In terms of protecting the public from further

5  crimes of this defendant, again, it goes towards, if this

6  defendant ever got out, it's almost guaranteed that what he

7  would do is return to Mexico and return to the same life

8  that he left.

9        Evidence of that is the fact that when he was

10  incarcerated in Mexico, he continued to lead the

11  organization from his jail cell in Mexico.  There's no

12  question that if he did it from his jail cell in Mexico, he

13  will do it again once he's out roaming the streets of Mexico

14  upon completing any sentence other than life in this case.

15        In terms of the sentencing disparities, we don't

16  believe that defense counsel has pointed to any other

17  defendant who's been sentenced on this level to make an

18  adequate comparison.

19        Looking alone in this circuit, the Court has

20  mentioned the *Cano Flores* case.  That was a case that was

21  prosecuted in this circuit after trial of a plaza boss of

22  the Gulf Cartel.

23        To be clear, the Gulf Cartel, during the time

24  period of that conspiracy from 2000 until 2010, the time

25  frame of the *Cano Flores* conspiracy, was a force to be

1  reckoned with in Mexico.

2          A plaza boss, someone who controlled a small

3  portion of the Mexico-United States border, received 35

4  years, a plaza boss.  Not the first in command of the Gulf

5  Cartel, not the second in command of the Gulf Cartel,

6  essentially someone on the level of the plaza people that

7  the defendant -- the plaza bosses that the defendant

8  controlled in those morning meetings that were had -- those

9  morning briefings of what was going on at the plaza along

10  the border, received 35 years.

11          THE COURT:  There is -- to my knowledge, I have

12  not seen a case of this magnitude in this circuit, certainly

13  since I've been a judge, which is 15 years.  I don't know if

14  there was anything before that; I'm not aware of anything

15  before that of this figure magnitude.

16          MR. ROSALES:  All of the other defendants that the

17  defense points to are either -- Colombian citizens.

18          And as the Court is aware, based on the

19  government's papers, the U.S. Government has an extradition

20  treaty with the country of Colombia that prevents us from

21  requesting a life sentence.

22          I believe one of the sentences that defense

23  mentioned was a 45-year sentence for one of those Colombian

24  defendants.  It's essentially, for someone of that age, a

25  life sentence, without actually saying a life sentence.

 1          But in this particular case, given all the

 2   evidence that the Court has heard, given the magnitude of

 3   drug trafficking, the span of 12 years -- and that's just

 4   the 12 years that were charged -- there was evidence in the

 5   proffer session with the Court leading up to trial and even,

 6   I believe, during a sentencing hearing, that this defendant

 7   had been involved since the 1990s on this large of a scale.

 8          There is no sentence that could deter him from

 9   going back to Mexico and doing this again.  There is no

10   sentence that would better protect the public.  And there is

11   no sentence that could -- that this defendant could be

12   compared to in this circuit or in many others that would be

13   an adequate sentence for this defendant, other than life.

14          THE COURT:  Thank you.

15          Mr. Balarezo.

16          MR. BALAREZO:  Thank you, Your Honor.

17          Your Honor, we do believe that the government's

18   request for a life sentence in this particular case under

19   the evidence before the Court is, quite frankly, vindictive

20   and is way out of proportion with what the facts actually

21   are.

22          I think the facts are undisputed, and my client

23   has admitted to the Court, that he was a member of the,

24   quote/unquote, Beltran Leyva Organization.  He has admitted

25   that he worked for his brother, Arturo Beltran Leyva, who

1  had a nickname of the Boss of Bosses.  I think that, in and

2  of itself, will tell the Court who the boss was.

3       Arturo was the one who was on the level with

4  Chapo Guzman and Mayo Zambada, part of the Federacion that

5  the government mentioned.

6       Alfredo has -- my client has told the Court that

7  he worked for his brother, Arturo.  He received cocaine from

8  his brother, he sold it in Culiacán, he knew that it was

9  coming to the United States.  His brother, Arturo, was

10  killed in 2009.

11       The cooperators, in particular -- well, all three

12  of them:  Poveda was the largest supplier of cocaine to

13  Arturo.  La Barbie, you didn't hear from him, but he would

14  have been a trial witness, was his armed wing, if you will,

15  security.  El Grande was a lieutenant of Arturo's.  And

16  Rey Zambada worked with Mayo Zambada.  They're brothers.

17       And on a personal note, what really troubles me

18  about this is that my client decided to plead guilty,

19  because, quite frankly, Your Honor, if he had gone to trial,

20  stood here for three months, listened to the evidence, which

21  the Court would have been able to see and the jury

22  determined that he was guilty, he would have been no worse

23  off than he is today.  So from my perspective, I tell him,

24  you should have gone to trial, because, really, you'd be

25  facing a life sentence anyway.  What did you win?  Nothing.

```
1              Just with that, I think that the Court should find
2      that a life sentence is not appropriate in this case.  The
3      Court can give him any number of sentence, any number short
4      of a life sentence, because he did accept responsibility, he
5      did preserve judicial economy, he did not force the
6      government to put forth their witnesses here in court,
7      although they did proffer the evidence.  He should get
8      something.
9              The Court giving him a sentence of life
10     imprisonment after a plea, a voluntary plea, sends a message
11     that, what is there to gain for other individuals who do the
12     same thing.
13             THE COURT:  Well, actually, that's a rather,
14     understandably, from your point of view, simplistic analysis
15     of the situation, Mr. Balarezo.
16             MR. BALAREZO:  How so, Your Honor?
17             THE COURT:  There are lots of strategic advantages
18     a defendant can seek by not going to trial and having all
19     that evidence come out that would, thereby, further educate
20     the Judge, should he be convicted later and sentenced at a
21     later time.
22             MR. BALAREZO:  Well, Your Honor --
23             THE COURT:  There are advantages to him
24     personally, and to others who the evidence would come out
25     against during the course of the trial.
```

1          So it's not as simple as you're trying to make it

2     sound.   There are advantages to a defendant to not going to

3     trial over and above the ones you're mentioning.

4          MR. BALAREZO:  Well, Your Honor, although I

5     disagree with the Court that the argument is simplistic,

6     there should be an advantage to him.  And I think the Court

7     has hit the nail on the head:  The advantage would be not

8     receiving a life sentence.  That should be the advantage.

9          Everything else is speculation.  He accepted

10    responsibility to the indictment.  The Court has found the

11    enhancement.  There's no basis to give him a life sentence

12    when he has pled guilty and foregone all of his rights.

13          As the Court indicated itself, he's waived his

14    rights to the Rule of Specialty.  So presumably, the

15    Court of Appeals will tell him that he has done that.  He'll

16    be done after today.  So the Court hit it right on the head.

17          What is the advantage to him to having pled

18    guilty?  Was it a miscalculation on his part?  Perhaps.  But

19    the fact is he did, he accepted responsibility.  You may not

20    have given him the two levels, but he is here for

21    sentencing.  So I think the Court should give him some

22    consideration, at a minimum, for that.

23          The government says that there are no cases that

24    reach this level.  I disagree with that.  There may not be

25    any in the District of Columbia Circuit.

1          But I think the most relevant one in this

2     particular case will be the one that I cited in our

3     sentencing memorandum, which was the *United States versus*

4     *Diego Montoya* in the Southern District of Florida.  That

5     individual was a leader, if not the leader, of a cartel in

6     Colombia.  His -- he was involved in a war with other

7     cartels; thousands of people died.  He was the source of the

8     majority of the cocaine at that time that came through

9     Mexico and eventually to the United States.  He was involved

10    in the death of an informant.  He pled guilty, at least the

11    records that are available indicate that he received a

12    45-year sentence.

13          It is correct that Colombia doesn't extradite its

14    citizens if they were to get a life sentence.  But that's

15    neither here nor there.  The fact is he was in a much higher

16    position than Mr. Beltran Leyva, had more to do with death

17    and cocaine trafficking than Mr. Beltran Leyva, yet he only

18    got a 45-year sentence.  So, at the very least, that's a

19    very comparable case.

20          And I did note at least three other cases

21    involving Mexican cartel leaders, at least three of them,

22    which are in the sentencing memorandum, where each of them

23    got 25 years.  Now, maybe they cooperated, we don't know

24    because the records are sealed.  The government should know

25    that.  And maybe they can inform the Court.  But 25 years

 1   for leaders --

 2            THE COURT:  One of those cases is a case that was

 3   tried in front of me for 10 weeks, and I know the facts in

 4   that case quite well, and it isn't even in the realm of

 5   comparable to this case.

 6            MR. BALAREZO:  Right.  That's --

 7            THE COURT:  It's not even in the realm of

 8   comparable.

 9            MR. BALAREZO:  The Court is talking about

10   *Lopesierra*.  I'm not discussing that one at this point.  I'm

11   talking about Mexican cartel leaders,Your Honor, which are

12   listed in my memorandum.

13            So for all -- I'm not going to belabor the point,

14   obviously, I think it's late -- we have made our specific

15   arguments in the sentencing memorandums, in the supplemental

16   sentencing memorandum.  We believe that the evidence that

17   the Court relied on for the enhancements are not credible

18   and are self-serving by those individuals.

19            Although the Guidelines may be at a level 50, the

20   Court does have discretion to give a sentence below life,

21   and we ask, respectfully, that the Court give him a 25-year

22   sentence.

23            He's a 47-year-old man.  By the time he is

24   released from a 25-year sentence, Your Honor, he will be in

25   his late 60s.

1            I think the Court is well-aware of recidivism

2    rates and all the other studies, which would indicate that

3    most likely he'll be done.  There's no -- the government

4    says there's no certainty, there's no evidence that he won't

5    do anything but drug traffic.  But, then again, there is no

6    evidence that he won't.  So their arguments versus ours,

7    I don't think that really goes to it.

8            But the Court can look at specific studies that

9    indicate that at that age, the recidivism rate declines.

10   His life expectancy in Mexico is not that high.  So even if

11   he gets out at a late-60s age, he would only have a few

12   years left to live Your Honor.

13           Again, we respectfully, for the reasons in all of

14   our pleadings and here indicate that the Court give him a

15   sentence of 25 years, with credit for the time he's already

16   served.

17           THE COURT:  All right.  Would your client like to

18   address the Court?

19           MR. BALAREZO:  Yes, Your Honor.

20           He has something that he wrote out.

21           THE COURT:  Okay.

22           THE DEFENDANT:  First of all, I'd like to

23   apologize, Your Honor, and forgiveness for the behavior that

24   brought me here.

25           And I apologize to God, who's the highest

```
 1   authority here, and you that represent us, and to my
 2   children, my children are the people I love the most, that
 3   I have told the truth before you.
 4          I accepted responsibility that I helped my brother
 5   in Culiacán, that I helped my brother, Arturo, to sell
 6   cocaine in Culiacán, knowing that it was coming to the
 7   United States.  But I have never sent one kilogram of
 8   cocaine to the United States, Your Honor.
 9          I ask you to please have mercy on me and let me
10   return one day to my family.
11          I have nothing to do with any Colombian,
12   Your Honor.
13          One day you will be -- there will be
14   investigations, profound investigations, and you will -- the
15   truth will be learned.
16          And I have nothing to do with La Barbie, with Rey,
17   or with El Grande.  I have absolutely nothing to do with
18   them, Your Honor.  They were my brother's people, nothing
19   else.
20          MR. BALAREZO:  Your Honor, he had prepared
21   something.  I think, perhaps, nerves got the better of him.
22   Would the Court allow me to read what he wanted to say or --
23   I don't know -- I don't know if he can.
24          THE COURT:  It's up to him.  If he wants to read
25   it into the record, he's welcome to do that, if he wrote
```

```
 1    something out.  He's already made a lot of statements.

 2               MR. BALAREZO:  There may be some issue with the

 3    ability to read the writing.

 4               THE COURT:  It's his writing, isn't it?

 5               MR. BALAREZO:  I typed it out for him based on

 6    notes that he gave me so it would be legible.

 7               THE COURT:  Well, you've had your chance to

 8    allocute.  This is his opportunity.

 9               THE DEFENDANT:  Yes, I do accept responsibility

10    for my offense.

11               THE COURT:  Tell him to read slowly.

12               THE DEFENDANT:  Which was to work for my brother,

13    Arturo, and to sell --- for selling drugs in Culiacán.

14               Can I mention the witness?  Can I?

15               MR. BALAREZO:  I think he's asking you.  I'm

16    telling him he can, but I don't know what the Court will

17    say.

18               THE COURT:  He can mention whoever he wants.

19               THE DEFENDANT:  The Colombian citizen

20    Mauricio Poveda was the main -- was the main supply, cocaine

21    supplier for Arturo, not to me.  And you can see any article

22    on that, and you'll see that I had nothing to do with him.

23               And this other gentleman, Barragan, he was my

24    brother, Arturo's, lieutenant.  He had nothing to do with

25    me; I had nothing to do with him.
```

1          Everyone knows that in Mexico; everybody knows

2     that what I am saying is the truth.

3          I have nothing to do with any of that.  Any of the

4     drugs that I've been accused of sending to the United States

5     in airplanes, I have nothing to do with that, Your Honor.

6          A profound and in-depth investigation will give

7     you those results, Your Honor, that I had nothing to do with

8     that, which were the charges that I was brought here from

9     Mexico for, but none of that has ever been proven, that

10    indictment.

11          Mr. Zambada, everybody knows that he worked for

12    his brother, Mayo, and that I had nothing to do with him.

13    He accused his own brother for having killed his son.

14          So what are you going to say about somebody who

15    doesn't know -- who has nothing to do with him?

16          That's it.

17          THE COURT:  All right.

18          Well, Mr. Beltran Leyva, you've come to the end of

19    a long road, a long road that's filled with violence and

20    with large, large-scale drug dealing that this Court is

21    convinced you were directly involved in as a leader and

22    organizer, large scale, larger than any case in my

23    familiarity in this circuit's 15 years I've been on this

24    Court, and, perhaps, even ever, although I can't say that

25    for certain.

```
 1              Under the 3553 factors that I am duty-bound to
 2     apply, I have to take into consideration the seriousness of
 3     the offense.  And in this case, there's no question in this
 4     Court's mind of the seriousness of your conduct here.  None
 5     whatsoever.  It is extremely serious.
 6              The Court must fashion a sentence that not only
 7     takes that into consideration but promotes respect for the
 8     law here in the United States, and, of course, to effect an
 9     adequate deterrence, not only of you, but others.
10              You'll be deterred when you're in jail, no
11     question.  But others need to be deterred from engaging in
12     the conduct that you've been engaging in for a long, long
13     period of time here.
14              Then, of course, there is, ultimately, the
15     sanctity of the obligation of this Court to protect the
16     public, to protect the public not only from you but from
17     others who would engage in this kind of conduct, and the
18     sentence that needs to be fashioned needs to be utmost
19     concerned about protecting the public.
20              You're engaged in the importation of a lot more
21     than 27 tons.  The Court, for the purposes of the forfeiture
22     ruling in this case, took an extremely conservative
23     viewpoint, bending over backwards to your benefit and
24     limiting it to the $500-plus million that you were able to
25     receive, in this Court's judgment, based on the evidence.
```

1          There was an exhaustive investigation here and the

2     agents attested to it and the agents put forward and the

3     government put forward, in its proffer, the witnesses who

4     would have come forward and proven, beyond a reasonable

5     doubt, the allegations that they made in this case.

6          So the Court can't reach any other conclusion in

7     its judgment than a Guidelines sentence is appropriate in

8     this case.  It has no basis to depart down whatsoever.

9     It would be extremely bad judgment and unfair to the public

10    and to the government, frankly, for it to depart from the

11    Guidelines Range.

12         So it's the judgment of the Court that the

13    defendant, Alfredo Beltran Leyva, be committed to the

14    custody of the Bureau of Prisons for a term of life

15    imprisonment on Count 1.

16         You're further sentenced to serve 60 months,

17    5 years of supervised release, and to pay a $100 special

18    assessment and a $5,000 fine.  The special assessment and

19    fine are immediately payable to the Clerk of our Court.

20    Within 30 days of any change of address, you shall notify

21    the Clerk until such time as your obligation is paid in

22    full.

23         With regard to your fine, within 72 hours of

24    release from custody, which I have to say but you won't be

25    released from custody because you're getting a life

```
 1   sentence, if it should somehow come to pass that you're
 2   released from custody, then you shall report in person to
 3   U.S. Probation in the District to which you are released.
 4          Your fine obligation, of course, is due and
 5   payable immediately.  But any balance that's due on it,
 6   you'll have to pay at a monthly rate of $50 a month to
 7   Probation.
 8          As to deportation compliance, you shall comply
 9   with the Bureau of Immigration and Customs Enforcement's
10   immigration process.  If deported, you shall not re-enter
11   the U.S. without legal authorization during the period of
12   supervision.
13          Should you receive permission to return to the
14   United States, which you won't because you need the
15   permission of the Attorney General to get that, but in the
16   unlikely event that you should receive permission to return
17   to the United States, you shall report to U.S. Probation in
18   the area where you intend to reside within 72 hours of
19   return.
20          Pursuant to 18 U.S. Code Section 3742, you have a
21   right to appeal the sentence imposed by the Court.  If you
22   choose to appeal, you must file the appeal within 14 days
23   after the Court enters judgment.  If you're unable to afford
24   the cost of an appeal, you may request permission from the
25   Court to file an appeal without any cost to you.
```

1           As defined in 28 U.S. Code Section 2255, you also

2    have a right to challenge the conviction entered or sentence

3    imposed if new and currently unavailable information becomes

4    available to you, or on a claim that you received

5    ineffective assistance of counsel in entering a plea of

6    guilty to the offense of conviction or in connection with

7    the sentencing.

8           If you're unable to afford the cost of an appeal,

9    you may request permission from the Court to file an appeal

10   without cost to you.

11          We have a number of pleadings and transcripts in

12   this case that are under seal.  They will not be released

13   from being under seal except with the express permission of

14   the Court and only after a motion is made by either side or

15   both to release something that is otherwise under seal.

16          So neither side is going to be caught by surprise

17   that something that's under seal has had the seal lifted.

18   The Court will have to be notified in advance by either

19   side, and the other side will have an opportunity to oppose

20   any request to unseal any of the portions of the documents

21   or the transcripts of any hearings that have taken place in

22   this particular case.

23          Any questions, Mr. Balarezo?

24          MR. BALAREZO:  No, Your Honor.

25          THE COURT:  Any questions for the government?

1              MR. ROSALES:  No, Your Honor.

2              THE COURT:  No questions?

3              The Court will stand in recess.

4              DEPUTY CLERK:  All rise.

5              This Honorable Court will stand in recess until

6     the return of court.

7              (Proceedings concluded at 4:32 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GROSS RECEIPTS FROM 2003/2004 UNTIL DEFENDANT'S ARREST

| Supplier | Method | Kilograms Per Shipment | | Number of Shipments | | Total Kilograms Sold to Defendant (Percentage of Colombian Investment of the Whole) | | Price Per Kilogram in Culiacan | Gross Receipts | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High | | Low | High |
| ▮▮▮ 2004 to 2007 | Speedboats | 2,500 | 3,000 | 15 | 20 | 24,375 (65%) | 39,000 (65%) | $16,000 | $390,000,000 | $624,000,000 |
| | Semi-Submersibles | 5,000 | 7,000 | 5* | 6* | 12,500 (50%) | 21,000 (50%) | $16,000 | $200,000,000 | $336,000,000 |
| | Fishing Vessels | 7,000 | 9,000 | 5 | | 17,500 (50%) | 22,500 (50%) | $16,000 | $280,000,000 | $360,000,000 |
| ▮▮▮ 2005 to 2007 | Speedboats | 2,500 | 5,000 | 3 | 4 | 4,875 (65%) | 13,000 (65%) | $16,000 | $78,000,000 | $208,000,000 |
| | Fishing Vessels | 7,000 | 8,000 | 3* | 4* | 10,500 (50%) | 16,000 (50%) | $16,000 | $168,000,000 | $256,000,000 |
| ▮▮▮ 2004 to 2008 | Speedboats | 1,200 | 1,500 | 6 | 7 | 3,600 (50%) | 5,250 (50%) | $16,000 | $57,600,000 | $84,000,000 |
| ▮▮▮ 2004 to 2008 | Fishing Vessels | 5,000 | | 3 | 4 | 15,000 (100%) | 20,000 (100%) | $16,000 | $240,000,000 | $320,000,000 |
| | Fishing Vessels | 5,000 | | 7* | 9* | 35,000 (100%) | 45,000 (100%) | $16,000 | $560,000,000 | $720,000,000 |

528

1

GOVERNMENT
EXHIBIT
6
12-CR-184 (RJL)

USCA Case #17-3027     Document #1729660     Filed: 05/07/2018     Page 391 of 394

UNITED STATES V. ALFREDO BELTRAN LEYVA
12-CR-184
GROSS RECEIPTS FROM 2003/2004 UNTIL DEFENDANT'S ARREST

| Supplier | Method | Kilograms Per Shipment | | Number of Shipments | | Total Kilograms Sold to Defendant (Percentage of Colombian Investment of the Whole) | | Price Per Kilogram in Culiacan | Gross Receipts | |
|---|---|---|---|---|---|---|---|---|---|---|
| ▇▇▇ 2004 to 2006 | Speedboats | 2,500 | 3,000 | 10 | | 16,250 (65%) | 19,500 (65%) | $16,000 | $260,000,000 | $312,000,000 |
| ▇▇▇ 2004 to 2007 | Speedboats | 2,500 | 3,000 | 10 | 12 | 16,250 (65%) | 23,400 (65%) | $16,000 | $260,000,000 | $374,400,000 |
| | Semi-Submersibles | 5,000 | 7,000 | 2 | 3 | 5,000 (50%) | 10,500 (50%) | $16,000 | $80,000,000 | $168,000,000 |
| | Fishing Vessels | 5,000 | | 3 | 5 | 7,500 (50%) | 12,500 (50%) | $16,000 | $120,000,000 | $200,000,000 |
| ▇▇▇ | Fishing Vessels | 7,000 | 9,000 | 4* | 5* | 14,000 (50%) | 22,500 (50%) | $16,000 | $224,000,000 | $360,000,000 |
| ▇▇▇ 2005 to 2008 | Speedboats | 2,500 | 3,000 | 2 | 4 | 2,500 (50%) | 6,000 (50%) | $16,000 | $40,000,000 | $96,000,000 |
| | Fishing Vessels | 6,000 | 8,000 | 4 | 6 | 12,000 (50%) | 24,000 (50%) | $16,000 | $192,000,000 | $384,000,000 |

GMP:PEN/AG/MPR/BR
F.#2009R01065/OCDETF# NY-NYE-616

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        Docket No. <u>09-CR-466(S-4)(BMC)</u>

JOAQUIN ARCHIVALDO GUZMAN LOERA,
       also known as "El Chapo," "El Rapido,"
       "Chapo Guzman," "Shorty," "El Senor,"
       "El Jefe," "Nana," "Apa," "Papa," "Inge"
       and "El Viejo,"

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S
<u>FIRST MOTIONS *IN LIMINE*</u>

                                 RICHARD P. DONOGHUE
                                 UNITED STATES ATTORNEY
                                 Eastern District of New York
                                 271 Cadman Plaza East
                                 Brooklyn, New York 11201

                                 ARTHUR G. WYATT, CHIEF
                                 Narcotic and Dangerous Drug Section
                                 Criminal Division
                                 U.S. Department of Justice

                                 OF COUNSEL:
                                 BENJAMIN G. GREENBERG
                                 United States Attorney
                                 Southern District of Florida

United States v. Thomas,
   116 F.3d 606 (2d Cir. 1997) ........................................................ 77, 79

United States v. Thornton,
   197 F.3d 241 (7th Cir. 1999) ............................................................ 64

United States v. Tin Yat Chin,
   371 F.3d 31 (2d Cir. 2004) ............................................................... 41

United States v. Tracy,
   12 F.3d 1186 (2d Cir. 1993) ........................................................ 50, 51

United States v. Tropeano,
   252 F.3d 653 (2d Cir. 2001) ........................................................ 42, 43

United States v. Ulerio,
   859 F.2d 1144 (2d Cir. 1988) ........................................................... 53

United States v. Urena,
   989 F. Supp. 2d 253 (S.D.N.Y. 2013) ............................................... 52

United States v. Vanwort,
   887 F.2d. 375 (2d Cir. 1989) ....................................................... 64, 67

United States v. Vayner,
   769 F.3d 125 (2d Cir. 2014) ............................................................. 46

United States v. Vegas,
   27 F.2d 773 (2d Cir. 1994) ............................................................... 17

United States v. Washington,
   705 F.2d 489 (D.C. Cir. 1983) .......................................................... 76

United States v. Weisberg,
   2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011) ..................................... 68

United States v. Wilkerson,
   84 F.3d 692 ...................................................................................... 59

United States v. Williams,
   205 F.3d 23 (2d Cir. 2000) ......................................................... 12, 25

United States v. Yannotti,
   541 F.3d 112 (2d Cir.2008) ........................................................ 55, 56

Washington v. Walsh,
   No. 08-cv-6237, 2010 WL 423056 (S.D.N.Y. Feb. 5, 2010) ............ 72